**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

RECEIVED

2016 SEP 26  A 10: 12

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

TREVA THOMPSON,                           )
MELISSA SWETNAM,                          )
ANTWOINE GILES,                           )
ANNA REYNOLDS,                            )
LAURA CORLEY,                             )
LARRY JOE NEWBY,                          )
MARIO DION YOW,                           )
JENNIFER ZIMMER,                          )
TIMOTHY LANIER, and                       )
PAMELA KING, individually                 )
and behalf of all others similarly        )
situated, and GREATER                     )
BIRMINGHAM MINISTRIES,                    )
                                          )
      Plaintiffs,                   )    CIVIL ACTION NO. 2:16-cv-783
                                          )
      v.                            )    **CLASS-ACTION COMPLAINT**
                                          )    **FOR DECLARATORY AND**
                                          )    **INJUNCTIVE RELIEF**
                                          )
STATE OF ALABAMA,                         )
JOHN H. MERRILL, in his official          )
capacity as Secretary of State,           )
GEORGE NOBLIN, in his official            )
capacity as Chairman of the               )
Montgomery County Board of Registrars)
and on behalf of a class of all voter     )
registrars in the State of Alabama,       )
CLIFFORD WALKER, in his official          )
capacity as Chairman of the Board of      )
Pardons and Paroles,                      )
                                          )
      Defendants.                   )
                                          )
_____)

Plaintiffs allege that:

## PRELIMINARY STATEMENT

1.    This is an action challenging Alabama laws and procedures respecting felon disenfranchisement.

2. As detailed below, Section 177(b) of the Alabama Constitution, which disenfranchises individuals with convictions of felonies "involving moral turpitude," is a direct successor to the Alabama's 1901 racially discriminatory constitutional disenfranchisement provision. It is inextricably tied to Alabama's long history of denying blacks citizens voting rights and equal access to the polls, using the criminal justice system to achieve those goals.

3. Soon after the Civil War and the passage of the Fourteenth and Fifteenth Amendments, Alabama began to use criminal disenfranchisement as a tool, hand-in-hand with convict leasing and other means, to deny blacks the right to vote and maintain white supremacy. Indeed, the explicit purpose of the 1901 Alabama Constitution was to formally "establish white supremacy." The felon disenfranchisement system in Alabama continues to serve that purpose.

4. In 1985, the Supreme Court held that the drafters of the disenfranchisement provision specifically selected the vague and arbitrary "moral turpitude" standard in order to disenfranchise blacks. Nonetheless, in 1996, Alabama re-inserted that same standard into its felon disenfranchisement law, which remains to this day.

5. The Alabama Legislature has never determined what felonies "involve moral turpitude." Yet the State of Alabama requires citizens to declare under penalty of perjury that they have not been convicted of a "disqualifying crime" in order to register to vote, stifling the registration of qualified voters.

6. The lack of any definition and the vagueness of this term has left the fundamental right to vote of hundreds of thousands of voters to ad hoc and arbitrary determinations by individual county registrars across the state.

7. The result is the disenfranchisement of approximately 7% of Alabama's total voting-age population and 15% of Alabama's black voting-age population.

8.     In 1969, the Supreme Court held that Section 2 of the Fourteenth Amendment sanctions some form of disenfranchisement based on criminal convictions. However, Section 2's language, which speaks of disenfranchisement of "rebellion, or other crime," does not sanction the broad disenfranchisement of individuals for convictions untethered to voting and far less serious than rebellion.

9.     Nor do the Fourteenth and Fifteenth Amendments, intended to guarantee equality and eliminate racial discrimination, countenance the use of criminal disenfranchisement as a means of excluding blacks from the right to vote.

10.     Alabama compounds this racially discriminatory system by requiring individuals to pay all fines and fees in order to be eligible to restore their voting rights. This requirement is nothing more than a modern day poll tax that disproportionately excludes black voters from the franchise.

11.     As detailed below, Plaintiffs pray that this Court strike down this discriminatory system in its entirety as racially discriminatory, unconstitutional, and unlawful under Section 2 of the Voting Rights Act.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 52 U.S.C. § 10308(f).

13.     This Court has personal jurisdiction over the defendants, all of whom are either elected officials in Alabama or appointed members of their respective Boards of Registrars. All of the defendants work and reside in the State of Alabama.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b). Among other things, the offices of all three named Defendants in this action are located in this District.

3

15.	This Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

## LEGAL FRAMEWORK

16.	Article VIII, Section 177, of the Alabama Constitution provides:

(a)	Every citizen of the United States who has attained the age of eighteen years and has resided in this state and in a county thereof for the time provided by law, if registered as provided by law, shall have the right to vote in the county of his or her residence. The Legislature may prescribe reasonable and nondiscriminatory requirements as prerequisites to registration for voting. The Legislature shall, by statute, prescribe a procedure by which eligible citizens can register to vote.

(b)	No person convicted of a felony involving moral turpitude, or who is mentally incompetent, shall be qualified to vote until restoration of civil and political rights or removal of disability.

17.	A person convicted of "a felony involving moral turpitude" can have her political rights restored, and therefore be eligible to register to vote, either by receiving a discretionary pardon from the Board of Pardons and Paroles, *see* Ala. Code § 15-22-36, or by receiving a Certificate of Eligibility to Register to Vote (CERV) from the Board of Pardons and Paroles, if she meets all the relevant requirements, *see* Ala. Code § 17-3-31.

18.	Alabama Code Section 15-22-36.1 outlines the requirements for a CERV and the process for applying and receiving a CERV. A person who has lost her right to vote by reason of felony conviction involving moral turpitude is eligible to receive a CERV if she meets the following requirements:

(1) The person has lost his or her right to vote by reason of conviction in a state or federal court in any case except those listed in subsection (g).
(2) The person has no criminal felony charges pending against him or her in any state or federal court.
(3) The person has paid all fines, court costs, fees, and victim restitution ordered by the sentencing court at the time of sentencing on disqualifying cases.
(4) Any of the following are true:
a. The person has been released upon completion of sentence.

4

b. The person has been pardoned.

c. The person has successfully completed probation or parole and has been released from compliance by the ordering entity.

19.     The convictions that make a person ineligible for a CERV as listed in Alabama

Code Section 15-22-36.1(g) are:

> Impeachment, murder, rape in any degree, sodomy in any degree, sexual abuse in any degree, incest, sexual torture, enticing a child to enter a vehicle for immoral purposes, soliciting a child by computer, production of obscene matter involving a minor, production of obscene matter, parents or guardians permitting children to engage in obscene matter, possession of obscene matter, possession with intent to distribute child pornography, or treason.

20.     If a person meets all the eligibility requirements for a CERV under Alabama Code

Section 15-22-36.1, issuance of a CERV to the eligible voter is mandatory. Ala. Code § 15-22-

36.1 (b) ("The Certificate of Eligibility to Register to Vote *shall* be granted upon a determination

that all of the requirements in subsection (a) are fulfilled.") (emphasis added).

21.     By making the payment of all legal financial obligations (including fines, fees, and

restitution) (hereinafter "LFOs") a mandatory eligibility criterion for a CERV, Section 15-22-36.1

disqualifies any persons from receiving a CERV if they are unable to pay "all fines, court costs,

fees, and victim restitution ordered by the sentencing court" in their criminal case.

### *"Felony Involving Moral Turpitude" is Undefined*

22.     The Alabama Legislature has failed to define the term "moral turpitude" and

therefore has failed to define the qualifications for voting in the State of Alabama. Alabama Code

Section 15-22-36.1(g) states that a person "who has lost his or her right to vote by reason" of

specified convictions is not eligible for a CERV. But this statute does not explicitly define which

felonies involve moral turpitude and may assume that all convicted felons are disfranchised,

notwithstanding the "moral turpitude" qualification in Section 177(b). There is no apparent

standard the Legislature used to determine which crimes make a citizen ineligible for a CERV.

5

23.     The remaining administrative guidance, to the extent it is followed, is non-exhaustive, non-authoritative, vague, and internally inconsistent.

24.     In 2005, the Attorney General of Alabama issued an opinion purporting to address, *inter alia*, the question of what felonies do or do not involve moral turpitude. Att'y Gen. Op. No. 2005-092, 2005 WL 1121853 (hereinafter "2005 Attorney General Opinion"). The opinion restates the Alabama Supreme Court's broad definition of moral turpitude, which is "an act of baseness, vileness or depravity in the private and social duties which a man owes to his fellowmen or to society in general." As the Attorney General has previously acknowledged, this definition ensures that the determination "will turn upon the moral standards" of the decision-maker. *Underwood v. Hunter*, 730 F.2d 614, 616 n. 2 (11th Cir. 1984), *aff'd sub. nom. Hunter v. Underwood*, 471 U.S. 222 (1985).

25.     The 2005 Attorney General Opinion states that it could "not provide an exhaustive list of every felony involving moral turpitude." Instead, it purports to provide a non-exhaustive list of crimes, or categories of crimes, thus far determined by Alabama courts to involve moral turpitude as well as a partial list of crimes thus far determined by Alabama courts *not* to involve moral turpitude.

26.     However, the Attorney General does not have the power to make law or set voter qualifications in the State of Alabama. Only the Alabama Legislature has the power to pass laws, and the judiciary has the power to interpret them. Ala. Const. art. III, § 43. Moreover, Article III, Section 177, of the Alabama Constitution clearly delegates the authority to set voter qualifications to the Legislature only. The 2005 Attorney General Opinion therefore adds nothing to the clarity of the term "involving moral turpitude." While the Attorney General sought to rely upon judicial opinions, those opinions are, for the most part, not based on cases where the Alabama courts were

6

defining "moral turpitude" in the context of Section 177(b). Therefore, they cannot stand for the proposition that those convictions are disqualifying under Section 177(b).

27.     The Attorney General's list of moral turpitude crimes is broader than the disqualifying crimes listed in Alabama Code Section 15-22-36.1(g) and includes murder, rape, burglary, robbery, income tax evasion, forgery, conspiracy to commit fraud, aggravated assault, possession of marijuana for resale, sale of marijuana, manslaughter, theft, transporting stolen vehicles across state lines, unauthorized sale of a controlled substance, bigamy, and all crimes where fraud is an element.

28.     The Attorney General's list of crimes *not* involving moral turpitude was limited to assault, doing business without a license, violation of liquor laws, aiding prisoner to escape, mere possession of marijuana, and driving under the influence.

29.     The crimes specified in the 2005 Attorney General Opinion are not linked to specific, enumerated crimes under the Alabama Code and thus require persons with felony convictions to determine whether their crimes of conviction match the general descriptions in the opinion. For example, the 2005 Attorney General Opinion does not indicate whether all degrees of the crime are included in each category. In the case of "crimes where fraud is an element," the opinion requires the reader to cross-reference the opinion with the elements enumerated in the criminal statute at issue.

30.     The Attorney General's list as set forth in his opinion does not address many of Alabama's over five hundred felonies.

31.     The Board of Pardons and Paroles' website also asserts that "possession of drugs" does not involve moral turpitude. Even accepting the authority of this statement from an agency that lacks the power to determine voter qualifications, it is not clear whether possession of drugs

for resale is disqualifying since the 2005 Attorney General Opinion lists possession of marijuana for resale as disqualifying.

32.     In 2007 and 2008, the Administrative Office of Courts (AOC) issued memos regarding the definition of moral turpitude for the purposes of criminal disenfranchisement. *See* Exhibit A. The AOC concluded that the list of crimes involving moral turpitude should be construed to include only those crimes previously so determined by Alabama appellate courts or listed in the 2005 Attorney General Opinion. It developed a list of approximately seventy such felonies.

