IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| TREVA THOMPSON, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:16-CV-783-WKW |
| | ) | [WO] |
| STATE OF ALABAMA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

## I. INTRODUCTION

Under Alabama law, an individual of voting age who commits a "felony involving moral turpitude" forfeits his or her right to vote. Ala. Const. art. VIII, § 177(b). Restoration of the right to vote is available only after the felon has completed all the terms of his or her sentence, which includes full payment of all fines, court costs, fees, and restitution. Ala. Code § 15-22-36.1 (2016). In this putative class action against the State of Alabama and its officials, Plaintiffs contend that these laws—section 177(b) of Article VIII of the Alabama Constitution of 1901, and section 15-22-36.1 of the Alabama Code—violate the federal constitution and section 2 of the Voting Rights Act, 52 U.S.C. § 10301. Plaintiffs allege that, due to their felony convictions or their financial inability to satisfy the monetary obligations associated with their convictions, they cannot vote in the State of Alabama.

In a prior Order, the court granted in part and denied in part Defendants'
motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure and
noted that a memorandum opinion would follow. (Doc. # 75.) This is that opinion.
For the reasons to follow, Counts 3, 4, 5, 6, 7, 8, 9, 10, 14, and 15 are due to be
dismissed either for failure to state a claim upon which relief can be granted or *sua
sponte* for lack of subject-matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(6), (h)(3).
But this action will proceed as to Counts 1, 2, 11, 12, and 13.

## II. JURISDICTION AND VENUE

Subject-matter jurisdiction is exercised pursuant to 28 U.S.C. § 1331, with the
exception of the counts over which this court lacks subject-matter jurisdiction for
the reasons discussed below. The parties do not contest personal jurisdiction or
venue.

## III. STANDARDS OF REVIEW

### A.  **Rule 12(b)(6)**

A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil
Procedure tests the sufficiency of the complaint against the legal standard articulated
by Rule 8 of the Federal Rules of Civil Procedure. Rule 8 provides that the complaint
must include "a short and plain statement of the claim showing that the pleader is
entitled to relief." Fed. R. Civ. P. 8(a)(2). When evaluating a motion to dismiss
pursuant to Rule 12(b)(6), the court must take the facts alleged in the complaint as

true and construe them in the light most favorable to the plaintiff. *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1321–22 (11th Cir. 2012). However, the court need not accept mere legal conclusions as true. *Id.* at 1325.

To survive a 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Additionally, notwithstanding the alleged facts, Rule 12(b)(6) "[d]ismissal is . . . permitted 'when on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action.'" *Glover v. Liggett Grp., Inc.*, 459 F.3d 1304, 1308 (11th Cir. 2006) (quoting *Marshall Cty. Bd. of Educ. v. Marshall Cty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993)); *see also Neitzke v. Williams*, 490 U.S. 319, 326–27 (1989) (explaining that Rule 12(b)(6) allows a court "to dismiss a claim on the basis of a dispositive issue of law").

**B.** **Rule 12(h)(3)**

"If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). "Rule 12(h)(3) motions are subject to the same standard as motions brought pursuant to Rule 12(b)(1)" of

the Federal Rules of Civil Procedure. *Peterson v. Cont'l Airlines, Inc.*, 970 F. Supp. 246, 248–49 (S.D.N.Y. 1997). In this case, the mootness inquiry is resolved on the complaint and the undisputed post-suit enactment of HB 282, as discussed in Part V.E., and, thus, presents a factual challenge. *See Williamson v. Tucker*, 645 F.2d 404, 413–14 (5th Cir. 1981)[1] (explaining that a factual Rule 12(b)(1) motion can be resolved as a matter of law when it implicates facts outside the pleading that are not contested).

## IV.    BACKGROUND

### A.    History of the Alabama Constitution's Disenfranchisement of Individuals Convicted of "Moral Turpitude" Crimes

In the beginning, section 182 of the Alabama Constitution of 1901 denied the right to vote to individuals convicted of "any . . . crime involving moral turpitude," be it a misdemeanor or a felony. Ala. Const. art. VII, § 182 (repealed 1996). Eighty-four years after the adoption of section 182, on a challenge to its application to misdemeanors, the U.S. Supreme Court in *Hunter v. Underwood*, 471 U.S. 222 (1985), held that section 182's "original enactment was motivated by a desire to discriminate against blacks on account of race," the impact of which had continued up to that point. *Id.* at 233. Thus, the Court struck down section 182's

---

[1] In *Bonner v. City of Prichard*, the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit issued prior to October 1, 1981. *See* 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

disenfranchisement provision as applied to misdemeanor offenses on grounds that it violated the Fourteenth Amendment's Equal Protection Clause. The Court expressly declined to decide whether section 182 "would be valid if enacted today without any impermissible motivation." *Id.*

A decade after the Court's decision in *Hunter*, the Alabama Legislature replaced section 182. In 1996, the Alabama Legislature unanimously passed Amendment 579, and the state's voters ratified the amendment thereafter. Amendment 579—hereinafter referred to and cited as section 177(b)[2]—provides that "[n]o person convicted of a felony involving moral turpitude . . . shall be qualified to vote until restoration of civil and political rights." Ala. Const. art. VIII, § 177(b). Section 177(b) thus restricted disenfranchisement to individuals convicted of felonies involving moral turpitude and effectively re-enfranchised individuals convicted of misdemeanors involving moral turpitude.

Section 177(b), the same as its predecessor, did not define "moral turpitude." The Alabama Constitution of 1901—and, until earlier this year, the Alabama Code—contained no definition of the phrase. As a result, the state's county boards of registrars had the unenviable task of sorting through "Alabama case law or, in

---

[2] In 2012, the Alabama Legislature proposed, and the voters approved, Amendment 865 to section 177. Amendment 865 added subsection (d) to section 177(b), providing that the "right of individuals to vote by secret ballot is fundamental." (*See* Doc. # 43, Ex. D (Act No. 2011-656).) The amendment did not affect the disenfranchisement provision in subsection (b).

absence of a court precedent, opinions of the Alabama Attorney General to determine whether" a given crime was a crime of moral turpitude. *Hunter*, 471 U.S. at 226; *Pippin v. State*, 197 Ala. 613, 616 (1916) (explaining, not too helpfully, that "moral turpitude" "impl[ies] something immoral in itself, regardless . . . whether it is punishable by law"). The Alabama Attorney General and the Alabama Administrative Office of Courts attempted to define the phrase in 2005, 2007, and 2008. (*See* Compl. ¶¶ 24–30, 32–35); *see generally Chapman v. Gooden*, 974 So. 2d 972, 976 (Ala. 2007) (recounting the Alabama Attorney General's 2005 opinion listing crimes that the Alabama courts have determined are crimes involving moral turpitude under § 177(b)). But, as alleged in the Complaint, this administrative guidance "is non-exhaustive, non-authoritative, vague, and internally inconsistent." (Compl. ¶ 23.)

**B.** **The Felony Voter Disqualification Act ("HB 282")**

The phrase "moral turpitude" evaded an authoritative definition until after the filing of this lawsuit. In its 2017 regular session, the Alabama Legislature defined the phrase "moral turpitude" for the first time when it unanimously passed the Felony Voter Disqualification Act, House Bill 282 ("HB 282"). Governor Kay Ivey signed HB 282 into law on May 25, 2017, and HB 282 went into effect on August 1, 2017.

