**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| TREVA THOMPSON, et al., | ) | |
| | ) | |
|   Plaintiffs, | ) | |
| | ) | **Civil Action No.** |
| | ) | **2:16-CV-783-ECM-SMD** |
| | ) | |
| JOHN H. MERRILL, in his Official | ) | |
| Capacity as Secretary of State, et al., | ) | |
| | ) | |
|   Defendants. | ) | |

**NONPARTY LEGISLATORS' RESPONSE TO PLAINTIFFS' OBJECTIONS TO
MAGISTRATE JUDGE'S RULING ON MOTION TO QUASH SUBPOENAS (DOC. 133)**

Pursuant to Federal Rule of Civil Procedure 72(a)(2), State Representative David Faulkner,

House District 46 of the Alabama House of Representatives and State Senator Cam Ward, Senate

District 14 of the Alabama Senate (collectively, the "Legislators"), submit this Response to

Plaintiffs' Objections to Magistrate Judge's Ruling on Motion to Quash Subpoenas. Doc. 201.[1]

## I.    BACKGROUND

As set out in Magistrate Judge Doyle's March 20, 2020 Order, Plaintiffs challenge

Alabama's constitutional and statutory scheme for the disenfranchisement and re-enfranchisement

of individuals convicted of felonies of moral turpitude. Doc. 199. A 1996 amendment to the

Alabama Constitution provides that individuals convicted of felonies involving moral turpitude

cannot vote until their civil and political rights had been restored. ALA. CONST. art. VIII, §177(b).

Doc. 178 at 2. In 2016, Alabama amended its statutory procedures for such individuals to have

their voting rights restored in ALA. CODE § 15-22-36.1(a). *Id.* In 2016, Plaintiffs filed a class-action

---

[1] In addition to the arguments set out below, the Legislators incorporate herein the arguments they submitted to the Court in their original motion and reply brief, Docs. 133, 146, as well as the arguments State Defendants have presented to the Magistrate Judge and to this Court, Docs. 147, 209.

complaint challenging the constitutional amendment and the statute. . In 2017, Alabama enacted a law that listed 47 felonies of moral turpitude for voting purposes, *i.e.,* the Definition of Moral Turpitude Act of 2017, ALA. CODE § 17-3-30.1.[2] *Id.*

Plaintiffs allege, *inter alia*, that both the Alabama constitutional amendment (§177(b)) and HB 282 are unconstitutional. They argue, among other things, that the amendment is racially discriminatory, that it is unconstitutionally retroactive, and that it unconstitutionally restricts voting on the basis of financial obligations. Docs. 1, 93. In their supplemental complaint, filed after enactment of HB 282, plaintiffs further allege that HB 282 imposes retroactive punishment in violation of the U.S. Constitution's prohibition on ex post facto laws. Doc. 93 at 13-14.

As part of discovery, Plaintiffs subpoenaed the Legislators on February 11, 2019, seeking to depose them during the 2019 legislative session. Docs. 133-1, 133-2. The subpoenas also directed the Legislators to produce virtually any documents in their possession, custody or control relating to the legislative consideration, process, and passage of HB 282, § 177(b) of the Alabama Constitution, and ALA. CODE § 15-22-36.1(a)(3) (2016), as well as any documents or other materials of any kind relating to felon voter disenfranchisement. *Id.*

On February 25, 2019, the Legislators filed a motion to quash the subpoenas and to enjoin Plaintiffs for issuing similar subpoenas. Doc. 133. Plaintiffs filed an opposition brief, Doc. 139, wherein they specifically identified as the target of the subpoenas the Legislators' participation on the Voter Disenfranchisement and Restoration of Rights Exploratory Committee (the "Exploratory Committee" or "Committee"). Doc. 139. The Legislators replied. Doc. 146.

---

[2] Throughout this litigation the parties and the Court have cited to the Definition of Moral Turpitude Act of 2017 as HB 282, House Bill 282, Act No. 2017-378, or ALA. CODE § 17-3-30.1. Thus, to avoid any confusion, and because the House Bill was the subject of the Exploratory Committee, unless otherwise indicated, the Legislators will hereinafter refer to the legislation as "HB 282".

On March 20, 2020, Magistrate Judge Doyle entered an order granting the motion to quash in its entirety. Doc. 199. On April 3, 2020, Plaintiffs submitted objections to the Magistrate Judge's Order. Doc. 201. This Court set a deadline of April 20, 2020 for the opposing party to respond. Doc. 202. However, neither the Plaintiffs' objections nor this Court's order was served on the Legislators' counsel. Consequently, the Legislators moved the Court for an extension of time to respond. Doc. 207. The Court granted an extension, allowing the Legislators until April 28, 2020 to submit their response to Plaintiffs' objections. Doc. 208. The Legislators now offer this response.

## II.    LEGAL STANDARD

Under Rule 45(d)(3), the Court must quash a subpoena that requires disclosure of privileged or other protected matter when no exception or waiver applies. FED. R. CIV. P. 45(d)(3)(A)(iii). The party seeking to quash the subpoena bears the burden of establishing that the information sought is privileged, and the requesting party bears the burden of showing that it is relevant. *Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 818 (5th Cir. 2004); *Fadalla v. Life Auto. Prods., Inc.*, 258 F.R.D. 501, 504 (M.D. Fla. 2007). The Court should balance the need for the requested discovery against the movant's interest in confidentiality. *See Fadalla*, 258 F.R.D. at 506. Furthermore, the person asserting the privilege need only describe the nature of the withheld documents "in a manner that ... will enable the parties to assess the claim." FED. R. CIV. P. 45(e)(2)(A). Finally, a district court's decision on whether to quash a subpoena is reviewed only for an abuse of discretion. *In re Hubbard*, 803 F.3d 1298, 1307 (11th Cir. 2015).

### III.   SUMMARY OF ARGUMENT

The Magistrate Judge correctly upheld the privilege and ordered that Plaintiffs' subpoenas be quashed and that they be enjoined from issuing similar subpoenas in the future. The Court should affirm the Magistrate Judge's Order for the following reasons:

- The Legislators' participation in the Exploratory Committee constitutes either a legislative act or an act undertaken in connection with or in aid of a legislative act, *i.e.*, the enactment of HB 282 and, therefore, the legislative privilege shields from inquiry their participation in the Committee.

- Even if the Legislators' participation in the Exploratory Committee does not constitute an independently privileged "legislative act" or an act undertaken in connection with or in aid of a legislative act, Plaintiffs' inquiries are barred because they are directed at the legislative motive and intent for the purpose of undermining a legislative decision. In fact, Plaintiffs concede that they "seek documents and testimony regarding the Legislators' *intent* in working to enact HB 282." Doc. 139 at 1.[3]

- The mere fact that legislation concerns "voting" does not *ipso facto* abrogate the legislative privilege. The limited exceptions to legislative privilege for enforcement of federal criminal statutes and redistricting challenges are inapplicable here.

- Plaintiffs have abundant alternative sources of non-privileged evidence to establish the element of intent required for their Fourteenth and Fifteenth Amendment claims (Counts 1 and 2) and for their ex post facto claim (Count 11). Plaintiffs have unfettered access to nonprivileged evidence regarding the purpose and work of the Committee, including publicly available Exploratory Committee meeting minutes and unfettered access to the 13 non-legislator members of the Exploratory Committee. In fact, Plaintiffs have deposed two representatives of the Secretary of State's Office who participated in the Committee meetings, as well as two other non-legislator participants at the Committee meeting.

- Contrary to Plaintiffs' assertion, there is no legislative privilege exception for ex post facto claims. As correctly held by the Magistrate Judge, *In re Hubbard*, 803 F.3d 1298 (11th Cir. 2015) does not support any such exception, but rather

---

[3] As noted in Nonparty Legislators' Motion to Quash, Doc. 133 at 4, Plaintiffs' claims under the Fourteenth and Fifteenth Amendments (Counts 1 and 2) require proof that the law "had a discriminatory effect and that it was motivated by a discriminatory purpose" before it is considered a suspect racial classification. *United States v. Armstrong*, 517 U.S. 456, 465 (1996). Plaintiffs' ex post facto claim (Count 11) likewise requires proof of intent by the legislature to punish. *See Smith v. Doe*, 538 U.S. 84, 92-93 (2003) (holding that "[a] conclusion that the legislature intended to punish would satisfy an ex post facto challenge without further inquiry into its effects").

simply states the existing law that evidence of an "intent to punish" gained from non-privileged sources is admissible in ex post facto cases, sources such as the text of the statute, legislative statements in the record, and other parts of legislative history, but not compelled responses to inquiries regarding legislative acts or legislators' motives or intent regarding such legislative acts.

- No privilege log is necessary for Plaintiffs to contest the privilege claim when, as here, the subpoenas and Plaintiffs' response so readily demonstrate the legislative nature of the documents and testimony sought, i.e., when the subpoenas necessarily trench upon the interests protected by the legislative privilege. Here, those interests are clear: protection against inquiry into (1) legislative acts or acts undertaken *in connection with or in aid of the passage of* HB 282, and (2) the motivation for those acts.

For these and other reasons set out more fully below, and pursuant to FED. R. CIV. P. 45(d)(3)(A)(iii), the Court should affirm the Magistrate Judge's Order granting the Nonparty Legislators' Motion to Quash and to Enjoin Plaintiffs From Effecting Same Upon Nonparty Legislators David Faulkner and Cam Ward.

## IV.   ARGUMENT

### A.   THE UNDISPUTED PURPOSE OF THE EXPLORATORY COMMITTEE WAS TO DRAFT LEGISLATION.

At the outset, it is important to understand the legislative nature of the Exploratory Committee. In support of their Objections, Plaintiff argue, albeit unsuccessfully, that the Legislators' participation in the Committee was not legislative in nature, and, therefore, not subject to legislative privilege; rather, they claim−without support−that the Secretary of State created the Committee to offer policy advice. The undisputed evidence, however, compellingly establishes that the purpose of the Committee was to draft a bill; that the Committee members provided valuable information essential to the legislative process and drafted the proposed legislation that became HB 282.

