**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| TREVA THOMPSON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | **2:16-cv-783-ECM-WMD** |
| | ) | |
| JOHN MERRILL, in his Official Capacity | ) | |
| as Secretary of State of Alabama, et al., | ) | |
| | ) | |
| Defendants. | | |

## PLAINTIFFS TREVA THOMPSON, DARIUS GAMBLE, AND GREATER BIRMINGHAM MINISTRIES' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW IN SUPPORT

Danielle Lang
Mark Gaber
J. Gerald Hebert
Molly Danahy
Campaign Legal Center
110114th St. NW, Ste. 400
Washington, DC 20005
(202) 736-2200

Jason Hipp
Jenner & Block LLP
919 Third Avenue
New York, NY 10022
(212) 407-1784

Jessica Ring Amunson
Jennifer Yun
Jenner & Block LLP
1099 New York Ave. NW,
Ste. 900
Washington, DC 20001
(202) 736-6000

J. Mitch McGuire
McGuire & Associates, LLC
31 Clayton Street
Montgomery, AL 36104
(334) 517-1000

James U. Blacksher
P.O. Box 636
Birmingham, AL 35201
(205) 591-7238

Pamela Karlan
Stanford Law School
559 Nathan Abbott Way
Stanford, CA 94305
(650) 725-4851

Armand G. Derfner
Derfner & Altman
575 King Street, Suite B
Charleston, S.C. 29403
(843) 723-9804

Aderson B. Francois
Institute for Public
Representation
Georgetown University Law
 Center
600 New Jersey Avenue NW
Washington, DC 20001
(202) 662-6721

*Counsel for Plaintiffs*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION .................................................................................................... 1

STATEMENT OF FACTS ....................................................................................... 2

    A.  Alabama Denies Rights Restoration to Citizens on the Basis of Wealth. ................... 2

    B.  Plaintiffs Thompson and Gamble Are Alabama Citizens Who Cannot Vote Because They Cannot Afford to Pay in Full their Outstanding LFOs. ......................... 3

    C.  Plaintiff Greater Birmingham Ministries Expends Significant Resources Helping Alabama Citizens with Felony Convictions Determine if They are Eligible To Vote Only to Conclude Their Outstanding LFOs Disqualify Them. ............................................................................................................... 6

    D.  LFOs Are a Widespread Barrier to Voter Eligibility in Alabama. ............................. 6

    E.  Many Alabama Citizens with Outstanding LFOs Cannot Afford To Pay Them. ................................................................................................................ 7

    F.  Alabama's Remission Process Provides No Meaningful Relief. ................................ 8

    G.  Alabama's Pardon Process is Discretionary and Burdensome. ................................ 10

    H.  This Litigation ....................................................................................................... 13

    I.  Upcoming Elections .............................................................................................. 14

LEGAL STANDARD .............................................................................................. 15

ARGUMENT ........................................................................................................... 15

I.    Plaintiffs Are Likely To Succeed on Their Claim that the LFO Requirement Violates the Equal Protection Clause. ..................................................................... 15

    A.  *Jones* Controls this Case and Requires Judgment in Plaintiffs' Favor on their Wealth Discrimination Claim (Count 13) ....................................................... 15

    B.  The Eleventh Circuit's Analysis in *Jones* Controls this Case and Requires Relief in Favor of Plaintiffs on their Wealth Discrimination Claim. ......................... 19

    C.  *Jones* Forecloses Defendants' Argument that Alabama's Discretionary Pardon Process Is a Viable Alternative to Paying LFOs. ........................................ 22

II.    Plaintiffs Will Suffer Irreparable Harm Absent an Injunction. ................................ 23

III.    The Balance of Equities Favors Granting a Preliminary Injunction ........................ 25

IV.    A Preliminary Injunction Will Serve the Public Interest ......................................... 27

CONCLUSION ........................................................................................................ 27

# TABLE OF AUTHORITIES

**CASES**

*Bearden v. Georgia*, 461 U.S. 660 (1983) .........................................................................17, 18, 21

*Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016) ................................................................26

*Georgia Coalition for People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251 (N.D. Ga. 2018) ................................................................................................................................25

*Harper v. Virginia State Board of Elections*, 383 U.S. 663 (1966)..................................17, 21, 25

*Jones v. DeSantis*, No. 4:19-cv-300, Slip Op., (N.D. Fla. May 24, 2020) .........................1, 19, 26

*Jones v. Governor of Florida*, 950 F.3d 795 (11th Cir. 2020)............................................. passim

*League of Women Voters of Florida, Inc., v. Detzner*, 314 F. Supp. 3d 1205 (N.D. Fla. 2018) ................................................................................................................................24

*League of Women Voters of Florida v. Browning*, 863 F. Supp. 2d 1155 (N.D. Fla. 2012) .........27

*League of Women Voters of Florida v. Cobb*, 447 F. Supp. 2d 1314 (S.D. Fla. 2006) ................25

*League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224 (4th Cir. 2014) ................................................................................................................................24

*League of Women Voters of United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) .....................25

*M.L.B. v. S.L.J.*, 519 U.S. 102 (1996) ..............................................................................16, 20

*Richardson v. Ramirez*, 418 U.S. 24 (1974) .....................................................................16

*Scott v. Roberts*, 612 F.3d 1279 (11th Cir. 2010) ............................................................23

*Siegel v. LePore*, 234 F.3d 1163 (11th Cir. 2000) ............................................................15

**CONSTITUTIONAL PROVISIONS AND STATUTES**

Ala. Const. art. VIII, § 177(b)..........................................................................................2

Ala. Code 15-22-36.1(a)(3).................................................................1, 2, 13, 15, 19, 26, 27

Ala. Code § 15-22-36.......................................................................................................8

Ala. Code § 15-22-36(a) ................................................................................................10

Ala. Code § 15-22-36.1(a) ...............................................................................................2

Ala. Code § 15-22-36.1(b) ................................................................................................3, 20

Ala. Code § 15-22-36.1(c) ....................................................................................................12

Ala. Code § 15-22-36.1(d) ...................................................................................................12

Ala. Code § 15-22-36.1(e) ...................................................................................................12

Ala. Code § 15-22-36.1(f) ......................................................................................................3

Ala. Code § 17-3-30.1 ..................................................................................................2, 14, 19

Ala. Code § 17-3-31 .............................................................................................................19

OTHER AUTHORITIES

*2020 Alabama Voter Guide*, Alabama Secretary of State, https://www.sos.alabama.gov/
    sites/default/files/2020%20Voter%20Guide%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.pdf ..............................................14

*2020 Election Information*, Alabama Secretary of State, https://www.sos.alabama.gov/
    alabama-votes/voter/election-information/2020 (last visited Apr. 15, 2020).........................14

Alabama Board of Pardons and Paroles Rules, Regulations, and Procedures, art. 8.7,
    https://paroles.alabama.gov/wp-content/uploads/Operating_Rules.pdf .................................10

Foster Cook, *The Burden of Criminal Justice Debt in Alabama: 2014 Participant Self-*
    *Report Survey* (2014), https://www.prisonpolicy.org/scans/uabtasc/the_burden_
    of_criminal_justice_debt_in_alabama-_part_1_main_report.pdf.......................................8, 19

*Pardon Results – Current Year*, Alabama Bureau of Pardons and Paroles, https://paroles.
    alabama.gov/hearing-information/pardon-results-current-year/ (last visited Apr. 29,
    2020) .............................................................................................................................13

*Pardon Results – Previous Year, Year of 2019*, Alabama Bureau of Pardons and Paroles,
    https://paroles.alabama.gov/hearing-information/pardon-results-previous-year/___(last
    visited Apr. 29, 2020) .......................................................................................................12

## INTRODUCTION

Alabama's procedure for re-enfranchising citizens previously disqualified by a felony conviction discriminates between citizens who are able to pay in full their legal financial obligations ("LFOs") and those who cannot afford to do so. Only those who have paid LFOs in full are eligible to obtain a Certificate of Eligibility to Register to Vote ("CERV"). Ala. Code § 15-22-36.1(a)(3). Alabama law makes no exception for those genuinely unable to pay their LFOs. *Id.* Under the Eleventh Circuit's decision in *Jones v. Governor of Florida*, 950 F.3d 795 (11th Cir. 2020), which struck down a similar scheme in Florida, Alabama's "pay-to-vote" procedure for restoring voting rights violates the Equal Protection Clause of the Fourteenth Amendment. *See Jones v. DeSantis,* No. 4:19-cv-300, Slip Op. at 2 (N.D. Fla. May 24, 2020). Because that violation will cause immediate and irreparable harm to Alabama voters who cannot obtain a CERV prior to the August and November 2020 elections solely due to their financial resources, and because the balance of equities and the public interest favor Plaintiffs, preliminary injunctive relief is warranted.