33.     This AOC list is incongruent with the Attorney General Opinion. For example, the AOC limits disqualifying forgery and theft of property crimes to convictions in the first and second degrees and excludes lesser degrees of those crimes, while the Attorney General's list does not contain such limitations. The Attorney General's list includes income tax evasion and all crimes involving fraud as an element, while the AOC list does not include those crimes.

34.     The AOC list is also not authoritative under Alabama law. The Legislature has the power to pass laws and the judiciary has the power to interpret them. Ala. Const. art. III, § 43. The AOC list relies upon judicial opinions, but those opinions are, for the most part, not based on cases where the Alabama courts were defining "moral turpitude" in the context of Section 177(b). Therefore, they cannot stand for the proposition that those convictions are disqualifying under Section 177(b).

35.     In 2008, the AOC distributed its list to circuit clerks, probate judges, and sheriffs, and urged them to disqualify only voters convicted of these crimes.

8

36.     The AOC list has been incorporated into the Alabama Law Institute's Alabama Election Handbook.[1] However, the handbook does not indicate that this list is the comprehensive list of convictions involving moral turpitude. The handbook also clearly states that it is "not an authoritative statement of the law."

37.     Upon information and belief, the Boards of Registrars do not rely solely on the 2007 AOC list of moral turpitude crimes in determining whether an applicant is eligible to register to vote.

## PARTIES

### *PLAINTIFFS*

### *Individual Plaintiffs*

38.     Plaintiff Treva Thompson is a black 48-year-old citizen of the United States who resides in Huntsville, Alabama, in Madison County. In 2005, Ms. Thompson was convicted of theft of property in the first degree, a class B felony, *see* Ala. Code § 13A-8-3. Ms. Thompson's crime of conviction does not appear as a disqualifying felony in Alabama Code Section 15-22-36.1(g). Prior to her conviction, Ms. Thompson was registered to vote in Madison County. Upon information and belief, on the basis of her conviction, the Madison County Board of Registrars removed her from the voter registration list. Ms. Thompson, believing she was eligible to vote after serving her time, reapplied to vote in 2015. Her application to vote was denied on the basis of her conviction, which the county registrar deemed disqualifying as a felony "involving moral turpitude."

39.     Ms. Thompson meets all the requirements for a CERV, *see* Ala. Code § 15-22-36.1, except the payment of all legal financial obligations. She has completed parole and probation and

---

[1] *Available at* http://ali.state.al.us/documents/election-handbook.pdf.

has no pending criminal charges, and was not convicted of a crime ineligible for a CERV, *see* Ala. Code § 15-22-36.1(g). Ms. Thompson, however, owes over $40,000 in legal financial obligations that she is not financially able to pay in full at this time or anytime in the foreseeable future. Her inability to pay these fines makes her ineligible for a CERV that would restore her voting rights. Ms. Thompson wishes to vote in the 2016 and future elections.

40.     Plaintiff Melissa Swetnam is a white 44-year-old citizen of the United States who resides in Huntsville, Alabama, in Madison County. In 2001, she was convicted of assault in the first degree, a class B felony, *see* Ala. Code § 13A-6-20. Ms. Swetnam's crime of conviction does not appear as a disqualifying felony in Alabama Code Section 15-22-36.1(g). Prior to her conviction, Ms. Swetnam was registered to vote in Madison County. Upon information and belief, on the basis of her conviction, the Madison County Board of Registrars removed her from the voter registration list. Ms. Swetnam would like to register to vote, but she is not sure whether her conviction is disqualifying and therefore cannot affirm under penalty of perjury on the voter registration application that she has not been convicted of a "disqualifying crime."

41.     Ms. Swetnam meets all the requirements for a CERV, *see* Ala. Code § 15-22-36.1, except the payment of all legal financial obligations. She is not on parole or probation, has no pending criminal charges, and was not convicted of a crime ineligible for a CERV, *see* Ala. Code § 15-22-36.1(g). Ms. Swetnam, however, owes over $9,000 in legal financial obligations that she is not financially able to pay in full at this time or anytime in the foreseeable future. She is currently paying $100 per month. At that rate, she would not pay off these fines for at least another seven and a half years. Her inability to pay these fines makes her ineligible for a CERV that would restore her voting rights. Ms. Swetnam wishes to vote in the 2016 and future elections.

42.     Plaintiff Antwoine D. Giles is a black 38-year-old citizen of the United States who resides in Montgomery, Alabama, in Montgomery County. In 2006, Mr. Giles was convicted of stalking in the first degree, a class C felony, *see* Ala. Code § 13A-6-90. Prior to his conviction, Mr. Giles was registered to vote in Montgomery County. Upon information and belief, on the basis of his conviction, the Montgomery County Board of Registrars removed him from the voter registration list. His sole crime of conviction, however, does not appear as a disqualifying felony in Alabama Code Section 15-22-36.1(g), nor in the 2005 Attorney General Opinion, nor in the list of disqualifying convictions compiled by the AOC. Mr. Giles is not sure whether his conviction is for a "felony involving moral turpitude" and therefore fears affirming under penalty of perjury that he has not been convicted of a "disqualifying crime." Mr. Giles wishes to register to vote and vote in the 2016 and future elections.

43.     Plaintiff Anna Reynolds is a black 60-year-old citizen of the United States who resides in Dothan, Alabama in Houston County. In 1997, Ms. Reynolds was convicted of theft of property in the second degree, a class C felony, *see* Ala. Code § 13A-8-4. In 2005, Ms. Reynolds was convicted of felony possession of a controlled substances, a class D felony, *see* Ala. Code § 13A-12-212(a)(1). In 2008, believing that none of her criminal convictions were disqualifying, Ms. Reynolds successfully registered to vote in Houston County. She was permitted to vote in 2008 and 2012 and in intervening state or local elections. This year, Ms. Reynolds checked her voter registration status and discovered that the Houston County Board of Registrars had removed her from the voter registration list. She contacted the registrar's office, which informed her that she was removed from the registration list on the basis of her 1997 theft of property conviction. Upon information and belief, she did not receive any notice of this removal from the voter registration list. Ms. Reynolds wishes to vote in the 2016 and future elections.

11

44.     Plaintiff Laura Corley is a white 28-year-old citizen of the United States who now resides in Trussville, Alabama, in Jefferson County. In 2015, she was convicted of two counts of possession of a controlled substance, class C felonies, *see* Ala. Code § 13A-12-212. Her crimes of conviction do not appear as disqualifying felonies in Alabama Code Section 15-22-36.1(g), nor in the 2005 Attorney General Opinion, nor in the list of AOC list of disqualifying crimes. Nonetheless, she was informed by a Board of Pardons and Paroles official that her convictions are disqualifying under Alabama law and that she is not eligible to vote unless her rights are restored. She proceeded to apply to restore her rights and received a letter informing her that her convictions were not disqualifying. Prior to her convictions, Ms. Corley was registered to vote in Mississippi, where she previously resided. She has never registered to vote in Alabama. Ms. Corley plans to register to vote on the basis of the Board of Pardons and Paroles' letter, but is not sure whether the Jefferson County Board of Registrars will consider her convictions disqualifying and deny her application. Furthermore, she is required to affirm under penalty of perjury that she has not been convicted of a disqualifying felony, which is uncertain in light of the conflicting information she has received. Ms. Corley wishes to vote in the 2016 and future elections.

45.     Plaintiff Larry Joe Newby is a black 60-year-old citizen of the United States who resides in Huntsville, Alabama, in Madison County. Mr. Newby has been convicted of two counts of receiving stolen property in the second degree, class C felonies, *see* Ala. Code § 13A-8-18, two counts of theft of property in the second degree, also class C felonies, *see* Ala. Code § 13A-8-4, and one count of possession of a controlled substance by fraud, also a class C felony, *see* Ala. Code § 13A-12-212(a)(2). Mr. Newby's crimes of conviction do not appear as disqualifying felonies in Alabama Code Section 15-22-36.1(g). Prior to his convictions, Mr. Newby was registered to vote in Madison County. Upon information and belief, on the basis of one or more of

12

his convictions, the Madison County Board of Registrars removed Mr. Newby from the voter registration list. Mr. Newby, believing he was eligible to vote after serving his time, applied to register to vote in 2015. His application to vote was denied on the basis of one or more of his convictions, which the county registrar deemed disqualifying as a felony "involving moral turpitude." Mr. Newby wishes to vote in the 2016 and future elections.

46.     Plaintiff Mario Dion Yow is a black 38-year-old citizen of the United States who resides in Mobile County. In 2014, Mr. Yow was convicted of trafficking cocaine, a class A felony, *see* Ala. Code § 13A-12-231(2). Mr. Yow's crime of conviction does not appear as a disqualifying felony in Alabama Code Section 15-22-36.1(g) nor in the 2005 Attorney General Opinion, nor in the AOC list of disqualifying crimes. Prior to his sole conviction, Mr. Yow was registered to vote in Mobile County and was an elected county constable. Upon information and belief, on the basis of his conviction, the Mobile County Board of Registrars removed Mr. Yow from the voter registration list. Mr. Yow would like to register to vote but is not sure whether his conviction is disqualifying and therefore cannot affirm under penalty of perjury that he has not been convicted of a "disqualifying crime." Mr. Yow wishes to vote in the 2016 and future elections.

47.     Plaintiff Jennifer Zimmer is a white 39-year-old citizen of the United States who resides in Montgomery, Alabama, in Montgomery County. In 2007, she was convicted of three class C felonies: theft of property in the second degree, breaking and entering a vehicle, and fraudulent use of a credit card, *see* Ala. Code §§ 13A-8-4, 13A-8-11(b), 13A-9-14(B). Her crimes of conviction do not appear as disqualifying felonies in Alabama Code Section 15-22-36.1(g). Prior to her convictions, Ms. Zimmer was registered to vote in Michigan, where she previously resided. She has never registered to vote in Alabama. Ms. Zimmer would like to register to vote, but she is not sure whether her convictions are disqualifying and therefore cannot affirm under

13

penalty of perjury that she has not been convicted of a "disqualifying crime." Ms. Zimmer wishes to vote in the 2016 and future elections.

48. Plaintiff Timothy Lanier is a black 50-year-old citizen of the United States who resides in Birmingham, Alabama, in Jefferson County. Mr. Lanier has previously been convicted of two counts of burglary in the first degree, class A felonies, *see* Ala. Code § 13-7-5, 2 counts of attempted murder, class A felonies, *see* Ala. Code § 13A-4-2, and conspiracy to obtain drugs by fraud, a class C felony, *see* Ala. Code § 13A-12-204. His crimes of conviction do not appear as disqualifying felonies in Alabama Code Section 15-22-36.1(g). He has never voted in Alabama, nor has he attempted to register to vote. Mr. Lanier now wishes to engage in greater part with his community. He volunteers with the Empowerment Alliance, a group that provides assistance to those reentering the community from incarceration. Mr. Lanier would like to register to vote, but he is not sure whether his convictions are disqualifying and therefore cannot affirm under penalty of perjury that he has not been convicted of a "disqualifying crime." Mr. Lanier wishes to vote in the 2016 and future elections.

49. Plaintiff Pamela King is a black 58-year-old citizen of the United States who resides in Montgomery, Alabama, in Montgomery County. In 1995, she was convicted of murder, a class A felony, *see* Ala. Code § 13A-6-2. Under Alabama Code Section 15-22-36.1(g), Pamela King is not eligible to apply to restore her voting rights under Alabama Code Section 15-22-36.1. Prior to her conviction, Ms. King was registered to vote in Montgomery County. She wishes to vote in the 2016 and future elections.