HB 282, which now is codified at section 17-3-30.1 of the Alabama Code, enumerates a list of more than forty Alabama felonies that "involv[e] 'moral turpitude'" within the meaning of section 177(b). Only the Alabama felony convictions listed prohibit an individual from voting in Alabama. HB 282 sets out its purposes, which are:

> a. To give full effect to Article VIII of the Constitution of Alabama of 1901, now appearing as Section 177 of Article VIII of the Official Recompilation of the Constitution of Alabama of 1901, as amended.
>
> b. To ensure that no one is wrongly excluded from the electoral franchise.
>
> c. To provide a comprehensive list of acts that constitute moral turpitude for the limited purpose of disqualifying a person from exercising his or her right to vote.

Ala. Code § 17-3-30.1(b)(2) (2017).

## C.   Section 15-22-36.1 of the Alabama Code

Section 177(b) provides an exception to voter disqualification where the individual convicted of a felony involving moral turpitude has had his or her "civil and political rights" restored. Ala. Const. art. VIII, § 177(b). This exception leads to the second Alabama law challenged in this action, namely, section 15-22-36.1(3) of the Alabama Code.

Under section 15-22-36.1, a convicted felon can apply for a Certificate of Eligibility to Register to Vote ("CERV") from the Board of Pardons & Paroles. An individual convicted of a felony involving moral turpitude is eligible to receive a

CERV if he or she meets specified requirements, including that "[t]he person has paid all fines, court costs, fees, and victim restitution ordered by the sentencing court at the time of sentencing on disqualifying cases." Ala. Code § 15-22-36.1(a)(3). If a person meets the eligibility requirements for a CERV, issuance of the certificate is mandatory. *Id.* § 15-22-36.1(b).

## D. <u>This Lawsuit</u>

### 1. *The Parties*

The ten individual Plaintiffs are Alabama citizens who, due to their felony convictions, have been purged from the voter registration list, have been denied applications to vote, or have not registered to vote in this state based on the uncertainty of whether their convictions disqualify them to vote. The organizational Plaintiff, Greater Birmingham Ministries, expends financial and other resources to help individuals with felony convictions determine if they are eligible to vote or to have their voting rights restored. The organization's central goal is "the pursuit of social justice in the governance of Alabama." (Compl. ¶ 62.)

Plaintiffs also seek to certify a class of Plaintiffs defined as: "All unregistered persons otherwise eligible to register to vote in Alabama who are now, or who may in the future be, denied the right to vote because they have been convicted of a felony." (Compl. ¶ 50.) The Complaint also enumerates nine subclasses of Plaintiffs.

Defendants are the State of Alabama, Alabama's Secretary of State, the Chair of the Board of Registrars for Montgomery County, and a Defendant class consisting of "[a]ll voter registrars in the State of Alabama." (Compl. ¶ 68.) The individual Defendants are sued in their official capacities only.

### 2. *The Claims*

The phrase "moral turpitude" is at the forefront of Counts 1 through 12, which challenge section 177(b) of the Alabama Constitution on federal constitutional and statutory grounds. Section 15-22-36.1 is the focus of the federal constitutional and statutory challenges in Counts 13 through 15.

In Counts 1 through 12, Plaintiffs bring a multitude of challenges against section 177(b). They contend that section 177(b) is racially discriminatory (Counts 1, 2), denies black voters equal opportunity to participate in the political process (Count 3), denies the franchise to Plaintiffs without a compelling state interest (Count 4), restricts free speech and association (Count 5), and burdens the right to vote (Counts 6, 7). Plaintiffs contend further that section 177(b) disqualifies voters without due process (Count 8), is vague, arbitrary, and irrational (Counts 9, 10), is an *ex post facto* law that retroactively punishes citizens (Count 11), and imposes cruel and unusual punishment (Count 12). These counts allege violations under the First Amendment, the Eighth Amendment, the Fourteenth Amendment's Equal

Protection and Due Process clauses, the Fifteenth Amendment, and section 2 of the Voting Rights Act, 52 U.S.C. § 10301 ("VRA").

In Counts 13 through 15, Plaintiffs allege that section 15-22-36.1(a)(3) transforms the ability to pay into an electoral standard, imposes a poll tax on voting, and denies black citizens the right to vote, in violation of the Fourteenth Amendment's Equal Protection Clause, the Twenty-Fourth Amendment, and section 2 of the VRA, respectively. Specifically, two of the individual Plaintiffs allege that they cannot meet the eligibility requirements for voting because they "are unable to afford to pay their remaining legal financial obligations." (Compl. ¶ 250.)

Plaintiffs ask for a declaratory judgment that section 177(b) of the Alabama Constitution, on its face and as applied, violates the First, Eighth, Fourteenth, and Fifteenth Amendments to the U.S. Constitution, the *Ex Post Facto* Clause of Article I of the U.S. Constitution, and section 2 of the VRA. They also seek a declaratory judgment that section 15-22-36.1(a)(3) of the Alabama Code violates the Fourteenth and Twenty-Fourth Amendments to the U.S. Constitution and section 2 of the VRA.

### 3. *The Order Denying Plaintiffs' Motion for Preliminary Injunction*

After the enactment of HB 282, Plaintiffs moved for a preliminary injunction. They argued that Defendants "ha[d] refused to take any meaningful action to implement HB 282" prior to the voter registration deadline of July 31, 2017, for the special election for the U.S. Senate seat in Alabama. (Doc. # 56, at 7.) Plaintiffs

sought preliminary injunctive relief for those individuals "whose voting rights under Section 177 of the [Alabama] Constitution ha[d] been affirmed by HB 282." (Doc. # 56 at 7.) Plaintiffs moved this court to require Defendants to reinstate HB 282 voters—voters who had lost the right to vote in the past two years, but whose eligibility was affirmed by HB 282—to the voter registration rolls and provide them with individualized notice of their eligibility to vote.

After briefing and a hearing, the court denied the motion in an opinion entered on July 28, 2017, finding that Plaintiffs had not met their high burden for obtaining a mandatory preliminary injunction. Plaintiffs had failed to demonstrate that any of the preliminary injunction factors weighed in their favor. Of significance here, the court found that HB 282, which clarified for Plaintiffs whether their Alabama felony convictions qualified as felonies "involving moral turpitude" under section 177(b), mooted their vagueness challenges (Counts 6 through 10) to section 177(b)'s moral turpitude phrase.[3] The claims' mootness is a jurisdictional flaw that precludes a

---

[3] Plaintiffs' preliminary injunction motion focused only on Counts 6–10. At the heart of these counts is a constitutional challenge that section 177(b)'s phrase "moral turpitude" is so vague that it fails to provide reasonable guidelines for determining whether a felony conviction "involves moral turpitude." (*See, e.g.*, Compl. ¶ 198 ("The failure [of the State of Alabama] to define . . . crimes of moral turpitude imposes an unconstitutional burden on those qualified to vote under Alabama law but who have been convicted of felonies." (Count 6)); Compl. ¶ 207 (incorporating ¶ 198 into Count 7); Compl. ¶ 211 ("[T]he risk of erroneous deprivation [of procedural due process] is high" because county registrars, with no legal training, must interpret § 177(b) in order to determine a citizen's eligibility to vote (Count 8)); Compl. ¶¶ 222, 224, 225 (§ 177(b)'s "prohibition on voting for those convicted of felonies involving moral turpitude—with possible exception of those crimes listed in Alabama Code Section 15-22-36.1(g)"—is standardless, does not provide fair notice of the conduct prohibited, and is void for vagueness (Count 9)); Compl. ¶ 227 ("Defendants' enforcement of Section 177(b) is not guided by a principled determination of

merits resolution of these claims. The court found that, because Counts 6, 7, 8, 9, and 10 are moot, Plaintiffs could not demonstrate a substantial likelihood of success on the merits and, thus, could not prevail on their preliminary injunction motion.