Plaintiffs mischaracterize the Committee's meetings as "casually or incidentally related to legislative affairs but not part of the legislative process itself." Doc. 201 at 3. There is nothing

casual or incidental about the Committee's work. It was not an esoteric process undertaken to develop a whitepaper paper to provide "policy advice." As established by the evidence, Alabama Secretary of State John Merrill formed the Committee in 2015 for the purpose of reviewing voter disenfranchisement and restoration of rights and to gather information for the proposal, formulation, and drafting of specific legislation to list felonies of moral turpitude. *See* Deposition of John Bennett ("J. Bennett Dep."), Doc. 146-1 at p. 95:2-13; Deposition of Edward Packard ("E. Packard Dep."), Doc. 146-2 at pp. 47:2-48:7, Doc. 150:3-11; 188:16-190:21; Deposition of Tim Jolly ("T. Jolly Dep.") , Doc. 209-2 at pp. 35:10-19; 107:18-108:4; Deposition of Win Johnson ("W. Johnson Dep."), Doc. 209-1 at p. 28:1-9; 30:13-31:4; 82:14-21.[4] The Committee included members and attended from diverse backgrounds, including government officials, judicial officers, ACLU representatives, victims' rights groups, etc.[5] The Committee met on at least three separate occasions: November 18, 2015, December 21, 2015 and January 20, 2016. *See* Exploratory Committee Meeting Minutes for 11/18/2015, 12/21/2015 and 01/20/2016, Docs. 146-4, 146-4, 146-5, respectively (also available at the Secretary of State's website at https://www.sos.alabama.gov/taxonomy/term/7).[6]

---

[4] Plaintiffs deposed Win Johnson and Judge Tim Jolly on July 10, 2019 and August 21, 2019, respectively, after the Legislators filed their Motion to Quash on February 25, 2019, and after the parties completed briefing on the matter before Magistrate Judge Doyle.

[5] As set forth in meeting minutes, the Exploratory Committee members included the following persons: State Senator Cam Ward; State Rep. David Faulkner; State Rep. Chris England; Ms. Holly Caraway, Chief Counsel for the Office of the Minority Senate Leader, representing State Senator Linda Coleman; Ms. Carlene Biehl, Volunteer Crime Victims Advocate; Mr. Michael Coleman, Executive Director of Hope Ministries; Mr. Jefferson Dunn, Commissioner of the Alabama Department of Corrections; Ms. Carol Hill, Registrar for the Shelby County Board of Registrars; Mr. Quin Hillyer, Freelance Journalist; Mr. Tim Jolley, Circuit Judge, 27th Judicial Circuit; Ms. Summer Scruggs, Circuit Clerk for the Clarke County Circuit Court; Mr. Cliff Walker, Chairman, Alabama Board of Pardons and Paroles; Ms. Marissa Dodson, ACLU representing Mr. Will Harrell; Win Johnson, representing Mr. Rich Hobson, Director of the Alabama Office of Courts; Hon. John Merrill, Alabama Secretary of State; Mr. Ed Packard, Director of Elections of the Office of the Alabama Secretary of State; and Mr. Richard Laird, Chief Legal Counsel to Alabama Secretary of State. *See* Exploratory Committee Meeting Minutes for 11/18/2015, 12/21/2015 and 01/20/2016, Docs. 146-3, 146-4, 146-5.

[6] The is some evidence to suggest that the Committee may also have met in October of 2015, for which there are no minutes of the meeting.

Over the course of its meetings, the Committee developed a list of felonies that it recommended be identified as crimes of moral turpitude for purposes of proposed legislation; it considered matters regarding the payment of court-ordered monies as a condition for restoration of the right to vote; and it drafted proposed legislation that became HB 282. *See* Exploratory Committee Meeting Minutes 11/18/2015, 12/21/2015 and 01/20/2016, Docs. 146-4, 146-4. 146-5; J. Bennett Dep., Doc. 146-1 at pp. 31:22-33:4, 68:15-69:2, 72:9-73:4, 91:21-92:10, 95:2-13; E. Packard Dep., Doc. 146-2 at p. 235:2-5. The Committee convened its final meeting on January 20, 2016, as a public meeting in Room 617 of the Alabama State House. *See* Exploratory Committee Minutes for 01/20/2016, Doc. 146-5. During that final meeting, the Committee added three additional felonies to its list of felonies of moral turpitude for the draft legislation: kidnapping, aggravated child abuse, and drug trafficking. *Id.* At the conclusion of the meeting, the Committee unanimously approved ***a draft bill*** with three abstentions. *Id.* The draft legislation was submitted as HB 282 in the Alabama House of Representatives, which the Alabama Legislature unanimously enacted during the 2017 regular session as Act 2017-378.[7] Doc. 80 at 6.

As reflected by the Committee minutes, Senator Ward and Representative Faulkner attended only the final meeting held on January 20, 2016. *See* Exploratory Committee Minutes for 01/20/2016, Doc. 146-5; *see also* E. Packard Dep., Doc. 146-2 at p. 166:17-167:13, 188:16-190:21, 206:5-207:7, 217:5-10, 235:2-5. There is no evidence that the Committee met or otherwise continued its work after its final meeting.[8]

---

[7] Governor Kay Ivey signed Act 2017-378, and it went into effect on August 1, 2017. Doc. 80 at 6. It is codified at ALA. CODE § 17-3-30.1.

[8] Plaintiffs suggests without citation that there was a secret meeting between Secretary Merrill and the Legislators that resulted in a change to the Committee's recommendation regarding the list of felonies of moral turpitude included in HB 282, and that Secretary Merrill later lobbied the Legislature to use the expanded list. Doc. 201 at 1-2.

In sum, the Exploratory Committee was not a mere academic exercise for interested persons to express their policy preferences for the benefit of the Secretary of State. Rather, the Committee proposed, formulated, and drafted a specific bill (HB 282) adopted and passed by the Legislature as Act 2017-378 to provide a list of felonies of moral turpitude.

B.    THE MAGISTRATE JUDGE CORRECTLY FOUND THAT THE LEGISLATIVE PRIVILEGE SHIELDS FROM INQUIRY THE LEGISLATORS' PARTICIPATION IN THE EXPLORATORY COMMITTEE

The Special Master correctly ruled the legislative privilege shields the Legislators' participation in the Exploratory Committee from Plaintiffs' inquiries because "it directly concerned the formulation, proposal, and passage of legislation."[9] Doc. 199 at 6. Even if participation in the Committee were not an independently privileged "legislative act," it is otherwise protected from inquiry as acts undertaken *in connection with or in aid of* a legislative act, to wit, enactment of HB 282. "'Once the legislative-act test is met, the principle is absolute.'" *MINPECO, S.A. v. Conticommodity Servs., Inc.*, 844 F.2d 856, 862 (D.C. Cir. 1988) (quoting *Miller v. Transamerican Press, Inc.*, 709 F.2d 524, 529 (9th Cir. 1983)). Plaintiffs, however, wrongly urge the Court to restrict the definition of "legislative acts" to the performance of legislative duties undertaken during an actual legislative session. Not only is this argument wildly contrary to the realities of the modern working legislature, but also it is contrary to the long-recognized purposes of the legislative privilege, as well as the many decisions construing the scope of the privilege.

---

[9] A subset of the legislative privilege is the deliberative process privilege. It protects documents which are "pre-decisional, deliberative and reflect the subjective intent of the legislators." *Doe v. Nebraska*, 788 F. Supp. 2d 975, 985 (D. Neb. 2011); *see also In re Grand Jury*, 821 F.2d 946, 959 (3d Cir. 1987) (suggesting "deliberative process privilege" protects state legislator "communications involving opinions, recommendations or advice about legislative decisions"). Many of the documents sought in the subpoena fall within those parameters as well.

1.    **The Court's privilege analysis should be informed by federal Speech or Debate Clause jurisprudence.**

The legislative privilege is important and has deep roots in federal common law. *In re Hubbard*, 803 F. 3d at 1307-08 (citing *Tenney v. Brandhove*, 341 U.S. 367, 372 (1951) (recognizing "[t]he privilege of legislators to be free from arrest or civil process for what they do or say in legislative proceedings")); *see also United States v. Gillock*, 445 U.S. 360, 372 n.10 (1980) (noting that *Tenney* "was grounded on its interpretation of federal common law"). The privilege "protects against inquiry into acts that occur in the regular course of the legislative process *and* into the motivation for those acts." *In re Hubbard*, 803 F. 3d. at 1310 (emphasis added) (citing *United States v. Brewster*, 408 U.S. 501, 525 (1972)); *see also Gillock*, 445 U.S. at 366-67 (same).

With respect to protected legislative acts, "the privilege protects the legislative process itself, and therefore covers both governors' and legislators' actions in *the proposal, formulation*, and passage of legislation." *In re Hubbard*, 803 F. 3d. at 1307-08, 1310 (emphasis added) (citing *Tenney*, 341 U.S. at 372, 376 (recognizing a legislative privilege for state legislators when acting "in the sphere of legitimate legislative activity")); *see also Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 416 (D.C. Cir. 1995) (explaining that the privilege applies "when the action complained of falls within the legislative sphere").[10]

In determining whether acts by state legislators fall within the scope of the legislative privilege, courts, including the Eleventh Circuit, have relied on federal interpretations of the coterminous federal Speech or Debate Clause. *See In re Hubbard*, 803 F.3d at 1310, n.11 (quoting *Supreme Court of Va. v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 732 (1980)) (holding that,

---

[10] *See also Reeder v. Madigan*, 780 F.3d 799, 800, 805-06 (7th Cir. 2015) (affirming the legislative privilege of state representatives and senators).