Under *Jones*, Plaintiffs are likely to succeed on their Equal Protection wealth discrimination claim (Count 13). Although Defendants have claimed that *Jones* was "wrongly decided" and have expressed their wish that the Eleventh Circuit's decision "*hopefully* will be corrected," Doc. 209 at 8-10 (emphasis in original), the Eleventh Circuit denied en banc review. After a trial on the merits, the district court has reaffirmed the central holding in *Jones.* Slip Op. at 39 ("*Jones* thus settles the question whether the pay-to-vote system, as applied to citizens who are genuinely unable to pay their LFOs, survives heightened scrutiny. It does not."). Thus, *Jones* squarely controls this case. Citizens like Plaintiffs Treva Thompson and Darius Gamble, who cannot afford to pay their LFOs in full before the upcoming elections, will suffer irreparable injury because they are unconstitutionally denied their right to vote on the basis of wealth. Absent this

Court's intervention, Alabama's denial of CERVs to those who are genuinely unable to pay their LFOs will unconstitutionally disenfranchise countless Alabama citizens in this year's elections in contravention of controlling Eleventh Circuit precedent.

## STATEMENT OF FACTS

### A.   Alabama Denies Rights Restoration to Citizens on the Basis of Wealth.

Alabama's Constitution renders any "person convicted of a felony involving moral turpitude" ineligible for voting "until restoration of civil and political rights." Ala. Const. art. VIII, § 177(b). Restoration of voting rights, however, depends upon the wealth of the applicant.

The process for individuals with felony convictions to obtain restoration of their voting rights is laid out in Section 15-22-36.1 of the Alabama Code. A person with a disqualifying felony[1] may apply to the Alabama Board of Pardons and Paroles (the "Board") for a CERV. Ala. Code § 15-22-36.1(a). The Board *must* grant a CERV if a person has completed their entire disqualifying felony sentence, including any probation or parole; has no pending felony charges; and has "paid all fines, court costs, fees, and victim restitution ordered by the sentencing court at the time of sentencing on disqualifying cases."[2] Ala. Code § 15-22-36.1(a)(3); *see also* Mot. to Dismiss at 31 (Doc. 80).

---

[1] Not all felony convictions in Alabama are disenfranchising. Only people with felony convictions "involving moral turpitude" lose their right to vote upon conviction. Ala. Const. art. VIII sec. 177. In 2017, the Alabama legislature enacted a list of specific convictions that are disqualifying under this standard. *See* Ala. Code § 17-3-30.1. In this brief, "disqualifying felony" refers to any felony listed in Section 17-3-30.

[2] Although the statute now makes clear that only LFOs imposed at the time of sentencing on disqualifying convictions are technically disqualifying, as a practical matter, payments are not ordinarily applied to disqualifying LFOs first. Thus, individuals can find themselves paying significant sums toward their total LFOs without seeing any reduction in the LFOs that disqualify them from voting. Only at the time of application for a CERV—after completion of sentence— may someone request that future payments be applied to their disqualifying LFOs directly. This only occurs if someone knows to ask for the "request to reprioritize costs" form and the court so orders. *See* Ex. 1.

The requirement of paying all fines, costs, and fees is mandatory, and the Board cannot issue a CERV if that requirement is not met. Ala. Code § 15-22-36.1(f). If the applicant satisfies "all of the requirements," including payment of LFOs, then receipt of a CERV is automatic; the Board must issue a CERV. Ala. Code § 15-22-36.1(b). Lack of funds to pay the debt is not an excuse: the Board does not consider an applicant's ability to pay LFOs when determining whether to grant or deny a CERV application. *See* Ex. 2, State Defendants' Objections and Responses to Plaintiffs' First Set of Requests for Admission at 29-30.

### B. Plaintiffs Thompson and Gamble Are Alabama Citizens Who Cannot Vote Because They Cannot Afford to Pay in Full their Outstanding LFOs.

Plaintiffs Treva Thompson and Darius Gamble are each former voters in the State of Alabama who have disqualifying felony convictions. Having completed their sentences, and with no pending felony charges, they would be entitled to have their voting rights restored through Alabama's CERV process if they paid their LFOs. However, Ms. Thompson and Mr. Gamble cannot afford to pay their LFOs in full before the upcoming elections. Thus, they cannot obtain a CERV, register to vote, or vote.

Plaintiff Thompson is a 51-year-old black citizen of the United States who resides in Huntsville, Alabama. Ex. 3, Declaration of Treva Thompson ("Thompson Decl.") ¶ 2. In 2005, she was convicted of theft of property in the first degree, a class B felony. *Id.* ¶ 3. In 2015, after completing her parole and probation, she reapplied to register to vote. *Id.* ¶ 4. The Madison County Board of Registrars denied her application because it deemed her conviction to be disqualifying. *Id.*; *see also* Thompson Decl. Ex. B. Ms. Thompson now meets all the requirements to regain her eligibility to vote through a CERV, except for one: she has more than $40,000 in outstanding LFOs, which she is unable to pay. Thompson Decl. ¶¶ 6-7, 9; *see also* Am. Answer ¶ 250 (Doc. 189) (admitting that Plaintiff Thompson is ineligible for CERV solely because of her outstanding

LFOs). Thompson sought a pardon, but was denied. Thompson Decl. ¶ 8; *see also* Thompson Decl. Ex. C; Ex. 4 (Board action sheet denying Plaintiff Thompson's pardon). Even with a full-time job, her annual income in 2019 was only $26,929, and she is living paycheck to paycheck, making it impossible for her to pay her LFOs in full. Thompson Decl. ¶¶ 6-7.

Plaintiff Gamble is a 44-year-old black citizen of the United States who resides in Gardendale, Alabama. Ex. 5, Declaration of Darius Gamble ("Gamble Decl.") ¶ 2. In 2008, he was convicted of trafficking cannabis, and the court imposed more than $50,000 in LFOs. *Id.* ¶ 3. In 2014, after completing a three-year sentence, a term of probation, and a court-ordered substance abuse program, Mr. Gamble applied for a CERV to restore his eligibility to vote, but was denied because of outstanding LFOs. *Id.* ¶ 5; *see also* Am. Answer ¶ 27 (Doc. 189) (admitting that Gamble is ineligible for CERV because of his outstanding LFOs). The letter stated that, among other CERV requirements, "***You must have paid off all of your court fees, restitution and probation fees***." Gamble Decl. Ex. B. (emphasis in original).

In January 2018, Mr. Gamble applied to the Board of Pardons and Paroles for a remission of his $50,000 fine. Gamble Decl. Ex. C (Gamble Remission Application). After he became a plaintiff in this lawsuit, defense counsel contacted the Board about Mr. Gamble, and his application was fast-tracked. *See* Exs. 6 (Redacted Emails) and 7 (Note on Gamble File). Despite expediting his application, the Board was unable to complete its own process with respect to Mr. Gamble's application, because they were unable to obtain a statement from his sentencing judge about whether his fines should be remitted. *See* Ex. 8 (emails documenting the Board's inability to obtain such a statement).

Finally, the Board informed Mr. Gamble that he would have to contact a judge in Shelby County on his own, and obtain a statement with respect to whether his fine should be remitted.