### *Plaintiff Class*

50. The Plaintiff Class that all Plaintiffs seek to represent is defined as: All unregistered persons otherwise eligible to register to vote in Alabama who are now, or who may in the future be, denied the right to vote because they have been convicted of a felony.

51. Plaintiffs also identify several subclasses that have standing to assert specific causes of action in this complaint.

## Subclasses Related to the Scope of Any
### Fourteenth Amendment Sanction of Felon Disenfranchisement

52. All Plaintiffs seek to represent a subclass (Subclass A) defined as follows: All unregistered persons otherwise eligible to register to vote in Alabama whose felony convictions are not crimes associated with voting such as "bribery, perjury, forgery, or other high crimes or misdemeanors," but who are now, or who may in the future be, denied the right to vote because they have been convicted of a felony, pursuant to the interpretation and enforcement of Section 177(b) of the Alabama Constitution by Defendants. The proposed Plaintiff Subclass A is by definition a subset of the broader proposed Plaintiff Class.

53. Plaintiffs Melissa Swetnam, Antwoine Giles, Laura Corley, and Mario Dion Yow seek to represent a subclass (Subclass B) defined as follows: All unregistered persons otherwise eligible to register to vote in Alabama whose felony convictions were not considered felonies at common law but who are now, or who may in the future be, denied the right to vote because they have been convicted of a felony, pursuant to the interpretation and enforcement of Section 177(b) of the Alabama Constitution by Defendants. The proposed Plaintiff Subclass B is by definition a subset of the broader proposed Plaintiff Class.

54. Plaintiffs Treva Thompson, Melissa Swetnam, Antwoine Giles, Anna Reynolds, Laura Corley, Larry Joe Newby, and Jennifer Zimmer seek to represent a subclass (Subclass C) defined as follows: All unregistered persons otherwise eligible to register to vote in Alabama

15

whose felony convictions are not class A felonies under Alabama law, but who are now, or who may in the future be, denied the right to vote because they have been convicted of a felony, pursuant to the interpretation and enforcement of Section 177(b) of the Alabama Constitution by Defendants. The proposed Plaintiff Subclass C is by definition a subset of the broader proposed Plaintiff Class.

### *Subclasses Related to the Vagueness of Section 177(b)'s Breadth*

55.     All plaintiffs except Plaintiff Pamela King seek to represent a subclass (Subclass D) defined as follows: All unregistered persons otherwise eligible to register to vote in Alabama who have not been convicted of felonies appearing in Alabama Code Section 15-22-36.1(g), but who are now, or who may in the future be, denied the right to vote because they have been convicted of a felony, pursuant to the interpretation and enforcement of Section 177(b) of the Alabama Constitution by Defendants. The proposed Plaintiff Subclass D is by definition a subset of the broader proposed Plaintiff Class.

56.     Plaintiffs Antwoine Giles, Laura Corley, and Mario Dion Yow seek to represent a subclass (Subclass E) defined as follows: All unregistered persons otherwise eligible to register to vote in Alabama who have not been convicted of felonies appearing in Alabama Code Section 15-22-36.1(g), the 2005 Attorney General Opinion, or the AOC list, but who are now, or who may in the future be, denied the right to vote because they have been convicted of a felony, pursuant to the interpretation and enforcement of Section 177(b) of the Alabama Constitution by Defendants. The proposed Plaintiff Subclass E is by definition a subset of the broader proposed Plaintiff Class.

57.     Plaintiffs Melissa Swetnam, Antwoine Giles, Anna Reynolds, Laura Corley, Mario Dion Yow, Jennifer Zimmer, and Timothy Lanier seek to represent a subclass (Subclass F) defined as follows: All unregistered persons otherwise eligible to register to vote in Alabama with felony

16

convictions, but who have not been convicted of felonies appearing in Alabama Code Section 15-22-36.1(g), who cannot be legally certain that their convictions are not disqualifying and therefore reasonably fear affirming under penalty of perjury that they have not been convicted of a "disqualifying crime." The proposed Plaintiff Subclass F is by definition a subset of the broader proposed Plaintiff Class.

### Subclasses Related to Plaintiffs' Procedural Due Process Rights

58.     Plaintiffs Treva Thompson and Larry Joe Newby seek to represent a subclass (Subclass G) defined as follows: All unregistered persons otherwise eligible to register to vote in Alabama who have not been convicted of felonies appearing in Ala. Code Ala. Code § 15-22-36.1(g), who have applied to register to vote, and whose applications were denied on the basis of a county registrar's determination that their felony convictions were "disqualifying" under Section 177(b) of the Alabama Constitution. The proposed Plaintiff Subclass G is by definition a subset of the broader proposed Plaintiff Class.

59.     Plaintiffs Treva Thompson, Melissa Swetnam, Antwoine Giles, Anna Reynolds, Larry Joe Newby, and Mario Dion Yow seek to represent a subclass (Subclass H) defined as follows: All previously registered persons otherwise eligible to register to vote in Alabama, who have not been convicted of felonies appearing in Ala. Code § 15-22-36.1(g), and who were removed from voter registration lists on the basis of a county registrar's determination that their felony convictions were "disqualifying" under Section 177(b) of the Alabama Constitution. The proposed Plaintiff Subclass H is by definition a subset of the broader proposed Plaintiff Class.

### Subclass Related to Payment of LFOs

60.     Plaintiffs Treva Thompson and Melissa Swetnam seek to represent a subclass (Subclass I) defined as follows: All unregistered persons otherwise eligible to register to vote in

17

Alabama who (a) are now, or who may in the future be, denied the right to vote because they have been convicted of a felony, pursuant to the interpretation and enforcement of Section 177(b) of the Alabama Constitution by Defendants; and (b) are unable to pay their fines, fees, and restitution due to their socioeconomic status; but (c) are otherwise eligible to apply for a CERV.

### *Organizational Plaintiff*

61.     Organizational plaintiff Greater Birmingham Ministries ("GBM") was founded in 1969 in response to the urgent human and justice needs in the greater Birmingham, Alabama area. GBM is a multi-faith, multi-racial organization that provides emergency services for people in need, and that engages the poor and the non-poor in systemic change efforts to build a strong, supportive community and to pursue a more just society for all people.

62.     A central goal of GBM is the pursuit of social justice in the governance of Alabama. GBM opposes state laws, policies, and practices that result in the exclusion of vulnerable groups or persons from the democratic process. Toward that end, GBM regularly engages in efforts to register, educate, and increase turnout among African-American and Latino voters, as well as low-income voters in general.

63.     As a result of Section 177(b) of the Alabama Constitution, GBM must devote staff time and resources to helping those with felony convictions (1) determine whether they may be eligible to register to vote, (2) attempt to register to vote, (3) determine whether they may be eligible for a CERV, and (4) apply for a CERV.

64.     Section 177(b) of the Alabama Constitution is causing, and will continue to cause, GBM to divert a portion of its limited financial and other organizational resources to assisting citizens with felony convictions to determine if they are eligible to register to vote and/or apply for a CERV and to assisting them in registering to vote and/or applying for a CERV. As a result,

GBM is limited, and will continue to be limited, in the resources that it can devote to its other core organizational goals.

## *DEFENDANTS*

65.     Defendant State of Alabama is sued in its own name with respect to Plaintiffs' claims under Section 2 of the Voting Rights Act, 52 U.S.C. § 10301. Congress has abrogated the State's Eleventh Amendment immunity in civil actions brought to enforce the rights guaranteed by the Voting Rights Act.

66.     Defendant John H. Merrill is the Secretary of State of Alabama and, as such, is the chief elections official in the state and is responsible for providing uniform guidance and promulgating administrative rules for election activities. Ala. Code § 17-1-3(a). He is sued in his official capacity only.

67.     Defendant George Noblin is the Chair of the Board of Registrars for Montgomery County and is responsible for registering voters in Montgomery County. Ala. Code §§ 17-3-1 et seq. He is sued in his official capacity only.

68.     The Defendant Class, represented by Defendant Noblin, is defined as: All voter registrars in the State of Alabama. The voter registrars, as a class, are sued in their official capacities only.

69.     Defendant Clifford Walker is the Chairman of the Board of Pardons and Paroles. The Board of Pardons and Paroles is the agency tasked with reviewing and distributing CERVs pursuant to Alabama Code Section 15-22-36.1.  He is sued in his official capacity only.

## **CLASS ALLEGATIONS**

70.     Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs bring this action on behalf of themselves and all other similarly situated persons. Plaintiffs do not seek claims for

compensatory relief. Instead, Plaintiffs seek only declaratory and injunctive relief broadly applicable to members of the Plaintiff Class and the Plaintiff Subclasses, as defined above. The requirements of Rule 23, and in particular Rule 23(b)(2), are met with respect to the Plaintiff Class and Plaintiff Subclasses, as defined above.

71.     The members of the Plaintiff Class and Plaintiff Subclasses are so numerous that joinder is impracticable. While exact numbers of members in the Plaintiff Class and Plaintiff Subclasses are not publicly available, upon information and belief, the total number of otherwise eligible citizens of Alabama disenfranchised on the basis of felony convictions exceeds 250,000. The Plaintiff Class and Plaintiff Subclasses are ascertainable through Defendants' records, as well as records kept by the Alabama Circuit Clerks and the Board of Pardons and Paroles.

72.     The questions of law and fact common to the Plaintiff Class and Plaintiff Subclasses predominate over questions affecting only individual class members, and include, but are not limited to, the following:

> a. Whether Section 177(b) was adopted with and/or perpetuates racially discriminatory intent;
>
> b. Whether Section 177(b) violates Section 2 of the Voting Rights Act;
>
> c. Whether Section 177(b) violates Section 1 of the Fourteenth Amendment and the First Amendment by denying the right to vote to those convicted of crimes for which disenfranchisement is not affirmatively sanctioned by Section 2 of the Fourteenth Amendment;
>
> d. Whether Section 177(b), as applied by Defendant Secretary of State and Defendant registrars, imposes an unconstitutional burden on the right to vote of

those convicted of felonies that may not constitute "felonies involving moral turpitude";

e. Whether Section 177(b), as applied by Defendant Secretary of State and Defendant registrars, is unconstitutionally vague;

f. Whether Section 177(b), as applied by Defendant Secretary of State and Defendant registrars, denies Plaintiff Class and/or Plaintiff Subclass members equal protection of the laws by arbitrarily and discriminatorily disenfranchising otherwise eligible citizens on the basis of arbitrarily chosen felony convictions;

g. Whether the denial of Plaintiff Class and/or Plaintiff Subclass members' voter registration applications and/or removal of Plaintiff Class and/or Plaintiff Subclass members from the voter registration lists on the basis of their felony convictions without a pre-deprivation hearing deprives Plaintiff Class and/or Plaintiff Subclass members of procedural due process;

h. Whether Section 177(b), as applied by Defendant Secretary of State and Defendant registrars, violates the Ex Post Facto Clause;

i. Whether Section 177(b), as applied by Defendant Secretary of State and Defendant registrars, imposes cruel and unusual punishment in violation of the Eighth Amendment;

j. Whether the requirement that a disqualified citizen pay all legal financial obligations in order to be eligible to restore her voting rights denies Plaintiff Class and/or Plaintiff Subclass members equal protection of the laws by imposing a wealth qualification on access to the right to vote;

k. Whether the requirement that a disqualified citizen pay all legal financial obligations in order to be eligible to restore her voting rights constitutes a poll tax and violates the Twenty-Fourth Amendment;

l. Whether the requirement that a disqualified citizen pay all legal financial obligations in order to be eligible to restore her voting rights violates Section 2 of the Voting Rights Act.