## V. DISCUSSION

### A.   Counts 1 and 2:   Fourteenth and Fifteenth Amendments (Intentional Racial Discrimination)

In Counts 1 and 2, Plaintiffs contend that section 177(b) of the Alabama Constitution—which disenfranchises individuals convicted of felonies "involving moral turpitude"—violates the Fourteenth Amendment's Equal Protection Clause and the Fifteenth Amendment because racial discrimination motivated its enactment.

"A state's decision to permanently disenfranchise convicted felons does not, in itself, constitute an Equal Protection violation." *Johnson v. Governor of State of Florida*, 405 F.3d 1214, 1217 (11th Cir. 2005) (en banc) (citing *Richardson v. Ramirez*, 418 U.S. 24, 53–55 (1974)). However, states cannot promulgate felon disenfranchisement laws "with the intent to deprive one racial group of its right to participate in the political process." *Id.* at 1218.

The U.S. Supreme Court has articulated a two-step procedure for analyzing whether a disenfranchisement law violates the Equal Protection Clause.[4]   First, the

_____

which felonies 'involve moral turpitude'" and, thus, has resulted in a system of arbitrary disenfranchisement in violation of the Fourteenth Amendment (Count 10)).)

   [4] Proof of racially discriminatory intent also is required to establish a violation of the Fifteenth Amendment. *See Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 481 (1997) ("Our decisions . . . have made clear that action by a State that is racially neutral on its face violates the

12

inquiry focuses on whether racially discriminatory intent was a "'substantial or motivating factor'" for the law's enactment that "continues to this day to have that effect." *Hunter v. Underwood*, 471 U.S. 222, 227–28 (1985). Second, "[o]nce racial discrimination is shown to have been a 'substantial' or 'motivating' factor behind enactments of law, the burden shifts [from the plaintiff] to the law's defenders to demonstrate that the law would have been enacted without this factor." *Id.* at 228 (applying this standard on review of a judgment after a trial on the merits); *see also Johnson*, 405 F.3d at 1222–23 (applying the *Hunter* Court's two-step test in reviewing a summary judgment ruling). This two-part procedure is an evidentiary standard. Only the first step is relevant at the Rule 12(b)(6) motion-to-dismiss stage, where the pleadings are under scrutiny. *See Hayden v. Paterson*, 594 F.3d 150, 163 n.11 (2d Cir. 2010) (noting that *Hunter*'s burden-shifting analysis did not apply on an appeal from judgment on the pleadings and that the "only concern [was] the first step in this analysis" ("[E]stablishing [a] prima facie case under [the] burden-shifting scheme applicable to employment discrimination claims 'is an evidentiary standard, not a pleading requirement . . . .'" (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002))).

---

Fifteenth Amendment only if motivated by a discriminatory purpose" (quoting *City of Mobile v. Bolden*, 446 U.S. 55, 62 (1980) (plurality opinion))). Hence, the court addresses Counts 1 and 2 under the same analytical framework.

Based on the foregoing principles, to survive Rule 12(b)(6) scrutiny, the Complaint must contain plausible allegations that racial discrimination motivated the enactment of Alabama's disenfranchisement provision. The U.S. Supreme Court has articulated six non-exhaustive factors that are probative of discriminatory intent. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). Those factors are: (1) "[t]he impact of the official action—whether it bears more heavily on one race than another"; (2) the historical context of the law, (3) the events leading up to the challenged decision; (4) departures from normal procedures; (5) departures from typical substantive, decision-making practices; and (6) "[t]he legislative or administrative history . . . , especially contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Id.* at 266–68.

Here, without suggesting any view on whether Plaintiffs ultimately will be able to prove intentional discrimination and having considered Defendants' arguments, the court finds, under *Arlington Heights*, that the law's impact, its historical context, and the events leading up to the enactment of section 177(b) are sufficient to allege plausibly a discriminatory intent to disenfranchise black voters. First, Plaintiffs have alleged sufficient facts of a disproportionate impact of section 177(b) on the black voting-age population, as compared to the white voting-age population. According to the allegations, section 177(b) disenfranchises 15% of the

black voting-age population in Alabama but only 5% of the white voting-age population. (Compl. ¶ 136.) Hence, the black voting-age population is three times as likely as the white voting-age population to suffer disenfranchisement under section 177(b). (*See also* Compl. ¶ 122 (stating that in 1995 "roughly 70 percent of Alabamans in prison were black").)

Second, Plaintiffs have summarized the undisputed "well established and documented" history of racially motivated disenfranchisement laws in Alabama. (Compl. ¶¶ 93–105.) It is alleged that, Southern states, including Alabama, have used felon disenfranchisement dating back to Reconstruction "as a means of achieving the wholesale disenfranchisement of blacks." (Compl. ¶ 93.) Significantly, the Supreme Court's decision in *Hunter*, as recounted in the Complaint and elsewhere in this opinion, evidences that the Alabama Constitutional Convention of 1901 purposely produced a post-Reconstruction state constitution intended to discriminatorily disenfranchise the state's black voting-age population. (Compl. ¶¶ 94–100); *see also Hunter*, 471 U.S. at 229 (observing that the Alabama Constitutional Convention of 1901 was "part of a movement that swept the post-Reconstruction South to disenfranchise blacks"). This historical context cannot be ignored.

Third, as to the sequence of events leading up to section 177(b), Plaintiffs allege that the racially discriminatory animus motivating the adoption in the 1901

Alabama Constitution of section 182's provision disenfranchising individuals convicted of "any . . . crime involving moral turpitude" infects section 177(b) because section 177(b) lifts the phrase "moral turpitude" directly from the 1901 Alabama Constitution. (Compl. ¶ 164.) Plaintiffs contend that the legislature's adoption of the phrase "moral turpitude" as the disenfranchising guidepost in section 177(b), without clarification of the phrase's meaning and denunciation of its racial heritage, makes it plausible that its motives included a racially impermissible one. In particular, Plaintiffs point out that an Alabama official criticized the inclusion of the phrase "moral turpitude" as having a dubious, ignoble usage and history" and its inclusion in section 177(b) as being "suspect." (Compl. ¶ 121 (noting that an attorney, while employed by a state agency, criticized the inclusion of the phrase "moral turpitude" in section 177(b) as being "suspect" and as having a "dubious, ignoble usage and history").)

These allegations show a connection between the past and the present that is sufficient to nudge the Fourteenth and Fifteenth Amendment claims "across the line from conceivable to plausible," *Twombly*, 550 U.S. at 570, even if it appears "that a recovery is very remote and unlikely," *id.* at 556 (citations and internal quotation marks omitted). It is undisputed that racial animus motivated Alabama lawmakers in 1901 to disenfranchise black voters under the guise of a facially neutral law. Whether the modern-day circumstances that Plaintiffs allege—the law's allegedly

continued disproportionate impact on the black voting-age population and section 177(b)'s reincorporation of a purportedly standardless standard (*i.e.*, "moral turpitude")—are enough to prevail on the merits of the Fourteenth Amendment equal protection and Fifteenth Amendment claims is not the question today. At this phase, when the well-pleaded facts are taken as true, Plaintiffs have alleged "enough to raise a right to relief above the speculative level," *id.* at 555, and that is sufficient for the claims to survive Rule 12(b)(6) scrutiny and to proceed to the discovery phase where an evidentiary sifting on intent will occur.