"'[i]t is well-established that state lawmakers possess a legislative privilege that is "similar in origin and rationale to that accorded Congressmen under the Speech or Debate Clause[.]'"). *See also Bryant v. Jones*, 575 F.3d 1281, 1304 (11th Cir. 2009) (holding common-law protections for state legislators are "essentially coterminous" with the protections Members of Congress receive under the Speech or Debate Clause); *Benisek v. Lamone*, 241 F. Supp. 3d 566, 573 (D. Md. 2017) (quoting *Tenney*, 341 U.S. at 376) ("While the Speech and Debate Clause by its terms protects only federal officials, the Supreme Court has developed a similar doctrine of immunity that shields state, regional, and local officials from civil liability based on their actions taken 'in the sphere of legitimate legislative activity.'"). The common law doctrines of legislative immunity and privilege are both "motivated by the same policy of comity," and therefore apply "in a parallel manner."[11] *Id.*

As noted in the analogous Speech or Debate Clause jurisprudence, the controlling principle for determining whether informal information gathering falls within the privilege is whether "the information is acquired *in connection with or in aid of* an activity that qualifies as 'legislative' in nature," not what the source of the information is. *Jewish War Veterans v. Gates*, 506 F. Supp. 2d 30, 57 (D.D.C. 2007) (emphasis added) (citing *Brown & Williamson*, 62 F.3d at 419; *Benford v. Am. Broad. Cos.*, 102 F.R.D. 208, 210 (D. Md. 1984), *rev'd* on jurisdictional grounds by *In re Guthrie*, 733 F.2d 634, 639 (4th Cir. 1984)). In other words, even if the act itself is non-legislative, it may still be protected *when undertaken in connection with or in aid of a legislative act*.

For example, in *United States v. Biaggi*, 853 F.2d 89 (2d Cir. 1988), the Second Circuit concluded that informal "legislative factfinding conducted by [Congressman] Biaggi during his

---

[11] In *Tenney v. Brandhove*, 341 U.S. 367 (1951), the plaintiff commenced the action against state legislators under the Civil Rights Act of 1871, 42 U.S.C. § 1983, and 42 U.S.C. § 1985(3), and the Court held that the legislators enjoyed a common law privilege by analogy to the Speech or Debate Clause.

Florida trips was protected [under the Speech or Debate Clause]." *Id.* at 103. Multiple courts have similarly applied the legislative privilege to information gathering undertaken in the aid of legislation. *See, e.g., Miller v. Transamerica Press, Inc.*, 709 F.2d 524, 530–31 (9th Cir. 1983) (legislator's receipt of "information pertinent to potential legislation or investigation" is part of privileged legislative process); *McSurely v. McClellan*, 553 F.2d 1277, 1286–87 (D.C. Cir. 1976) (quoting Reinstein & Silverglate, *Legislative Privilege and the Separation of Powers*, 86 HARV. L. REV. 1113, 1154 (1973)) ("We have no doubt that information gathering, whether by issuance of subpoenas or field work by a Senator or his staff, is essential to informed deliberation over proposed legislation.... 'The acquisition of knowledge through informal sources is a necessary concomitant of legislative conduct and thus should be within the ambit of the privilege so that congressmen are able to discharge their constitutional duties properly.'"); *Noel v. City of New York*, No. 15-cv-05236, 2019 WL 3852444, at *4 (S.D.N.Y. Aug. 15, 2019) (holding that "[t]he legislative privilege also protects formal and informal fact and information-gathering activities about the subject of potential legislation, as well as documents regarding or reflecting the fruits of this research).[12]

## 2. The Magistrate Judge correctly rejected Plaintiffs' highly restrictive definition of "legislative acts."

Contrary to the overwhelming body of caselaw, Plaintiffs argue that the Magistrate Judge's interpretation of protected legislative acts is excessively broad. Doc. 201 at 3-4. But their argument is based solely on the naked and conclusory assertion that participation in the Exploratory Committee is not shielded by the privilege because participation in the Committee was not part of

---

[12] The Supreme Court previously has held that "'[a] legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change.'" *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 504 (1975) (quoting *McGrain v. Daugherty*, 273 U.S. 135, 175 (1927)).

the legislative process. Doc. 201 at 3. This conclusion is contrary to the undisputed facts regarding the Committee's purpose and function, to the realities of the modern legislative process, and to the underlying purpose of the privilege in fostering the free flow of information critically needed by legislators to discharge their official duties free of the burden or threat of defending litigation either as a party or as a witness. *See Dyas v. City of Fairhope*, Civ. A. No. 08-0232-WS-N, 2009 WL 3151879, at *7-8 (S.D. Ala. Sept. 24, 2009). As noted above, the privilege extends to communications with third parties for purposes of formulating legislation, *i.e.*, acts undertaken *in connection with or in aid of* a legislative act. Indeed, the Eleventh Circuit has held that "legislators' actions in the proposal, formulation, and passage of legislation" are protected by the privilege. *In re Hubbard*, 803 F.3d at 1308. Given the requirement that the privilege "be read broadly to effectuate its purposes," *see United States v. Johnson,* 383 U.S. 169, 180 (1966),[13] the Court should apply the protection where legislators and third parties engage in communications for information gathering purposes, as well as for actions undertaken in proposing, formulating, and drafting legislation.[14]

In the instant case, both publicly available minutes of the Exploratory Committee and the undisputed deposition testimony provided by the Secretary of State's Chief of Staff and Press Secretary, John Bennett, and the Administrator of Elections, Edward Packard, as well as Committee member Judge Tim Jolly and participant Win Johnson, establish the legislative purpose and nature of the Exploratory Committee—to review voter disenfranchisement and restoration of

---

[13] *See also Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 501 (1975).

[14] By no means do the Legislators claim that every communication with third parties is privileged or that the privilege covers every act a legislator performs. Rather, the privilege applies to inquiries regarding their participation in the Exploratory Committee as an independently privileged legislative act or as an act undertaken in connection with or in aid of a legislative act, *i.e.*, enactment of HB 282 as Act 2017-378. Further, inquiries regarding the Legislators' participation in the Exploratory Committee aimed at uncovering their individual motives or the corporate motive of the Alabama Legislature with respect to the enactment of HB 282 as Act 2017-378 are impermissible.

rights and to draft legislation to list felonies of moral turpitude. Mr. Packard's sworn deposition

testimony compellingly establishes these facts:

> **BY MS. LANG:**
>
> Q. Was the goal of the committee to draft a bill that could pass the legislature even if it was not the preferred outcome of the committee members?
>
>     MS. MESSICK: Object to form.
>
> A. No. The goal was always to come up with a bill that had the support of all the committee members even if the committee members didn't agree with particular aspects of the bill; that they ultimately vote on a bill altogether that they could all support even if it didn't go their way, so to speak, in particular instances.
>
>           * * * *
>
> Q. In creating this committee with the goal of coming out with a bill that Secretary Merrill would support, was the goal to have a bill that could pass the legislature?
>
>     MS. MESSICK: Object to form.
>
> A. The goal of the committee was to come up with a bill that will pass the legislature.
>
>           * * * *
>
> Q. Was it your goal to come up with a bill that could pass the legislature?
>
>     MS. MESSICK: Object to form.
>
> A. Personally? Well, as a member of the staff, I hoped that we would come up with a bill that would pass the legislature.
>
> Q. And was that part of the consideration in deciding how to draft the bill?
>
>     MS. MESSICK: Object to form.
>
> A. Yes, I would say that's always a consideration when you're drafting legislation.

Packard, Dep., Doc. 146-2 at pp. 188:16-190:21; *see also id.* at p. 217:5-10. Committee participants Bennett, Johnson, and Jolly similarly testified that the purpose of the Committee was to draft legislation. J. Bennett Dep., Doc. 146-1 at pp. 68:15-69:2, 91:21-92:10, 95:2-13; T. Jolly Dep., Doc. 209-2 at pp. 35:10-19; 107:18-108:4; W. Johnson Dep., Doc. 209-1 at p. 28:1-9; 30:13-31:4; 82:14-21 (explaining that "the whole point was to lead [to] legislation.").

In sum, the Legislators met as part of a diverse committee of constituent and interest groups formed by the Secretary of State for purposes of reviewing voter disenfranchisement and restoration of rights and drafting legislation to list specific felonies of moral turpitude. And, in fact, the Committee *drafted the legislation* (HB 282) which became the Felony Voter Disqualification Act (Act 2017-378). Thus, Plaintiffs' *ipse dixit* characterization of the Committee's function as the mere generation "policy advice" is incomplete and misleading. Doc. 201 at 1-2. Thus, the Magistrate Judge correctly found that the Legislators' participation in the Committee constitutes an independently privileged legislative act or an act undertaken in connection with or in aid of a specific legislative act, *i.e.*, passage of HB 282 as Act 2017-378.[15]

3. **The Magistrate Judge correctly found that participation of non-legislative third-parties in the Exploratory Committee did not operate as a waiver of the legislative privilege.**

Although Plaintiffs' claimed that legislative privilege "is waived due to the presence and participation of non-legislative actors", Doc. 201 at 4-6, the Magistrate Judge correctly rejected that argument as unsupported. Doc. 199 at 6. Many courts, including Alabama's Northern District, have held that meetings or communications between legislators and third parties, such as lobbyists,

---

[15] Plaintiffs' suggestion that the one-year gap between the Exploratory Committee's final meeting in January 2016 and the passage of HB 282 in May 2017 somehow divests the Committee of its legislative nature is just plain silly. Doc. 201 at 4. Legislation often takes years to develop and implement, and the free-flow exchange of information between legislative officials, executive officers, partisans, political interest groups, or constituents to discuss issues that bear on potential legislation is not somehow stripped of its legislative character by the mere passage of time. The dispositive question is not temporal, but rather whether the acts at issue are legislative in nature or acts undertaken in connection with or in aid of the passage of legislation.

constituents, experts and interest groups, for the purpose of information gathering are protected by legislative privilege. Plaintiffs should be familiar with this principle because Plaintiff Greater Birmingham Ministries was the named plaintiff in their unsuccessful challenge to Alabama's Voter ID legislation in *Greater Birmingham Ministries v. Merrill*, ("*GBM v. Merrill*"), No. 2:15-cv-02193-LSC (N.D. Ala. Mar. 13, 2017), Doc. 133-1. In *GBM*, Judge Coogler found that the legislative privilege applied to a legislator's communications with third parties when undertaken in connection with or in aid of a legislative act:

> The Eleventh Circuit has not directly addressed the issue of whether the legislative privilege extends to protect legislators from having to produce their communications with third parties. However, it has unequivocally held that "legislators' actions in the proposal, formulation, and passage of legislation" are protected by the privilege. *In re Hubbard*, 803 F.3d at 1308. The Court is of the opinion that the privilege should be applied to protect legislators from having to produce documents shared with third parties or communications between themselves and third parties where they engaged in such sharing or communications *for the purpose of exploring and formulating legislation*.
>
> Indeed, such discussions aid legislators in the discharge of their legislative duty. *See Dyas v. City of Fairhope*, 2009 WL 3151879, at *8 (S.D. Ala. Sept. 24, 2009) ("A privilege that prohibits a plaintiff from asking a legislator what was said in the decisive meeting but allows questions concerning any potential influences on his or her decision—such as conversations with constituents, review of documents and other information-gathering, as well as potential bias—offers a legislator no protection worth having."); *Arizona v. Arpaio*, 314 F.R.D. 664, 670 (D. Az. 2016) (communications with constituents for purpose of "[o]btaining information pertinent to potential legislation or investigation" is a legitimate legislative activity protected by the federal legislative privilege); *Jewish War Veterans of the U.S. of Am., Inc. v. Gates*, 506 F. Supp. 2d 30, 57 (D.D.C. 2007) (communications with executive branch, constituents, interested organizations, and members of the public are protected by federal legislative privilege if these communications "constitute information gathering in connection with or in aid of . . . legislative acts").