4

Gamble Decl. ¶ 8. Mr. Gamble submitted a letter to the Shelby County Court, which treated his letter as a motion for sentence modification. Gamble Decl. Ex. D. The DA who prosecuted Mr. Gamble filed a response in opposition to the remission of Mr. Gamble's fine, but acknowledged they had pleaded him under the wrong statute, resulting in the imposition of a $50,000 fine instead of the $25,000 fine associated with his crime of conviction. *See* Ex. 9 (Gamble Remission Opp.). Accordingly, the Court agreed to reduce the total amount of Mr. Gamble's fine to the correct amount, with a concomitant reduction in the amount of collection fees imposed because he has been unable to pay off his fine. Gamble Decl. Ex. E (Gamble Fine Correction Order); *see also* Gamble Decl. ¶ 7.

According to Board records, Mr. Gamble meets five of the six criteria in favor of obtaining remission. Ex. 10 (Probation and Parole Officer's Remarks). The only criterion he does not meet is paying in full his LFOs. *Id.* Similarly, Mr. Gamble only has one criterion marked as a negative with respect to his remission application—that he has not paid his LFOs.[3] *Id.* Nearly two and a half years after his application was filed, it appears the Board has yet to issue a final decision on the remission of Mr. Gamble's fine. Separately, Mr. Gamble also applied for a pardon, which also remains pending. *See* Gamble Decl. ¶¶ 7, 10.

Although Mr. Gamble has made regular monthly payments—pursuant to a payment plan agreed upon with the Shelby County Clerk—he still owes almost $30,000 in LFOs. Gamble Decl. ¶ 11. Because of the financial support he provides to his four children and mother, Mr. Gamble can make only a small monthly payment toward his LFOs and certainly will not be able to pay his disqualifying debt before the upcoming elections. *Id.* ¶ 12.

---

[3] The Board has not explained how having outstanding LFOs is a factor that weighs against remission of those LFOs.

5

### C. Plaintiff Greater Birmingham Ministries Expends Significant Resources Helping Alabama Citizens with Felony Convictions Determine if They are Eligible To Vote, Only to Conclude Their Outstanding LFOs Disqualify Them.

Organizational Plaintiff Greater Birmingham Ministries ("GBM") expends financial and other resources to help Alabama citizens with felony convictions determine if they are eligible to vote or have their voting rights restored. GBM serves low-income and historically disenfranchised communities in the Birmingham, Alabama area. Supporting the restoration of voting rights among those with past convictions is central to its mission. *See* Ex. 11, Declaration of Scott Douglas, Executive Director of GBM ("Douglas Decl.") ¶ 3.

Because of the requirement that people with prior convictions must have paid their LFOs in full before obtaining a CERV, GBM must devote significant staff time and resources to helping those with felony convictions determine if they have outstanding LFOs, even when they clearly lack the means to pay. *Id.* ¶¶ 7-9, 12-13. If the individuals have remaining unpaid LFOs, GBM helps them apply for a request for remission of fines—which, due to low literacy rates among those who GBM aids, often requires significant staff time. *Id.* ¶ 10. Thus, Alabama's LFO requirement causes and will continue to cause GBM to divert limited resources away from other priorities toward assisting citizens who cannot pay LFOs determine if they are eligible for rights restoration. *Id.* ¶¶ 14-15. To make matters worse, this process is often futile for individuals who are unable to pay their LFOs. Thus, Alabama's LFO requirement, as applied to those unable to pay, diverts substantial resources from GBM's core services, even though the work they do to assist people who cannot pay often does not ultimately re-enfranchise a significant number of the Alabama citizens GBM assists. *Id.*

### D. LFOs Are a Widespread Barrier to Voter Eligibility in Alabama.

The vast majority of Alabama citizens who lose their right to vote because of a felony conviction owe LFOs to the State of Alabama. In fact, over 73% of individuals disqualified from

voting because of a felony conviction between 1993 and 2019 owe LFOs. *See* Ex. 12, Declaration of Daniel A. Smith ("Smith Report") ¶ 79. Thus, of the estimated 135,579 individuals with disqualifying convictions between 1993 and 2019, nearly 100,000—or nearly 3 percent of the citizen voting age population of Alabama—owe outstanding LFOs. *Id.*[4]

In Alabama, individuals with felony convictions typically owe a substantial amount of LFOs. The median amount owed by individuals with disqualifying felony convictions is over $1,500, with Black individuals owing on average more than their white counterparts. Smith Report ¶ 82. The majority (58%) of individuals with a disqualifying felony conviction owe *more than $1,000*, while more than 20,000 Alabama residents with disqualifying convictions owe *more than $10,000* in LFOs. *Id.* ¶ 79 & Table 3. Because of these high amounts, most Alabama citizens with a felony conviction remain disenfranchised even after completing their sentences and all other requirements for a CERV. *Id.*

Thus, it is not surprising that CERVs are granted at an alarmingly low rate—only 22% in both fiscal years 2019 and 2018, *see* Ex. 13 at 8, Ex. 14 at 7 (Board Annual Reports)—and the most common reason for CERV denials is unpaid LFOs. Smith Report ¶ 80.

E.   **Many Alabama Citizens with Outstanding LFOs Cannot Afford To Pay Them.**

The financial means of citizens who have been disqualified to vote are typically meager, as they often enter the criminal justice system indigent and then must overcome the challenges of obtaining gainful employment after experiencing a felony conviction (and frequently a term of imprisonment). Income levels tend to be lower among people who are incarcerated, even before their incarceration. Smith Report ¶ 11. And incarceration itself typically results in incomes that

---

[4] *See also* U.S. Census Bureau, Citizen Voting Age Population: Alabama (Nov. 15, 2016), https://www.census.gov/library/visualizations/2016/comm/citizen_voting_age_population/cb16-tps18_alabama.html. This estimate is necessarily underinclusive because it does not include those with convictions from before 1993, from out-of-state, or from federal court.

are 10% to 30% *lower* after a conviction. *Id.* This hardship is felt more dramatically in Alabama, which has higher poverty levels and a household median income that is $14,000 less than the national household income. *Id.* ¶¶ 13-14. In 2014, one study estimated that Alabama's formerly incarcerated population had a median income of $8,000.[5] And even individuals with higher or more stable incomes may be unable to pay their LFOs given the magnitude of LFOs imposed in Alabama, like the fine imposed on Plaintiff Gamble. *See, e.g.*, Ala. Code § 13A-12-231(1)(a) (imposing a fine of $25,000 for trafficking cannabis weighing between 2.2 and 100 pounds).

Individuals have substantial motivation to pay off their LFOs to the extent they can afford to do so. Under Alabama law, a person who fails to pay their LFOs can have their probation extended or revoked, their driver's license suspended, their wages garnished, and substantial interest and other penalties added on top of their existing LFOs. *See, e.g.,* Ala. R. Crim. P. 26.11(i)(3); Ex. 15 (report outlining extensive tools to collect restitution). Furthermore, failure to pay outstanding debt can have a substantial impact on a person's credit score, and thus their ability to purchase a car or home, or to access a line of credit for other necessities. These consequences provide powerful motivation for people to pay off their LFOs when they have the means to do so.

### F.  Alabama's Remission Process Provides No Meaningful Relief.

The Board has limited authority to remit fines, one of the types of LFOs that must be paid to qualify for a CERV. Ala. Code. § 15-22-36. The Board does not have the authority to remit other types of LFOs, including costs, fees, and restitution. *Id.*; Ex. 16, Rule 30(b)(6) Deposition of Board of Pardons and Paroles, Eddie Cook and Askisha Jones ("30(b)(6) Board Dep.") at 75:12-18. The Board also does not have authority to remit fines imposed at the municipal level. *Id.* at

---

[5] *See* Foster Cook, *The Burden of Criminal Justice Debt in Alabama: 2014 Participant Self-Report Survey* 4 (2014), https://www.prisonpolicy.org/scans/uabtasc/the_burden_of_criminal_justice_ debt_in_alabama-_part_1_main_report.pdf.

75:19-76:1. Nor can it remit fines from out-of-state or federal convictions. Ex. 17 (2017 Board email stating "[w]e do not work out of state or federal remissions.").