73. The claims of Plaintiffs Treva Thompson, Melissa Swetnam, Antwoine Giles, Anna Reynolds, Larry Joe Newby, Mario Dion Yow, Jennifer Zimmer, Timothy Lanier, and Pamela King are typical of the Plaintiff Class and Plaintiff Subclasses as defined above. Plaintiffs are not aware of any conflict between their interests and those of the Plaintiff Class and Subclasses they seek to represent.

74. Plaintiffs can fairly and adequately represent the interests of the Plaintiff Class and Plaintiff Subclasses because they are similarly situated with members of their classes. Plaintiffs have retained counsel experienced in class-action litigation and voting rights litigation to represent them and the Plaintiff Class and Subclasses for the purpose of this litigation.

75. Defendants have acted, or refused to act, on grounds generally applicable to the entire class and subclasses, and final injunctive relief and corresponding declaratory relief are appropriate respecting the classes as a whole.

76. A class action is superior to other available means for the fair and efficient adjudication of the Plaintiff Class and Plaintiff Subclass members' claims because joinder of all members is impracticable. Absent the class action, the members of the Plaintiff Class and Plaintiff Subclasses will continue to suffer deprivation of their right to vote.

77.     The Defendant Class, defined as all voter registrars in the State of Alabama, is also so numerous as to make it impractical to join them all before this Court. Each county in Alabama has at least three registrars. Ala. Code § 17-3-2. Alabama has sixty-seven counties.

78.     The questions of law and fact common to the Plaintiff Class and Plaintiff Subclasses predominate over questions affecting only individual class members, and include, but are not limited to, the questions listed in paragraph 72, *supra*.

79.     Defendant Noblin can fairly and adequately represent the interests of the Defendant Class because his interests do not conflict with the interests of the Defendant Class members he would represent and he is similarly situated with members of the Defendant Class.

80.     The defenses of Defendant Noblin are typical of the Defendant Class as a whole.

81.     A class action is therefore superior to other available means for the fair and efficient adjudication of the Defendant Class members' defenses.

## FACTUAL ALLEGATIONS

### *A History of Racial Discrimination in Voting*

82.     Alabama's history of criminal disenfranchisement is inextricably intertwined with Alabama's long history of denying black citizens the right to vote.

83.     That history is well established and documented. In addition to Alabama's constitutional protection of slavery and the restriction of the right to vote to white males until the Civil War forced it to abandon those practices, Alabama's history of racial discrimination in voting includes, *inter alia*, the use of terror and violence, economic intimidation, all-white primaries, bans on single-shot voting, at-large elections, literacy tests, poll taxes, "grandfather" clauses, and good character tests, all with the aim of excluding blacks from the franchise. *See, e.g., Dillard v. Crenshaw Cnty.*, 640 F. Supp. 1347, 1357 (M.D. Ala. 1986) (detailing Alabama's "unrelenting

23

historical agenda, spanning from the late 1800's to the 1980's, to keep its black citizens economically, socially, and politically downtrodden, from the cradle to the grave").

84.     Accordingly, in 1965, Alabama was declared a covered state under Section 4(b) of the Voting Rights Act on the basis of its enforcement of unconstitutional tests or devices and its low voter registration and turnout rates. *See South Carolina v. Katzenbach*, 383 U.S. 301, 312 (1966) ("Discriminatory administration of voting qualifications has been found in all eight Alabama cases.").

85.     Since 1965 and continuing to the present, Alabama has a sustained record of racial discrimination in voting, necessitating federal intervention. *See, e.g.*, *Renewing the Temporary Provisions of the Voting Rights Act: Legislative Options after LULAC v. Perry: Hearing Before the Subcommittee on the Constitution, Civil Rights and Property Rights of the Senate Committee on the Judiciary*, 109th Cong. 365-402 (July 13, 2006) (compiling evidence of Alabama's sustained record of racial discrimination); *Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257 (2015) (redistricting); *City of Pleasant Grove v. United States*, 479 U.S. 462 (1987) (racially selective annexations); *Hunter v. Underwood*, 471 U.S. 222 (1985) (felon disfranchisement); U.S. Dep't of Justice, Alabama Voting Determination Letters, http://www.justice.gov/crt/records/vot/obj_letters/state_letters.php?state=al (last visited Dec. 1, 2015) (listing all objections imposed against Alabama under Section 5 of the Voting Rights Act, including 24 objections from 1990 to 2008, as well as pre-1990 objections to voter re-identification and literacy requirements).

86.     As recently as January 2014, a federal court in the Southern District of Alabama "bailed-in" the City of Evergreen in Conecuh County for preclearance under Section 3(c) of the

Voting Rights Act because voter registrars and election officials there continued to unconstitutionally discriminate against black voters.

### *Criminal Disenfranchisement: A Sordid History*

87. Across the country and particularly in the South, felon disenfranchisement carries with it a sordid history as part and parcel of the racist practice of convict leasing and the South's intractable opposition to granting blacks the right to vote.

88. During Reconstruction, after the passage of the Fourteenth and Fifteenth Amendments, Southern states employed felon disenfranchisement as a back door to the wholesale disenfranchisement of blacks. States expanded their lists of disenfranchising offenses—which were previously closely cabined—to include a broad set of minor offenses, tailored their lists based on racial theories of crimes blacks were "prone" to commit, and then prosecuted petty crimes against blacks as a means to both push them into the pipeline of convict leasing and disenfranchise them permanently. *See* Pippa Holloway, *Living in Infamy* 80 (2014).

89. For example, South Carolina added larceny to its list of disenfranchising offenses in 1880. *Id.* at 62-63. One South Carolinian described the scene there around election time: "Negroes are frequently arraigned . . . on the most trivial charges of larceny . . . the whole proceedings clearly indicate, in many cases, that the prosecution is merely a pretext to deprive a negro of his vote." *Id.* at 68.

90. Likewise, Virginia disenfranchised those convicted of petit larceny in 1875. *Id.* at 61. In practice, it also kept official lists of "Convicted Colored Males Who Are Thereby Disenfranchised." *Id.* at 67.

91. North Carolina, which also expanded disenfranchisement to minor property crimes in 1875, likewise maintained lists and enforced its laws in a racist manner. *Id.* In Iredell County,

for example, 114 of 122 disenfranchised voters were black, and of those, 104 were disenfranchised based on a larceny conviction. *Id.*

92. Mississippi tied together race and disenfranchisement even more explicitly. In *Ratliff v. Beale*, 20 So. 865, 868 (Miss. 1896), the court explained that, "[r]estrained by the federal constitution from discriminating against the negro race, the [Mississippi Constitutional] convention discriminated against their characteristics and the offenses to which its weaker members were prone." Aided by the 1876 Pig Law, which expanded the definition of larceny, Mississippi's Constitution served to both disenfranchise blacks and increase the size of its convict-leasing program. *Id.* at 57, 59.

93. Alabama was no exception to this pattern of employing felon disenfranchisement as a means of achieving the wholesale disenfranchisement of blacks.

### *Criminal Disenfranchisement Based on "Moral Turpitude":*
### *An Intentional Mechanism to Disenfranchise Blacks*

#### Alabama's 1901 Convention

94. In 1901, Alabama held an all-white Constitutional Convention. The 1901 Convention was "part of a movement that swept the post-Reconstruction South to disenfranchise blacks." *Hunter v. Underwood*, 471 U.S. 222, 229 (1985).

95. The explicit purpose of the 1901 Convention, as expressed by the Convention president John Knox in his opening address, was to "establish white supremacy" in Alabama. *Id.*

96. Specifically, the drafters of the 1901 Alabama Constitution sought to impose voter qualifications "that would subvert the guarantees of the fourteenth and fifteenth amendments without directly provoking a legal challenge." *Underwood v. Hunter*, 730 F.2d 614, 619 (11th Cir. 1984), *aff'd* 471 U.S. 222 (1985).

26

97.     To this end, the drafters expanded Alabama's criminal disenfranchisement provision, adopting Section 182 of the 1901 Constitution, which provided:

> [T]hose who shall be convicted of treason, murder, arson, embezzlement, malfeasance in office, larceny, receiving stolen property, obtaining property or money under false pretenses, perjury, subornation of perjury, robbery, assault with intent to rob, burglary, forgery, bribery, assault and battery on the wife, bigamy, living in adultery, sodomy, incest, rape, miscegenation, crime against nature, or any crime punishable by imprisonment in the penitentiary, or of any *infamous crime or crime involving moral turpitude*; also, any person who shall be convicted as a vagrant or tramp, or of selling or offering to sell his vote or the vote of another, or of buying or offering to buy the vote of another, or of making or offering to make a false return in any election by the people or in any primary election to procure the nomination or election of any person to any office, or of suborning any witness or registrar to secure the registration of any person as an elector.

98.     The purpose of this provision was, once again, to disenfranchise blacks. John Fielding Burns, who introduced the provision, boasted "the crime of wife-beating alone would disqualify sixty percent of Negroes." *Underwood*, 730 F.2d at 620 (citing J. Gross, *Alabama Politics and the Negro, 1874–1901* 244 (1969)).

99.     The criminal disenfranchisement provision was framed specifically to disenfranchise blacks: "In addition to the general catchall phrase 'crimes involving moral turpitude' the suffrage committee selected such crimes as vagrancy, living in adultery, and wife beating that were thought to be more commonly committed by blacks." *Hunter*, 471 U.S. at 232.

100.    To justify the disenfranchisement of blacks through this mechanism and others in the 1901 Convention, Knox, the Convention president, specifically invoked the prevalent view of the moral superiority of Anglos over blacks: "The justification for whatever manipulation of the ballot that has occurred in this State has been the menace of negro domination. . . . These provisions are justified in law and in morals, because it is said that the negro is not discriminated against on

27

account of his race, but on account of his intellectual and moral condition." Angela Behrens, Christopher Uggen, & Jeff Manza, *Ballot Manipulation and the "Menace of Negro Domination": Racial Threat and Felon Disenfranchisement in the United States, 1850-2002*, 109 Am. J. Soc. 559, 571 (2003).

101.    At the same time that Alabama sought to use the criminal system to disenfranchise black voters, it was also utilizing the criminal system to reimpose involuntary servitude of blacks in the aftermath of the Civil War and the passage of the Thirteenth Amendment.

102.    After the end of the Civil War, many Southern states utilized the exception to the Thirteenth Amendment's prohibition on involuntary servitude for criminal punishment to create a massive convict-leasing system—wherein states and counties could sweep black communities for petty crimes and violations of the "Black Codes" and then lease those prisoners to private entities for forced labor—to replace slave labor. *See generally* Douglas Blackmon, *Slavery by Another Name* (2008).

103.    Alabama was the worst offender. Alabama created the largest convict-leasing system in the South—providing large companies like Tennessee Coal and Iron and then U.S. Steel with nearly unlimited labor—and was the last to outlaw the practice. While ascertaining the exact number of victims of this system is not possible given shoddy record keeping, historians estimate that well over 100,000 Alabaman prisoners were "leased" during the sixty-year period that this system prevailed. The mortality rate of these prisoners was extraordinarily high, between 3 and 25 percent. *See* Douglas Blackmon, *From Alabama's Past, Capitalism Teamed With Racism to Create Cruel Partnership*, Wall St. J. (July 16, 2001).

104.    These leased prisoners, like the slaves that preceded them, were nearly exclusively black. According to one source, in an average year, 97 percent of Alabama's county convicts (those

convicted of minor crimes) were "colored." David M. Oshinsky, *Worse Than Slavery: Parchman Farm and the Ordeal of Jim Crow Justice* (1996).