Defendants persist, though, that the Eleventh Circuit's en banc decision in *Johnson v. Governor of State of Florida*, 405 F.3d 1214 (11th Cir. 2005), compels a contrary finding. In *Johnson*, which was on appeal from a summary judgment ruling, the Eleventh Circuit rejected an equal protection claim that racial animus motivated the adoption of Florida's 1968 reenactment of a century-old disfranchisement law. *Johnson*, at least presently, is distinguishable on three grounds.

First, the cases are in different procedural postures. Here, it is the pleading's allegations that are subject to scrutiny, not summary judgment evidentiary submissions. *See El-Amin v. McDonnell*, No. 3:12-CV-00538-JAG, 2013 WL 1193357, at *4 (E.D. Va. Mar. 22, 2013) (denying a Rule 12(b)(6) motion to dismiss and distinguishing the *Johnson* decision on grounds that it was decided after "the

parties filed summary judgment motions and submitted evidence, which is the appropriate time to determine whether the parties' historical arguments stand up to scrutiny and what weight to afford them"). Indeed, the *Johnson* defendants suffered defeat on Rule 12(b)(6) review. The district court denied the motions to dismiss in a succinct order barely exceeding two pages. *See Johnson v. Bush*, 1:00-cv-03542-JLK (S.D. Fla. Jan. 30, 2001) (order denying defendants' motion to dismiss).

Second, there was no evidence in *Johnson* that Florida's 1868 constitutional provision disenfranchising felons was the product of racial discrimination. *Johnson*, 405 F.3d at 1216; *see also id.* (observing that the "plaintiffs' own historical expert conceded that prior to the instant case, no historian who had studied Florida's 1868 Constitution had ever contemplated that the 1868 criminal disenfranchisement provision was enacted with discriminatory intent"). Here, the racial animus underlying the 1901 Alabama Constitution's disenfranchisement law not only is pleaded, but also is a fact judicially established by the highest court in the land. *See, e.g.*, *Hunter*, 471 U.S. at 233 (Section 182's "original enactment was motivated by a desire to discriminate against blacks on account of race."). Third, unlike Plaintiffs here, the *Johnson* plaintiffs did not allege that "racial discrimination motivated the adoption of Florida's 1968 felon disenfranchisement law," *Johnson*, 405 F.3d at 1220, and they "concede[d] that the 1968 provision was not enacted with discriminatory intent," *id.* at 1223. There is no such concession here.

Reviewing the well-pleaded allegations in the light most favorable to Plaintiffs and applying the *Arlington Heights* factors, the court finds that the Complaint states an actionable claim for intentional discrimination under the Fourteenth Amendment's Equal Protection Clause and the Fifteenth Amendment. Accordingly, Defendants' motion to dismiss Counts 1 and 2 is due to be denied.

## B.     Count 3:  Section 2 of the VRA

In Count 3, Plaintiffs allege that Alabama's enforcement of section 177(b) of the Alabama Constitution impermissibly abridges the right to vote based on race, both through its purpose and results.  They bring this claim under section 2 of the VRA.

Section 2 of the VRA prohibits states and their political subdivisions from enforcing any "qualification or prerequisite to voting" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color."  52 U.S.C. § 10301(a).  Section 2 encompasses claims that a voting practice results in racial discrimination and claims that a voting practice is purposefully racially discriminatory.[5]  *See McMillan v. Escambia County*, 748 F.2d 1037, 1046 (5th Cir. 1984) ("Congress intended that fulfilling either the more

---

[5] After the U.S. Supreme Court interpreted section 2 of the VRA to cover only practices that were intentionally discriminatory, *see Mobile v. Bolden*, 446 U.S. 55 (1980), Congress amended the VRA in 1982 to permit a plaintiff to challenge a voting practice under a results test. *See Chisom v. Roemer*, 501 U.S. 380, 395 (1991) (explaining that section 2 adopted a results test, "thus providing that proof of discriminatory intent is no longer necessary to establish any violation of the section").

restrictive intent test or the results test would be sufficient to show a violation of section 2."); *Greater Birmingham Ministries v. Merrill*, No. 2:15-CV-02193-LSC, 2017 WL 2903197, at *2 (N.D. Ala. July 7, 2017).

Relying on the Eleventh Circuit's decision in *Johnson*, 405 F.3d at 1214, Defendants contend that Plaintiffs' section 2 claim is not cognizable as a results claim or as a purposeful-discrimination claim. In *Johnson*, the Eleventh Circuit held that section 2 of the VRA did not apply to Florida's felon-disenfranchisement law. After reviewing the congressional record accompanying amendments to the VRA, it reasoned, "Congress never intended the [VRA] to reach felon disenfranchisement provisions." *Id.* at 1232; *see also id.* at 1234 ("Congress has expressed its intent to *exclude* felon disenfranchisement provisions from Voting Rights Act scrutiny."). The Eleventh Circuit sought to avoid a construction of the VRA that conflicted with the U.S. Constitution. It explained that interpreting section 2 of the VRA to "prohibit a practice that the Fourteenth Amendment permits," namely, a state's enactment of a felon-disenfranchisement law, would "raise[] grave constitutional concerns" by effectuating a federal statutory override of the U.S. Constitution. *Id.* at 1232.

Plaintiffs propose two avenues to get around the *Johnson* decision. First, they contend that the *Johnson* decision does not foreclose a section 2 purposeful-discrimination claim. (Doc. # 48, at 25.) Although the *Johnson* court's discussion focuses on a section 2 results claim, the court's pronouncements do not appear to

leave a path under section 2 of the VRA for a purposeful-discrimination challenge to a felon-disenfranchisement law. The court's holding, which excluded Florida's disenfranchisement law from section 2's reach, emanated from a perception that Congress did not intend for the VRA to apply *at all* to felon-disenfranchisement laws.[6] At least two circuits have interpreted the *Johnson* decision as precluding categorically any challenge to a felon-disenfranchisement law under section 2 of the VRA. *See Farrakhan v. Gregoire*, 623 F.3d 990, 993 (9th Cir. 2010) (en banc) (per curiam) (stating that the Eleventh Circuit in *Johnson* "concluded that felon disenfranchisement laws are categorically exempt from challenges brought under section 2 of the VRA" (citing *Johnson*, 405 F.3d at 1234); *Simmons v. Galvin*, 575 F.3d 24, 31 (1st Cir. 2009) (observing that, in *Johnson*, "the Eleventh Circuit concluded in an en banc decision that *all* felon disenfranchisement claims are excluded from the scope of § 2 of the VRA" (emphasis added) (citing *Johnson*, 405 F.3d at 1214)).