Doc. 133-3 at 22 (emphasis in original).

In addition to the decisions Judge Coogler cited in *GBM*, many other courts have similarly applied the legislative privilege to factfinding and communications with third parties as either

legislative acts themselves or as acts in connection with or in aid of a legislative act. *See, e.g.,* *Almonte v. City of Long Beach*, 478 F.3d 100, 107 (2d Cir. 2007) (finding that state legislative immunity protects a legislator's conversations with "executive officers, partisans, political interest groups, or constituents...to discuss issues that bear on potential legislation"); *Gov't of Virgin Islands v. Lee*, 775 F.2d 514, 521 (3d Cir. 1985) ("[F]act-finding, information gathering, and investigative activities are essential prerequisites to the drafting of bills and the enlightened debate over proposed legislation. As such, fact-finding occupies a position of sufficient importance in the legislative process to justify the protection afforded by legislative immunity."); *Bruce v. Riddle*, 631 F.2d 272, 280 (4th Cir. 1980) ("Meeting with 'interest' groups, professional or amateur, regardless of their motivation, is a part and parcel of the modern legislative procedures" and is protected by state legislative immunity); *United States v. Dowdy*, 479 F.2d 213, 223-24 (4th Cir. 1973) (applying the privilege to conferences with government officials and the procurement of various government documents, which by themselves were proper-non-legislative acts, but could be considered preparation in aid of participation in House Committee); *Puente Arizona v. Arpaio*, 314 F.R.D. 664, 670 (D. Az. 2016) (communications with constituents for purpose of "[o]btaining information pertinent to potential legislation or investigation" is a legitimate legislative activity protected by the federal legislative privilege); *Williams v. Johnson*, 597 F. Supp. 2d 107, 117 (D.D.C. 2009) (councilmember's communications with an agency as to which the councilmember had oversight authority, regarding alleged misconduct at the agency, constituted information-gathering protected by the Speech or Debate Clause); *Jeff D. v. Kempthorne*, No. CV–80–4091–E–BLW, 2006 WL 2540090, at *3 (D. Idaho Sept. 1, 2006) (legislator's communications with third party were protected by state legislative privilege where the purpose of these communications

was to gather information for legislative purposes), *aff'd in part sub nom.*, *Jeff D. v. Otter*, 643 F.3d 278 (9th Cir. 2011).

Moreover, the decisions Plaintiffs cite in support of their waiver argument are readily distinguishable. Both *Committee For a Fair & Balanced Map v. Illinois State Bd. of Elections*, No. 11 C 5065, 2011 WL 4837508 (N.D. Ill. Oct. 12, 2011) and *Baldus v. Brennan*, No. 11-CV-562, 2011 WL 6122542 (E.D. Wis. Dec. 8, 2011) were redistricting decisions that involved the use of third-party consultants hired to develop redistricting maps and, therefore, unlike the instant case, fall within one of the few judicially-recognized exceptions to the legislative privilege.[16] For that reason alone, the cases are distinguishable. As noted by Judge Coogler in *GBM*, application of a limited exception to the legislative privilege in redistricting cases "makes sense because … the subjective decision-making process of the legislature in redistricting is the very issue and crux of the constitutional challenge." Doc. 133-3 at 12.

Accepting Plaintiffs' claim that the participation of third parties in the Exploratory Committee constitutes an *ipso facto* waiver of the privilege would create a significant obstacle to the free and fair exchange of information needed by legislators to carry out their public duties−duties undertaken in connection with or in aid of a legislative act. Such a result wholly ignores the contemporary world of legislating, where legislators are available 24/7/365 by internet, email, cell phone, etc. to address questions and concerns of their constituents, interest groups, lobbyists, government officials, and others and to gather information in their capacities as legislators discharging their public duties in furtherance of unfettered legislative deliberation free

---

[16] Some courts, including the Ninth Circuit Court of Appeals, have declined to apply an exception to the legislative privilege even when the information sought concerns legislative acts, motivations, or deliberations regarding redistricting plans. *See, e.g., Lee v. City of Los Angeles*, 908 F.3d 1175 (9th Cir. 2018) (holding that legislative privilege protected city officials from being deposed and questioned regarding legislative acts, motivations, or deliberations pertaining to city's redistricting plan).

of the burden or threat of defending litigation either as a party or a witness. In fact, this is precisely the type of free exchange of information the privilege was intended to foster and protect. *Dyas*, 2009 WL 3151879 at *7-8. As stated by the Supreme Court, "judicial inquiries into legislative or executive motivation represent a substantial intrusion" such that calling a decision maker as a witness "is therefore 'usually to be avoided.'" *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 n.18 (1977) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971)).

In sum, if the legislative privilege, like the principle of legislative immunity, is truly such that its importance is difficult to overstate, *see Bethune-Hill v. Virginia State Bd. Of Elections*, 114 F. Supp.3d 323, 333 (E.D. Va. 2015), then waiver cannot be premised on an action that courts have characterized as "part and parcel" of the modern legislative process. *See Bruce*, 631 F.2d at 280. Moreover, if regular communication with and responsiveness to constituents and others waives the legislative privilege, then the privilege is simply no more.

For this reason alone, the Magistrate Judge correctly held that the legislative privilege shields the Legislators from inquiries regarding their participation in the Exploratory Committee.

## C. LEGISLATIVE PRIVILEGE SEPARATELY SHIELDS LEGISLATORS FROM INQUIRIES REGARDING MOTIVATION FOR LEGISLATIVE ACTS.

The Legislators' participation on the Exploratory Committee in drafting HB 282 was so obviously legislative in nature, that the Magistrate Judge discussed, but did not rule on, the alternative and equally compelling motive argument, i.e., that legislative privilege also protects against inquiries directed at discovering motivation for legislative acts. Doc. 199 at 4-5.[17] Yet, that

---

[17] On pages 4 and 5 of his Order, Magistrate Judge Doyle discusses the fact that the legislative privilege "protects against any inquiry into acts that occur in the regular course of the legislative process and *into the motivation for those acts*." Doc. 199 at 4-5 (emphasis in original) (quoting *In re Hubbard*, 803 F.3d. at 1310).

argument provides a second, persuasive, and independent basis for affirming the Magistrate Judge's Order.

It is undisputed that Plaintiffs concede "the legislature's intent is a central issue in the case" and forms the basis of their subpoenas for documents and testimony from which they seek to identify an "intentionally discriminatory purpose." Doc. 201 at 10. As the Magistrate Judge correctly noted, the legislative privilege "protects against any inquiry into acts that occur in the regular course of the legislative process and *into the motivation for those acts*." Doc. 199 at 4-5 (emphasis in original) (quoting *In re Hubbard*, 803 F.3d. at 1310). *See also Brewster*, 408 U.S. at 525; *Tenney*, 341 U.S. at 377 (declaring "that it [i]s not consonant with our scheme of government for a court to inquire into the motives of legislators"); *Searingtown Corp. v. Incorporated Village of North Hills*, 575 F. Supp. 1295, 1298 (E.D.N.Y. 1981) (holding that legislative privilege protects legislators from "discovery aimed at delving into their thought processes, motivations, and deliberations regarding the legislation they enacted and of which plaintiffs complain."). Citing the Supreme Court's decision in *United States v. O'Brien*, the Eleventh Circuit noted in *Hubbard*, "the Supreme Court [has] held that, as a 'principle of constitutional law,' courts cannot "strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive," and "that courts may not 'void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it.'" 803 F.3d at 1312 (quoting *United States v. O'Brien*, 391 U.S. 367, 383-84 (1968)). *See also Arizona v. California*, 283 U.S. 423, 455 (1931) ("Into the motives which induced members of Congress to enact the [statute], this court may not inquire.").

Therefore, in the unlikely event the Court were to conclude that the Legislators' participation in the Exploratory Committee was not independently privileged as a "legislative act,"

or was not otherwise undertaken in connection with or in aid of a legislative act (*i.e.*, enactment of HB 282 as Act 2017-378), the privilege inquiry does not end there. Once it is established that a litigant is attempting to undermine a legislative decision, such as the enactment of HB 282 in this case, the privilege applies. *See Dyas,* 2009 WL 3151879 at *9; *MLC Auto. LLC v. Town of Southern Pines*, No. 1:05cv1078, 2007 WL 128945, *5-6 (M.D.N.C. Jan. 11, 2007); *Kay v. City of Rancho Palos Verdes*, No. CV 02–03922 MMM RZ, 2003 WL 25294710, *11 (C.D. Cal. Oct. 10, 2003); *Orange v. Cty. of Suffolk*, 855 F. Supp. 620, 625 (E.D.N.Y. 1994).