More importantly, the Board's process for reviewing a remission application is discretionary, time consuming, and ultimately futile in nearly all cases. The Board has produced a database that purports to include all of its electronic records of requests for fines and forfeitures. Although it dates back to requests submitted as early as 1997, there are only 170 records. Ex. 18 (Remissions Database). And only two applications led to fines actually being remitted across those 170 records. *Id.*

Take Plaintiff Gamble. He applied for a remission of his $50,000 fine in January 2018. *See* Gamble Decl. Ex. C. Shortly afterwards he became a plaintiff in this litigation, including as a putative class representative for Count 13's wealth discrimination claim. Doc. 93. In March 2018, litigation counsel for State Defendants emailed the Board's Chief Legal Counsel with the subject line "Thompson – new Plaintiff," an email brought to the attention of the Board's leadership. Ex. 6 (Redacted Emails). Mr. Gamble's remission file was thereafter updated with the following notation: "5/18 ASAP per [Board Assistant Executive Director] Sarah Still." Ex. 7.

Notwithstanding the apparent prioritization of Mr. Gamble's file, the remission process lingered for over a year and a half, and appears never to have actually been completed. Delays included a four-month gap before the Board contacted a sentencing judge for a reference, *see* Ex. 8 at 6-7; a nearly three-month gap before the Board contacted a second judge because the first judge no longer had Mr. Gamble's file, *see id.* at 2, 4, and refusal by the second judge to consider the matter because of a potential conflict, *id.* at 2. The Board even asked Shelby County authorities to "go to the court house and talk to these [j]udges" in an attempt to force action. *Id.* at 1. By July 2019, a Board officer lamented, "I never thought it would be so difficult for some [*sic*] to write a

simple recommendation, but everyone seem[s] to want to pass the task to someone else." Ex. 19. A year and a half passed by, and Mr. Gamble's remission application was never fully processed, even though it was given "ASAP" priority. Mr. Gamble was ultimately able to get the Shelby County court to correct his fine amount, *see supra* at 5, but the court did not remit the fine. Gamble Ex. E. As such, Mr. Gamble still owes almost $30,000 in LFOs. Gamble Decl. ¶ 8.

As Mr. Gamble's experience illustrates, the remission process does not offer meaningful relief for those who wish to vote but cannot afford their LFOs.

### G.   Alabama's Pardon Process is Discretionary and Burdensome.

While the Board has the authority to grant pardons that, *inter alia*, restore a citizen's right to vote, the pardon process is dramatically different from the statutory right to voting rights restoration provided by the CERV process and provides no practical relief to Plaintiffs and others similarly situated.

First, the process is entirely discretionary. Ala. Code § 15-22-36(a) (granting Board "the authority and power," but not obligation, to grant pardons); *see also* Alabama Board of Pardons and Paroles Rules, Regulations, and Procedures, art. 8.7, https://paroles.alabama.gov/wp-content/uploads/Operating_Rules.pdf ("If the Board grants a pardon, the Board will also decide whether to restore any or all civil and political rights lost as a result of the conviction.").

Second, even though the Board has the *authority* to grant pardons to individuals with a disqualifying felony conviction who cannot obtain a CERV because of outstanding LFOs, the Board does not do so *in practice*. The Board has denied Plaintiff Thompson's application for a pardon and failed to act on Plaintiff Gamble's application. *See* Thompson Decl. ¶ 10; Gamble Decl. ¶ 10. Furthermore, the Board's Rule 30(b)(6) representatives testified that a pardon applicant's payment of LFOs is "an important consideration in determining whether or not to grant a pardon," and that the existence of outstanding LFOs can be the *sole* reason a pardon application

10

is denied. *See* Ex. 16 (30(b)(6) Board Dep.) at 58:1-6, 59:8-14; *see also id.* at 31:6-32:4 (testifying that Board "will look at whether there are fees owed"); *id.* at 46:1-9 (testifying that one factor in favor of granting pardon is "[i]f there are any outstanding fines, court costs, they have paid that or made great efforts to pay that"); *see also id.* at 49:5-51:3. Likewise, the Board action sheet for pardons lists "paid Court ordered money" and "paid restitution supervision fees" as reasons favoring granting a pardon. Ex. 20. In fact, the Board warns applicants in writing that their outstanding LFOs imperil their chances of obtaining a pardon. *See* Ex. 21 (exemplar letter produced by Board informing applicant "it has been discovered that you owe $2,328.30" and that "[i]t is in your best interest to address this matter with the Circuit Clerk Office prior to your hearing with the Board. Money owed to the Board is considered a negative point that is factored into the Board's decision to grant or deny a pardon"); Ex.22  (warning applicant that $32.50 in outstanding monies would be a "significant factor" in his pardon determination); Ex. 23 (May 24, 2016 Board email) ("The person can apply for the pardon regardless of outstanding monies, but if the monies are not paid by the time a hearing is held, the pardon won't be granted until that money is cleared up."). Indeed, it appears that the means-based test for pardons imposes an even *higher* burden than the CERV process because the Board considers outstanding parking tickets, reliance on State assistance, and other financial factors beyond LFOs in determining whether to grant a pardon. Ex. 16 (30(b)(6) Board Dep.) at 48:13-16 (testifying that "[l]ack of reliance on State assistance is a reason for favoring a grant" of pardon); *id.* at 52:13-16 (testifying that the Board considers outstanding traffic tickets in assessing whether to grant pardon). Other times, decisions about whether to grant a pardon are extended until the applicant provides evidence that she has paid her outstanding LFOs. *Id.* at 65:21-66:19. In the "few cases" the Board's representative could recall

where a pardon was granted notwithstanding the existence of outstanding LFOs, it was exclusively cases in which the applicant "had shown a history of continuous paying for years." *Id.* at 72:15-23.

Apart from its discretionary nature and its reliance on means-based factors, the pardon process also imposes significant delays and procedural hurdles. Obtaining a pardon through the Board typically takes two years *or more* from the time of application. Ex. 24 (May 24, 2016 Board email: "Yes, we are very back logged (at least 4-5 years) at this time. Voting Rights will be restored within 30-45 days but the full pardon will take a lot longer."); Ex. 25 (Board email showing that it was processing 2014 application files in 2018). In contrast, a CERV application has a statutorily mandated timeline of less than forty-five days. *See* Ala. Code § 15-22-36.1(c)-(e). Moreover, the pardon process is far more burdensome, requiring not only a hearing but a complete investigation, including extensive personal and social history, by a local probation officer and a full report, including letters of support, from the applicant. Ex. 26 (sample letter requiring original or certified birth certificate, social security card, *and* photo ID); Ex. 27 (investigation template forms). It even requires submission to a DNA test. Ex. 16 (30(b)(6) Board Dep.) at 39:18-23; Ex. 28 (sample letter requiring DNA test within 15 days). And for those with out-of-state convictions, applicants must apply for a pardon in that state before the Board will consider an application even with respect to Alabama convictions. *See* Ex. 29 ("Under current policy, you must first apply for a pardon in Virginia where you have a felony conviction(s) before we will process a pardon for your Alabama conviction(s)."). Unsurprisingly, fewer than 800 pardon applications were granted in 2019; to date only 60 have been granted in 2020.[6] *See Pardon Results – Previous Year, Year of 2019*, Alabama

---

[6] The COVID-19 pandemic has rendered pardons practically unavailable, with the Bureau not currently scheduling pardon hearings. *COVID-19 Headquarters Office and Hearing Information*, Alabama Bureau of Pardons and Paroles, https://paroles.alabama.gov/covid-19-headquarters-office-and-hearing-room-information/ (last visited May 27, 2020). The last pardon hearing was

Bureau of Pardons and Paroles, https://paroles.alabama.gov/hearing-information/pardon-results-previous-year/ (last visited Apr. 29, 2020); *Pardon Results – Current Year*, Alabama Bureau of Pardons and Paroles, https://paroles.alabama.gov/hearing-information/pardon-results-current-year/ (last visited Apr. 29, 2020). The discretionary standards for granting a pardon are distinct from and more difficult to meet than the minimum requirements for mandatory re-enfranchisement under the CERV statute.[7] And the CERV process—the only form of *automatic* re-enfranchisement actually available to Alabamians with disqualifying felony convictions—discriminates against citizens who lack the financial means to pay their outstanding LFOs.