105. Thus, the Black Codes, the convict leasing system, and the 1901 criminal disenfranchisement provision all worked together to establish and maintain white supremacy in Alabama. The State convicted black citizens of petty crimes and Black Code violations in the tens of thousands, leased them out to private entities for forced labor with extraordinary financial rewards for the State, and then excluded them permanently from the political franchise on the basis of those convictions. This is the legacy of disenfranchisement on the basis of "moral turpitude" in Alabama.

## "Moral Turpitude" in Alabama after the 1901 Convention

106. Racially discriminatory views connecting the disenfranchisement of blacks to their "criminal attitudes" did not end in the early 1900s. In 1961, in a State Democratic Executive Committee meeting discussing a discriminatory requirement that candidates run for numbered places in all at-large elections, a committee member stated that many blacks "cannot qualify because of their criminal records or criminal attitudes," but nonetheless argued that the State must layer additional discriminatory requirements to "protect the white people of Alabama." *Dillard v. Crenshaw Cnty.*, 640 F. Supp. 1347, 1357 (M.D. Ala. 1986).

107. In 1969, a Constitutional Commission was appointed by the Governor with the purpose of updating and revising the 1901 Constitution.

108. The Commission released its proposed constitution in 1973. With respect to criminal disenfranchisement, the Commission recommended the following simplification of Section 182: "No person convicted of a felony involving moral turpitude, or who is mentally

29

incompetent, shall be qualified to vote until restoration of civil and political rights or removal of disability."

109.    The commentary to the Commission's drafts of the 1973 proposed Constitution explained the purpose of this simplified provision. The Commission noted that the long list of specific crimes might become "a matter of constitutional interpretation or constitutional amendment." First Draft of Proposed Alabama Constitution at 8 (Oct. 23, 1970). Thus, the Commission sought to "describe such disqualifications in general terms, thus overcoming these objections and eliminating a long, scattered, and redundant list of disqualifying crimes." *Id.* The commentary included no discussion of alternative motives for criminal disenfranchisement that differed in kind from Section 182 of the 1901 Constitution.

110.    Upon information and belief, the 1973 proposal took the "including moral turpitude" clause directly from Section 182 of the 1901 Constitution. The only alternative models cited in the commentary to the 1973 proposal did not include that language.

111.    The 1973 Commission sought to simplify the felon disenfranchisement provision, as compared to the lengthy 1901 clause, but there is no evidence that it sought to eliminate its racially discriminatory intent and effect. Indeed, in 1973, George Wallace was Governor of Alabama and there was little political appetite for meaningful change through the Commission. Accordingly, the Commission sought to limit its recommendations to modest proposals intended to streamline the lengthy and unmanageable prior constitution. *See* William H. Stewart, *The Tortured History of Efforts to Revise the Alabama Constitution of 1901*, 53 Ala. L. Rev. 295 (2001). The Commission's proposed constitutional reforms were not adopted at that time.

112.    In the 1980s, voters challenged Section 182 as intentionally racially discriminatory. The challenge focused specifically on the provision disenfranchising those convicted of the

30

enumerated misdemeanors and "crime[s] involving moral turpitude." In 1984, the Eleventh Circuit found "as a matter of law that discriminatory intent motivated Section 182" and enjoined the challenged provisions, including the "crime involving moral turpitude" provision. *Underwood*, 730 F.2d at 620.

113.    With respect to "moral turpitude," the Eleventh Circuit wrote: "The attorney general in opinion has acknowledged that the classification of presently unaddressed offenses 'will turn upon the moral standards of the judges who decide the question.' Thus does the serpent of uncertainty crawl into the Eden of trial administration." *Id.* at 616 n.2 (internal quotation marks and citations omitted).

114.    The Eleventh Circuit held that it was "unable to discern any evidence that [Section 182] was actually intended to serve" the valid "state interest in denying the franchise to those convicted of violating its laws." *Id.* at 620.

115.    The Supreme Court affirmed the Eleventh Circuit and held that Section 182, including the provision disenfranchising citizens convicted of crimes involving moral turpitude, was motivated by racial animus. Rejecting the State's contention "that the State has a legitimate interest in denying the franchise to those convicted of crimes involving moral turpitude," the Court held that "such a purpose simply was not a motivating factor of the 1901 convention. In addition to the general catchall phrase 'crimes involving moral turpitude' the suffrage committee selected such crimes as vagrancy, living in adultery, and wife beating that were thought to be more commonly committed by blacks." *Hunter*, 471 U.S. at 232.

116.    Against this backdrop, Alabama adopted Amendment 579 to the 1901 Constitution in 1996.

117.    Amendment 579's criminal disenfranchisement provision is a word-for-word adoption of the 1973 proposed revision of Section 182. Amendment 579 added Section 177(b) to the Alabama Constitution, which now provides, in relevant part, that "No person convicted of a felony involving moral turpitude, or who is mentally incompetent, shall be qualified to vote until restoration of civil and political rights or removal of disability."

118.    Amendment 579 was proposed by the Legislature in 1995, submitted at the June 4, 1996 election, and proclaimed ratified on June 19, 1996.

119.    The sponsor of the bill that became Amendment 579 represented to the Legislature and to the press that it would make no substantive changes to the 1901 Constitution and was intended merely to simplify the language governing voting.

120.    Upon information and belief, none of the legislative history behind Amendment 579 provides any non-racial motive for the "including moral turpitude" language that was taken directly, without comment, from Section 182's intentionally racially discriminatory language.

121.    Indeed, Alabama officials have questioned the inclusion of this explicitly racially tainted language in the 1996 revision. In a 2007 memo from the AOC about the "moral turpitude" provision, Griffin Sikes, Director of the Legal Division of the AOC, recounted the moral turpitude standard's "dubious, ignoble usage and history." He noted that "it is difficult to understand the decision made in the mid-1990s to reintroduce, via Amendment 579 to the Alabama Constitution, the phrase, 'involving moral turpitude,' as a basis for again disqualifying or disenfranchising Alabama citizens of their right to vote" and concluded that "[t]he use of this standard is suspect." *Id.*

122.    In 1995 and 1996, the State Legislature must have been keenly aware of the strong connections between Alabama's long history of slavery, convict leasing, and the modern incarceral

state. In 1995, Governor James revived the chain gang in Alabama, a powerful symbol of Alabama's racist convict-leasing system. Nancy A. Ozimek, *Reinstitution of the Chain Gang: A Historical and Constitutional Analysis*, 6. B.U. Pub. Int. L.J. 753, 758-59 (1997). At that time, roughly 70 percent of Alabamans in prison were black. Anne Hull, *Chained to a New Kind of Justice*, St. Petersburg Times, June 25, 1995, at A1.

123.    Commentators repeatedly called upon the Governor to end this practice, arguing that it was an unfortunate return to Alabama's "dark ages" and a stark reminder of slavery. Linnet Myers, *Alabama Chain Gang Program Rattles Feelings*, Chi. Tribune, May 3, 1995.

124.    The practice also stoked racist remarks from the public. One resident reportedly said of the practice: "I love seeing 'em in chains. They ought to make them pick cotton." Tracey Meares, *Weak Link*, U. Chi. Mag., February 1996. Echoing this sentiment in his own campaign, State Senator Charles Davidson argued that biblical teachings justified slavery. *Bible Backed Slavery, Says a Lawmaker*, N.Y. Times, May 9, 1996.

125.    However, despite critiques regarding the chain gang's explicit racist connotations, the practice did not end in Alabama until a lawsuit was filed and ultimately settled by the State in 1998. In approving the settlement agreement, the court noted that the "heinous roots" of the chain gang had "provoked much concern from commentators as well as jurists." *Austin v. Hopper*, 15 F. Supp. 2d 1210, 1216 (M.D. Ala. 1998) (citing *Alabama v. Engler*, 85 F.3d 1205, 1210 (6th Cir. 1996) (Jones, J., concurring) (noting that a fugitive from Alabama, whom the Sixth Circuit held should be extradited by the State of Michigan, "will be tossed into a prison system that has adopted the barbaric 'discipline' of the chain gang" and stating that "this perpetuation of injustice cloaked in the tattered cloth of the Alabama justice system is deplorable")).

33

126. While the chain gang practice was being hotly debated, the Alabama Legislature approved Amendment 579.

### *Disproportionate Impact of Section 177(b) on Black Citizens*

127. Upon information and belief, at the time of Section 182's adoption, it disenfranchised ten times as many blacks as whites.

128. Section 182's (now Section 177(b)) disproportionate and discriminatory effects on blacks continue today.

129. At the time *Hunter v. Underwood* was decided in 1985, the experts estimated that blacks were at least 1.7 times as likely as whites to be disenfranchised under Section 182.

130. By 1996, when Amendment 579 was ratified, the impact of criminal disenfranchisement on black citizens in Alabama was greater both in comparative and actual magnitude as a result of the dramatic increase in mass incarceration in Alabama, which fell unevenly on the black community.

131. The state prison population in Alabama is now nearly three times the size it was in the mid-1980s. The number of incarcerated persons per 100,000 people has more than doubled.

132. The incarceration rate presents stark racial disparities. Based on recent estimates, black residents are incarcerated at a rate over three times that of white residents.

133. This explosion in overall incarceration, which exacerbates its extreme racially disparate impact, was well underway by 1996 when Amendment 579 was ratified. Since 1985, when *Hunter* was decided, the rate of incarceration had risen from approximately 300 per 100,000 to nearly 500 per 100,000.

134. According to a 2010 study by the Sentencing Project, approximately 7 percent of the voting age population in Alabama is disenfranchised as a result of Section 177(b).

34

135.    Because Alabama prosecutes and convicts its black citizens at substantially higher rates than its white citizens, the rates of disenfranchisement do not fall evenly on the state's black and white citizens.

136.    According to the Sentencing Project study, approximately 15 percent of the black voting age population in Alabama is disenfranchised by Section 177(b), while less than 5 percent of the white voting age population in Alabama is similarly disenfranchised. In other words, black Alabamians are three times more likely to be disenfranchised by Section 177(b) than whites. Blacks comprise well over half of all individuals disenfranchised on the basis of convictions while comprising only approximately one quarter of the total voting age population.

137.    Alabama disenfranchises blacks on the basis of convictions at nearly double the nationwide rate.

### *Disproportionate Impact of LFOs Requirement on Black Citizens*

138.    Even disregarding the stark racially disproportionate effect of Section 177(b), the requirement that citizens be able to pay all LFOs in order to qualify to receive a CERV and restore their right to vote also has a disproportionate impact on black citizens.

139.    According to the 2010-2014 American Community Survey, the poverty rate of blacks in Alabama (31.6%) is well over double the rate of whites (13.8%); and white per capita income ($27,354) is nearly double black per capita income ($16,027).

140.    According to the 2010-2014 American Community Survey, the unemployment rate of blacks in Alabama (16%) is double the rate of unemployment of whites (8.1%).

141.    These systemic and disproportionately lower economic conditions for blacks in Alabama are the result, at least in part, of a long history of state-sponsored racial discrimination in

Alabama across all spectrums of society including, but not limited to, education, voting, and employment.

142.    These systemic and disproportionately lower economic conditions for blacks in Alabama result in blacks being less able to pay their LFOs and become eligible to restore their voting rights.

143.    In a 2015 study, political scientists Marc Meredith and Michael Morse analyzed Alabama Board of Pardons and Paroles data and determined that blacks are statistically less likely to be able to pay all their LFOs. Specifically, blacks are 10% more likely to have a non-zero LFO balance in Alabama. Blacks are also 16% more likely to have their voting rights applications denied due to outstanding LFOs.