Second, Plaintiffs argue that the *Johnson* decision does not foreclose a section 2 results claim where, as here, the "discriminatory result . . . involves more than simple disproportionality." (Doc. # 48, at 26.) Their argument finds some support

---

[6] The *Johnson* court was clear, though, that "states cannot use disenfranchisement provisions to discriminate intentionally on the basis of race." 405 F.3d at 1230 (citing *Hunter*, 471 U.S. at 222). It said, "[P]laintiffs have a remedy if the state's provision violates the Equal Protection Clause," *id.* at 1230, a remedy that Plaintiffs pursue in this litigation.

in the Ninth Circuit's case law.  *Compare Farrakhan v. Washington*, 338 F.3d 1009, 1014–15 (9th Cir. 2003) ("*Farrakhan I*") (holding that section 2 of the VRA applied to Washington's felon-disenfranchisement law), *with Gregoire*, 623 F.3d at 992–93 (expressing doubt as to the validity of *Farrakhan I*'s holding but concluding that "plaintiffs bringing a section 2 VRA challenge to a felon disenfranchisement law based on the operation of a state's criminal justice system must at least show that the criminal justice system is infected by *intentional* discrimination or that the felon disenfranchisement law was enacted with such intent").  Regardless, Plaintiffs' argument finds no sustenance in the pages of the Eleventh Circuit's *Johnson* decision.

In sum, the Eleventh Circuit's decision in *Johnson* forecloses Plaintiffs' claim under section 2 of the VRA.  Accordingly, Count 3 is due to be dismissed.

## C.     Count 4:  Fourteenth Amendment (Fundamental Right)

In Count 4, Plaintiffs allege that section 177(b) impermissibly burdens their fundamental right to vote in violation of the Equal Protection Clause of the Fourteenth Amendment.  They advocate that, under the standard of strict scrutiny, Defendants must show a compelling state interest and narrow tailoring to further that interest in order to justify section 177(b)'s disenfranchisement of individuals convicted of felonies involving moral turpitude.

Relying principally on the Supreme Court's decision in *Richardson v. Ramirez*, 418 U.S. 24 (1974), Defendants argue that Plaintiffs, as convicted felons, do not have a fundamental right to vote. In its prior Order denying Plaintiffs' motion for preliminary injunction, this court rejected the argument that Plaintiffs, as convicted felons, have a fundamental right to vote. It explained that, absent a disenfranchisement classification that discriminates based on race or another suspect class,

> [a] state's decision to deprive some convicted felons, but not others, of voting rights is not subject to a strict scrutiny standard. In *Richardson v. Ramirez*, 418 U.S. 24 (1974), the Supreme Court upheld a California statute disenfranchising felons convicted of "infamous crimes," holding that, notwithstanding the guarantee of equal protection in [s]ection 1 of the Fourteenth Amendment, the reduced-representation clause in [s]ection 2 permitted the state to disenfranchise felons. *See id.* at 52–55. The Court rejected the petitioners' argument that the statute limiting their voting rights was subject to strict scrutiny. It reasoned that states can disenfranchise felons on the "demonstrably sound proposition that [section] 1, in dealing with voting rights as it does, could not have been meant to bar outright a form of disenfranchisement which was expressly exempted from the less drastic sanction of reduced representation which [section] 2 imposed for other forms of disenfranchisement." *Id.* at 55.

> The Third, former Fifth, Sixth, and Ninth Circuits have interpreted *Richardson*'s analysis of the interplay between [s]ections 1 and 2 of the Fourteenth Amendment as immunizing felon-disenfranchisement provisions from strict scrutiny under the Equal Protection Clause. In *Owens v. Barnes*, 711 F.2d 25 (3d Cir. 1983), which addressed a challenge that Pennsylvania's law disenfranchising convicted felons during their incarceration violated equal protection, the Third Circuit held that *Richardson* compelled the conclusion that "the right of convicted felons to vote is not fundamental." *Id.* at 27 (citing *Richardson*, 418 U.S. at 654). It held that "the state cannot only

disenfranchise all convicted felons but it can also distinguish among them provided that such distinction is rationally related to a legitimate state interest." *Id.* Pennsylvania could have rationally concluded that one of the losses attendant to incarceration should be the loss of "participation in the democratic process" and that incarcerated and un-incarcerated felons did not stand on equal footing for purposes of voting rights. *Id.* at 28. The Sixth Circuit aligned with *Owens*, holding that "[i]t is undisputed that a state may constitutionally disenfranchise convicted felons," [*Wesley v. Collins*, 791 F.2d 1255, 1261 (6th Cir. 1986)] (citing *Richardson*, 418 U.S. at 24), and that "the right to vote is not fundamental," *id.* (citing *Owens*, 711 F.2d at 27).

The Ninth Circuit emphasized that, as for their equal protection claim, the plaintiffs could not "complain about their loss of a fundamental right to vote because felon disenfranchisement is explicitly permitted under the terms of *Richardson*, [4]18 U.S. at 55." *Harvey v. Brewer*, 605 F.3d 1067, 1079 (9th Cir. 2010). It explained that it would "not apply strict scrutiny as [it] would if plaintiffs were complaining about the deprivation of a fundamental right." *Id.* Finally, in *Shepherd v. Trevino*, 575 F.2d 1110, 1114–15 (5th Cir. 1978), the former Fifth Circuit applied the rational-basis test, rather than strict scrutiny, to a state statutory scheme that disenfranchised all convicted felons, but that provided a mechanism [through the state] for the restoration of voting rights only to those who were convicted in state court, not federal court.

*Thompson v. Alabama*, No. 2:16-CV-783-WKW, 2017 WL 3223915, at *6 n.3 (M.D. Ala. July 28, 2017). Based on this court's prior ruling and the well-reasoned decisions of the Third, former Fifth, Sixth, and Ninth Circuits, section 177(b)—Alabama's disenfranchisement law—is not subject to a fundamental rights equal protection analysis.

In their briefing, however, Plaintiffs seek to avoid this court's prior ruling. Count 4, they say, "present[s] a question never addressed by either the Supreme

Court or the Eleventh Circuit" because the *Richardson* Court did not decide "which crimes fall under Section 1's 'affirmative sanction' of disenfranchisement." (Doc. # 48, at 43–44 (citing *Richardson*, 418 U.S. at 24).) Plaintiffs argue that they can prove that the phrase "other crime" in section 2 of the Fourteenth Amendment "does not extend to the crimes for which [they] were convicted." (Doc. # 48, at 118.) Plaintiffs' proffered construction of "other crime" would take their voting rights out of the reach of *Richardson*'s holding and put those rights back in the fundamental rights framework. But Plaintiffs' failure to cite any supporting case law exemplifies the novelty of the theory. And the Ninth Circuit decision upon which Plaintiffs rely to argue that the "Supreme Court has not addressed [the] scope of [the] affirmative sanction in § 2" rejected a restricted definition of "other crimes." *Harvey*, 605 F.3d at 1075 ("At bottom, plaintiffs provide absolutely no support for the proposition that the word 'crimes' meant 'common-law felonies' at the time of the Fourteenth Amendment's ratification."). The court declines to take Plaintiffs' novel path and restrict felon disenfranchisement to the narrow circumstances they urge.

Accordingly, Count 4—which is a claim that section 177(b) violates equal protection under the strict scrutiny standard—is not legally cognizable. Because Plaintiffs' pleading in Count 4 makes the claim therein contingent upon the application of a strict scrutiny standard of review, Count 4 is due to be dismissed.