This principle is cogently illustrated in *Dyas v. City of Fairhope*, a case which Plaintiffs failed to address before the Magistrate Judge and failed to address in their Objections. In *Dyas*, nonparty members of the Fairhope City Council and the Zoning and Planning Commission moved to quash deposition subpoenas seeking, *inter alia*, testimony regarding traffic and rezoning decisions. 2009 WL 3151879, at *1-2. Although the *Dyas* court applied an overly restrictive definition of "legislative acts,"[18] it nevertheless granted the motion to quash after finding that the inquiries were directed at legislative motive. The Court found that outside interference with legislative functions "does not occur only when a legislator is questioned about his or her vote or discussions of the issue while the body is in session"; that it also occurs when inquiries target the motives of legislators (either directly or indirectly) for the purpose of proving individual or corporate intent to attack and undermine a legislative decision. *Id.* at 8-9. Quoting the U.S. Supreme Court's decision in *Bogan v. Scott–Harris*, 523 U.S. 44, 54-55 (1998), the *Dyas* Court held that "'it simply is not consonant with our scheme of government for a court to inquire into the motives of legislators.'" 2009 WL 3151879, at *8. The *Dyas* court specifically found the

---

[18] Although the *Dyas* court's decision to limit "legislative acts" to actual voting and to discussions preceding the vote of the Council or Commission while in session, *Hubbard*, as well as many other decisions discussed above, have since clarified the privilege is much broader and extends to "legislators' actions in the proposal, formulation, and passage of legislation." *In re Hubbard*, 803 F.3d at 1310.

prohibition regarding motive extended to questions concerning the sources of a legislator's information, *e.g.*, informal discussions, document review, information-gathering, as well as their discussions with City residents and constituents regarding traffic and rezoning decisions. *Id.* at *7-8. As cogently stated by the Court,

> A privilege that prohibits a plaintiff from asking a legislator what was said in the decisive meeting but allows questions concerning any potential influences on his or her decision—such as conversations with constituents, review of documents and other information-gathering, as well as potential bias—offers a legislator no protection worth having. Independence is equally threatened by the scrutiny, motives are probed by indirection, and the hassle and distraction are if anything enhanced.
>
> * * * *
>
> In short, the privilege prevents a litigant from deposing an unwilling legislator to probe for evidence with which to support the litigant's challenge to a legislative decision as improperly motivated, procedurally defective or otherwise infirm. Once it is established that the litigant attacks a legislative decision, the privilege applies to questioning seeking to undermine that decision, *including questioning concerning acts that are not themselves legislative and thus not independently privileged.*

*Id.* at 8-9 (emphasis added).[19]

---

[19] The *Dyas* court also found that the privilege extended beyond direct inquiries regarding a legislator's motive for voting a certain way (a protected "legislative activity"); that it also prohibited inquiries by the plaintiffs aimed at establishing motive indirectly, *e.g.*, inquiries into the historical background of past official actions; the sequence of events leading up to the challenged decisions; departures from normal procedural sequences; substantive factors usually considered important in such decisions; and the legislative history of the decisions. *Dyas*, 2009 WL 3151879, *8. The court provided specific examples of prohibited questions:

> For example, a litigant cannot ask a legislator questions directly or indirectly probing corporate or individual intent (including, without limitation, questions concerning information considered or made known to the deponent or other legislators; questions concerning the *Arlington Heights* considerations or others like them; and questions concerning comments made by or to any legislator or group of legislators, before or after enactment). Similarly, a litigant cannot ask a legislator questions directly or indirectly probing the sequence of events leading to the legislative decision (including, without limitation, questions touching on procedure or timing). This list is not exhaustive but merely illustrative.

*Id.* *9.

The *Dyas* court specifically rejected the plaintiffs' argument urging the court to adopt the position in *Miles–Un–Ltd., Inc. v. Town of New Shoreham*, 917 F. Supp. 91, 98 (D.N.H. 1996), wherein that court held that legislators should be shielded from inquiries directed at motive and attacking a legislative decision only where the activities themselves constitute legitimate legislative activity. *Dyas*, 2009 WL 3151879, *9. The court cited several contrary decisions precluding inquiry into related non-legislative matters preceding a challenged legislative decision. *Id.* at *10 (citing *MLC Auto., LLC*, 2007 WL 128945 at *5–6 ("precluding inquiry into related non-legislative matters preceding the challenged legislative decision because otherwise 'the testimonial privilege would effectively be eviscerated'"); *Cty. of Suffolk*, 855 F. Supp. at 625 ("This Court notes that Legislator Binder's communicative activities, including his acquisition of information for the purpose of his legislative activities, fall within his legislative privilege."). *See also United States v. Dowdy*, 479 F.2d 213, 223-24 (4th Cir. 1973) (holding that the Speech or Debate Clause privilege "does not simply protect against inquiry into acts which are manifestly legislative. In our view it also forbids inquiry into acts which are purportedly or apparently legislative, even to determine if they are legislative in fact.").

Consequently, in the instant case, even if the Court were to somehow find that the Magistrate Judge erred in finding that the Legislators' participation in the Exploratory Committee constituted a legislative act or acts undertaken in connection with or in aid of the passage of HB 282 as Act 2017-378, the privilege would still preclude inquiries aimed at delving into Rep. Faulkner's and Senator Ward's thought processes, motivations, and deliberations regarding the legislation they enacted and that is now made, in part, the basis of Plaintiffs' claims.

As previously noted, Plaintiffs have made no secret that "the legislature's intent is a central issue in the case", Doc. 201 at 10, and that the purpose of the challenged subpoenas is to "seek

documents and testimony regarding the Legislators' intent in working to enact HB 282, about the meaning and scope of Section 177(b) of the Alabama Constitution, and regarding Section 15-22-36.1(a)(3) of the Alabama Code."[20] Doc. 139 at 1. Furthermore, Plaintiffs have requested all documents and communications "concerning the purpose, design, drafting, passage, implementation, or effect of HB 282." *See* Doc. 133 at 10, Doc. 133-1; Doc. 133-2. And, although the Alabama Legislature enacted HB 282 as Act 2017-378 after Plaintiffs filed their complaint, Plaintiffs submitted supplemental allegations on March 1, 2018, adding HB 282 as an additional basis for their Fourteenth and Fifteenth Amendment claims (Counts 1 and 2).[21] Doc. 93 at ¶¶44-51. In those counts, Plaintiffs claim that HB 282 maintains the discriminatory impact of Section 177(b) (ALA. CONST. art. VIII, § 177(b)).[22] *Id.* Additionally, Plaintiffs attack HB 282 by asserting an ex post fact claim (Count 11) which triggers an issue of punitive intent. Doc. 93 at ¶¶ 52-57. Whether the claim is one of punitive or racially discriminatory intent, Plaintiffs inquiries target the Legislatures corporate motive and intent.[23] Accordingly, Plaintiffs' inquiries are directed either at legislative acts or acts undertaken by the Legislators in connection to and aid of enactment of HB 282 as Act 2017-378, or they are directed at discovering and discrediting legislative motive. In either case, legislative privilege shields Rep. Faulkner and Sen. Ward from such inquiries.

---

[20] Although Plaintiffs challenge the 1996 Amendment (Section 177(b)), the Legislators were not serving in the Alabama Legislature at the time of its proposal. Consequently, even if they could be questioned, they would have no information regarding the motive or intent of the Legislature at the time it proposed Section 177(b) in 1995.

[21] In fact, Plaintiffs specifically state that they filed their supplemental factual allegation "to supplement only their allegation with respect to their remaining claims in light of HB 282 and to add new claims that have arisen in light of HB 282 and Defendant Merrill's improper retroactive implementation of it." Doc. 93 at ¶25.

[22] The fact that Plaintiffs now attack HB 282 as intentionally racially discriminatory is also reflected by their new allegation that the Act omits certain "white collar" crimes that were previously included in the 1819 and 1861 Alabama Constitutions when only white males could vote. Doc. 98 at ¶10.

[23] Although Plaintiffs also have added a claim alleging that the Secretary of State improperly applied HB 282 retroactively, *see* Doc. 93 at ¶¶82-90, that claim does not concern the enactment of the Act or otherwise implicate any acts undertaken by the Legislators in drafting and procuring enactment of the Act.

D.      THE MAGISTRATE JUDGE CORRECTLY FOUND THE PLAINTIFFS' CLAIMS DID NOT
        ABROGATE THE PRIVILEGE.

Conceding that their subpoenas are intended for the improper purpose of ferreting out alleged legislative motive, Plaintiffs alternatively argue that their claims abrogate the privilege because they seek to vindicate "important federal interests." Doc. 201 at 7, 9. They further ask the Court to analyze the privilege in light of the five-factor balancing test established in *Rodriguez v. Pataki*, 280 F. Supp. 2d 89 (S.D.N.Y. 2003) and used by some courts in redistricting cases. Plaintiff Greater Birmingham Ministries unsuccessfully asserted this argument when they challenged the Alabama voter ID law, arguing that a claim of racial discrimination in voting was one of the "extraordinary circumstances" referenced in *Arlington Heights* that warranted abrogation of the legislative privilege. *GBM v. Merrill*, No. 2:15-cv-02193-LSC (N.D. Ala. Mar. 13, 2017), Doc. 133-3 at 11. Although the Legislators in no way discount the importance of federal voting rights, as set forth in their Motion to Quash, Doc. 133 at 13, and as noted by the Eleventh Circuit in *Hubbard*, courts routinely have rejected invitations to expand exceptions to the legislative privilege beyond the enforcement of federal criminal statutes and redistricting challenges. *See In re Hubbard*, 803 F.3d at 1311-12. In fact, courts, including the Northern District in *GBM*, have routinely rejected legislative privilege challenges related to claims of racial discrimination in voting. In other words, the mere fact that legislation concerns voting does not automatically abrogate the legislative privilege.