### H.  This Litigation.

Plaintiffs brought suit on September 26, 2016. Doc. 1. Among other claims, Plaintiffs alleged in Count 13 that the CERV process defined in Alabama Code § 15-22-36.1(a)(3) violates the Equal Protection Clause of the Fourteenth Amendment by making wealth or affluence, through obligatory payment of fines and fees, an electoral standard, drawing an impermissible distinction between those able and unable to pay outstanding LFOs. Doc. 1 ¶ 245-252.

On December 26, 2017, this Court ruled on Defendants' first motion to dismiss. Doc. 80. Among other claims, this Court denied Defendants' motion to dismiss the wealth discrimination Equal Protection claim (Count 13). *Id.* at 36. The Court found that Defendants had presented only "thin arguments" for dismissal of the claim. *Id*. at 35. On December 3, 2019, this Court ruled on Defendants' renewed motion to dismiss, Doc. 178, and again rejected Defendants' attempt to dismiss the claim.

---

held in March 2020. *Pardon Results – Current Year*, Alabama Bureau of Pardons and Paroles, https://paroles.alabama.gov/hearing-information/pardon-results-current-year/ (last visited May 27, 2020).

[7] Moreover, a person who is denied a pardon—perhaps solely because she still owes LFOs—is ineligible to seek a pardon again for two years. Ex. 16 (30(b)(6) Board Dep.) at 38:17-20.

On January 24, 2020, this Court denied Plaintiffs' motion for class certification. Doc. 194. Plaintiffs Thompson and Gamble had sought to represent an LFO subclass of "All persons otherwise eligible to register to vote in Alabama who (1) are now, or who may in the future be, denied the right to vote pursuant to Section 177(b) because of a conviction for a felony 'involving moral turpitude' as defined by section (c) of Alabama Code Section 17-3-30.1; and (2) are unable to pay their fines, fees, and/or restitution due to their socioeconomic status; but (3) are otherwise eligible to apply for a CERV." *Id.* at 2. This Court denied the motion for a class certification because "a class injunction . . . would be identical in scope, breadth and effect to an individual injunction awarded in favor of the individual plaintiffs alone." Doc. 194 at 9-10 (quoting *M.R. v. Bd. of Sch. Comm'rs of Mobile Cty.*, 286 F.R.D. 510, 521 (S.D. Ala. 2012)).

Trial is scheduled for February 1, 2021—after several upcoming elections. Doc. 195 at 1. After trial was scheduled, the Eleventh Circuit issued its decision in *Jones*, ruling that Florida's LFO requirement discriminates on the basis of wealth in violation of the Fourteenth Amendment.

## I.   Upcoming Elections.

Alabama will hold local municipal elections on August 25, 2020. *See Upcoming Elections*, Ala. Sec'y of State, https://www.sos.alabama.gov/alabama-votes/voter/upcoming-elections (last visited May 19, 2020). The next general election will be held in Alabama on November 3, 2020. *Id*. The voter registration deadline for the August 25 election is August 11, 2020 and the deadline for the November 3 election is October 19, 2020. *2020 Alabama Voter Guide*, Ala. Sec'y of State, https://www.sos.alabama.gov/sites/default/files/2020%20 Voter%20Guide%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.pdf.

Plaintiffs Thompson and Gamble wish to vote in the August 25, 2020 municipal election and the November 3, 2020 general election, as do thousands of other voters who would be eligible to vote but for their inability to pay outstanding fines and fees to the State.

14

## LEGAL STANDARD

Plaintiffs are entitled to a preliminary injunction when they show: "(1) [they have] a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). Plaintiffs meet all four prongs of the preliminary injunction standard with regard to their claim that Alabama's LFO requirement violates the Equal Protection Clause (Count 13). As such, Plaintiffs are entitled to an order enjoining the Board from enforcing the LFO requirement against those who are genuinely unable to pay and requiring the Board to implement a procedure for those individuals to receive a CERV.

## ARGUMENT

**I.      Plaintiffs Are Likely To Succeed on Their Claim that the LFO Requirement Violates the Equal Protection Clause.**

The Eleventh Circuit decision in *Jones*, which held that the LFO requirement under Florida law discriminated on the basis of wealth in violation of the Fourteenth Amendment, squarely controls this case. 950 F.3d 795. Because Alabama's LFO requirement is substantially the same as the pay-to-vote requirement at issue in *Jones*, Plaintiffs are likely to succeed on their claim that the LFO requirement in Alabama Code Section 15-22-36.1(a)(3) violates the Equal Protection Clause.

### A.   *Jones* Controls This Case and Requires Judgment in Plaintiffs' Favor on Their Wealth Discrimination Claim (Count 13).

The Eleventh Circuit's decision in *Jones* resolves the two merits questions facing this Court with regard to Plaintiffs' Equal Protection claim: the level of scrutiny to be applied and the constitutionality of Alabama's LFO requirement as applied to those who cannot pay. In holding

15

that heightened scrutiny applies, the Eleventh Circuit chiefly relied on *M.L.B. v. S.L.J.*, 519 U.S. 102 (1996), which "instructed . . . that wealth classifications are subject to heightened scrutiny in two circumstances—where they are used to restrict access to the franchise and in the administration of criminal justice." *Jones*, 950 F3d at 808 (citing *M.L.B.*, 519 U.S. at 124). Because re-enfranchisement schemes conditioned on payment of LFOs "directly implicate[] wealth discrimination both in the administration of criminal justice and in access to the franchise," the Eleventh Circuit reasoned, heightened scrutiny applies. *Id.* at 817.

First, a re-enfranchisement scheme triggers heightened scrutiny in the criminal justice context when "the State alleviates punishment for some, but mandates that it continue for others, based solely on account of wealth." *Jones*, 950 F.3d at 819. The Eleventh Circuit held that a state extends the punishment of disenfranchisement solely on the basis of wealth when it automatically re-enfranchises those who can pay their LFOs, but denies automatic re-enfranchisement to those who cannot. *Id.* Second, and most obviously, a re-enfranchisement scheme that discriminates on the basis of wealth triggers heightened scrutiny specifically because it implicates access to the franchise. *Id.* at 820. The Eleventh Circuit found that while "states have the green light to exclude felons from the franchise" under *Richardson v. Ramirez*, 418 U.S. 24, 54 (1974), a state's "abridgement of a felon's right to vote is still subject to constitutional limitations; states do not have carte blanche to deny access to the franchise to some felons and not others." *Jones*, 950 F.3d at 822. Because "the right to vote is too precious, too fundamental to be so burdened or conditioned," once a state "provides an avenue to ending the punishment of disenfranchisement,"

it may not "erect a wealth barrier absent a justification sufficient to overcome heightened scrutiny."[8] *Id.* at 823 (quoting *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966)).[9]

The Eleventh Circuit rejected Florida's argument that because states may disenfranchise those with felony convictions entirely, the state only needs a rational basis to make wealth-based distinctions in deciding whose voting rights should be restored. As the court explained, the Supreme Court has repeatedly held that heightened scrutiny applies to wealth-based distinctions in criminal justice contexts, and "the fact that the State originally was entitled to withhold access to the franchise from felons is immaterial." *Jones*, 950 F.3d at 819. Moreover, "the state's ability to *deprive* someone of a profoundly important interest does not change the nature of the right, nor whether it is deserving of heightened scrutiny when access to it is made to depend on wealth." *Id.* at 823 (citing *Williams v. Illinois*, 399 U.S. 235, 240-41 (1970); *Tate v. Short*, 401 U.S. 395, 398 (1970); *Bearden v. Georgia*, 461 U.S. 660, 672-73 (1983); *Harper*, 383 U.S. at 670).