### Enforcement of Section 177's "Moral Turpitude" Standard

144.    As discussed above, the Alabama Legislature has failed to define the term "moral turpitude" and therefore has failed to define the qualifications for voting in the State of Alabama.

145.    Alabama Code Section 15-22-36.1(g) assumes that that the felonies listed therein are disqualifying but does not reference Section 177(b) or the moral turpitude standard and may assume that all convicted felons are disfranchised, notwithstanding the "moral turpitude" qualification in Section 177(b).

146.    Beyond Alabama Code Section 15-22-36.1(g), there are only non-exhaustive and non-authoritative interpretations of what crimes are disqualifying under Section 177.

147.    Nonetheless, the State of Alabama Voter Registration Form requires a voter to swear and sign, under penalty of perjury, that she is "not barred from voting by reason of a disqualifying felony conviction." Below the signature line, the form states: "If you falsely sign this

statement, you can be convicted and imprisoned for up to five years." The form does not provide any additional information about what constitutes a "disqualifying felony."

148.    Similarly, the State Instructions for Alabama on the Federal Voter Registration Form state that in order to register to vote in Alabama, an applicant must "not have been convicted of a felony involving moral turpitude (or have had your civil and political rights restored)." The registration form requires the applicant to swear and affirm that she has "reviewed [her] state's instructions" and "meet[s] the eligibility requirements of [her] state." It warns that false information may result in fines and/or imprisonment. The form does not provide any additional information about what constitutes a "felony involving moral turpitude."

149.    Upon information and belief, the Secretary of State provides no information whatsoever on its website regarding what felonies it deems disqualifying. Upon information and belief, nowhere does it refer to the Attorney General's list, the AOC list, or Alabama Code Section 15-22-36.1(g) or otherwise explain to voters how they would determine whether their convictions are disqualifying.

150.    Registrars for each county in Alabama comprise a Board of Registrars. They are collectively and individually responsible for registering electors. Ala. Code §§ 17-3-1 et seq.

151.    Registrars in Alabama are also responsible for purging electors disqualified on the basis of convictions of felonies involving moral turpitude from the voter registration lists on a continuous basis. Ala. Code § 17-4-3.

152.    No legal training is required to be a registrar. Ala. Code § 17-3-2(a) (noting that qualifications include: (1) being a qualified elector, (2) being a resident of the county, (3) possessing a high school diploma or equivalent, and (4) possessing computer and map reading skills).

37

153. Upon information and belief, registrars in Alabama are responsible for making the determination of whether a voter applicant's felony conviction is disqualifying.

154. If an Alabama registrar improperly determines that a voter applicant's crime is disqualifying, the voter applicant must affirmatively appeal that decision to probate court in order to receive an adjudication of her qualifications as a voter. Ala. Code § 17-3-55. In the interim, she is unable to vote.

155. Upon information and belief, registrars in Alabama are also responsible for making the determination of whether a current registered voter's conviction is disqualifying and thus whether the current voter's name should be removed from the voter registration list.

156. Upon information and belief, the Secretary of State, Defendant Merrill, instructs registrars to rely upon the 2005 Attorney General Opinion where it is applicable and that they may consult, if they so decide, the Attorney General's Office if they are unsure of a crime's classification as disqualifying.

157. Before striking a voter from the registration list based on a disqualifying criminal conviction, an Alabama registrar must send the voter a notice and "on the date set in the notice . . . the board shall proceed to consider the case of the elector whose name it proposes to strike . . . and make its determination." Ala. Code § 17-4-3

158. Upon information and belief, voting registrars in Alabama do not uniformly follow this requirement or uniformly provide registered voters the opportunity to respond to the registrar's determination of whether the applicant's conviction is disqualifying.

159. If a registrar in Alabama improperly determines that a voter's crime is disqualifying and strikes her from the registration list, the voter must affirmatively appeal that decision to probate

38

court in order to receive an adjudication of her qualifications as a voter. Ala. Code § 17-3-55. In the interim, she is unable to vote.

160.    Upon information and belief, there is no uniform system for determining the eligibility of voter applicants and voter registrants across the state.

## CLAIMS

### Count 1: Intentional Race Discrimination, 14th Amendment
### (42 U.S.C. § 1983)
### (All Plaintiffs and Plaintiff Class)
### (Against Defendant Merrill, Defendant Noblin, and Defendant Class)

161.    Plaintiffs reallege the facts set forth in paragraphs 1-160, above.

162.    The disenfranchisement of persons convicted of crimes "involving moral turpitude" was adopted by Alabama in 1901 with an explicit intent to exclude blacks from the electoral franchise.

163.    In 1985, the Supreme Court unanimously held that Section 182, Section 177(b)'s predecessor, and particularly the disenfranchisement of those convicted of crimes "involving moral turpitude," was intentionally racially discriminatory.

164.    In 1995, the Alabama Legislature proposed Amendment 579, which reintroduced a provision disenfranchising those convicted of felonies "involving moral turpitude" despite its "ignoble usage and history." Amendment 579 was a word-for-word adoption of a 1973 proposal to simplify, but not substantively change, Section 182. The phrase "involving moral turpitude" was lifted directly from the intentionally racially discriminatory Section 182. Ultimately, the only legislative history on the intent behind the adoption of the "involving moral turpitude" clause is the 1901 legislative history, which has already been fully adjudicated and deemed intentionally racially discriminatory.

165.     Since its inception, Alabama's disenfranchisement of those convicted of crimes involving moral turpitude has had a dramatically disproportionate effect on blacks in Alabama. That effect was in full force in 1995 and remains in full force today.

166.     Section 177(b) of the Alabama Constitution, which codifies Amendment 579, violates the Fourteenth Amendment to the Constitution of the United States because it purposely denies equal protection in registering and voting to Plaintiffs and other minority voters on account of race.

**Count 2: Intentional Race Discrimination, 15th Amendment**
**(42 U.S.C. § 1983)**
**(All Plaintiffs and Plaintiff Class)**
**(Against Defendant Merrill, Defendant Noblin, and Defendant Class)**

167.     Plaintiffs reallege the facts set forth in paragraphs 1-160, above.

168.     Section 177(b) of the Alabama Constitution, which codifies Amendment 579, violates the Fifteenth Amendment to the Constitution of the United States because it purposely denies and abridges the right to register and vote to Plaintiffs and other minority voters on account of race or previous condition of servitude.

**Count 3: Racial Discrimination in Voting, Section 2 of the Voting Rights Act**
**(52 U.S.C. § 10301)**
**(All Plaintiffs and Plaintiff Class)**
**(Against Defendant State of Alabama, Defendant Merrill, Defendant Noblin, and Defendant Class)**

169.     Plaintiffs reallege the facts set forth in paragraphs 1-160, above.

170.     Section 2 of the Voting Rights Act prohibits any state from enacting or administering any voting prerequisite or qualification for voting that results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color or membership in a language minority group.

171.     Under the totality of the circumstances, Alabama's enforcement of Section 177(b) of the Alabama Constitution results in racial discrimination in voting because it denies black voters an equal opportunity to participate effectively in the political process and therefore violates Section 2 of the Voting Rights Act.

172.     Section 177(b) of the Alabama Constitution also violates Section 2 of the Voting Rights Act because it purposefully denies black voters an equal opportunity to participate in the political process.

### Count 4: Non-Racial Discrimination in Voting, 14th Amendment
### (42 U.S.C. § 1983)
### (All Plaintiffs and Plaintiffs Subclasses A, B, C)
### (Against Defendant Merrill, Defendant Noblin, and Defendant Class)

173.     Plaintiffs reallege the facts set forth in paragraphs 1-160, above.

174.     "There is no right more basic in our democracy than the right to participate in electing our political leaders." *McCutcheon v. FEC*, 134 S. Ct. 1434, 1440-41 (2014). The Supreme Court has recognized that "voting is of the most fundamental significance under our constitutional structure" and the right to an effective vote is protected by the Equal Protection Clause of the Fourteenth Amendment. *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (internal quotation marks omitted). Indeed, the right to vote is the "fundamental political right . . . preservative of all rights." *Reynolds v. Sims*, 377 U.S. 533 (1964) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356 (1886)).

175.     The Supreme Court has held that a citizen cannot be denied the right to vote absent a compelling state interest. *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621 (1969) (holding unconstitutional a law that denied the right to vote in school board elections to those who were not parents or custodians of children in the local public schools and who did not own or lease taxable real property in the district because it did not "sufficiently further a compelling state interest to justify denying the franchise"); *see also Dunn v. Blumstein*, 405 U.S. 30 (1972) (striking down a

lengthy residency requirement); *Carrington v. Rash*, 380 U.S. 89 (1965) (striking down an exclusion of military residents).[2]

176.    Section 2 of the Fourteenth Amendment provides as follows:

Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, *except for participation in rebellion, or other crime,* the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.

(emphasis added).

177.    Even if Section 2 implicitly sanctions some criminal disenfranchisement, *see Richardson v. Ramirez*, 395 U.S. 621 (1969), the exception for "participation in rebellion, or other crime," cannot be reasonably read in light of its textual context and history to sanction disenfranchisement for *any* crime.

178.    *Richardson v. Ramirez* did not address the question of the breadth of "other crime" in Section 2 of the Fourteenth Amendment.

179.    The most appropriate reading of "other crime" in light of its paradigm case, rebellion, is to limit Section 2's affirmative sanction to crimes that are meaningfully connected to the political act of voting such as treason, bribery, or perjury.

---

[2] This Court is bound to follow Supreme Court precedent holding that the right to vote is not among the privileges or immunities of United States citizenship protected by Section 1 of the Fourteenth Amendment. *Minor v. Happersett* 88 U.S. (21 Wall.) 162 (1874). Accordingly, plaintiffs do not seek relief from this Court based on the Privileges or Immunities Clause at this time. However, Plaintiffs preserve the allegation that the right to vote is protected by both the Equal Protection Clause and the Privileges or Immunities Clause because either *Minor v. Happersett* was wrongly decided, or it has been superseded by subsequent Amendments and development of federal constitutional law. Therefore, all allegations related to the infringement of the right to vote pursuant to the Fourteenth Amendment incorporate both Equal Protection and Privileges or Immunities allegations.

42

180. Prior to the Civil War, Alabama only disenfranchised those convicted of precisely these crimes. The 1819 Constitution provided that only those convicted of "bribery, perjury, forgery, or other high crimes or misdemeanors" lost their right to vote. Ala. Const. of 1819, art. VI, § 5. The term of art "high crimes or misdemeanors" was at that time and still is generally understood to be limited to political crimes involving the abuse of public office.

181. The breadth of Section 2 of the Fourteenth Amendment's sanction, at least in Alabama, should be limited to the disenfranchising crimes in Alabama's 1819 Constitution, which are reasonably connected to the political act of voting and were the disenfranchising crimes in Alabama at the time of the Fourteenth Amendment's drafting.

182. None of the Plaintiffs or members of Subclass A have been convicted of the limited political crimes that were disenfranchising under the 1819 Constitution; therefore, their disenfranchisement on the sole basis of their convictions denies them access to the political franchise and equal protection of the laws in violation of the Fourteenth Amendment.

183. In the alternative, at minimum, the use of the paradigm case of "rebellion," a serious and dangerous crime, counsels that "other crime" must be restricted to common law felonies and/or particularly serious crimes.