D.   **Count 5:  First Amendment**

In Count 5, Plaintiffs allege that voting is a "form of speech and expression" and that section 177(b) violates the First Amendment because it denies felons the right to vote for crimes that are unrelated "to the political act of voting, felonies at common law, or class A felonies under Alabama law."  (Compl. ¶ 191.)

Defendants urge dismissal of Count 5, arguing that the "fundamental rights analysis that the Supreme Court held [did] not to apply to felons . . . is based jointly on the Fourteenth and First Amendment."  (Doc. # 43, at 38 (emphasis omitted) (citing *Richardson*, 418 U.S. at 24).)  Not surprisingly, Plaintiffs cite no decision in their briefing in which a court has struck down a state's felon-disenfranchisement law on First Amendment grounds.  To the contrary, as set out in the next footnote, courts confronted with First Amendment challenges to felon-disenfranchisement laws consistently have rejected such claims.  Those courts have reasoned that the First Amendment does not guarantee the right to vote, at least partly based upon the Supreme Court's rationale in *Richardson*.[7]  This court aligns with these decisions.

---

[7] *See Farrakhan v. Locke*, 987 F. Supp. 1304, 1314 (E.D. Wash. 1997) (To recognize a First Amendment claim, "the Court would have to conclude that the same Constitution that recognizes felon disenfranchisement under § 2 of the Fourteenth Amendment also prohibits disenfranchisement under other amendments . . . .  The Court is not inclined to interpret the Constitution in this internally inconsistent manner or to determine that the Supreme Court's declaration of the facial validity of felon disenfranchisement laws in *Richardson v. Ramirez* was based only on the fortuity that the plaintiffs therein did not make their arguments under different sections of the Constitution."), *rev'd in part on other grounds*, 338 F.3d 1009 (9th Cir. 2003); *accord Lawrie v. Harris*, No. CIV S-11-0698 EFB P, 2011 WL 3501000, at *3 (E.D. Cal. Aug. 9, 2011) ("The First Amendment does not guarantee felons the right to vote." (citing *Farrakhan*, 987

Accordingly, Plaintiffs' First Amendment claim in Count 5 fails on an issue of dispositive law and is due to be dismissed.

**E.     Counts 6–10 (Vagueness Challenges Under the First and Fourteenth Amendments**

In a prior Order, the court found that HB 282, which was enacted after the filing of this lawsuit, rendered Counts 6–10 moot and that this jurisdictional flaw precluded Plaintiffs from demonstrating a substantial likelihood of success on the merits for purposes of their motion for preliminary injunction.  (Doc. # 72, at 11–18.)  Because the issue of mootness was subject to review under the preliminary-injunction standard, arose from a matter outside the pleadings (*i.e.*, the undisputed enactment of HB 282), and addressed subject-matter jurisdiction, the ruling cannot apply mechanically to Defendants' pending Rule 12(b)(6) motion to dismiss.

Nonetheless, a federal court "ha[s] an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party."[8] *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006).  It must dismiss a

---

F. Supp. at 1314)); *Hayden v. Pataki*, No. 00 CIV. 8586 (LMM), 2004 WL 1335921, at *6 (S.D.N.Y. June 14, 2004) ("[T]he case law is clear that the First Amendment does not guarantee felons the right to vote."), *aff'd and remanded*, 449 F.3d 305 (2d Cir. 2006), *and aff'd and remanded sub nom. Hayden v. Paterson*, 594 F.3d 150 (2d Cir. 2010); *see Johnson v. Bush*, 214 F. Supp. 2d 1333, 1338 (S.D. Fla. 2002) ("[I]t is clear that the First Amendment does not guarantee felons the right to vote."), *aff'd on other grounds*, 405 F.3d 1214 (11th Cir. 2005).

[8] Defendants did not raise mootness as a ground for dismissal in their pending motion to dismiss, but that is because the parties completed briefing on the motion to dismiss prior to HB 282's enactment.  Defendants did raise mootness in their brief in opposition to Plaintiffs' motion for preliminary injunction.  In any event, this court can consider an issue of mootness *sua sponte*.

claim if at any time it determines that subject-matter jurisdiction is lacking. Fed. R. Civ. P. 12(h)(3). When a claim is moot, the court lacks subject-matter jurisdiction to adjudicate the claim. *See Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1182 (11th Cir. 2007); *see also Nat'l Advert. Co. v. City of Miami*, 402 F.3d 1329, 1332 (11th Cir. 2005) ("A change in the law . . . can give rise to mootness.").

For the reasons set out in the court's prior Order (Doc. # 72, at 11–18), which are incorporated here, Counts 6–10 are moot. Because the jurisdictional doctrine of mootness deprives the court of subject-matter jurisdiction over Counts 6–10, these counts will be dismissed without prejudice under Rule 12(h)(3).

## F.   Count 11 (*Ex Post Facto* Clause) and Count 12 (Eighth Amendment)

In Count 11, Plaintiffs allege that section 177(b)'s felon-disenfranchisement provision imposes retroactive criminal punishment in violation of the *Ex Post Facto* Clause of the U.S. Constitution. *See* U.S. Const. art. I, § 10. In Count 12, Plaintiffs contend that section 177(b) constitutes "cruel and unusual punishment" in violation of the Eighth Amendment to the U.S. Constitution. *See* U.S. Const. amend. VIII.

The Eighth Amendment "bans only cruel and unusual *punishment*." *Wilson v. Seiter*, 501 U.S. 294, 302 (1991). Similarly, "an ex post facto claim can only be successful if the law can be characterized 'as "*punishment*" in the constitutional sense.'" *Manocchio v. Kusserow*, 961 F.2d 1539, 1541 (11th Cir. 1992) (emphasis added) (quoting *Flemming v. Nestor*, 363 U.S. 603, 613 (1960)). The Eighth

Amendment and *Ex Post Facto* Clause focus, therefore, on proscribed forms of punishment.

The framework for analyzing whether a statute imposes punishment for purposes of the Eighth Amendment and the *Ex Post Facto* Clause is twofold. *See Smith v. Doe*, 538 U.S. 84, 92 (2003) (applying a two-step "intent-effects" test to analyze whether a state statute violated the *Ex Post Facto* Clause); *United States v. Under Seal*, 709 F.3d 257, 263 (4th Cir. 2013) (applying the *Smith v. Doe* framework to determine whether a statute imposed punishment proscribed by the Eighth Amendment). First, a court must look to the legislative intent at the time of the challenged statute's passage. If "the intention of the legislature was to impose punishment, that ends the inquiry," *Smith*, 538 U.S. at 92, and a plaintiff may proceed with the constitutional challenge. If, however, the legislature intended "to enact a regulatory scheme that is civil and nonpunitive," the court must proceed to step two and determine "whether the statutory scheme is '"so punitive either in purpose or effect as to negate"'" the legislature's civil intent. *Id.* (quoting *United States v. Ward*, 448 U.S. 242, 248–49 (1980)).

Defendants contend that Alabama's felon-disenfranchisement law does not impose punishment and thus violates neither the Eighth Amendment nor the *Ex Post Facto* Clause. There is a long line of non-binding decisions, as Defendants point out, in which courts have rejected claims that felon-disenfranchisement laws

transgress the Eighth Amendment's prohibition against cruel and unusual punishment or retrospectively increase punishment in violation of the *Ex Post Facto* Clause. These decisions rest principally on the U.S. Supreme Court's dicta in *Trop v. Dulles*, 356 U.S. 86, 96 (1958), and a historical perspective that disenfranchisement laws are non-penal regulations on voting eligibility.[9] These decisions ultimately may carry the day for Defendants, but not today.