In *GBM*, Plaintiff Greater Birmingham Ministries unsuccessfully challenged Alabama's voter ID law. As in this case, they argued that their claims asserted under the Fourteenth and Fifteenth Amendment (as well as Section 2 of the Voting Rights Act of 1965), should be excepted from the legislative privilege. Judge Coogler, however, correctly rejected that argument as follows:

It is also true that some district courts have found a limited exception to legislative privilege in cases involving legislative redistricting, *i.e.*, "gerrymandering." This makes sense because in contrast to the case at bar, the subjective decision-making process of the legislature in redistricting is the very issue and crux of the constitutional challenge:

Legislative redistricting is a *sui generis* process. While it is an exercise of legislative power, it is not a routine exercise of that power. The enactment of statutes ordinarily involves the implementation of public policy by a duly constituted legislative body. Redistricting involves the establishment of the electoral structure by which the legislative body becomes duly constituted. Inevitably, it directly involves the self-interest of the legislators themselves. *Marylanders for Fair Representation, Inc. v. Schaefer*, 144 F.R.D. 292, 304 (D. Md. 1992) (Murnaghan & Motz, JJ., concurring); *see also Bethune-Hill v. Virginia State Bd. Of Elections*, 144 F. Supp.3d 323, 337 (E.D. Va. 2015) (the reason redistricting cases are 'extraordinary' as contemplated by *Arlington Heights* is because the 'natural corrective mechanisms built into our republic system of government offer little check upon the very real threat of legislative self-entrenchment") (internal quotation marks omitted). If legislative privilege is raised in opposition to discovery request *in these type cases*, courts often use a balancing test to determine whether and to what extent the privilege should be honored.

****

However one characterizes the legislative privilege, *Plaintiffs offer no support for applying this balancing test in anything other than redistricting cases.* Indeed, virtually all of the cases Plaintiffs cite in support concern redistricting litigation.

****

In contrast, district courts have refused to abrogate the legislative privilege in cases dealing with Section 2 VRA challenges.

****

In sum, this Court is not persuaded that decisions in criminal prosecutions or *inapposite redistricting cases* compel the broad production of documents sought in the instant case, especially in light of binding Eleventh Circuit principles with regard to the Eleventh Circuit principles with regard to the legislative privilege espoused in *In re Hubbard*.

*GBM*, No. 2:15-cv-02193-LSC (N.D. Ala. Mar. 13, 2017) (emphasis added), Doc. 133-3 at 13-15. Yet, despite the clear holding in *GBM*, Plaintiffs once again rely on inapposite redistricting decisions.[24]

Plaintiffs cite *no decisions* recognizing an exception to the legislative privilege regarding a challenge to a state disenfranchisement law based on race (or wealth) discrimination. Plaintiffs cite the decisions of *Nashville Student Org. Comm. v. Hargett*, 123 F. Supp. 3d 967 (M.D. Tenn. Aug. 12, 2015) and *Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016), for the erroneous proposition that courts "have pierced legislative privilege in voter ID cases." Doc. 201 at 8-9, n.1. Their assertion of this tired, rejected argument is shameful. Not only do Plaintiffs attempt to mislead the Court regarding the import of these decisions, they know they are misleading the Court regarding the *Veasey* voter ID decision because Judge Coogler in *GMB* specifically rejected this same argument as a misrepresentation of the facts. As noted in Judge Coogler's opinion, the parties in *Veasey* "did not raise on appeal the district court's handling of the legislative privilege issue," and, more importantly, "54 of the Texas legislators either *actively waived the privilege or passively waived the privilege* by failing to assert it in response to inquiries directed to that question." *GBM*, Doc. 133-3 at 19-21 (emphasis added) (citing *Veasey*, 830 F.3d at 236-37). As Judge Coogler noted, "[t]his waiver resulted in both the trial court and the appellate court having significant deposition testimony before it."[25] *Id.*

---

[24] Plaintiffs cite the following redistricting cases in their opposition brief: *Bethune-Hill v. Virginia State Bd. Of Elections*, 114 F. Supp. 3d 323, 337 (E.D. Va. 2015); *Comm. for a Fair and Balanced Map v. Ill. State Bd. Of Educ.*, 2011 WL 4837508 (N.D. Ill. Oct. 12, 2011); *Favors v. Cuomo*, 2015 WL 7075960 (E.D.N.Y. Feb. 8, 2015).

[25] Importantly, and as Judge Coogler noted, even after the Fifth Circuit found an affirmative waiver of the legislative privilege in *Veasey*, the court "still ordered that the production be done under seal and specifically reserved the issue of whether the legislative privilege should be pierced until the time of trial, noting that it was not inclined to fully pierce the privilege given the importance of preserving confidential communication among legislators. *GBM*, No. 2:15-cv-02193-LSC (N.D. Ala. Mar. 13, 2017), Doc. 133-3 at 20.

*Nashville Student Organizing Committee* is likewise distinguishable because it was a redistricting decision that fell squarely within the category of unique cases providing a limited exception to the legislative privilege. The instant case, however, is not a redistricting case. Further, Plaintiffs omit the fact that even while allowing some legislator depositions to proceed, the court "specifically reserve[d] decision as to which, if any, of the topics covered in the deposition will result in admissible testimony" and specifically advised the plaintiffs' counsel that "the deposition testimony shall not be disseminated to the plaintiffs, the press, or anyone else" because "subject matter of the testimony is highly sensitive and *potentially privileged*." 123 F. Supp. 3d at 971-72 (emphasis added). Thus, even in a redistricting case, which the current case surely is not, the court was not inclined to fully pierce the privilege given the importance of preserving confidential communication among legislators. Moreover, three subsequent cases citing *Nashville Student Organizing Committee* have applied the legislative privilege.[26]

Plaintiffs also appear to argue that the Eleventh Circuit's recent decision in *Jones v. Governor of Fla.*, 950 F.3d 795 (11th Cir. 2020) (per curiam) creates by implication an exception to the legislative privilege merely because the Court affirmed a preliminary injunction order based on a finding that the plaintiffs were likely to prevail on a Fourteenth Amendment equal protection challenge to a Florida re-enfranchisement statute that allegedly discriminated on the basis of wealth. Doc. 201 at 8. But *Jones* did not address legislative privilege at all, and it certainly did not carve out a new exception to the legislative privilege for wealth-based claims.[27]

---

[26] *See Michigan State A. Philip Randolph Institute v. Johnson*, 2018 WL 1465767 (E.D. Mich. Jan. 4, 2018); *League of Women Voters of Mich. v. Johnson*, 2018 WL 2335805 (E.D. Mich. May 23, 2018); *Citizens Union of City of New York v. Attorney General of New York*, 269 F. Supp. 3d 124 (S.D.N.Y. Sep. 1, 2017).
[27] There is no final decision in the *Jones* litigation. The Eleventh Circuit merely affirmed the district court's issuance of a preliminary injunction based on its conclusion that felons were likely to succeed on the merits of their equal protection claim. *Jones*, 950 F.3d at 832-33.

In this case, Plaintiffs expressly seek to enforce the subpoenas to seek out the chimera of *race* discrimination they assume underpins the development and passage of HB 282, as they claim in this litigation. Count 13−Plaintiffs' Fourteenth Amendment wealth discrimination claim−has nothing to do with race discrimination. Furthermore, nowhere in *Jones* did the Eleventh Circuit endorse a blanket exception (or any exception) to legislative privilege merely because a Plaintiff may state a proper cause of action under the Fourteenth Amendment, based on wealth discrimination.[28]

Finally, Plaintiffs' claim that the Magistrate Judge erred by failing to apply the balancing factors articulated in the abrogated[29] decision of *Rodriguez v. Pataki*, 280 F. Supp. 2d at 93–94 is without merit. Doc. 201 at 8. As noted above, Plaintiff Greater Birmingham Ministries made this same argument in *GMB*, and Judge Coogler specifically rejected it, finding that there was "no support for applying the *Rodriguez* balancing test *in anything other than redistricting cases*." *GBM*, No. 2:15-cv-02193-LSC (N.D. Ala. Mar. 13, 2017) (emphasis added), Doc. 133-3 at 13. In fact, Plaintiffs cite no contrary decisions applying the *Rodriguez* balancing test outside of redistricting litigation. Furthermore, even in its redistricting decisions, the United States Supreme Court has never applied the *Rodriguez* factors. *See* Christopher Asta, Note, *Developing a Speech Or Debate Clause Framework For Redistricting Litigation*, 89 N.Y.U. L. REV. 238, 262 (noting that "the Supreme Court has never engaged in this balancing analysis in the redistricting context,

---

[28] The decision of *Loesel v. City of Frankenmuth*, No. 08-11131-BC, 2010 WL 456931 (E.D. Mich. Feb. 4, 2010), cited by Plaintiffs, is likewise distinguishable on many levels. In particular, the court allowed the plaintiffs to depose members of a city planning commission in part because the city had already allowed two other members of the commission to testify on an equal protection claim regarding a zoning ordinance, and the city failed to respond to the plaintiffs' waiver argument. *Id*. at *6.

[29] The Second Circuit Court of Appeals' decision in *Almonte v. City of Long Beach*, 478 F.3d 100, 107 (2d Cir. 2007) abrogating the holding in *Rodriguez*. Whereas the district court in *Rodriguez* suggested that "a conversation between legislators and knowledgeable outsiders, such as lobbyists, to mark up legislation" would not be privileged, *see Rodriguez*, 280. F. Supp. 2d. at 101, the Second Circuit in *Almonte* found that state legislative immunity protects a legislator's conversations with "executive officers, partisans, political interest groups, or constituents...to discuss issues that bear on potential legislation." *Almonte*, 478 F.3d at 107.

making it a particularly unmoored exercise"). Moreover, regardless of Plaintiffs allusions to what "other courts have done," the Eleventh Circuit has never adopted or applied the *Rodriguez* factors even to redistricting cases or any other decisions regarding the application of legislative privilege.

For these reasons, the Magistrate Judge correctly rejected Plaintiffs' argument seeking to expand the limited exceptions to the legislative privilege.