Applying heightened scrutiny, the Eleventh Circuit found that Florida's LFO requirement was unconstitutional as applied to those who cannot pay their outstanding LFOs. To reach that conclusion, the court applied four considerations for heightened scrutiny articulated in *Bearden*: "(1) the nature of the individual interest affected; (2) the extent to which it is affected; (3) the rationality of the connection between legislative means and purpose; and (4) the existence of alternative means for effectuating the purpose." *Jones*, 950 F.3d at 825 (quoting *Bearden*, 461 U.S.

---

[8] The Eleventh Circuit considered and declined to follow two out-of-circuit decisions holding that rational basis review applied to re-enfranchisement schemes for individuals with felony convictions. *See Jones*, 950 F.3d at 808-09.

[9] The *Jones* court's explanation of the limited holding of *Richardson* forecloses Defendants' contention, repeatedly advanced in this case, *see, e.g.*, Doc. 174 (Notice of Supplemental Authority regarding Eighth Amendment and *Ex Post Facto* claims), that *Richardson* creates a Constitution-free zone that forecloses the ability of those with prior convictions to challenge voting rights restrictions.

at 666-67) (internal quotations omitted). For the first factor, the court found that the individual interest affected—the right to vote—was "undoubtedly a weighty interest." As for the second factor, the interest is "profoundly affected," because under the LFO requirement, those with prior convictions "sustain the 'deprivation of a meaningful opportunity to enjoy the benefit' of the ability to vote." *Id.* (quoting *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 20 (1973)). The court then rejected the state's argument that those genuinely unable to pay their LFOs were not significantly affected because of alternative avenues for fulfilling the LFO requirement, including the availability of an executive clemency process for obtaining rights restoration, because the alternatives put forward by the state were "all entirely discretionary in nature." *Id.* at 826.

Addressing the third consideration, the court found that preventing those who are unable to pay outstanding LFOs from voting is hardly related to a legitimate state interest, rejecting the state's arguments that the LFO requirement furthered its interests in deterrence, collection of LFOs, "protection of the ballot box," and "punishment for punishment's sake." *Id.* at 826-27.

Analyzing the last of the *Bearden* factors, the Eleventh Circuit found that the state had ample alternatives to pursue its collection interest: the state already has "numerous other means for exacting compliance with financial obligations," such as referring to collection agencies, garnishing wages, and conducting civil forfeiture. *Id.*[10] Explaining that "it is undeniable that the

---

[10] Further, the Eleventh Circuit found that even if rational basis review were to apply, it is likely that Florida's disparate treatment of those who can pay LFOs and those who cannot pay in restoring voting rights would still be infirm. *See Jones*, 950 F.3d at 809 ("Although we are convinced that heightened scrutiny applies in this case, we have reservations about whether the wealth-based disparities created by the LFO requirement would pass even rational basis scrutiny."). The court explained that "if a substantial enough proportion of felons cannot pay their LFOs, it may be irrational to demand that they do," and that while plaintiffs in *Jones* had not yet *proven* that a "substantial proportion of felons (let alone a substantial majority of them) are indigent," they

LFO requirement punishes those who cannot pay more harshly than those who can," the court concluded that "[d]enying access to the franchise to those genuinely unable to pay solely on account of wealth does not survive heightened scrutiny." *Jones*, 950 F.3d at 807.

### B.   The Eleventh Circuit's Analysis in *Jones* Controls this Case and Requires Relief in Favor of Plaintiffs on their Wealth Discrimination Claim.

The *Jones* decision controls this case and requires relief in favor of Plaintiffs on their wealth discrimination claim because Alabama's voting rights restoration laws are indistinguishable from Florida's in any respect relevant to the Eleventh Circuit's reasoning.

The crux of the Eleventh Circuit's ruling in *Jones* is that a state may not "punish those felons who are genuinely unable to pay fees, fines, and restitution . . . while re-enfranchising all other similarly situated felons who can afford to pay." *Jones*, 950 F.3d at 819. The same principle renders Alabama's LFO requirement unconstitutional. In Alabama, a person convicted of a "felony involving moral turpitude" can have her voting rights restored through the non-discretionary CERV process. *See* Ala. Code §§ 17-3-30.1, 31. In order to receive a CERV, the applicant must have "paid all fines, court costs, fees, and victim restitution ordered by the sentencing court at the time of sentencing." Ala. Code 15-22-36.1(a)(3). If a person meets all the eligibility requirements

---

presented evidence suggesting that is the case. *Id.* at 815-16. After a trial on the merits, the district court found that in fact "the overwhelming majority of felons who have not paid their LFOs in full, but who are otherwise eligible to vote, are genuinely unable to pay the required amount, and thus, under Florida's pay-to-vote system, will be barred from voting solely because they lack sufficient funds." *Jones v. DeSantis*, No. 4:19-cv-300, Slip Op. at 43 (N.D. Fla. May 24, 2020).

Because the Eleventh Circuit held that heightened scrutiny applies to wealth-based classifications in re-enfranchisement schemes, Plaintiffs here do not have to establish that a substantial portion of individuals with felony convictions in Alabama are indigent in order to prevail. However, Plaintiffs have presented evidence that the majority of people with disqualifying felony convictions in Alabama have significant balances of LFOs, that outstanding LFOs are the largest barrier to voting rights restoration for Alabamians, and that Alabama's formerly incarcerated population has a median income of around $8,000. *See* Smith Report ¶¶ 11-14; 77-80; Cook, *supra*, at 4. Thus, Alabama's LFO requirement cannot survive even rational basis review.

for a CERV under the statute, the Board must issue a CERV to the applicant; no discretion is involved. Ala. Code § 15-22-36.1(b) ("The Certificate of Eligibility to Register to Vote *shall* be granted upon a determination that all of the requirements in subsection (a) are fulfilled.") (emphasis added); *see also* Ex. 2, State Defendants' Objections and Responses to Plaintiffs' First Set of Requests for Admission at 29-30 (asserting that there is no "decision-making in the sense of discretion involved in the grant or denial of Certificates of Eligibility to Register to Vote"). As Defendants have admitted, the Board does not consider the applicant's ability to pay outstanding fines, fees, or restitution when deciding whether to deny an application for a CERV. *See id.* As a result, Alabama citizens who satisfy all CERV eligibility criteria except for the LFO requirement and lack the means to pay their LFOs are prevented from registering to vote solely based on their wealth, while other similarly situated individuals who are able to pay their LFOs are entitled to receive a CERV.[11] As was the case in Florida, this re-enfranchisement scheme directly implicates the two circumstances under which a wealth classification triggers heightened scrutiny: use of a wealth-based distinction both in the administration of criminal justice and in restricting access to the franchise. *See Jones*, 950 F.3d at 808 (citing *M.L.B.*, 519 U.S. at 124). As was also the case in Florida, such a scheme "punishes those who cannot pay more harshly than those who can," and therefore does not survive heightened scrutiny. *Jones*, 950 F.3d at 800.

Defendants' proffered interests for barring those who cannot afford to pay their LFOs from obtaining CERVs are foreclosed by *Jones*. According to the Eleventh Circuit, those who genuinely lack the means to pay their LFOs cannot be "encouraged" to pay restitution or "complete their

---

[11] Defendants have admitted that Plaintiff Thompson and Plaintiff Gamble are ineligible for CERVs because of their outstanding LFOs. *See* Am. Answer ¶ 250 (Doc. 189) (admitting that Plaintiff Thompson is ineligible for CERV because of her outstanding LFO); *id.* ¶ 27 (admitting that Plaintiff Gamble is ineligible for CERV because of his outstanding LFOs).

entire sentence," as Defendants have contended in this case, *see* Mot. to Dismiss at 63-64 (Doc. 43), because "collection is futile" as applied to those who lack the financial resources to pay. As the Eleventh Circuit aptly put it, "the State cannot draw blood from stone." *Jones*, 950 F.3d at 827 (citing *Tate*, 401 U.S. at 399 and *Bearden*, 461 U.S. at 670-71). In other words, the State's collection interest, no matter how legitimate, cannot be furthered by the LFO requirement, because "[i]f a felon is truly unable to pay, it makes no sense to assert that he will be incentivized to pay his LFOs with money that he does not have." *Id*. As explained above, the financial means of Alabama citizens with disqualifying felony convictions are typically meager, with a median income of as little as $8,000. *See supra* at 8. Given the magnitude of LFOs in Alabama, taking away one's right to vote cannot "encourage" those with limited means to pay off their LFOs.