184. Alabama's disenfranchisement of all those convicted of "felonies involving moral turpitude," as it is now amorphously applied, does not meet this standard however it is defined. The 2005 Attorney General Opinion lists, for example, possession of marijuana for resale, codified at Alabama Code Section 13A-12-213, as a crime of moral turpitude. It is a class C felony, until recently the least serious of the three categories of felonies and now the second to least serious category of felonies. Ala. Code § 13A-5-3 (adding class D felonies as of Jan. 30, 2016). The presumptive punishment for this crime alone is a non-prison punishment.

185.     Serious crimes, akin to rebellion, may be defined in reference to common law felonies at the time of the Fourteenth Amendment's adoption. These are limited to murder, manslaughter, arson, burglary, robbery, rape, sodomy, mayhem, and larceny. *Jerome v. United States*, 318 U.S. 101, 108 n.6 (1943). This construction is supported not only by the text but also by the historical record. The Reconstruction Act of 1867 limited criminal disenfranchisement to "participation in the rebellion or for felony at common law," Reconstruction Act of Mar. 2, 1867, ch. CLII (1867), and the Readmission Acts for each of the readmitted states, including Alabama, also limited criminal disenfranchisement for "such crimes as are now felonies at common law." *See* Act of June 22, 1868, c. 69 15 Stat. 71; Act of June 25, 1868, c. 70, 15 Stat. 73; Act of Jan. 26, 1870, c. 10, 16 Stat. 62; Act of Feb. 1, 1870, c. 12, 16 Stat. 63; Act of Feb. 23, 1870, c. 19, 16 Stat. 7; Act or Mar. 30, 1870, c. 39, 16 Stat. 80; Act of July 15, 1870, c. 299, 16 Stat. 363.

186.     Plaintiffs Melissa Swetnam, Antwoine Giles, and Mario Dion Yow, and all members of Subclass B were not convicted of crimes considered felonies at common law; therefore, their disenfranchisement on the sole basis of their convictions denies them access to the political franchise and equal protection of the laws in violation of the Fourteenth Amendment.

187.     Serious crimes, akin to rebellion, may also be defined in reference to Alabama's own standards and limited to class A felonies, the top tier of felonies according to the State of Alabama.

188.     Plaintiffs Treva Thompson, Melissa Swetnam, Antwoine Giles, Larry Joe Newby, and Jennifer Zimmer, and all members of Subclass C have not been convicted of any class A felonies under Alabama law; therefore, their disenfranchisement on the sole basis of their convictions denies them access to the political franchise and equal protection of the laws in violation of the Fourteenth Amendment.

44

**Count 5: Non-Racial Discrimination in Voting, 1st Amendment**
**(42 U.S.C. § 1983)**
**(All Plaintiffs and Plaintiffs Subclasses A, B, C)**
**(Against Defendant Merrill, Defendant Noblin, and Defendant Class)**

189.    Plaintiffs reallege the facts set forth in paragraphs 1-160, above.

190.    Voting and participating in the election process is a form of speech and expression. It is the ultimate form of political speech and association and is entitled to First Amendment protection.

191.    As a restriction on free speech and association, Section 177(b)'s denial of the right to vote to citizens convicted of crimes that are not crimes related to the political act of voting, felonies at common law, or class A felonies under Alabama law, violates the First Amendment.

**Count 6: Unconstitutional Burden on the Right to Vote, 14th Amendment**
**(42 U.S.C. § 1983)**
**(All Plaintiffs except Plaintiff King and Plaintiff Subclasses D, E, F)**
**(Against Defendant Merrill, Defendant Noblin, and Defendant Class)**

192.    Plaintiffs reallege the facts set forth in paragraphs 1-160, above.

193.    Alabama citizens who have not been convicted of felonies involving moral turpitude are entitled to vote under Alabama law and the Fourteenth Amendment protects that right.

194.    When analyzing the constitutionality of a restriction on voting, the Court "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration

'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

195. When the right to vote is "subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'" *Burdick*, 504 U.S. at 434 (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). "But when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Id.* at 434 (quoting *Anderson*, 460 U.S. at 788).

196. The federal and state voter registration forms for Alabama require Alabama citizens to sign under penalty of perjury that they have not been convicted of a "felony involving moral turpitude" (federal form) or a "disqualifying crime" (state form).

197. Neither the federal nor state voter registration forms for Alabama provide additional information about what constitutes a felony involving moral turpitude or a disqualifying crime. Neither form provides any examples of disqualifying or non-disqualifying crimes. A reasonable person cannot determine whether her felony conviction "involves moral turpitude" or is "disqualifying" under state law.

198. The failure to define or list disqualifying crimes or crimes of moral turpitude imposes an unconstitutional burden on those qualified to vote under Alabama law but who have been convicted of felonies.

199. Moreover, even if Alabama citizens investigate state law, those convicted of felonies not appearing in Alabama Code Section 15-22-36.1(g)—the only available source of disqualifying crimes (but not tied to the moral turpitude standard or Section 177(b))—cannot be certain whether their conviction is disqualifying or not. Those convicted of crimes not appearing

in the 2005 Attorney General Opinion will find it even more difficult to guess (under penalty of perjury) whether they are eligible to vote.

200.    The inability to determine whether one is eligible to vote despite a prior felony conviction imposes an unconstitutional burden on those qualified to vote under Alabama law but who have been convicted of felonies.

201.    Further, Alabama's application of Section 177(b) leaves registrars, untrained in the law, with the first responsibility for determining whether a voter applicant's conviction or registered voter's conviction is disqualifying or not. Registrars have neither the power to define qualifications of electors in the State of Alabama—a task delegated to the Legislature, Ala. Const. art. VIII, § 177(b)—nor interpret the Constitution—a task delegated to the courts.

202.    This denial of the right to vote in circumstances where an Alabama registrar improperly determines that a voter applicant's crime is disqualifying also imposes an unconstitutional burden on those qualified to vote under Alabama law but who have been convicted of felonies.

203.    The burdens described above are "severe" and discriminatory. They impose significant burdens on eligible Alabama voters with felony convictions that they do not impose on other eligible Alabama voters.

204.    Defendants' application of Section 177(b) imposes an unconstitutional burden on the right to vote of eligible Alabama voters with felony convictions in violation of the Equal Protection Clause.

### Count 7: Unconstitutional Burden on the Right to Vote, 1st Amendment
### (42 U.S.C. § 1983)
### (All Plaintiffs, except Plaintiff King, and Plaintiff Subclasses D, E, F)
### (Against Defendant Merrill, Defendant Noblin, and Defendant Class)

205.    Plaintiffs reallege the facts set forth in paragraphs 1-160, above.

206. Voting and participating in the election process is a form of speech and expression. It is the ultimate form of political speech and association and is entitled to First Amendment protection.

207. For the reasons set forth in paragraphs 193 to 204, Defendants' application of Section 177(b) imposes an unconstitutional burden on the right to vote on eligible Alabama voters with felony convictions in violation of the First Amendment.

## Count 8: Deprivation of Procedural Due Process, 14th Amendment
### (42 U.S.C. § 1983)
### (Plaintiffs Treva Thompson, Melissa Swetnam, Antwoine Giles, Anna Reynolds, Larry Joe Newby, Mario Dion Yow, and Plaintiff Subclasses G and H)
### (Against Defendant Merrill, Defendant Noblin, and Defendant Class)

208. Plaintiffs reallege the facts set forth in paragraphs 1-160, above.

209. The right to vote is a form of liberty under Alabama and federal law.

210. Defendants' enforcement of Section 177(b) provides Alabama citizens with little to no pre-deprivation process before revoking their right to vote, a fundamental right protected by both the Alabama and United States Constitutions.

211. Voter registration applicants are provided with no process whatsoever pre-deprivation, and the decision regarding a citizen's eligibility under Section 177(b) is left to registrars with no legal training. Therefore, the risk of erroneous deprivation is high.

212. Voters being removed from the voter registration lists are entitled to notice and some minimal opportunity to be heard under Alabama law. Ala. Code § 17-3-56.

213. Upon information and belief, a voter applicant's notice and opportunity to be heard is not uniformly enforced in Alabama.

214.    Moreover, the Alabama Supreme Court has held that Defendants' failure to provide the necessary notice and opportunity to be heard, Ala. Code § 17-3-56, does not invalidate the deprivation. *Williams v. Lide*, 628 So.2d 531 (Ala. 1983).

215.    Any minimal process provided still allows registrars, untrained in the law, to determine the voter's eligibility under Section 177(b). Therefore, the risk of erroneous deprivation is high.

216.    Defendants' enforcement of Section 177(b) denies Plaintiffs whose names are removed from the voter registration lists or whose voter registration applications are denied on the basis of their felony convictions procedural due process in violation of the Fourteenth Amendment.

## Count 9: Void for Vagueness, 1st and 14th Amendments
### (42 U.S.C. § 1983)
### (All Plaintiffs, except Plaintiff King, and Plaintiff Subclass D)
### (Against Defendant Merrill, Defendant Noblin, and Defendant Class)

217.    Plaintiffs reallege the facts set forth in paragraphs 1-160, above.

218.    Voting and participating in the election process is a fundamental right protected by the Fourteenth Amendment.

219.    Voting and participating in the election process is also a form of speech and expression. It is the ultimate form of political speech and association and is entitled to First Amendment protection.

220.    The void for vagueness doctrine addresses two interconnected constitutional concerns: "first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not

act in an arbitrary or discriminatory way." *F.C.C. v. Fox Televisions Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012).

221.     When a regulation impinges on the right to free speech, "rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Id.*; *see also Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 870–71 (1997) ("The vagueness of [regulation of speech] raises special First Amendment concerns because of its obvious chilling effect.").

222.     The prohibition on voting for those convicted of felonies involving moral turpitude—with the possible exception of those crimes listed in Alabama Code Section 15-22-36.1(g), although that statute does not reference Section 177(b) or the moral turpitude standard—"fails to provide a person of ordinary intelligence fair notice of what is prohibited." *Fox Televisions Stations, Inc.*, 132 S. Ct. at 2317 (quoting *United States v. Williams*, 533 U.S. 285 (2008)).

223.     As such, it impermissibly chills the speech of many eligible Alabama voters.

224.     Moreover, it is so "standardless that it authorizes or encourages seriously discriminatory enforcement." *Id.* As such, it impermissibly invites and allows for discrimination with respect to access to the electoral franchise.

225.     The prohibition on voting for those convicted of felonies "involving moral turpitude" is void for vagueness under the First and Fourteenth Amendments.

### Count 10: Arbitrary Disenfranchisement, 14th Amendment
### (42 U.S.C. § 1983)
### (All Plaintiffs and Plaintiff Class)
### (Against Defendant Merrill, Defendant Noblin, and Defendant Class)

226.     Plaintiffs reallege the facts set forth in paragraphs 1-160, above.

227.     Defendants' enforcement of Section 177(b) is not guided by any principled determination of which felonies "involve moral turpitude."

228.    Defendants' enforcement of Section 177(b) irrationally disenfranchises an arbitrary set of Alabama citizens with felony convictions.

229.    Therefore, Defendants' enforcement of Section 177(b) cannot withstand even rational basis scrutiny.

230.    Moreover, Defendants' enforcement of Section 177(b) is also not uniform across the state and allows for arbitrary disenfranchisement depending on where an Alabama citizen lives within the state.

231.    "The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that another." *Bush v. Gore*, 531 U.S. 98, 105 (2000); *see, e.g.*, *Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 665 (1966) ("[O]nce the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment.").

232.    Defendants' enforcement of Section 177(b) results in arbitrary disenfranchisement of Alabama citizens in violation of the Fourteenth Amendment.