Even if it is true that no court has found a felon-disenfranchisement law to impose unconstitutional punishment, section 177(b) requires its own analysis. Defendants' arguments stop short of applying *Smith v. Doe*'s framework to section 177(b).[10] Absent developed arguments from Defendants, the court declines to formulate the arguments, to attempt to discern the legislature's intent behind section

---

[9] In *Trop*, the U.S. Supreme Court observed that "a statute has been considered nonpenal if it imposes a disability, not to punish, but to accomplish some other legitimate governmental purpose." 356 U.S. at 595. It then cited a state's disenfranchisement of an "ordinary felon" as an example of a non-penal law that would pass muster under the *Ex Post Facto* Clause:

> A person who commits a bank robbery, for instance, loses his right to liberty and often his right to vote. If, in the exercise of the power to protect banks, both sanctions were imposed for the purpose of punishing bank robbers, the statutes authorizing both disabilities would be penal. But because the purpose of the latter statute is to designate a reasonable ground of eligibility for voting, this law is sustained as a nonpenal exercise of the power to regulate the franchise.

*Id.* at 596 (internal footnote omitted).

[10] Defendants' collection of cases sheds light on whether felon-disenfranchisement laws have "been regarded in our history and traditions as a punishment." *Smith*, 538 U.S. at 97. But that consideration is just one of many at the effects-stage of the *Smith v. Doe* analysis. That analysis becomes relevant only after a legislative intent to create a non-punitive regulatory scheme is shown at the intent-stage.

177(b)'s enactment, and to apply the multiple factors relevant to that analysis. That analysis is better left for another stage of this lawsuit, on an evidentiary record and on reasoned arguments. Defendants' motion to dismiss Counts 11 and 12 is due to be denied.

## G.    Counts 13, 14, 15:  Conditioning the Restoration of the Right to Vote upon Payment of Fines, Court Costs, Fees, and Restitution

In Counts 13, 14, and 15, Plaintiffs challenge section 15-22-36.1(a)(3) of the Alabama Code on federal constitutional and statutory grounds.  Section 15-22-36.1 provides a process for convicted felons to obtain automatic restoration of their voting rights if, among other requirements, they have "paid all fines, court costs, fees, and victim restitution ordered by the sentencing court at the time of sentencing on disqualifying cases."  Ala. Code § 15-22-36.1(a)(3).  If the convicted felon satisfies the specified statutory criteria, then the Alabama Board of Pardons and Paroles must issue him or her a "Certificate of Eligibility to Register to Vote" ("CERV").  *Id.* § 15-22-36.1(b).  Plaintiffs contend that the statutory requirement conditioning restoration of voting rights on full payment of all case-related legal financial obligations ("LFOs"[11]) discriminates based on wealth in violation of the Equal

---

[11] Plaintiffs use the term "LFOs" and define it as "including fines, fees, and restitution." (*See, e.g.*, Compl. ¶ 21.)  Because Plaintiffs do not treat or analyze differently these three enumerated components of LFOs, which are all monetary parts of their criminal sentences, the court does not either.

Protection Clause, is an impermissible poll tax that violates the Twenty-Fourth Amendment, and violates section 2 of the VRA.

Defendants submit one argument for why all three counts fail collectively. The court begins with this argument. However, because ultimately the argument fails, discussion with respect to Defendants' alternative arguments directed to the individual counts will follow.

### 1. *Alabama's Alternative Pardon Process for Restoration of Voting Rights*

Felons can bypass section 15-22-36.1's requirement of full payment of LFOs as a condition of voting restoration by applying for a pardon under section 15-22-36 of the Alabama Code. According to Defendants, "[t]he availability of a pardon under Alabama Code § 15-22-36 dooms" Counts 13, 14, and 15. (Doc. # 43, at 63.) They again rely on the Eleventh Circuit's decision in *Johnson*, 405 F.3d at 1214, to support their argument.

In *Johnson*, the plaintiffs filed a class action on behalf of all Florida citizens who had served their felony sentences, but who were ineligible to register to vote under Florida's disenfranchisement law. *See id.* at 1216. The Eleventh Circuit summarily disposed of the plaintiffs' claims that Florida's executive clemency process for re-enfranchisement imposed a poll tax in violation of the Fourteenth Amendment, the Twenty-Fourth Amendment, and section 10 of the Voting Rights Act. *Id.* at 1216 n.1. It concluded that, because Florida's procedure for applying for

executive clemency provided a mechanism for felons who were financially unable to pay restitution to obtain the right to vote, "Florida d[id] not deny access to the restoration of the franchise based on ability to pay . . . ." *Id.* The fact that indigent felons had to submit to a hearing was "insufficient" to support their claims. *Id.*

As Defendants point out, the process for a convicted felon to obtain a pardon from the Alabama Board of Pardons and Paroles gives the board the authority to remit a fine associated with the conviction. *See* Ala. Code § 15-22-36(a). This alternative statutory avenue for a convicted felon to secure re-enfranchisement at first blush would seem to indicate that, in Alabama, like in Florida, "the right to vote can be granted to felons who cannot afford to pay restitution." *Id.* Plaintiffs argue, though, that restoration of voting rights only through the pathway of a discretionary pardon with the potential for a fine remittance erects a barrier to voting based on the felon's ability to pay. Namely, indigent felons, as opposed to felons with financial means, have only one of two state-provided methods to obtain the franchise and cannot pursue what Plaintiffs contend is the more preferable method of automatic restoration.

After careful consideration of the parties' arguments, the court declines to dismiss Counts 13, 14, and 15 based upon the *Johnson* decision, which is the sole authority upon which Defendants rely. At least four reasons compel this conclusion.

First, the *Johnson* court's analysis of the plaintiffs' poll tax claims is sparse, relegated to a short discussion in an introductory footnote. The bulk of that decision focused on other federal constitutional and statutory claims.

Second, Defendants analogize section 15-22-36.1 to Florida's Rules of Executive Clemency, which were at issue in *Johnson*. But there is scant context in *Johnson* from which to construct a meaningful parallel between Florida's and Alabama's re-enfranchisement laws. The *Johnson* decision does not provide a citation for those rules or quote them, and Defendants do not submit the rules or provide meaningful discussion of their terms. Against this backdrop, it would be unwise to predicate a finding that section 15-22-36.1 does not deprive felons of "the restoration of the franchise based on ability to pay" on the bare fact that the Eleventh Circuit has found that a different Florida law does not.

Third, it is noted again that this action stands in a different procedural posture than the *Johnson* case. The claims in *Johnson* reached the circuit on cross-motions for summary judgment, not on a Rule 12(b)(6) motion to dismiss.

Fourth, Defendants do not address whether the distinctions, noted by Plaintiffs, between Alabama's and Florida's paths to re-enfranchisement (two paths versus one) are material ones. Suffice it to say, at this juncture, these distinctions separate this action from *Johnson*.

So the court turns to Defendants' other arguments, which are made with the assumption that Alabama law requires a felon to pay LFOs as a condition of re-enfranchisement.