### E.   THE MAGISTRATE JUDGE CORRECTLY FOUND THAT PLAINTIFFS HAD ACCESS TO OTHER SOURCES OF NON-PRIVILEGED EVIDENCE.

As correctly noted by the Magistrate Judge, "Plaintiffs can gather evidence of legislative purpose from non-privileged sources and have not shown that these are inadequate." Doc. 201 at 7. Indeed, the availability of non-privileged sources of evidence available to Plaintiffs regarding the Exploratory Committee and its role in proposing and drafting HB 282 is an embarrassment of riches. First, they have access to the minutes of all the meetings of the Exploratory Committee. Those minutes, which identify the attendees and summarize the content of the meetings, are publicly available on the Alabama Secretary of State's website at https://www.sos.alabama.gov/index.php/taxonomy/term/7. Further, the only meeting the Legislators attended, which occurred on January 20, 2016, was open to the public and conducted in the Alabama State House (Room 617). In addition, the Committee included 13 other non-legislative members who could potentially provide testimony and/or documents regarding the purpose, function and business of the Committee. In fact, Plaintiffs acknowledge the participation of clergy, freelance journalists, ACLU advocates, judicial officers and crime victim advocates. Doc. 139 at 5.[30]

---

[30] One of the redistricting cases Plaintiffs cites actually supports the Legislators' argument that the availability of nonprivileged evidence favors nondisclosure. In particular, in *Committee for a Fair and Balanced Map v. Illinois State Bd. of Elections*, No. 11 C 5065, 2011 WL 4837508, at *8 (N.D. Ill. 2011), the court held that "the availability of other evidence favors non-disclosure. Plaintiffs already have considerable information at their fingertips. This includes public hearing minutes, special interest group position papers, statements made by lawmakers during debate,

Although Plaintiffs appear to suggest that the Legislators invoke the privilege to shield from discovery other non-legislative Committee members such as ACLU representatives and freelance journalists, Doc. 201 at 6, nothing could be further from the truth. The legislative privilege is personal to each legislator. *See, e.g., ACORN v. County of Nassau*, No. 05-2301, 2007 WL 2815810, \*4 (E.D.N.Y. Sept. 25, 2007) (holding that "[t]he legislative privilege 'is a personal one and may be waived or asserted by each individual legislator.'" (quoting *Marylanders for Fair Representation, Inc. v. NAACP, Inc.*, 144 F.R.D. 292, 298 (D. Md. 1992)); *see also Favors v. Cuomo*, 285 F.R.D. 187, 211 (E.D.N.Y. 2012) ("[A] legislator cannot assert or waive the privilege on behalf of another legislator."). Thus, Plaintiffs are free to seek discovery from other non-legislative members of the Committee, which they have done. Even before the Legislators filed their Motion to Quash, Plaintiffs deposed Committee participants Edward Packard and John Bennett of the Office of Secretary of State. Since then, Plaintiffs have also deposed Committee attendee Win Johnson, former Director of the Legal Division of the Alabama Office of Courts, and Committee member the Honorable Tim Jolley, former Circuit Judge of Marshall County, Alabama, obtaining an additional 278 pages of sworn testimony regarding the Committee's activities. *See* Docs. 209-1, 209-2.

Given the abundant source of non-privileged evidence available to Plaintiffs, the Supreme Court's cautionary statement in *Arlington Heights*, 429 U.S. at 267-68, rings particularly true—that it would be an "*extraordinary instance*" that would allow the direct questioning of legislators to establish motive and intent. Even if Plaintiffs could establish such extraordinary circumstances, "*such testimony frequently will be barred by privilege*." *Id.* at 268 & n.18. (emphasis added).[31] In

---

committee reports, press releases, newspaper articles, census reports, registered voter data and election returns. These documents and data are a matter of public record. As such, these factors weigh against disclosure."

[31] Judge Coogler recognized the correctness of this interpretation in *GBM*, citing the same exact passage from the decision and stating that "*Arlington Heights* thus appears to require both extraordinary circumstances *and* an exception

that event, "when the [legislative] privilege makes relevant evidence unavailable, the parties will have to present their cases as best they can without the evidence, as would occur in other instances when nonparties possess privileged information." *Fields v. Office of Eddie Bernice Johnson*, 459 F.3d 1, 32 (D.C. Cir. 2006).

F.    **THE MAGISTRATE JUDGE CORRECTLY FOUND NO EXCEPTION TO THE LEGISLATIVE PRIVILEGE FOR EX POST FACTO CLAIMS.**

Citing footnote 14 from *Hubbard*, Plaintiffs erroneously contend that their assertion of an ex post facto claim creates an exception to the legislative privilege. Doc. 139 at 10-11. Plaintiffs are simply wrong, and as recognized by the Magistrate Judge, they drastically misread *Hubbard* on this issue. Doc. 199 at 7. Contrary to Plaintiffs' assumption, the legislative privilege applies in actions involving ex post facto claims in the same way it applies to other kinds of actions.

As found by the Special Master, "[t]he footnote does not speak to the legislative privilege at all and certainly does not state that it is abrogated whenever a plaintiff brings an ex post facto challenge." Doc. 199 at 7. Rather, it is found in a section of the Eleventh's Circuit's opinion discussing how, with regard to certain kinds of claims, evidence of an alleged illicit motive or intent is simply not a relevant basis on which to nullify a statute that is constitutional on its face:

> In *United States v. O'Brien*, the Supreme Court held that, as a "principle of constitutional law," courts cannot "strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." 391 U.S. 367, 383, 88 S. Ct. 1673, 1682, 20 L. Ed.2d 672 (1968). The plaintiff in *O'Brien* had challenged a congressional statute on free-speech grounds by citing from the legislative history statements of three Congressmen and then using those statements to argue that "the 'purpose' of Congress" in passing the statute "was 'to suppress freedom of speech.'" *See id.* at 382–83, 385–86, 88 S. Ct. at 1682, 1683–84. The Supreme Court rejected the challenge outright, citing the "fundamental principle of constitutional adjudication" that courts may not "void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it." *Id.* at 383–84, 88 S. Ct. at 1682–83; *see also Arizona v. California*, 283 U.S. 423, 455, 51 S. Ct. 522, 526, 75 L. Ed. 1154 (1931) ("Into

---

to the privilege in order to question a legislator concerning intent." *GBM*, No. 2:15-cv-02193-LSC (N.D. Ala. Mar. 13, 2017), Doc. 133-3 at 11.

the motives which induced members of Congress to enact the [statute], this court may not inquire.").

*In re Hubbard*, 803 F.3d at 1312.

The Court noted in *dicta* in footnote 14 that evidence of motive or intent can be relevant as to other kinds of claims:

> *O'Brien* acknowledged that there are limitations to this rule. *See* 391 U.S. at 383 n.30, 88 S. Ct. at 1682 n.30 (noting that "an inquiry into the legislative purpose" is permissible where a law is challenged as a bill of attainder, as an ex post facto law, or on another ground that requires the court to determine whether the challenged statute is "penal in nature"). Our discussion of the *O'Brien* rule is limited to the context before us: a free-speech retaliation challenge to an otherwise constitutional statute.

*Id.* at 1312 n.14.[32]

Although the Court acknowledged the rather unsurprising and well-established point that evidence of legislative motive or intent can be relevant in *some* cases, it did not propose how courts should examine legislative motive, nor does it stand for the proposition that such an examination should or may include testimony of individual legislators and others as to their subjective motivations.[33] Rather, as discussed above, and as courts have recognized, where evidence of

---

[32] The United States Supreme Court has repeatedly warned about the limited usefulness of the statements by an individual legislator in discerning a multi-member legislative body's purpose. *E.g.*, *Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 297 (2010); *N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929, 942 (2017) ("What Congress ultimately agrees on is the text that it enacts, not the preferences expressed by certain legislators." (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998))); *Minis v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 385 (2012) ("[T]he views of a single legislator, even a bill's sponsor, are not controlling." (citing *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 118 (1980))); *GTE Sylvania, Inc.*, 447 U.S. at 117-18 (1980) ("And ordinarily even the contemporaneous remarks of a single legislator who sponsors a bill are not controlling in analyzing legislative history." (citing *Chrysler Corp. v. Brown*, 441 U.S. 281, 311 (1979))).
[33] *See Kay*, 2003 WL 25294710, at *8:

> Plaintiffs cite only one case to support their assertion that they should be permitted to depose numerous local legislators and others about the City's motives, but that case, *United States v. O'Brien*, 391 U.S. 367, 88 S. Ct. 1673, 20 L. Ed.2d 672 (1968), merely states in dicta that on occasion courts must "examine the legislative motive in enacting a statute." *Id.* at 384 n.30 (dicta). It does not prescribe *how* courts should examine legislative motive, nor does it stand for the proposition that such an examination should or may include testimony of individual legislators and others as to their subjective motivations.

(emphasis in original).

motive is relevant, that evidence can be properly obtained from various legitimate sources, such as the text of the statute, the legislative record (including committee reports and floor debates), etc. *See*, *e.g., Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 484 (1977) (rejecting argument that an act was a punitive bill of attainder, stating: "[T]his Court is not free to invalidate Acts of Congress based upon inferences that we may be asked to draw from our personalized reading of the contemporary scene or recent history. In judging the constitutionality of the Act, we may only look to its terms, to the intent expressed [in the legislative record] by Members of Congress who voted its passage, and to the existence or nonexistence of legitimate explanations for its apparent effect.").

In short, *Hubbard* provides no support for Plaintiffs' assertion that an ex post facto challenge abrogates the legislative privilege and thus allows Plaintiffs to drag legislators into depositions and discovery. Moreover, Plaintiffs cite *no* decision supporting the proposition that an ex post facto claim furthers an important federal interest such that the legislative privilege must yield–a proposition which, if adopted, would effectively render the privilege useless because future plaintiffs would simply attach an ex post facto claim to every lawsuit to circumvent the privilege.[34] The only other court to address the legislative privilege in the context of an ex post facto challenge affirmed application of the privilege. *See Metzger v. Am. Fidelity Assur. Co.*, No. CIV-05-1387-M, 2007 WL 895141, *1-4 (W.D. Okla. Mar. 22, 2007) (granting motions to quash by state senator and state representative based on legislative privilege in case involving ex post facto claim).

Furthermore, Plaintiffs simply declare, without citation to any authority, that their ex post facto claim does not implicate the established justifications behind the legislative privilege

---

[34] The Legislators in no way seek to diminish the legitimacy of a proper ex post facto challenge, but rather contend that such claims do not override the legislative privilege, which the Eleventh Circuit as described as "important" with its "deep roots in federal common law." *In re Hubbard*, 803 F.3d at 1307.