The State also has no legitimate interest in "protecting the ballot box" from those who are unable to pay, Mot. to Dismiss at 64 (Doc. 43), because "[v]oter qualifications have no relation to wealth nor to paying or not paying this or any other tax," *Jones*, 950 F.3d at 827 (quoting *Harper*, 383 U.S. at 666).

Lastly, the State's contention that only those who can pay their LFOs are "sufficiently rehabilitated to be entitled to vote," Defs.' Mot. to Dismiss at 64 (Doc. 43), essentially constitutes an admission of wealth discrimination. As the Eleventh Circuit held in *Jones*, a classification that deems one individual to be more rehabilitated than another solely based on ability to pay, despite having committed the same crime, directly contravenes the holding in *Harper. See Jones*, 950 F.3d at 827. Because Alabama's LFO requirement suffers from the same constitutional infirmities identified by the *Jones* court, it too must be invalidated.

**C.** ***Jones* Forecloses Defendants' Argument that Alabama's Discretionary Pardon Process Is a Viable Alternative to Paying LFOs.**

The *Jones* decision also forecloses Defendants' argument that the availability of a discretionary pardon process cures the LFO requirement's constitutional infirmity. Defendants in this case have claimed that the availability of the pardon process means Alabama "does not actually require a felon to pay all [LFOs] before restoring his or her rights," because anyone can apply for a pardon as an alternative to a CERV. Mot. to Dismiss at 62 (Doc. 43). The government in *Jones* likewise claimed that the availability of an entirely discretionary executive clemency process saved that state's LFO requirement. The Eleventh Circuit rejected Florida's argument, finding that the clemency process suffered from a "basic infirmity—[it is] entirely discretionary in nature. . . . [N]o member of the Clemency Board is *required* to grant rights restoration. We can hardly call pursuing a discretionary grant that at best will take years to receive, if received at all, a suitable alternative. After all, those felons who are able to pay enjoy nearly immediate, *automatic* re-enfranchisement as of right." *Jones*, 950 F.3d at 826.[12]

The Court should reject Alabama's identical argument here. Not only is Alabama's pardon process discretionary, but the evidence shows that failure to pay LFOs is typically asserted as a reason to *deny* pardon applications. The Board's Rule 30(b)(6) representative testified that the Board views outstanding LFOs as an "important consideration" in determining whether to grant a pardon, favorably views applicants who do not receive financial assistance from the State, and has

---

[12] The Eleventh Circuit found that two other alternatives provided by the Florida statute were also insufficient to overcome heightened scrutiny of the wealth-based classification because they are also illusory and discretionary: the Florida statute provided that the LFO requirement would be deemed complete with (1) approval of discharge of the obligation by a court subject to the approval of the person to whom the obligation is owed, or (2) completion of community service hours if a court converts the obligation into service hours. *See Jones*, 950 F.3d at 826.

22

denied pardon applications solely because the person had outstanding LFOs. *See supra* at 10-12. In short—those who cannot afford to pay need not apply.

The entirely discretionary process of receiving a pardon in the State of Alabama is not a suitable alternative to the CERV process, which is a nondiscretionary process that automatically re-enfranchises people who meet specific statutory criteria. Indeed, Plaintiffs Thompson and Gamble both applied for pardons. Plaintiff Thompson's application was rejected. Thompson Decl. ¶ 10. And Plaintiff Gamble's application remans pending years later. Gamble Decl. ¶¶ 7-10. Mr. Gamble's application for remission has likewise been pending for nearly two and a half years. Thus, even if the availability of a hypothetical, discretionary, and delayed remedy was not foreclosed as a defense by the Eleventh Circuit's ruling in *Jones*, it certainly does not provide any remedy to Plaintiffs' claims in this case. Moreover, other than the illusory pardon process, there are no additional statutory alternatives to paying off LFOs in Alabama's re-enfranchisement scheme, which renders restoration of voting rights even more illusory for Alabama citizens with felony convictions than it was for plaintiffs in *Jones.* Because the Eleventh Circuit has already rejected the "discretionary alternative remedy" defense, Plaintiffs are likely to succeed on the merits of their claims.

## II.    Plaintiffs Will Suffer Irreparable Harm Absent an Injunction.

Unless this Court enjoins the LFO requirement as to those unable to pay, Plaintiffs will suffer irreparable harm. "An injury is 'irreparable if it cannot be undone through monetary remedies.'" *Scott v. Roberts,* 612 F.3d 1279, 1295 (11th Cir. 2010) (citation omitted). The loss of one's ability to vote in an election clearly fits this bill. Once one misses an opportunity to exercise one's constitutional right to vote in a particular election, that opportunity is forever lost. No monetary relief can remedy the deprivation. *See Jones*, 950 F.3d at 828. For this reason, the Eleventh Circuit has held that "[t]he denial of the opportunity to cast a vote that a person may

otherwise be entitled to cast—even once—is an irreparable harm." *Id.*; *see League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (noting that "[c]ourts routinely deem restrictions on fundamental voting rights irreparable injury" and citing cases); *League of Women Voters of Fla., Inc., v. Detzner*, 314 F. Supp. 3d 1205, 1223 (N.D. Fla. 2018) ("[I]rreparable injury is presumed when '[a] restriction on the fundamental right to vote' is at issue." (citation omitted) (alteration in original)).

Without a preliminary injunction, Plaintiffs and many others are under imminent threat of being denied their right to vote in upcoming elections. According to Plaintiffs' expert, Dr. Daniel Smith, who analyzed Alabama's felony conviction and LFO records, there are over 99,000 individuals with felony convictions between 1993 and 2019 who have outstanding LFO obligations in Alabama, close to 90,000 of whom owe more than $1,000. *See* Smith Report ¶ 79 & Table 3.

Alabama will hold local municipal elections on August 25, 2020, and the general election for President and other offices will take place November 3, 2020. Because of outstanding debt that they are unable to pay, Plaintiffs are prohibited from registering to vote and voting in either of these upcoming elections. Plaintiff Thompson owes $30,000 in restitution, well in excess of her annual income before taxes and not including any expenses. Thompson Decl. ¶¶ 5-7. Plaintiff Gamble owes almost $30,000 in fines from his prosecution and conviction. Gamble Decl. ¶¶ 8-9. Neither has the financial ability to pay these LFOs in full before the next election. Despite meeting every other qualification for a CERV, Plaintiffs are denied the right to vote solely because of their lack of wealth.

GBM will also suffer direct, irreparable injury to its organizational mission absent an injunction. GBM currently spends a great deal of time helping Alabamians with limited means

24

navigate the CERV process to regain their voting rights. In many instances, however, this time is wasted because of the high number of individuals with outstanding LFOs that they cannot afford to pay. Douglas Decl. ¶¶ 8-16. Thus, GBM's efforts to register voters are frustrated both by the LFO requirement itself, which impedes its mission of registering voters, and by the diversion of its resources to often futile efforts to assess these voters' eligibility or apply for other means of rights restoration. Courts in this circuit and elsewhere have routinely deemed these irreparable harms. *See, e.g.*, *Ga. Coal. for People's Agenda, Inc. v. Kemp*, 347 F.Supp.3d 1251, 1268 (N.D. Ga. 2018) (finding irreparable harm when organizations' voter "registration and mobilization efforts . . . will continue to be frustrated and organization resources will be diverted"); *League of Women Voters of Fla. v. Cobb*, 447 F.Supp.2d 1314, 1339 (S.D. Fla. 2006) (finding irreparable harm when organizations "significantly scaled back their voter registration operations and are losing valuable time … to add new registrants to Florida's voter rolls"); *see also League of Women Voters of U.S. v. Newby,* 838 F.3d 1, 9 (D.C. Cir. 2016) (finding "injury for purposes both of standing and irreparable harm" when "obstacles" "make it more difficult for the Leagues to accomplish their primary mission of registering voters" before registration deadline).