### Count 11: Retroactive Punishment, Ex Post Facto Clause
### (42 U.S.C. § 1983)
### (All Plaintiffs, except Plaintiff King, and Plaintiff Subclass D)
### (Against Defendant Merrill, Defendant Noblin, and Defendant Class)

233.    Plaintiffs reallege the facts set forth in paragraphs 1-160, above.

234.    Article 1, Section 10, of the United States Constitution prohibits States from passing ex post facto laws that impose retroactive punishments of their citizens.

235.    Section 177(b)'s permanent disenfranchisement of those convicted of "felonies involving moral turpitude," unless the citizen's rights are affirmatively restored, is inherently

51

penal. No constitutional, non-punitive rationale for limiting the rights of citizens with felony convictions to vote can support Section 177(b). *See* Pamela S. Karlan, *Convictions and Doubts: Retribution, Representation, and the Debate Over Felon Disenfranchisement*, 56 Stan. L. Rev. 1147, 1150-55 (2004).

236.    Therefore, the only potentially constitutional rationale remaining for Alabama's broad felon disenfranchisement regime is a punitive one, triggering ex post facto scrutiny. *See Smith v. Doe*, 538 U.S. 84, 92-93 (2003) (holding that "a conclusion that the legislature intended to punish would satisfy an *ex post facto* challenge without further inquiry into its effects").

237.    Moreover, the disenfranchisement of citizens has harsh punitive effects on individuals. It imposes an affirmative disability on citizens that is, in many cases, permanent, and is excessive with respect to any non-punitive purpose. *See id.* at 97 (noting that the factors most relevant to an ex post facto inquiry include whether the regulation imposes an affirmative disability or is excessive with respect to any non-punitive purpose).

238.    Since "moral turpitude" is undefined and decided on an ad hoc basis by county registrars, the imposition of Section 177(b)'s penalty is necessarily retroactive and violates the Constitution's prohibition on ex post facto laws.

### Count 12: Disenfranchisement as Cruel and Unusual Punishment, 8th Amendment (42 U.S.C. § 1983) (All Plaintiffs and Plaintiff Class) (Against Defendant Merrill, Defendant Noblin, and Defendant Class)

239.    Plaintiffs reallege the facts set forth in paragraphs 1-160, above.

240.    The Eighth Amendment "succinctly prohibits '[e]xcessive' sanctions," and the Supreme Court has held that "punishment for crime should be graduated and proportioned to [the] offense." *Atkins v. Virginia*, 536 U.S. 304, 311 (2002).

241.     Section 177(b), as enforced by Defendant Merrill and Defendant registrars, currently indiscriminately and permanently disenfranchises individuals who have been convicted of a wide-range of minor crimes including many class C felonies. It imposes the same punishment on a person convicted of murder as a person convicted of a minor drug crime.

242.     Alabama citizens like Plaintiff Thompson and many others have been convicted of crimes for which the sentencing court determined either no prison time or minimal prison time was appropriate, but nonetheless face permanent exclusion from the political franchise and thus permanent exclusion from meaningful participation in our democracy. They are sentenced, in essence, to civil death.

243.     Section 177(b) is also an outlier nationwide. Only eight other states still impose permanent disenfranchisement on any subset of citizens with felony convictions, and several of those remaining eight states more narrowly limit the subset of persons subjected to permanent disenfranchisement than Section 177(b).

244.     Section 177(b) imposes indiscriminate, unusual, and often widely disproportionate punishment on Alabama citizens in violation of the Eighth Amendment.

### Count 13: Disenfranchisement for Failure to Pay LFOs, 14th Amendment
### (42 U.S.C. § 1983)
### (Plaintiffs Treva Thompson, Melissa Swetnam, and Plaintiff Subclass I)
### (Against Defendant Walker)

245.     Plaintiffs reallege the facts set forth in paragraphs 1-160, above.

246.     A state "violates the Equal Protection Clause of the Fourteenth Amendment whenever it makes the affluence of the voter or payment of any fee an electoral standard." *Harper*, 383 U.S. at 666; *see also Johnson v. Governor of State of Florida*, 405 F.3d 1214, 1217 (11th Cir. 2005).

247. By requiring an otherwise eligible Alabama citizen to pay all legal financial obligations before she is able to restore her right to vote, Alabama Code Section 15-22-36.1(a)(3) impermissibly makes payment of fines and fees an electoral standard.

248. By requiring an otherwise eligible Alabama citizen to pay all legal financial obligations before she is able to restore her right to vote, Alabama Code Section 15-22-36.1(a)(3) impermissibly makes the affluence of an otherwise eligible voter an electoral standard.

249. Wealth "is not germane to one's ability to participate intelligently in the electoral process." *Harper*, 383 U.S. at 668.

250. Plaintiffs Treva Thompson and Melissa Swetnam, and members of Plaintiff Subclass I are unable to afford to pay their remaining legal financial obligations, and this is the only reason they are not eligible to vote in the state of Alabama.

251. It is well established that "a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn*, 405 U.S. at 336.

252. Alabama Code Section 15-22-36.1(a)(3) invidiously discriminates between Alabama citizens with prior disqualifying felonies who are able to pay their legal financial obligations and Alabama citizens with prior disqualifying felonies who are unable to pay their legal financial obligations in violation of the Fourteenth Amendment.

## Count 14: Disenfranchisement for Failure to Pay LFOs, Poll Tax, 24th Amendment
### (42 U.S.C. § 1983)
### (Plaintiffs Treva Thompson, Melissa Swetnam, and Plaintiff Subclass I)
### (Against Defendant Walker)

253. Plaintiffs reallege the facts set forth in paragraphs 1-160, above.

254. The Twenty-Fourth Amendment provides that "the right of citizens of the United States to vote in any primary or other election for President or Vice President, for electors for

President or Vice President, or for Senator or Representative in Congress, shall not be denied or abridged by the United States or any State by reason of failure to pay *any poll tax or other tax*." (emphasis added).

255. For those who are otherwise eligible to restore their right to vote, Alabama Code Section 15-22-36.1(a)(3) denies the right to vote to those who cannot afford to pay their legal financial obligations by reason of their failure to pay fines and fees to the State of Alabama.

256. Alabama Code Section 15-22-36.1(a)(3) directly conflicts with the prohibition of the Twenty-Fourth Amendment.

### Count 15: Disenfranchisement for Failure to Pay LFOs, Section 2 of the Voting Rights Act (52 U.S.C. § 10301) (Plaintiffs Treva Thompson, Melissa Swetnam, and Plaintiff Subclass I) (Against Defendant State of Alabama and Defendant Walker)

257. Plaintiffs reallege the facts set forth in paragraphs 1-160, above.

258. As a result of a long history of state-sponsored official discrimination that has led to continuing severe economic disparities between white and black residents, Alabama Code Section 15-22-36.1(a)(3) disproportionately disenfranchises black citizens with prior disqualifying convictions compared to white citizens with prior disqualifying convictions.

259. Regardless of Sections 2's application to felon disenfranchisement provisions because of Section 2 of the Fourteenth Amendment's specific sanction of criminal disenfranchisement, *see Johnson v. Governor of Florida*, 405 F.3d 1214 (11th Cir. 2005), Section 2 of the Voting Rights Act—which broadly applies to any "voting qualification or prerequisite to voting or standard, practice, or procedure"—applies to the prerequisites for voting and voting qualifications set by Alabama for those with prior disqualifying convictions; *see Allen v. State Bd.*

*of Elections*, 393 U.S. 544, 567 (1969) (noting that Section 2 was intended to have the "broadest possible scope").

260.    Alabama Code Section 15-22-36.1(a)(3) violates Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, because it results in the denial of the right to vote on account of race.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

(1) Certify the Plaintiff Class and Plaintiff Subclasses as defined in paragraphs 50 to 60.

(2) Certify the Defendant Class of all voter registrars in the State of Alabama.

(3) Issue a declaratory judgment that Section 177(b) of the Alabama Constitution, by its terms and as applied, violates the Ex Post Facto Clause of Article I of the United States Constitution, the First, Eighth, Fourteenth, and Fifteenth Amendments of the United States Constitution, and Section 2 of the Voting Rights Act, 52 U.S.C. § 10301;

(4) Issue a declaratory judgment determining that Alabama Code Section 15-22-36.1(a)(3) violates the Fourteenth and Twenty-Fourth Amendments of the United States Constitution and Section 2 of the Voting Rights Act, 52 U.S.C. § 10301;

(5) Enjoin the Defendants, their agents, employees and all those persons acting in concert or participation with them, from enforcing Section 177(b) or Alabama Code Section 15-22-36.1(a)(3), including:

   a.   enjoining Defendants from denying any voter registration applications on the basis of felony convictions;

   b.   enjoining Defendants from removing any voters from the voter registration rolls on the basis of felony convictions;

    c. requiring Defendants to restore Alabama citizens to the voter registration rolls

       if they were removed on the sole basis of their felony convictions;

    d. enjoining Defendants from denying any applications for CERVs on the basis

       of failure to pay any legal financial obligations;

    e. requiring Defendants to inform those with disqualifying convictions that the

       failure to pay legal financial obligations does not disqualify them from

       restoring their right to vote under Alabama Code Section 15-22-36.1.

(6) Award Plaintiffs their costs, expenses, and reasonable attorneys' fees incurred in the

    prosecution of this action, as authorized by the Voting Rights Act and the Civil

    Rights Attorneys Fees Awards Act of 1973, 52 U.S.C. § 10310(e) and 42 U.S.C

    § 1988;

(7) Grant such other equitable and further relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED,

J. MITCH MCGUIRE
Alabama Bar No: ASB-8317-S69M
MCGUIRE & ASSOCIATES, LLC
31 Clayton Street
Montgomery, AL 36104
(334) 517-1000
jmcguire@mandabusinesslaw.com

DANIELLE LANG (*pro hac vice* motion to be filed)
California Bar No: 304450
J. GERALD HEBERT (*pro hac vice* motion to be filed)
Virginia Bar No: 38432
CAMPAIGN LEGAL CENTER
1411 K Street NW Suite 1400
Washington, DC 20005
(202) 736-2200
dlang@campaignlegalcenter.org
ghebert@campaignlegalcenter.org

JAMES U. BLACKSHER
Alabama Bar No: ASB-2381-S82J
P.O. Box 636
Birmingham, AL 35201
(205) 591-7238
jblacksher@ns.sympatico.ca

JESSICA RING AMUNSON (*pro hac vice* motion to be filed)
District of Columbia Bar No: 497223
JENNER & BLOCK LLP
1099 New York Ave. NW, Ste. 900
Washington, DC 20001
(202) 736-6000
jamunson@jenner.com

PAMELA KARLAN (*pro hac vice* motion to be filed)
New York Bar No: 2116994
STANFORD LAW SCHOOL
559 Nathan Abbott Way
Stanford, CA 94305
(650) 725-4851
karlan@stanford.edu

ADERSON B. FRANCOIS (*pro hac vice* motion to be filed)
District of Columbia Bar No: 498544
PATRICK LLEWELLYN (*pro hac vice* motion to be filed)
District of Columbia Bar No: 1033296
INSTITUTE FOR PUBLIC REPRESENTATION
GEORGETOWN UNIVERISTY LAW CENTER
600 New Jersey Avenue NW
Washington, DC 20001
(202) 662-6721
abf48@georgetown.edu

ARMAND G. DERFNER (*pro hac vice* motion to be filed)
South Carolina Bar No: 1650
DERFNER & ALTMAN
575 King Street, Suite B
Charleston, S.C. 29403
(843) 723-9804
aderfner@derfneraltman.com

*Counsel for Plaintiffs and Plaintiff Class*