## 2. Count 13: The Fourteenth Amendment's Equal Protection Clause

Defendants contend that requiring convicted felons to pay LFOs as a condition of re-enfranchisement invokes rational basis review under the Fourteenth Amendment and that the State easily has four "legitimate interests that are rationally related to the requirement that felons pay all [LFOs] before having their rights restored." (Doc. # 43, at 63.) Plaintiffs counter that none of the asserted reasons "meets the low standard of rationality, much less the heightened 'compelling state interest' standard [the State] must meet." (Doc. # 48, at 86.) Hence, a preliminary dispute exists about which level of scrutiny applies in the equal protection analysis.

Neither the U.S. Supreme Court nor the Eleventh Circuit has addressed the level of scrutiny applicable to equal protection challenges to felon-re-enfranchisement laws. Even if this court were to align with the weight of non-binding authority and apply rational basis review, dismissal under Rule 12(b)(6) is premature on Defendants' thin arguments. Defendants provide only snippets from cases in a string citation to support their position that there are multiple rational bases for conditioning re-enfranchisement on the payment of fines, costs, and restitution.

(Doc. # 43, at 64.)   But even a cursory review of these cases reveals notable distinctions that Defendants have failed to address.

To illustrate, in *Harvey v. Brewer*, 605 F.3d 1067 (9th Cir. 2010), the Ninth Circuit had "little trouble concluding that Arizona ha[d] a rational basis for restoring voting rights only to those felons who have completed the terms of their sentences, which includes the payment of any fines or restitution orders." *Id.* at 1079.  But, in *Harvey*, unlike in this case, no plaintiff had "alleged that he [was] indigent"; hence, the Ninth Circuit expressly declined to address whether "withholding voting rights from those who are truly unable to pay their criminal fines due to indigency would not pass this rational basis test . . . ." *Id.*  Defendants omit any reference to this factual distinction in their cursory citation to *Harvey*.  (*See* Doc. # 43, at 64.)

For now at least, Count 13 will go forward.  Defendants' motion to dismiss Count 13 is due to be denied.

### 3.  **Count 14:  *The Twenty-Fourth Amendment (Poll Tax)***

The Twenty-Fourth Amendment prohibits laws that deny or abridge the right to vote "by reason of failure to pay any poll tax or other tax."  U.S. Const. amend. XXIV.  Defendants present multiple arguments, all of which Plaintiffs refute, why Count 14 fails as a matter of law.  One is dispositive:  Section 15-22-36.1(a)(3) is not a poll tax.

A state may not make a voter's affluence or ability to pay a poll tax an electoral standard. *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 666 (1966). Several courts, including the Sixth Circuit, have reasoned persuasively that requiring full payment of criminal fines and restitution as a condition of re-enfranchisement does not amount to a poll tax because the fines are terms of the sentence that "Plaintiffs themselves incurred."[12] *Johnson v. Bredesen*, 624 F.3d 742, 751 (6th Cir. 2010); *see also Harvey*, 605 F.3d at 1080 ("That restoration of [convicted felons'] voting rights requires them to pay all debts owed under their criminal sentences does not transform their criminal fines into poll taxes."). In *Bredesen*, convicted felons who had served their prison sentences and had satisfied the conditions of supervised release were ineligible under Tennessee law to register to vote because they owed past-due child support payments or restitution to the victims of their criminal offenses. Affirming a judgment on the pleadings for the defendants, the Sixth Circuit held that, "even if the Twenty-Fourth Amendment applied to Tennessee's re-enfranchisement law, the provisions requiring payment of restitution and child support do not represent taxes on voting imposed by the state, and therefore do not violate the Amendment's terms." *Bredesen*, 624 F.3d at 751. In other words, "restitution and child-support-payment provisions fail to qualify as the sort of taxes

---

[12] In *Johnson v. Governor of State of Florida*, 405 F.3d 1214 (11th Cir. 2005), the Eleventh Circuit declined to address "whether conditioning an application for clemency on paying restitution would be an invalid poll tax." *Id.* at 1217.

the Amendment seeks to prohibit." *Id.*; *see also Johnson v. Bredesen*, 579 F. Supp. 2d 1044, 1059 (M.D. Tenn. 2008) ("Imposing a requirement that convicted felons comply with . . . outstanding court orders cannot reasonably be construed as a 'tax' on voting."), *aff'd*, 624 F.3d 742 (6th Cir. 2010); *Coronado v. Napolitano*, No. CV–07–1089–PHX–SMM, 2008 WL 191987, at *4–5 (D. Ariz. Jan. 22, 2008) (finding that Arizona's re-enfranchisement law did not "make ability to pay 'an electoral standard,' but limit[ed] re-enfranchisement to those who ha[d] completed their sentences—including the payment of any fine or restitution imposed").

Based on the foregoing persuasive authority, Alabama's statutory requirement that Plaintiffs must pay their LFOs to be eligible for a CERV does not impose a poll tax and, thus, does not violate the Twenty-Fourth Amendment. Consequently, Plaintiffs fail to state a claim upon which relief can be granted under the Twenty-Fourth Amendment. Count 14 is due to be dismissed.

### 4. Count 15: *Section 2 of the VRA*

In Count 15, Plaintiffs allege that section 15-22-36.1(a)(3) "disproportionately disenfranchises black citizens with prior disqualifying convictions compared to white citizens with prior disqualifying convictions." (Compl. ¶ 258.) Consequently, Plaintiffs argue that section 15-22-36.1(a)(3) violates section 2 of the VRA "because it results in the denial of the right to vote on account of race." (Compl. ¶ 260.)

Although Count 15 challenges Alabama's conditions of re-enfranchisement, as opposed to Alabama's conditions for disenfranchisement, the theory outlined in Count 15 is that section 15-22-36.1 is a disenfranchisement law. In other words, the Complaint's theory recognizes no difference in the aims of Alabama's laws on disenfranchisement and re-enfranchisement. For this reason, as Defendants urge, Count 15, like Count 3, cannot survive in the wake of the Eleventh Circuit's *Johnson* decision: "Congress never intended the [VRA] to reach felon disenfranchisement provisions." 405 F.3d at 1232. Accordingly, Count 15 is due to be dismissed.

## VI.  CONCLUSION

To summarize the more-than-nine-thousand words preceding this section in a single thirty-six-word sentence: Plaintiffs' challenge to Alabama's constitutional and statutory scheme for the disenfranchisement and re-enfranchisement of individuals convicted of crimes of moral turpitude will proceed, but only on a third of the counts in Plaintiffs' fifteen-count complaint.

Consistent with the reasoning of this opinion, it is ORDERED as follows:

(1)     Counts 3, 4, 5, 14, and 15 are DISMISSED with prejudice for failure to state a claim upon which relief can be granted; and

(2)     Counts 6, 7, 8, 9, and 10 are DISMISSED without prejudice for lack of subject-matter jurisdiction.

This action proceeds as to five counts: Plaintiffs' claims that section 177(b) of the Alabama Constitution is racially discriminatory in violation of the Fourteenth Amendment's Equal Protection Clause and the Fifteenth Amendment (Counts 1 and 2); Plaintiffs' claim that section 177(b) is an *ex post facto* law that retroactively punishes citizens (Count 11); Plaintiffs' claim that section 177(b) violates the Eighth Amendment's proscription against cruel and unusual punishment (Count 12); and Plaintiffs' claim that section 15-22-36.1(a)(3) of the Alabama Code violates the Fourteenth Amendment's Equal Protection Clause (Count 13).

DONE this 26th day of December, 2017.

/s/ W. Keith Watkins
CHIEF UNITED STATES DISTRICT JUDGE