33

discussed above and discussed at length in the Defendants' motion to quash. Plaintiffs are wrong.

Just as with any other claim, compelling discovery and testimony with regard to an ex post facto

claim interferes with a legislator's day-to-day duties and raises a constant threat of compelled

discovery that would absolutely chill open and honest legislative deliberations. Plaintiffs' bare

declaration to the contrary is without support in logic, fact, or law.[35]

## G.   THE MAGISTRATE JUDGE CORRECTLY FOUND THAT A PRIVILEGE LOG WAS UNNECESSARY FOR THE PARTIES TO ASSESS THE PRIVILEGE CLAIM.

The Magistrate Judge correctly held that no privilege log was required based on the holding

in *Hubbard* that "Rule 45 requires only enough description and precision to enable the parties to

assess the claim." Doc. 199 at 8 (quoting *In re Hubbard*, 803 F.3d at 1309). More particularly, the

*Hubbard* court held as follows:

> What we have said in this Part applies as well to the district court's ruling that the
> lawmakers were required to personally review the documents and raise their
> privilege claims by affidavit. *See supra* Part III.A. *Lawmakers do not need to
> personally review any documents or sign affidavits to "enable the parties to assess
> the claim[s]," Fed.R.Civ.P. 45(e)(2)(A)(ii), where the subpoena necessarily
> trenches upon the interests protected by the legislative privilege.* The nature of
> AEA's sole remaining claim defines the purpose of the subpoenas, which in turn
> answers the question of whether the privilege applies.

803 F.3d at 1311, n.12 (emphasis added).

As previously established, Plaintiffs' subpoenas "necessarily trenches upon the interests

protected by the legislative privilege," as every aspect of the discovery and testimony sought to be

compelled from the Defendants concerns (1) the Legislators' participation in the Exploratory

Committee−including information gathering, proposal, formulation, and actual drafting of

HB 282−which constitutes either a legislative act or an act undertaken in connection with or in aid

---

[35] Additionally, even if their ex post facto claim in some way abrogated the legislative privilege – and it clearly does not − Plaintiffs cannot rely on that portion of their claim regarding the enactment of what became Section 177(b) of the Alabama Constitution, as the Legislators were not in the Alabama Legislature during that time and thus have no testimony or documentary evidence to offer.

of a legislative act, or (2) inquiries directed at the legislative motive and intent underlying the enactment of HB 282. As held in *Hubbard*, "legislators' actions in the proposal, formulation, and passage of legislation" are protected by the privilege, as well as "requests for information about the motives for legislative votes and legislative enactments." *In re Hubbard*, 803 F.3d at 1310. In sum, given Plaintiffs' admissions as to the scope and purpose of their subpoenas, there can be no serious dispute that the testimony and other evidence they seek "trenches upon the interests protected by the legislative privilege." Thus, no privilege log is required.

Finally, Plaintiffs erroneously attempt to recast *Hubbard's* holding on the issue of the privilege log requirement as a one-off. They claim that, unlike the instant case, the *Hubbard* court found that the AEA's First Amendment retaliation claim was by definition an "inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts" and that, therefore, "none of the information sought could have been outside the privilege." *In re Hubbard*, 803 F.3d at 1310-11. The Legislators agree that *Hubbard* did so hold. But that same rationale applies here because, as previously established, none of the information Plaintiffs seek falls outside the privilege.

Plaintiffs further attempt, albeit unsuccessfully, to distinguish *Hubbard* by asserting the *ipse dixit* argument that the Legislators' participation in the Exploratory Committee is not legislative in nature and therefore not subject to the legislative privilege. Alternatively, they claim that the Legislators waived the privilege by communicating with third parties. Doc. 201 at 11-12. The Legislators have addressed both unsupported arguments above and need not repeat them here. As cogently stated by the Magistrate Judge:

> *Hubbard* unequivocally holds that "[t]he privilege protects the *legislative process* itself" and covers "legislator's actions in the *proposal, formulation, and passage* of legislation." 803 F.3d at 1308). … Ward's and Faulkner's activity on the committee is

> protected because it directly concerned the formulation, proposal,
> and passage of legislation.

Doc. 199 at 6 (emphasis in original).

Thus, it is beyond credible argument to suggest that the testimony and materials Plaintiffs seek here do not concern the legislative process or underlying motive regarding the formulation, proposal and drafting of the legislation (HB 282). Plaintiffs have acknowledged it. *See* Doc. 201 at 10 (wherein Plaintiffs assert that "the [L]egislature's intent is a central issue in the case, supporting the evidentiary need for the subpoenaed documents and testimony," and therefore must be able to search for "an intentionally discriminatory purpose").

As found by the Magistrate Judge, "[t]he extensive briefing on the privilege issue here shows that the parties fully understand the legislators' claim of privilege." Doc. 199 at 8. Accordingly, the Court should reject Plaintiffs' privilege log argument, just like the Eleventh Circuit in *Hubbard*. *See also Metzger*, 2007 WL 895141, *4 (rejecting the same "privilege log" argument, and finding that "even if no privilege log has been provided, the nature of the documents sought is clear from the text of Plaintiff's request."). *Compare Church v. Montgomery Cty., Maryland*, 335 F. Supp. 3d 758, 772 (D. Md. 2018) (rejecting need for privilege log where defendants were sufficiently specific in asserting executive privilege).

## V.   CONCLUSION

The consequences of allowing Plaintiffs' discovery to proceed extend far beyond the facts of this case. Requiring legislators to testify and to search for and produce any documents to support an attack on the legislative process or their legislative motives would open the floodgates of discovery and create significant distractions by compelling legislators to divert substantial time, energy and attention from their legislative duties to oppose unnecessary and improper requests. Contrary to Plaintiffs' assertion, the legislative privilege is not limited to disputes regarding the

content of privileged communications as in the attorney-client privilege.[36] The privilege is also designed "to provide state legislators and other state officials acting within the legislative sphere with 'breathing room' to debate and decide on policy and mold it into legislation. Discovery of background documents and data would defeat this purpose of the immunity." *Campaign for Fiscal Equity v. State*, 179 Misc. 2d 907, 908 (N.Y. 1999). *See also Humane Soc'y of New York v. City of New York*, 188 Misc. 2d 735, 740 (N.Y. 2001) (same). A contrary result will chill legislators' participation in the legislative process as they will seek to avoid exposure from suit or legal process and general harassment. It is the citizens, however, who would lose their chance at effective representation in the halls of government.

The Exploratory Committee at issue in this case was the model of citizen involvement. Not only did its members provide valuable information essential to the legislative process, but also the Committee drafted HB 282, which became Act 2017-378. Secretary Merrill intentionally crafted the membership of the Committee to include persons representing constituencies of diverse viewpoints. That diversity of perspectives fostered the creation and unanimous passage of a well-considered piece of legislation. This is precisely the kind of give-and-take exchange of information the citizens of Alabama desire and the application of legislative privilege should foster. If plaintiffs are allowed, however, to compel legislators to testify or to rummage through legislative documents and files in search of possible motivations revealed by their participation in such committees, that participation will end, and the legislative process will suffer the loss of valuable sources of information.

---

[36] Unlike the attorney-client privilege, which Plaintiffs poorly attempt to analogize, the legislative privilege concerns not only the content of confidential communications, but more importantly, the protection of the legislative process itself, *i.e.*, preventing the diversion of legislators' time, energy, and attention from legislative tasks to defend litigation.

As cited by the Legislators to the Magistrate Judge, in 1797, Thomas Jefferson offered sage advice regarding legislative privilege during the heated debates and trials concerning the Alien and Sedition Acts. During the course of a federal grand jury investigation of several anti-Federalist Members of Congress, Jefferson made the following observation:

> [I]n order to give to the will of the people the influence it ought to have, and the information which may enable them to exercise it usefully, it was a part of the common law, adopted as the law of this land, that their representatives, in the discharge of their functions, should be free from the cognizance or coercion of the . . . Judiciary
> . . . .

8 Works of Thomas Jefferson 322–23 (Ford Educ. 1904). Those words should weigh heavily and inform the Court's decision here.

For these reasons, the Court should affirm the Magistrate Judge's Order granting the Nonparty Legislators' Motion to Quash and to Enjoin Plaintiffs From Effecting Same Upon Nonparty Legislators David Faulkner and Cam Ward.

Respectfully submitted this 28th day of April, 2020.

/s/ Christopher W. Weller
CHRISTOPHER W. WELLER (WEL020)
Attorney for Nonparty Legislator Representative
David Faulkner

OF COUNSEL
CAPELL & HOWARD, P.C.
P. O. Box 2069
Montgomery, AL  36102-2069
(334) 241-8000
(334) 241-8266
Chris.weller@chlaw.com

/s/ Marc James Ayers
MARC JAMES AYERS (AYE006)
Attorney for Nonparty Legislator Senator Cam
Ward

OF COUNSEL
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, Alabama 35203-2119
(205) 521-8000
(205) 521-8800 (Fax)
mayers@bradley.com

## CERTIFICATE OF SERVICE

I hereby certify that, on the 28th day of April, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Armand G. Derfner (aderfner@derneraltman.com);

Danielle Lang (dlang@campaignlegalcenter.org);

James U. Blacksher (jblacksher@ns.sympatico.ca);

Jessica Ring Amunson (jamunson@jenner.com);

J. Gerald Herbert (gherbert@campaignlegalcenter.org);

J. Mitch McGuire (jmcguire@mandabusinesslaw.com);

Mark P. Gaber (mgaber@campaignlegalcenter.org);

Michael E. Stewart (mstewart@jenner.com)

Jason P. Hipp (jhipp@jemmer.com)

Jennifer J. Yun (jyun@jenner.com)

Molly Danahy (mdanahay@campaignlegal.org)

James W. Davis (jimdavis@ago.state.al.us)

Misty S. Fairbanks Messick (mmessick@ago.state.al.us)

Brad A. Chynoweth (bchynoweth@ago.state.al.us)

Winfield Sinclair (wsinclair@ago.state.al.us)

/s/ Christopher W. Weller