## III.   The Balance of Equities Favors Granting a Preliminary Injunction.

The threatened irreparable injury to Plaintiffs' right to vote far outweighs any harm a preliminary injunction might cause Defendants.

On one side of the ledger sits Plaintiffs' "interest in their opportunity to exercise the core democratic right of voting," and GBM's interest in helping other Alabama citizens do so. *Jones*, 950 F.3d at 829. This interest is of paramount importance: voting is a "fundamental political right, because [it is] preservative of all rights." *Harper*, 383 U.S. at 667 (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886)).

By contrast, a preliminary injunction will merely impose—at most—an administrative burden on Defendants. As the Eleventh Circuit noted in *Jones*, the scope of that burden is up to the state. There, the court explained that the state could devise its procedure, but must make "a good faith effort to ensure that no felon otherwise eligible to vote . . . is prevented from doing so because of his or her genuine inability to pay LFOs." *Jones*, 950 F.3d at 829-30.[13] The court noted that there were "a range of options available that do not appear unduly burdensome in light of the significance of the plaintiffs' interest." *Id.* at 830. The same is true for Alabama.[14]

Defendants cannot invoke the burdens the State created for itself through the CERV process to continue an unconstitutional restriction on the right to vote. *See Jones*, 950 F.3d at 830. "There is no contest between the mass denial of a fundamental constitutional right and the modest administrative burdens to be borne by [the Board] and other state and local offices involved in elections." *Fish v. Kobach*, 840 F.3d 710, 755 (10th Cir. 2016). Nor can Defendants rely on their abstract interest in protecting the State's statute. *See Jones*, 950 F.3d at 829; *see also supra* Part I.B (demonstrating inadequacy of Defendants' proffered state interests). The balance of equities thus supports an injunction.

---

[13] After a trial on the merits, the district court ordered an ability to pay process that creates a rebuttable presumption of inability to pay for individuals that "had an appointed attorney or was granted indigent status in the last proceeding that resulted in a felony conviction," or submit an affidavit of inability to pay. *Jones v. DeSantis*, No. 4:19-cv-300, Slip Op. at 121-22 (N.D. Fl. May 24, 2020).

[14] A preliminary injunction must be applied broadly, given the rationale behind this Court's denial of Plaintiffs' motion for class certification. *See* Opinion Denying Class Certification at 9 (Doc. 194) (noting that "a class injunction . . . would be identical in scope, breadth and effect to an individual injunction awarded in favor of the individual plaintiffs" (citation omitted)); Defendants' Br. Opposing Class Certification at 15 (Doc. 113) (explaining that "an injunction not to enforce [Ala. Code § 15-22-36.1(a)(3)] would have the same effect whether entered for one plaintiff or one thousand plaintiffs").

**IV.    A Preliminary Injunction Will Serve the Public Interest.**

Finally, enjoining the LFO requirement as applied to those unable to pay would serve the public interest. "The vindication of constitutional rights . . . serve[s] the public interest almost by definition." *League of Women Voters of Fla. v. Browning*, 863 F.Supp.2d 1155, 1167 (N.D. Fla. 2012). By providing a procedure by which those unable to pay their LFOs can register to vote, an injunction would vindicate Plaintiffs' constitutional rights. Thus, a "conclusion that the plaintiffs have a substantial likelihood of success on the merits disposes of th[e] [public interest] question in short order." *Jones*, 950 F.3d at 831.

This is all the more so because of the nature of the right being preserved. "The 'cautious protection of the Plaintiffs' franchise-related rights is without question in the public interest.'" *Id.* at 830 (citation omitted). Alabamians have a vital interest in "ensuring that their peers who are eligible to vote are able to do so in every election." *Id.* at 831.

Moreover, allowing financial difficulties to stand between otherwise-eligible voters and the ballot box could harm public confidence in Alabama's elections. *See Jones*, 950 F.3d at 830 ("[T]he knowledge that otherwise-eligible voters were not counted 'would be harmful to the public's perception of the election's legitimacy. . . .'" (citation omitted)). As Alabama heads toward its first elections in over a century conducted during a global pandemic, that public confidence is even more vital. The public interest therefore weighs in favor of enjoining the LFO requirement as to those unable to pay.

**CONCLUSION**

Accordingly, the Court should enjoin Alabama Code Section 15-22-36.1(a)(3) as applied to those who lack the ability to pay their LFOs.  Because the deadline to register to vote in the upcoming August municipal elections is August 11 and because Plaintiffs and others similarly

situated must apply for and receive a CERV prior to registering to vote, movants respectfully request an expeditious ruling on this motion for preliminary injunction.

Dated: May 27, 2020

<div style="margin-left: 40%;">

Respectfully Submitted,

/s/ *Jessica Ring Amunson*

Jessica Ring Amunson
(DC Bar: 497223)
Jennifer Yun
(DC Bar: 1600953)
Jenner & Block LLP
1099 New York Ave. NW, Ste. 900
Washington, DC 20001
(202) 736-6000
jamunson@jenner.com
jyun@jenner.com

Jason Hipp
(NY Bar: 5232277)
Jenner & Block LLP
919 Third Avenue
New York, NY 10022
(212) 407-1784
jhipp@jenner.com

J. Mitch McGuire
(AL Bar: ASB-8317-S69M)
McGuire & Associates, LLC
31 Clayton Street
Montgomery, AL 36104
(334) 517-1000
jmcguire@mandabusinesslaw.com

Danielle Lang
(CA Bar: 304450)
Mark Gaber
(DC Bar: 988077)
J. Gerald Hebert
(VA Bar: 38432)

</div>

Molly Danahy
(DC Bar: 1643411)
Campaign Legal Center
1101 14th St. NW Suite 1400
Washington, DC 20005
(202) 736-2200
mgaber@campaignlegalcenter.org
dlang@campaignlegalcenter.org
ghebert@campaignlegalcenter.org
mdanahy@campaignlegalcenter.org

James U. Blacksher
(AL Bar: ASB-2381-S82J)
P.O. Box 636
Birmingham, AL 35201
(205) 591-7238
jblacksher@ns.sympatico.ca

Pamela Karlan
(NY Bar: 2116994)
Stanford Law School
559 Nathan Abbott Way
Stanford, CA 94305
(650) 725-4851
karlan@stanford.edu

Aderson B. Francois
(DC Bar: 498544)
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue NW
Washington, DC 20001
(202) 662-6721
abf48@georgetown.edu

Armand G. Derfner
(SC Bar: 1650)
Derfner & Altman
575 King Street, Suite B
Charleston, S.C. 29403
(843) 723-9804
aderfner@derfneraltman.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that, on May 27, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record as listed below:

Brad A. Chynoweth
State of Alabama
Office of the Attorney General
501 Washington Avenue
Post Office Box 300152
Montgomery, AL 36130
334.242.7997
Fax: 334.353.8440
Email: bchynoweth@ago.state.al.us

James William Davis
State of Alabama
Office of the Attorney General
P O Box 300152
Montgomery, AL 36130-0152
334-353-1356
Fax: 334-353-8440
Email: jimdavis@ago.state.al.us

Laura Elizabeth Howell
Office of the Alabama Attorney General
P O Box 300152
Montgomery, AL 36130
334-353-1018
Fax: 334-353-8440
Email: lhowell@ago.state.al.us

Misty Shawn Fairbanks Messick
Office of the Attorney General
P O Box 300152
Montgomery, AL 36130-0152
334-353-8674
Fax: 334-353-8440
Email: mmessick@ago.state.al.us

Winfield James Sinclair
Office of the Attorney General
P O Box 300152

Montgomery, AL 36130
334-242-7300
Fax: 334-353-8440
Email: wsinclair@ago.state.al.us

*Counsel for Defendants*

/s/      *Jessica Ring Amunson*

Jessica Ring Amunson
(DC Bar: 497223)
*Counsel for Plaintiffs*

31