IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| Treva Thompson, Timothy Lanier, | ) | |
| Pamela King, Darius Gamble, | ) | |
| and Greater Birmingham Ministries, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. |
| v. | ) | 2:16-cv-783-ECM-SMD |
| | ) | |
| John H. Merrill, in his official capacity | ) | |
| as Secretary of State, James Snipes, III, in | ) | |
| his official capacity as Chair of the | ) | |
| Montgomery County Board of Registrars, | ) | |
| and Leigh Gwathney, in her official | ) | |
| capacity as Chair of the Board of Pardons | ) | |
| and Paroles, | ) | |
| | ) | |
| Defendants. | ) | |

**S**TATE **D**EFENDANTS' **B**RIEF IN **S**UPPORT OF **T**HEIR **M**OTION FOR **S**UMMARY **J**UDGMENT

Steve Marshall
  *Attorney General*

James W. Davis (ASB-4063-I58J)
Winfield J. Sinclair (ASB-1750-S81W)
Misty S. Fairbanks Messick (ASB-1813-T71F)
*Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Post Office Box 300152
Montgomery, Alabama 36130-0152
telephone:     334.353.8674
facsimile:     334.353.8400
Jim.Davis@AlabamaAG.gov
Winfield.Sinclair@AlabamaAG.gov
Misty.Messick@AlabamaAG.gov

***Counsel for the State Defendants***

1

## TABLE OF CONTENTS

Table of Authorities ...............................................................................................5

State Defendants' Brief in Support of Their Motion for Summary Judgment ..............................18

I.    Felon disenfranchisement generally ..............................................................18

II.   Felon disenfranchisement in Alabama ...........................................................20

III.  Proceedings to date ........................................................................................23

IV.   Summary judgment standard .........................................................................27

V.    Secretary Merrill and Chair Snipes are entitled to summary judgment on Counts 1 and 2, which allege that Alabama's current constitutional provision disenfranchising on the basis of convictions for felonies of moral turpitude is intentionally racially discriminatory, in violation of the Equal Protection Clause and the Fifteenth Amendment, respectively ..............................................28

      a.   The *Hunter v. Underwood* analytical framework .................................29

      b.   *Arlington Heights* and impact ............................................................30

           i.    *Arlington Heights* and impact: disenfranchising felons............................30

           ii.   *Arlington Heights* and impact: using moral turpitude as a standard ..........32

      c.   Other *Arlington Heights* factors.........................................................35

           i.    Other *Arlington Heights* factors: the difficulty of proving intent.............36

           ii.   Other *Arlington Heights* factors: the history in *Hunter v. Underwood* ...............................................................................................37

           iii.  Other *Arlington Heights* factors: the 1901 Constitutional Convention ...............................................................................................39

           iv.   Other *Arlington Heights* factors: constitutional revision efforts through the 1980s......................................................40

                 1.   Other *Arlington Heights* factors: constitutional revision efforts through the 1980s—Governor Brewer's efforts................41

                 2.   Other *Arlington Heights* factors: constitutional revision efforts through the 1980s—Governor James' efforts ...................44

                 3.   Other *Arlington Heights* factors: constitutional revision efforts through the 1980s—Lt. Governor Baxley's efforts............50

        v.  Other *Arlington Heights* factors: Ala. Act No. 95-443 proposes to repeal the 1901 Suffrage and Elections Article and Ala. Const. art. VIII § 177 is adopted ...................................................................................52

    d.  *Arlington Heights* factors: the analysis should end soon after 1996.....................55

    e.  *Arlington Heights* analysis: shifting the burden.....................................56

VI.   Felony disenfranchisement is not punishment, a point which is relevant to Count 11 (*Ex Post Facto* Clause), Count 12 (Cruel and Unusual Punishment Clause), and Count 13 (wealth discrimination) .........................................................................58

VII.  The United States Constitution would be rendered internally inconsistent if felony disenfranchisement, which is affirmatively sanctioned by the Fourteenth Amendment, could violate the *Ex Post Facto* Clause (Count 11) or the Eighth Amendment's Cruel and Unusual Punishment Clause (Count 12)...................................68

VIII. Secretary Merrill and Chair Snipes are entitled to summary judgment on Count 12 which alleges cruel and unusual punishment in violation of the Eighth Amendment.......71

IX.   Secretary Merrill and Chair Snipes are entitled to summary judgment on Count 11 which alleges a violation of the *Ex Post Facto* Clause, Count 17 which alleges a similar claim under the Due Process Clause in the event that disenfranchisement is not punishment (which it is not), and Count 16 which relatedly alleges that Plaintiffs are subject to retroactive disenfranchisement in violation of the Due Process Clause on grounds that the State provides a right to Plaintiffs to vote which is being denied ..........................................................................................................................77

    a.  Alabama law was clear at the time that the individual Plaintiffs committed their felonies that those felonies were disenfranchising .........................................78

    b.  Since 1996 and through today, Ala. Const. art. VIII, § 177(b) has disenfranchised persons convicted of felonies involving moral turpitude; Ala. Code § 17-3-30.1 merely replaces the common law definition of moral turpitude with a statutory definition.....................................................................80

X.    Chair Gwathney is entitled to summary judgment on Count 13, which alleges wealth discrimination in violation of the Equal Protection Clause .............................................86

    a.  Background ..........................................................................................87

        i.  The Florida litigation ...............................................................87

        ii.  Restoration of voting rights through pardons and CERVs .......................90

        iii.  Plaintiff Treva Thompson .........................................................93

        iv.  Plaintiff Darius Gamble .............................................................94

    v. Plaintiff Greater Birmingham Ministries ...................................................97

    vi. Consideration of inability to pay in Alabama State courts .......................99

  b. Alabama's court-ordered monies requirement is constitutional under rational basis review..........................................................................................................100

  c. The *Jones* panel concluded that strict scrutiny was triggered because disenfranchisement is punishment being imposed on the basis of wealth, but Alabama does not assert an interest in punishing through disenfranchisement ........................................................................................................................104

  d. The *Jones* panel was wrong to conclude that strict scrutiny was required because declining to re-enfranchise a felon based on his failure to pay court-ordered monies is wealth discrimination .............................................................105

  e. Even if strict scrutiny applies, Alabama's court-ordered monies requirement is constitutional when the State's true interests are fairly weighed....................109

XI. Secretary Merrill is entitled to summary judgment on Count 18, which alleges that the State mail-in form does not comply with a provision of the National Voter Registration Act of 1993 ..................................................................................................111

  a. GBM only alleged a claim concerning the State mail-in form and, in any event, lacks standing to challenge any other Alabama voter registration form ........................................................................................................................113

  b. The State mail-in form includes a statement that specifies each of Alabama's eligibility requirements and was amended last year to reasonably address concerns for potential voters that GBM raised ....................................................115

  c. Secretary Merrill has the better reading of § 20508(b)(2)(A)'s requirement to include a statement that specifies each eligibility requirement .......................118

  d. GBM's reading of § 20508(b)(2)(A) would lead to absurd results ....................126

  e. GBM's reading of § 20508(b)(2)(A) would render that provision unconstitutional; § 20508(b)(2)(A) should be interpreted to avoid raising constitutional concerns.........................................................................................133

  XII. Conclusion ................................................................................................................137

Certificate of Service ...................................................................................................138

TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez,*
   585 U.S. ___, 138 S. Ct. 2305 (2018) ............................................................ *passim*

*Advisory Opn. to the Governor re: Implementation of Amendment 4, The Voting Restoration Amendment,*
   288 So. 3d 1070 (Fla. 2020) (*per curiam*) ................................................... 87

*Arkansas Games & Fish Com'n v. United States,*
   568 U.S. 23 (2012) ......................................................................................... 121

*Arizona v. Inter Tribal Council of Arizona,*
   570 U.S. 1 (2013) ....................................................... 111, 122-23, 133-34

*Broadway v. State Farm Mut. Auto. Ins. Co.,*
   364 F. Supp. 3d 1329 (M.D. Ala. 2019) ...................................................... 27

*Cal. Dep't of Corr. v. Morales,*
   514 U.S. 499 (1994) ....................................................................................... 77

*CBS Inc. v. PrimeTime 24 Joint Venture,*
   245 F.3d 1217 (11th Cir. 2001) ............................................................ 118, 119

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) ....................................................................................... 27

*Chambliss v. State,*
   373 So.2d 1185 (Ala. Crim. App. 1979) ...................................................... 50

*Chapman v. Gooden,*
   974 So.2d 972 (Ala. 2007) ..................................................................... 81, 116

*Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.,*
   467 U.S. 837 (1984) ....................................................................................... 123

*City of Miami Gardens v. Wells Fargo & Co.,*
   931 F.3d 1274 (11th Cir. 2019) ............................................................. 80, 114

*City of Mobile v. Bolden,*
   446 U.S. 55 (1980) ......................................................................................... 28

*Cotton v. Fordice,*
   157 F.3d 388 (5th Cir. 1998) ............................................................... 38-39, 56

*Crowell v. Benson,*
   285 U.S. 22 (1932) ......................................................................................... 133

*Dolan v. United States Postal Serv.*,
    546 U.S. 481 (2006) ................................................................................119

*Durr v. Shinseki*,
    638 F.3d 1342 (11th Cir. 2011) ...................................................118, 126

*Edwards v. Aguillard*,
    482 U.S. 578 (1987) ..................................................................................36

*Envtl. Def. v. Duke Energy Corp.*,
    549 U.S. 561 (2007) ..................................................................................64

*Ex parte Holladay*,
    466 So. 2d 956 (Ala. 1985) .......................................................................84

*Ex parte McIntosh*,
    443 So. 2d 1283 (Ala. 1983) ........................................................33, 79, 80

*Farrakhan v. Locke*,
    987 F. Supp. 1304 (E.D. Wash. 1997) .................................................69-70

*Flemming v. Nestor*,
    363 U.S. 603 (1960) ..................................................................................58

*Fort v. Brinkley*,
    112 S.W. 1084 (Ark. 1908) .......................................................................32

*Forty Three Investments, LLC v. Water Works Bd. of City of Birmingham*,
    ___ So.3d ___, 2020 WL 2091815 (Ala. Civ. App. 2020) ...................84-85

*Gelman v. Federal Election Comm'n*,
    631 F.2d 939 (D.C. Cir. 1980) ................................................................133

*Gilmour v. Gates, McDonald and Co.*,
    382 F.3d 1312 (11th Cir. 2004) (*per curiam*) .......................................113

*Greater Birmingham Ministries v. Alabama*,
    161 F. Supp. 3d 1104 (N.D. Ala. 2016) ...............................................98-99

*Greater Birmingham Ministries v. Secretary of State for Alabama*,
    966 F.3d 1202 (11th Cir. 2020) .......................................................27, 74-75

*Green v. Bd. of Elections of City of New York*,
    380 F.2d 445 (2d Cir. 1967) ............................................................ *passim*

*Harrison v. Benchmark Electronics Huntsville, Inc.*,
    593 F.3d 1206 (11th Cir. 2010) ..............................................................119

*Hayden v. Pataki,*
    449 F.3d 305 (2d Cir. 2006) (*en banc*) .................................................. 18-19, 68, 69

*Harness v. Hosemann,*
    2019 WL 8113392 (S.D. Miss. 2019) ..................................................... 56, 69-70

*Harper v. Va. State Bd. of Elections,*
    383 U.S. 663 (1966) ............................................................................... *passim*

*Harvey v. Brewer,*
    605 F.3d 1067 (9th Cir. 2010) ............................................................... *passim*

*Helvering v. Gregory,*
    69 F.2d 809 (2d Cir. 1934) ...................................................................... 119

*Hernández v. Mesa,*
    589 U.S. ___, 140 S. Ct. 735 (2020) ........................................................ 121

*Hinds v. Lynch,*
    790 F.3d 259 (1st Cir. 2015) .................................................................... 59

*Hobson v. Pow,*
    434 F. Supp. 362 (N.D. Ala. 1977) .......................................................... 21

*Horwitz v. Kirby,*
    197 So. 3d 943 (Ala. 2015) ...................................................................... 120

*Hudson v. United States,*
    522 U.S. 93 (1997) ............................................................................... 65, 67

*Hurd v. State,*
    68 So.3d 219 (Ala. Crim. App. 2010) ...................................................... 99

*Husted v. A. Philip Randolph Inst.,*
    584 U.S. ____, 138 S. Ct. 1833 (2018) ............................................... 111, 134

*Hunter v. Underwood,*
    471 U.S. 222 (1985) ............................................................................... *passim*

*Jacobson v. Fla. Sec'y of State,*
    957 F.3d 1193 (11th Cir. 2020) ................................................................ 98

*Johnson v. Bredesen,*
    624 F.3d 742 (6th Cir. 2010) .............................................................. 70, 104

*Johnson v. Governor of Fla.,*
    405 F.3d 1214 (11th Cir. 2005) (*en banc*) ........................................... *passim*

*Jones v. DeSantis*,

   410 F. Supp.3d 1284 (N.D. Fla. 2019) ............................................................ *passim*

*Jones v. DeSantis*,

   ___ F. Supp.3d ___, 2020 WL 2618062 (N.D. Fla. 2020) .................................90, 108

*Jones v. Governor of Fla.*,

   950 F.3d 795 (11th Cir. 2020) ........................................................................ *passim*

*Jordan v. De George*,

   341 U.S. 223 (1951) ...............................................................32, 78, 130, 136

*Katzenbach v. Morgan*,

   384 U.S. 641 (1966) ..............................................................................134

*Kennedy v. Mendoza-Martinez*,

   372 U.S. 144 (1963) ......................................................................60, 64-68

*Kucana v. Holder*,

   558 U.S. 233 (2010) ..............................................................118-19, 121

*Lassiter v. Northampton Cty. Bd. of Elections*,

   360 U.S. 45 (1959) ..................................................................134-35

*League of Women Voters of the United States v. Newby*,

   238 F.Supp.3d 6 (D.D.C. 2017) ............................................................111

*Lee v. Wisconsin State Board of Dental Examiners*,

   29 Wis.2d 330, 139 N.W.2d 61 (Wisc. 1966) .........................................33

*Leocal v. Ashcroft*,

   543 U.S. 1 (2004) .............................................................................112

*Loving v. Virginia*,

   388 U.S. 1 (1967) ..............................................................................42

*Madison v. State*,

   161 Wash.2d 85, 163 P.3d 757 (2007) (*en banc*) .............................101, 104

*Mathis v. United States*,

   579 U.S. ___, 136 S. Ct. 2243 (2016) ..................................................130

*Mason v. Village of El Portal*,

   240 F.3d 1337 (11th Cir. 2001) .............................................................36

*Matthews v. State*,

   286 So. 2d 91 (Ala. Crim. App. 1973) ....................................................79

*McCleskey v. Kemp*,

   481 U.S. 279 (1987) ................................................................................................ 30

*McGuire Oil Co. v. Mapco, Inc.*,

   612 So.2d 417 (Ala.1992) ......................................................................................... 85

*Meriwether v. Crown Inv. Corp.*,

   268 So. 2d 780 (Ala. 1972) ....................................................................................... 33

*Miles v. Apex Marine Corp.*,

   498 U.S. 19 (1990) ................................................................................................. 122

*Miller v. Johnson*,

   515 U.S. 900 (1995) ................................................................................................ 29

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,

   429 U.S. 274, (1977) ............................................................................................... 29

*Mullaney v. Wilbur*,

   421 U.S. 684 (1975) ........................................................................................... 85-86

*Naturist Soc'y, Inc. v. Fillyaw*,

   958 F.2d 1515 (11th Cir. 1992) ............................................................................ 118

*Owens v. Barnes*,

   711 F.2d 25 (3d Cir.1983) ...................................................................................... 101

*Pace v. Armstrong World Indus., Inc.*,

   578 So. 2d 281 (Ala. 1991) ...................................................................................... 84

*Pers. Adm'r of Mass. v. Feeney*,

   442 U.S. 256 (1979) ................................................................................................ 30

*Pippen v. State*,

   73 So. 340 (Ala. 1916) ............................................................................................ 32

*Pub. Citizen v. U.S. Dep't of Justice*,

   491 U.S. 440 (1989) .......................................................................................... 131-33

*Raysor v. DeSantis*,

   No. 19A1071, 591 U.S. ___, ___ S. Ct. ___, 2020 WL 4006868 (July 16, 2020) ................... 59

*Reno v. Bossier Parish Sch. Bd.*,

   520 U.S. 471 (1997) ................................................................................................ 28

*Richardson v. Ramirez*,

   418 U.S. 24 (1974) ......................................................................................... *passim*

*Robinson v. Ash*,
    374 F. Supp. 3d 1171 (M.D. Ala. 2019) ...................................................................27

*Robinson v. California,*
    370 U.S. 660 (1962) ...............................................................................................69

*Rummel v. Estelle*,
    445 U.S. 263 (1980) ...............................................................................................71

*Shea v. Vialpando*,
    416 U.S. 251 (1974) .............................................................................................124

*Shelby Cty., Ala. v. Holder*,
    570 U.S. 529 (2013) ...............................................................................................21

*Shepherd v. Trevino*,
    575 F.2d 1110 (5th Cir. 1978) ....................................................................... *passim*

*Skinner v. State*,
    987 So. 2d 1172 (Ala. Crim. App. 2006) .............................................................130

*Simmons v. Galvin*,
    575 F.3d 24 (1st Cir. 2009) ............................................................................ *passim*

*Sims v. Callahan*,
    112 So. 2d 776 (Ala. 1959) ...............................................................................32-33

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944) .........................................................................................124-25

*Smith v. Doe*,
    538 U.S. 84 (2003) ......................................................................................... *passim*

*Stahlman v. Griffith*,
    456 So. 2d 287 (Ala. 1984) ....................................................................................79

*State v. Manley*,
    441 So. 2d 864 (Ala. 1983) ....................................................................................52

*State v. R.B.F.*,
    ___ So.3d ___, 2020 WL 1228015 (Ala. Crim. App. 2020).................................100

*State v. T. R. Miller Mill Co.*,
    130 So. 2d 185 (Ala. 1961) ....................................................................................84

*Thole v. U.S. Bank N.A.*,
    590 U.S. ____, 140 S.Ct. 1615 (2020).....................................................................99

*Trop v. Dulles,*
    356 U.S. 86 (1958) ................................................................................ 65-66

*United States v. Farley,*
    607 F.3d 1294 (11th Cir. 2010) ................................................... 72-73, 75

*United States v. Johnson,*
    451 F.3d 1239 (11th Cir. 2006) (*per curiam*) ............................ 71, 73, 74

*United States v. Mead Corp.,*
    533 U.S. 218 (2001) ........................................................................ 124-25

*United States v. O'Brien,*
    391 U.S. 367 (1968) ................................................................................ 36

*United States v. Stevens,*
    559 U.S. 460 (2010) ......................................................................... 74, 79

*United States v. Ursery,*
    518 U.S. 267 (1996) ......................................................................... 59, 68

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
    429 U.S. 252 (1977) ........................................................................ *passim*

*Volkswagen of Am., Inc. v. Dillard,*
    579 So. 2d 1301 (Ala. 1991) .................................................................. 85

*Wachovia Bank, N.A. v. United States,*
    455 F.3d. 1261 (11th Cir. 2006) ...................................... 119, 121, 135

*Washington v. Davis,*
    426 U.S. 229 (1976) ............................................................................... 29

*Washington v. State,*
    75 Ala. 582 (1884) ...................................................................... 31, 62, 68

*Washington State Grange v. Washington State Republican Party,*
    552 U.S. 442 (2008) .................................................................. 74, 78-79

*Weems v. United States,*
    217 U.S. 349 (1910) ............................................................................... 73

*Wilson v. Seiter,*
    501 U.S. 294 (1991) ............................................................................... 58

*Worley v. Gooden,*
    Case No. 1051712 (Ala. Oct. 25, 2006) .......................................... 81-82

*Zadvydas v. Davis,*

   533 U.S. 678 (2001) ...................................................................................133

**Constitutional Provisions**

Ala. Const. of 1819 art. VI, § 5 .................................................................20

Ala. Const. of 1861 art. VI, § 5 .................................................................20

Ala. Const. of 1865 art. VIII, § 1 ...............................................................20

Ala. Const. of 1868 art. VII, § 3 .......................................................20, 57, 64

Ala. Const. of 1875 art. VIII § 3 ..........................................................20, 57

Ala. Const. of 1901 art. VIII § 182 .......................................................*passim*

Ala. Const. art. IV, § 46 ..........................................................................32

Ala. Const. art. V, § 114 ..........................................................................32

Ala. Const. art. V, § 138 ..........................................................................32

Ala. Const. art. VI, § 152 .........................................................................32

Ala. Const. art. VI, § 160 .........................................................................32

Ala. Const. art. VII, § 173 ...................................................................33, 57

Ala. Const. art. VIII, § 177 .................................................................*passim*

Ala. Const. art. XVIII, § 284 .....................................................................28

Ala. Const. art. XVIII, § 285 .....................................................................28

Fla. Const. art. VI, § 4 (1968) ...................................................................42

Fla. Const. art. VI, § 4 (2018) ...................................................................87

Md. Const. art. 1, § 2 (1956) .....................................................................42

Miss. Const, art. XII, § 241 (1890) .......................................................38-39

U.S. Const. art. I § 2 ..............................................................................134

U.S. Const. art. I § 10 (*ex post facto* clause) .......................................*passim*

U.S. Const. art. II § 1 ............................................................................134

U.S. Const. art. III § 2 .....................................................................74, 100

U.S. Const. amend. VIII .....................................................................*passim*

U.S. Const. amend. XIV .....................................................................*passim*

U.S. Const. amend. XV.......................................................................*passim*

U.S. Const. amend. XVII .........................................................................134

U.S. Const. amend. XIX ..........................................................................134

U.S. Const. amend. XXIV ........................................................................134

U.S. Const. amend. XXVI ............................................................................................134

**Acts and Statutes**

Act of June 25, 1868, ch. 50, 15 Stat. 73 (Readmission Act for Alabama) ...................64

Ala. Act No. 83-683 ...................................................................................................52

Ala. Act No. 95-443 ............................................................................................. *passim*

Ala. Act No. 2003-415 ................................................................................................22

Ala. Act No. 2011-656 .......................................................................................... *passim*

Ala. Act No. 2016-387 ................................................................................................22

Ala. Act No. 2017-378 .......................................................................................... *passim*

Ala. Act No. 2018-537 ..............................................................................................127

Ala. Act No. 2019-513 ................................................................................................22

Ala. Act No. 2019-514 ..............................................................................................127

Ala. Code § 5-2A-6 .....................................................................................................33

Ala. Code § 5-6A-1 .....................................................................................................33

Ala. Code § 5-17-44 ....................................................................................................33

Ala. Code § 5-17-55 ....................................................................................................33

Ala. Code § 8-6-9 ........................................................................................................33

Ala. Code § 8-6-17 ....................................................................................................129

Ala. Code § 8-19A-11 .................................................................................................33

Ala. Code § 11-5-33 ....................................................................................................34

Ala. Code § 11-43-210 ................................................................................................34

Ala. Code § 11-43C-17 ...............................................................................................34

Ala. Code § 11-44E-42 ...............................................................................................34

Ala. Code § 11-49B-6 .................................................................................................34

Ala. Code § 12-16-60 ..................................................................................................34

Ala. Code § 12-21-162 ................................................................................................34

Ala. Code § 13A-5-2 ...........................................................................................94, 106

Ala. Code § 13A-5-6 .............................................................................................74, 75

Ala. Code § 13A-5-11 ...............................................................................89, 94, 106

Ala. Code § 13A-5-12 ..............................................................................................106

Ala. Code § 13A-5-40 ...........................................................................................126-27

Ala. Code § 13A-6-2 .................................................................................................127

Ala. Code § 13A-6-3 .................................................................................................127

Ala. Code § 13A-6-20 ...............................................................................................127

Ala. Code § 13A-6-21 ...............................................................................................127

Ala. Code § 13A-6-43 ...............................................................................................127

Ala. Code § 13A-6-44 ...............................................................................................127

Ala. Code § 13A-6-61 ...............................................................................................127

Ala. Code § 13A-6-62 ...............................................................................................127

Ala. Code § 13A-6-63 ...............................................................................................127

Ala. Code § 13A-6-64 ...............................................................................................127

Ala. Code § 13A-6-65.1 ............................................................................................127

Ala. Code § 13A-6-66 ...............................................................................................127

Ala. Code § 13A-6-67 ...............................................................................................127

Ala. Code § 13A-6-69 ...............................................................................................127

Ala. Code § 13A-6-69.1 ............................................................................................127

Ala. Code § 13A-6-121 .............................................................................................127

Ala. Code § 13A-6-122 .............................................................................................127

Ala. Code § 13A-6-123 .............................................................................................127

Ala. Code § 13A-6-124 .............................................................................................127

Ala. Code § 13A-6-125 .............................................................................................127

Ala. Code § 13A-6-152 .............................................................................................127

Ala. Code § 13A-6-153 .............................................................................................127

Ala. Code § 13A-7-5 .................................................................................................129

Ala. Code § 13A-7-6 .................................................................................................129

Ala. Code § 13A-8-2.1 ..............................................................................................129

Ala. Code § 13A-8-3 .................................................................................................129

Ala. Code § 13A-8-4 .................................................................................................129

Ala. Code § 13A-8-7 .................................................................................................129

Ala. Code § 13A-8-8 .................................................................................................129

Ala. Code § 13A-8-10.4 ............................................................................................129

Ala. Code § 13A-8-41 ...............................................................................................129

Ala. Code § 13A-8-42 ...............................................................................................129

Ala. Code § 13A-8-43 ...............................................................................................129

Ala. Code § 13A-9-2 .......................................................................................... 129

Ala. Code § 13A-9-3 .......................................................................................... 129

Ala. Code § 13A-9-3.1 ....................................................................................... 129

Ala. Code § 13A-10-152 .................................................................................... 127

Ala. Code § 13A-10-153 .................................................................................... 127

Ala. Code § 13A-10-154 .................................................................................... 127

Ala. Code § 13A-10-171 .................................................................................... 127

Ala. Code § 13A-10-193 ............................................................................. 128, 129

Ala. Code § 13A-10-194 .................................................................................... 128

Ala. Code § 13A-10-195 .................................................................................... 128

Ala. Code § 13A-10-196 .................................................................................... 128

Ala. Code § 13A-10-197 .................................................................................... 128

Ala. Code § 13A-10-198 .................................................................................... 128

Ala. Code § 13A-10-199 .................................................................................... 128

Ala. Code § 13A-10-200 .................................................................................... 128

Ala. Code § 13A-11-2 ........................................................................................ 128

Ala. Code § 13A-12-191 .................................................................................... 128

Ala. Code § 13A-12-192 .................................................................................... 128

Ala. Code § 13A-12-196 .................................................................................... 128

Ala. Code § 13A-12-197 .................................................................................... 128

Ala. Code § 13A-12-200.2 ................................................................................. 128

Ala. Code § 13A-12-231 ............................................................................. 128, 74

Ala. Code § 13A-13-1 ........................................................................................ 128

Ala. Code § 13A-13-3 ........................................................................................ 128

Ala. Code § 15-13-159 ......................................................................................... 34

Ala. Code § 15-13-160 ......................................................................................... 34

Ala. Code § 15-18-65 ...................................................................................... 93, 99

Ala. Code § 15-18-67 ...................................................................................... 93, 99

Ala. Code § 15-18-68 ................................................................................. 93, 99, 100

Ala. Code § 15-18-69 ...................................................................................... 93, 99

Ala. Code § 15-22-36 ...................................................................................... 22, 90

Ala. Code § 15-22-36.1 ................................................................................... *passim*

Ala. Code § 16-24B-3 .......................................................................................... 34

15

Ala. Code § 17-3-30 ................................................................................................63

Ala. Code § 17-3-30.1 ....................................................................................... *passim*

Ala. Code § 17-3-31 ..........................................................................................63, 131

Ala. Code § 17-3-33 ..............................................................................................120

Ala. Code § 17-3-34 .......................................................................................... 120-21

Ala. Code § 22-18-6 ................................................................................................34

Ala. Code § 22-30D-8 ............................................................................................34

Ala. Code § 26-15-3 ..............................................................................................128

Ala. Code § 26-15-3.1 ...........................................................................................128

Ala. Code § 27-40-5 ................................................................................................34

Ala. Code § 34-2-34 ................................................................................................34

Ala. Code § 34-3-86 ................................................................................................34

Ala. Code § 34-4-21 ................................................................................................34

Ala. Code § 34-4-29 ................................................................................................34

Ala. Code § 34-8A-4 ...............................................................................................34

Ala. Code § 34-8A-16 .............................................................................................34

Ala. Code § 34-9-10 ................................................................................................34

Ala. Code § 34-9-18 ................................................................................................34

Ala. Code § 34-13-56 ..............................................................................................34

8 U.S.C. § 1182 ......................................................................................................35

8 U.S.C. § 1227 ......................................................................................................35

21 U.S.C. § 206 ......................................................................................................35

42 U.S.C. § 1983 ....................................................................................................36

52 U.S.C. § 10303 (Section 4 of the Voting Rights Act) .................................................21

52 U.S.C. § 10304 (Section 5 of the Voting Rights Act) .................................................21

52 U.S.C. §§ 20501 *et seq.* ....................................................................................120

52 U.S.C. § 20502 ..................................................................................................115

52 U.S.C. § 20504 ...........................................................................................115, 121

52 U.S.C. § 20505 ..........................................................................112, 114, 118, 121

52 U.S.C. § 20506 ...........................................................................................121, 122

52 U.S.C. § 20507 ...........................................................................................120, 121

52 U.S.C. § 20508 .......................................................................................... *passim*

52 U.S.C. § 21083 ..................................................................................................122

**Regulations**

11 C.F.R. §§ 9428.3 *et seq.*..................................................................................118, 123

**Rules**

Ala. R. App. P. 18 ....................................................................................................85

Ala. R. Crim. P. 26.11.......................................................................................99-100

Fed. R. Civ. P. 25 ....................................................................................................23

Fed. R. Civ. P. 30 ....................................................................................................91

Fed. R. Civ. P. 56 ....................................................................................................27

M.D. Ala. LR 83.1 ............................................................................................34-35, 57

U.S. Vet. App. R. Admis & Prac, Rule 7..................................................................35

**Other Authorities**

Ala. Att'y Gen. Opinion to Hon. William C. Segrest, Executive Director, Board of Pardons and Paroles, dated March 18, 2005, A.G. No. 2005-092................................................................81

BLACK'S LAW DICTIONARY (6th ed. 1990) ...............................................................118

Mirjan R. Damaska, *Adverse Legal Consequences of Conviction and their Removal: A Comparative Study*, 59 J.Crim. L., Criminology & Police Sci. 347 (1968) ...........................18

Charles Gamble, *McElroy's Alabama Evidence*, § 145.01(7) (3d ed. 1977)...............................33

A. Scalia & B. Garner, *Reading Law* (2012) ..........................................................119

WEBSTER'S NEW COLLEGIATE DICTIONARY (1974)...................................................119

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, Unabridged. 2019................................118

<u>**S**TATE **D**EFENDANTS' **B**RIEF IN **S**UPPORT OF **T**HEIR **M**OTION FOR **S**UMMARY **J**UDGMENT</u>

This litigation involves a multi-pronged attack on Alabama's laws concerning disenfranchisement due to a conviction for a felony involving moral turpitude and the manner in which Alabama law provides that voting rights may be restored for some felons. While there are a lot of moving parts, at the end of the day there are no genuine disputes of material fact, and Secretary of State John H. Merrill, Chair of the Montgomery County Board of Registrars James Snipes, III, and Chair of the Board of Pardons and Paroles Leigh Gwathney (collectively, the State Defendants) are entitled to judgment as a matter of law as to each claim pending against them.

## I.      Felon disenfranchisement generally.

"[T]he practice of disenfranchising those convicted of crimes is of ancient origin." *Hayden v. Pataki*, 449 F.3d 305, 316 (2d Cir. 2006) (*en banc*). "Greek city states, such as Athens, for example, gave offenders the status of *atimia* (translated as dishonor) which excluded them from the activities of the polis, including voting and the right to serve on juries. Crimes of *atimia* were not dissimilar from those that later fell into the category of moral turpitude. A common feature was some element of deception, treason, fraud or false pretenses . . . . " Decl. and Expert Report of David T. Beito, Ph.D., Exhibit 1, at 4 (footnote omitted). "The Romans, in both the republic and the empire, had analogous legal provisions. They too put an emphasis on infamous crimes (or *infamia*) of fraud or deception such a forgery, perjury, bearing false witness, or acting in bad faith under a contract." *Id.* at 4-5 (footnote omitted). *See also Hayden*, 449 F.3d at 316 ("The Roman Republic also employed infamy as a penalty for those convicted of crimes involving moral turpitude.") (*citing* Mirjan R. Damaska, *Adverse Legal Consequences of Conviction and their Removal: A Comparative Study*, 59 J.Crim. L., Criminology & Police Sci. 347, 351 (1968)).

"A wide variety of philosophers including Aristotle, Immanuel Kant, John Locke, Jean-Jacques Rousseau, Montesquieu, and John Stuart Mill supported the general concept of criminal disenfranchisement."  Beito Report, Exhibit 1, at 5 (footnote omitted).  "Criminal disenfranchisement in Europe during the Middle Ages showed a great continuity with practices in ancient Greece and Rome.  It was a key facet of 'civil death,' which removed all citizenship rights, including the franchise."  *Id.*

Crossing the pond and the years, "[c]riminal disenfranchisement was a feature of American law during the colonial era."  Beito Report, Exhibit 1, at 6.  *See also Hayden*, 449 F.3d at 316 ("Similar laws disenfranchising felons were adopted in the American Colonies and the Early American Republic as well.").  "This pattern of criminal disenfranchisement continued in the first century after American independence."  Beito Report, Exhibit 1, at 6.  "[E]leven state constitutions adopted between 1776 and 1821 prohibited or authorized the legislature to prohibit exercise of the franchise by convicted felons. Moreover, twenty-nine states had such provisions when the Fourteenth Amendment was adopted . . . ."  *Green v. Bd. of Elections of City of New York*, 380 F.2d 445, 450 (2d Cir. 1967) (Friendly, J.) (footnotes omitted).

Section 2 of the Fourteenth Amendment provides for apportioning representation in Congress, and reduces that representation "when the right to vote at any election" for federal or State office "is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, *except for participation in rebellion, or other crime*."  U.S. Const. amend. XIV § 2.  The Supreme Court of the United States has recognized that this provision is "an affirmative sanction" for "the exclusion of felons from the vote."  *Richardson v. Ramirez*, 418 U.S. 24, 54 (1974).  Thus, the Constitution expressly recognizes the right of a State to disenfranchise felons.  *Id.*; *see also Simmons v. Galvin*, 575 F.3d

24, 34 (1st Cir. 2009) (felony disenfranchisement is "deeply rooted in our history, in our laws, and in our Constitution"); *Jones v. Governor of Fla.*, 950 F.3d 795, 801 (11th Cir. 2020) ("Regardless of the political trend toward re-enfranchisement, there is nothing unconstitutional about disenfranchising felons—even all felons, even for life.").

## II.        Felon disenfranchisement in Alabama.

Alabama has long disenfranchised convicted criminals.  The Constitution of 1819 provided that "Laws shall be made to exclude from office, *from suffrage*, and from serving as Jurors, those who shall hereafter be convicted of bribery, perjury, forgery, or other high crimes or misdemeanors."  Ala. Const. of 1819 art. VI, § 5, reproduced as Exhibit 2 at 13 (emphasis added). The 1861 Constitution was similar, Ala. Const. of 1861 art. VI, § 5, reproduced as Exhibit 3 at 13, as was the 1865 Constitution, Ala. Const. of 1865 art. VIII, § 1, reproduced as Exhibit 4 at 15.

"The convention drafting Alabama's Constitution of 1868 during the Reconstruction period was dominated by Radical Republicans and African Americans.  The resulting Constitution was sweeping in felon disenfranchisement, in some ways more sweeping in this respect than the Constitutions of 1819, 1861, or 1865 or, for that matter, most other States.  It disenfranchised for 'treason, embezzlement of public funds, malfeasance in offices, *crimes punishable by law with imprisonment in the penitentiary*, or bribery' as well as for violating the 'rules of civilized warfare.'"  Beito Report, Exhibit 1, at 11 (emphasis added; footnote omitted); *see also* Ala. Const. of 1868 art. VII, § 3, reproduced as Exhibit 5 at 13.  "The 1875 Constitution (which reflected the end of Reconstruction in Alabama) continued the all-inclusive mandate of depriving suffrage for 'treason, embezzlement of public funds, malfeasance in office, larceny, bribery, or *other crime punishable by imprisonment in the penitentiary*.'"  Beito Report, Exhibit 1, at 12 (emphasis added); *see also* Ala. Const. of 1875 art. VIII § 3, reproduced as Exhibit 6 at 21.

Alabama's 1901 Constitution continued felon disenfranchisement and added a laundry list of other disqualifying convictions. *Hunter v. Underwood*, 471 U.S. 222, 223 n. ** (1985). Some of that laundry list were selected on the theory that the crimes were more likely to be committed by blacks and poor whites. *Id.* at 229-33. Over the years, portions of the 1901 provision were stricken. *E.g.*, *id.* at 225 (holding the provision unconstitutional insofar as applied to misdemeanants); *Hobson v. Pow*, 434 F. Supp. 362, 367 (N.D. Ala. 1977) (holding that the "assault and battery on the wife" clause violates Equal Protection). Still, at a minimum, all felonies remained disenfranchising until the State took affirmative action.

In 1996, Alabama voters repealed the 1901 Suffrage and Elections Article and replaced it with one that, *inter alia*, provided that only felonies involving moral turpitude are disenfranchising. Ala. Act No. 95-443 (proposing a constitutional amendment), reproduced as Exhibit 7; Exhibit 8 (certification of election results) at 2 (Amendment 1); Ala. Const. art. VIII, § 177(b) ("No person convicted of a felony involving moral turpitude, or who is mentally incompetent, shall be qualified to vote until restoration of civil and political rights or removal of disability.").[1] Thereafter, in 2012, Alabama voters replaced the 1996 Amendment with a new one that that repeated the same felony disenfranchisement language, but added a subsection on secret ballots. Exhibit 10 at 2-3, 12-13.[2]

---

[1]   This provision was precleared, Exhibit 9, as then required by § 5 of the Voting Rights Act, now codified at 52 U.S.C. § 10304. "Section 5 of the Act required States to obtain federal permission before enacting any law related to voting—a drastic departure from basic principles of federalism. And § 4 of the Act applied that requirement only to some States—an equally dramatic departure from the principle that all States enjoy equal sovereignty." *Shelby Cty., Ala. v. Holder*, 570 U.S. 529, 534–35 (2013). The *Shelby County* Court struck down the coverage formula in § 4, *id.* at 556-57, thereby immobilizing § 5 in Alabama.

[2]   Preclearance was not required. Exhibit 11.

In 2017, Alabama enacted a statute listing (and limiting) which felonies involve moral turpitude for voting purposes, Ala. Act No. 2017-378, reproduced as Exhibit 12, and, in 2019, Alabama created a new felony of aggravated theft by deception and added it to the list of disenfranchising felonies, Ala. Act No. 2019-513, reproduced as Exhibit 13, at 2, 11, 18.  *See also* Ala. Code § 17-3-30.1 (codifying, as relevant here, Ala. Act Nos. 2017-378 & 2019-513).

At the time § 177(b) was adopted in 1996, the Alabama Board of Pardons and Paroles had the authority and power, "after conviction and not otherwise," to "grant pardons and paroles and remit fines and forfeitures" "[i]n all cases, except treason and impeachment and cases in which [a] sentence of death is imposed and not commuted."  Ala. Code § 15-22-36(a).  The ABPP has the same power today.  *Id.*

In 2003, Alabama created the Certificate of Eligibility to Register to Vote, which made it possible for some disenfranchised felons to get their voting rights back without going through the more time-consuming and discretionary pardon process.  Ala. Act No. 2003-415, reproduced as Exhibit 14.[3]  Recently, Alabama revised the CERV process with an eye toward making it easier and faster.  Ala. Act No. 2016-387, reproduced as Exhibit 16; *see also* Ala. Code § 15-22-36.1.

As it stands now, to be eligible for a CERV, a felon must have "paid all fines, court costs, fees, and victim restitution ordered by the sentencing court at the time of sentencing on the disqualifying cases."   Ala. Code § 15-22-36.1(a)(3).  He must also not have any felony charges pending against him, Ala. Code § 15-22-36.1(a)(2), and must have "been released upon completion of sentence," "been pardoned," or "successfully completed probation or parole and . . . been released from compliance by the ordering entity,"  Ala. Code § 15-22-36.1(a)(4)(a)-(c).  Finally, he must not have been convicted of a limited number of specified felonies which make one

---

[3]     The new CERV process was precleared.  Exhibit 15.

ineligible for a CERV.  Ala. Code § 15-22-36.1(a)(1) & (g).  Those felonies are: "Impeachment, murder, rape in any degree, sodomy in any degree, sexual abuse in any degree, incest, sexual torture, enticing a child to enter a vehicle for immoral purposes, soliciting a child by computer, production of obscene matter involving a minor, production of obscene matter, parents or guardians permitting children to engage in obscene matter, possession of obscene matter, possession with intent to distribute child pornography, or treason."  Ala. Code § 15-22-36.1(a)(1) & (g).

In sum, Alabama has repealed and replaced any racist elements of the 1901 Suffrage and Elections Article, limited which felons are disenfranchised based on a felony conviction, and taken steps to restore voting rights to some felons.

## III.   Proceedings to date.

Ten individual Plaintiffs and one organizational Plaintiff filed suit in September 2016.[4] Doc. 1.  They sued the State of Alabama, the Secretary of State, the Chair of the Montgomery County Board of Registrars,[5] and the Chair of the Board of Pardons and Paroles.[6]  Doc. 1 at ¶¶ 65-69.  Plaintiffs originally demanded a plaintiff class and sub-classes as well as a defendant class of the Boards of Registrars throughout the State.  Doc. 1 at ¶¶ 50-60, 68, 70-81.

---

[4]     The original Plaintiffs were Treva Thompson, Melissa Swetnam, Antwoine Giles, Anna Reynolds, Laura Corley, Larry Joe Newby, Mario Dion Yow, Jennifer Zimmer, Timothy Lanier, Pamela King, and Greater Birmingham Ministries. Doc. 1 at ¶¶ 38-49, 61-64.

[5]     At the time the litigation was filed, George Noblin was the Chair of the Montgomery County Board of Registrars.  Doc. 1 at ¶ 67.  He passed away, and his successor, Cindy Sahlie, was substituted pursuant to Fed. R. Civ. P. 25(d).  *See* doc. 111.  Recently, James Snipes, III assumed the office of Chair and was substituted pursuant to Fed. R. Civ. P. 25(d).  *See* doc. 226.

[6]     At the time the litigation was filed, Cliff Walker was the Chair of the Board of Pardons and Paroles.  Doc. 1 at ¶ 69.  He was succeeded in that role by Lyn Head, who was substituted pursuant to Fed. R. Civ. P. 25(d).  *See* doc. 131.  She was then succeeded last Fall by Leigh Gwathney, who has been substituted pursuant to Fed. R. Civ. P. 25(d). *See* doc. 172.

The State Defendants filed a motion to dismiss all Counts.  Doc. 43.  Then-Chief Judge Watkins entered a Memorandum Opinion and Order dismissing Counts 3 through 10 as well as Counts 14 and 15.  Doc. 80 at 39.  This left Counts 1 and 2 (which allege intentional racial discrimination, in violation of the Equal Protection Clause and the Fifteenth Amendment, respectively), Count 11 (which alleges an *Ex Post Facto* Clause violation), Count 12 (which alleges a Cruel and Unusual Punishment Clause violation), and Count 13 (which is now fairly described as a wealth discrimination claim under the Equal Protection Clause).  Doc. 80 at 40.

Thereafter, in March 2018, Plaintiffs filed a supplemental complaint, doc. 93, which added Plaintiff Darius Gamble, *id.* at ¶¶ 26-27, and made additional allegations in support of the organizational Plaintiff, Greater Birmingham Ministries, *id.* at ¶¶ 28-31.  Plaintiffs continued to seek a class and sub-classes, though different ones, *id.* at ¶¶ 32-43, and they continued to demand a defendant class, *id.* at ¶¶ 44-64, 70-90 (Counts indicating against defendant class).  They made additional allegations with respect to the claims that Chief Judge Watkins had left standing, *id.* at ¶¶ 44-69, and they added three new Counts, *id.* at ¶¶ 70-101.

The State Defendants renewed their motion to dismiss the original claims and moved to dismiss the supplemental complaint. Doc. 95.  Included in the motion was an alternative motion for summary judgment on Count 18, which concerns voter registration forms.  Doc. 95 at 1, 17-24.  Plaintiffs cross-moved for summary judgment on that claim.  Doc. 97 at 35-45.  This Court entered a Memorandum Opinion and Order declining to dismiss or grant judgment on any claims, except that the claim in Count 18 was dismissed, but only insofar as it concerned the Federal Form.  Doc. 179-1 at 25.  Two Plaintiffs (Giles and Corley) and the State of Alabama were also dismissed.

*Id.*[7] Ultimately, the State Defendants filed an amended answer to both the original and supplemental complaints.  Doc. 189.

Plaintiffs moved for certification of a Plaintiff class and sub-classes, doc. 106, and that motion was denied, doc. 194.  There have also been two motions for preliminary injunction, each of which was denied, docs. 72 & 225, and various discovery disputes. The following chart summarizes which Counts remain pending and the parties to each Count:

---

[7]     Other Plaintiffs were dismissed at various points in the litigation.  Doc. 94 (Joint Stipulation of Dismissal of Plaintiffs Swetnam, Reynolds and Newby); doc. 96 (Order dismissing Plaintiffs Swetnam, Reynolds, and Newby); doc. 107 (Joint Stipulation of Dismissal of Plaintiff Yow); doc. 157 (Joint Stipulation of Voluntary Dismissal of Plaintiff Jennifer Zimmer Without Prejudice); doc. 180 (Order recognizing that the dismissals of Yow and Zimmer were effective).

| Count | State Defendant(s) | Plaintiff(s) |
|---|---|---|
| **Count 1:** Intentional racial discrimination in violation of the Equal Protection Clause | Secretary of State Merrill<br><br>Chair of the Montgomery County Board of Registrars Snipes | Treva Thompson<br><br>Timothy Lanier<br><br>Pamela King<br><br>Darius Gamble<br><br>Greater Birmingham Ministries |
| **Count 2:** Intentional racial discrimination in violation of the Fifteenth Amendment | | |
| **Count 11:** Retroactive punishment in violation of the *Ex Post Facto* Clause | | |
| **Count 12:** Cruel and unusual punishment in violation of the Eighth Amendment | | |
| **Count 13:** Wealth discrimination in violation of the Equal Protection Clause | Chair of the Board of Pardons and Paroles Gwathney | Treva Thompson<br><br>Darius Gamble<br><br>Greater Birmingham Ministries |
| **Count 16:** Unlawful deprivation of State-created right to vote in violation of the Due Process Clause | Secretary of State Merrill<br><br>Chair of the Montgomery County Board of Registrars Snipes | Treva Thompson<br><br>Timothy Lanier<br><br>Pamela King<br><br>Darius Gamble<br><br>Greater Birmingham Ministries |
| **Count 17:** Unlawful retroactive deprivation of the right to vote in violation of the Due Process Clause | | |
| **Count 18:** Failure to specify eligibility requirements pursuant to the NVRA (but not as to the Federal Form) | Secretary of State Merrill | Greater Birmingham Ministries |

### IV.    Summary judgment standard.

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). "Alternatively, a movant who does not have a trial burden of production can assert, without citing the record, that the nonmoving party cannot produce admissible evidence to support a material fact." *Robinson v. Ash*, 374 F. Supp. 3d 1171, 1176 (M.D. Ala. 2019) (internal citations and quotation marks omitted).

"If the movant meets its burden, the burden shifts to the nonmoving party to establish — with evidence beyond the pleadings — that a genuine dispute material to each of its claims for relief exists." *Robinson*, 374 F. Supp. 3d at 1176. "A genuine factual dispute exists only if a reasonable factfinder could find by a preponderance of the evidence that the plaintiff is entitled to a verdict." *Greater Birmingham Ministries v. Secretary of State for Alabama*, 966 F.3d 1202, 1220 (11th Cir. 2020) (internal citations and quotation marks omitted). "The court views the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmoving party." *Broadway v. State Farm Mut. Auto. Ins. Co.*, 364 F. Supp. 3d 1329, 1335 (M.D. Ala. 2019).

"It is irrefutable that a motion for summary judgment can—and should—be granted when the conditions of Rule 56 are met," *GBM*, 966 F.3d at 1221, even in cases involving challenges to Alabama's election laws, *id*.

**V.**      **Secretary Merrill and Chair Snipes are entitled to summary judgment on Counts 1 and 2, which allege that Alabama's current constitutional provision disenfranchising on the basis of convictions for felonies of moral turpitude is intentionally racially discriminatory, in violation of the Equal Protection Clause and the Fifteenth Amendment, respectively.**

Counts 1 and 2 allege that Ala. Const. art. VIII, § 177(b), which provides that "No person convicted of a felony involving moral turpitude . . . shall be qualified to vote until restoration of civil and political rights . . . ," is intentionally racially discriminatory.  Count 1 alleges a violation of the Equal Protection Clause of the Fourteenth Amendment, *see Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."), while Count 2 alleges a violation of the Fifteenth Amendment, *see Reno v. Bossier Parish Sch. Bd.,* 520 U.S. 471, 481 (1997) (*citing City of Mobile v. Bolden*, 446 U.S. 55 (1980),  for the proposition that "action by a State that is racially neutral on its face violates the Fifteenth Amendment only if motivated by a discriminatory purpose").  Because both claims require proof of racially discriminatory *intent*, Secretary Merrill and Chair Snipes analyze the claims together.  *Cf.* doc. 80 at 12-13 & n. 4.

Ala. Const. art. VIII, § 177(b) is the result of a constitutional amendment which was proposed by the Alabama Legislature in 1995 by Ala. Act No. 95-443, Exhibit 7, and then adopted by approximately 75% of the electorate at the 1996 primary election, Exhibit 8 at 2 (Amendment 1).[8]  That amendment, Amendment 579, repealed and replaced the Suffrage and Elections Article from the 1901 Constitution.  *See* Ala. Const. art. VIII, § 177(b); Ala. Act No. 95-443.  Thereafter,

---

[8]      For present purposes, Alabama's Constitution may be amended when the Legislature proposes a Constitutional Amendment and that Amendment is approved by the electorate by a majority vote.  Ala. Const. art. XVIII, § 284; *see also* Ala. Const. art. XVIII, § 285.  The Governor's role in the process is limited to her individual capacity as a voter; she does not sign the proposed Constitutional Amendment before the people consider it.  *See* Ala. Const. art. XVIII, § 284.

the Alabama Legislature in 2011 proposed a new constitutional amendment which repeated the

language from 1996 and added a new subdivision on secrecy of the ballot.  Exhibit 10 at 11-14.

That amendment, Amendment 865, was also adopted by the electorate.  *See* Ala. Const. art. VIII,

§ 177(b).  Thus, Plaintiffs' burden at trial would be to prove that the Alabama Legislature chose

to propose, and the Alabama electorate chose to adopt, Ala. Const. art. VIII, § 177(b) in order to

disenfranchise blacks.

### a.  The *Hunter v. Underwood* analytical framework.

This is a difficult showing to make, for "the 'good faith of the state legislature must be

presumed.'"  *Abbott v. Perez*, 585 U.S. ___, 138 S. Ct. 2305, 2324 (2018) (*quoting Miller v.

Johnson*, 515 U.S. 900, 915 (1995)).    In *Hunter v. Underwood*, 471 U.S. 222 (1985), two

misdemeanants challenged § 182 of the Alabama Constitution, which was in the mid-1990s

repealed and replaced by § 177(b), the provision at issue in the present litigation.  In *Hunter,* the

Court said:

> Presented with a neutral state law that produces disproportionate effects
> along racial lines, the Court of Appeals was correct in applying the approach of
> *Arlington Heights* to determine whether the law violates the Equal Protection
> Clause of the Fourteenth Amendment:
>
>> "[O]fficial action will not be held unconstitutional solely
>> because it results in a racially disproportionate impact. ... Proof of
>> racially discriminatory intent or purpose is required to show a
>> violation of the Equal Protection Clause." 429 U.S., at 264–265.
>
> *See Washington v. Davis*, 426 U.S. 229, 239 (1976). Once racial discrimination is
> shown to have been a "substantial" or "motivating" factor behind enactment of the
> law, the burden shifts to the law's defenders to demonstrate that the law would have
> been enacted without this factor. *See Mt. Healthy* [*City Sch. Dist. Bd. of Educ. v.
> Doyle*], 429 U.S. [274,] 287 [(1977)].

*Hunter*, 471 U.S. at 227-28 (parallel citations omitted).    Thus, assuming *arguendo*

"disproportionate effects along racial lines," *id.* at 227, Plaintiffs must show that racially

discriminatory intent was "a substantial or motivating factor behind enactment of the law," *id.* at 228. *See also Abbott*, 138 S. Ct. at 2324 ("Whenever a challenger claims that a state law was enacted with discriminatory intent, the burden of proof lies with the challenger, not the State."). If Plaintiffs were able to do that, which they cannot, the burden would shift to Secretary Merrill and Chair Snipes "to demonstrate that that law would have been enacted without this factor." *Hunter*, 471 U.S. at 228.

### b. *Arlington Heights* and impact.

The *Arlington Heights* analysis "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266. "The impact of the official action whether it bears more heavily on one race than another, may provide an important starting point." *Id.* (internal citation and quotation marks omitted). Only when there is "a clear pattern, unexplainable on grounds other than race" is it also the ending point. *Id. Cf. McCleskey v. Kemp*, 481 U.S. 279, 299 n. 21 (1987) ("It is entirely appropriate to rely on the legislature's legitimate reasons for enacting and maintaining a capital punishment statute to address a challenge to the *legislature's* intent."); *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 275 (1979) ("Just as there are cases in which impact alone can unmask an invidious classification, there are others, in which—notwithstanding impact—the legitimate noninvidious purposes of a law cannot be missed. This is one.") (internal citation omitted). Otherwise, *intent* claims would, in reality, be no more than *impact* claims.

### i. *Arlington Heights* and impact: disenfranchising felons.

Here, of course, Alabama has obvious legitimate reasons—other grounds—for disenfranchising felons. It is undeniable that Alabama "properly has an interest in excluding from the franchise persons who have manifested a fundamental antipathy to the criminal laws of the

state or of the nation by violating those laws sufficiently important to be classed as felonies."
*Shepherd v. Trevino*, 575 F.2d 1110, 1115 (5th Cir. 1978). *See also Washington v. State*, 75 Ala. 582, 585 (1884) ("The presumption is, that one rendered infamous by conviction of felony, or other base offense indicative of great moral turpitude, is unfit to exercise the privilege of suffrage, or to hold office, upon terms of equality with freemen who are clothed by the State with the toga of political citizenship."); U.S. Const. amend. XIV, § 2 (recognizing the lawfulness of criminal disenfranchisement).

Judge Friendly has explained that

The early exclusion of felons from the franchise by many states could well have rested on Locke's concept, so influential at the time, that by entering into society every man 'authorizes the society, or which is all one, the legislature thereof, to make laws for him as the public good of the society shall require, to the execution whereof his own assistance (as to his own decrees) is due.' A man who breaks the laws he has authorized his agent to make for his own governance could fairly have been thought to have abandoned the right to participate in further administering the compact. On a less theoretical plane, it can scarcely be deemed unreasonable for a state to decide that perpetrators of serious crimes shall not take part in electing the legislators who make the laws, the executives who enforce these, the prosecutors who must try them for further violations, or the judges who are to consider their cases. . . . A contention that the equal protection clause requires New York to allow convicted mafiosi to vote for district attorneys or judges would not only be without merit but as obviously so as anything can be. . . .

*Green v. Bd. of Elections of City of New York*, 380 F.2d 445, 451-52 (2d Cir. 1967).

The concern is real. In the late 1990s, prisoners in Massachusetts responded to a criminal disenfranchisement proposal "by forming a political action committee ('PAC')[] aimed at influencing criminal justice issues, including sentencing, prison reform, and 'Draconian laws on punishment.' PACs, *inter alia*, raise money for and endorse candidates." *Simmons v. Galvin*, 575 F.3d 24, 26-27 (1st Cir. 2009); *see also id.* at 33 ("prisoners attempted to organize to change the laws under which they were convicted, sentenced, and imprisoned").

In Alabama, voters elect the Members of the Alabama Senate and House, Ala. Const. art. IV, § 46, the Governor and the Attorney General, Ala. Const. art. V, § 114, the sheriffs, Ala. Const. art. V, § 138, the district attorneys, Ala. Const. art. VI, § 160(a), and judges at every level, Ala. Const. art. VI, § 152.

Thus, the State has a well-established non-racial interest in excluding felons from the ballot box.  As set out above, *see* 20-21, *supra*, Alabama has pursued that interest since, at least, achieving statehood two centuries ago.

### ii. *Arlington Heights* and impact: using moral turpitude as a standard.

Section 177(b) narrowed Alabama's disenfranchisement of felons from all felons—as had been the case under § 182, *see Hunter*, 471 U.S. at 223 n. ** ("any crime punishable by imprisonment in the penitentiary")—to just those felonies involving moral turpitude, Ala. Const. art. VIII, § 177(b); Ala. Act No. 95-443.  "The term 'moral turpitude' has deep roots in the law." *Jordan v. De George*, 341 U.S. 223, 227 (1951). According to Dr. David T. Beito, "The widely cited legal guide of 1898 by Martin L. Newell, *The Law of Libel and Slander*, defined moral turpitude as 'an act of baseness, vileness, or depravity in the private and social duties which a man owes to his fellow-men or to society in general.'" Beito Report, Exhibit 1, at 17 (footnote omitted). Similar language has since been found in court decisions in Alabama and elsewhere.[9]

---

[9]      *E.g., Fort v. Brinkley*, 112 S.W. 1084, 1084 (Ark. 1908) ("Moral turpitude is defined to be an act of baseness, vileness, or depravity in the private and social duties which a man owes to his fellowmen or to society in general.  Moral turpitude implies something immoral in itself, regardless of the fact whether it is punishable by law. The doing of the act itself, and not its prohibition by statute, fixes the moral turpitude.  It seems clearly deducible from the above-cited authorities that the words "moral turpitude" had a positive and fixed meaning at common law . . . .") (internal citations and quotation marks omitted); *Pippen v. State*, 73 So. 340, 342 (Ala. 1916) (*quoting Fort v. Brinkley*); *Sims v. Callahan*, 112 So. 2d 776, 785 (Ala. 1959) ("This court has several times defined the words 'moral turpitude,' as used in this provision, as meaning something immoral in itself, regardless of the fact that it is punished by law.  It must not merely be mala prohibita, but

"The presence of moral turpitude has been used as a test in a variety of situations, including legislation governing the disbarment of attorneys and the revocation of medical licenses. Moral turpitude also has found judicial employment as a criterion in disqualifying and impeaching witnesses, in determining the measure of contribution between joint tortfeasors, and in deciding whether certain language is slanderous." *Jordan*, 341 U.S. at 227 (footnotes omitted).  This makes sense because moral turpitude targets inherently bad conduct.   "Moral turpitude signifies an inherent quality of baseness, vileness and depravity.  It is immoral in itself, regardless of the fact that it is punished by law." *Ex parte McIntosh*, 443 So. 2d 1283, 1284 (Ala. 1983) (quoting Charles Gamble, *McElroy's Alabama Evidence*, § 145.01(7) (3d ed. 1977)); *see also* n. 9, *supra.*

Consistent with the Supreme Court's pronouncement, moral turpitude is used in a variety of Alabama laws, most often concerning competence to hold certain offices and in statutes governing licensure.[10] With respect to the judicial system, provisions that predate Ala. Const. art.

---

the act itself must be inherently immoral. The doing of the act itself, and not its prohibition by statute, fixes the moral turpitude."); *Meriwether v. Crown Inv. Corp.,* 268 So. 2d 780, 787 (Ala. 1972) ("Moral turpitude has been defined as 'as act of baseness, vileness or depravity in the private and social duties which a man owes to his fellowmen or to society in general.' *Lee v. Wisconsin State Board of Dental Examiners*, 29 Wis.2d 330, 139 N.W.2d 61 [(Wisc. 1966)]. The inherent nature of the offense itself, rather than the mere fact that such acts are made criminal offenses, determines whether any given offense involves moral turpitude."); *Ex parte McIntosh*, 443 So. 2d 1283, 1284-85 (Ala. 1983).

[10]     *E.g.,* Ala. Const. art. VII, § 173(a) (certain State officials "may be removed from office for . . . any offense involving moral turpitude while in office, or committed under color thereof, or connected therewith."); Ala. Code § 5-2A-6(a)(7) ("The superintendent or any member of the Banking Board may be removed from office . . . for: . . . (7) Any offense involving moral turpitude while in office, committed under color thereof or connected therewith."); Ala. Code § 5-17-44(a)(7) (same for the administrator or any member of the Credit Union Board); Ala. Code § 5-6A-1 ("No person convicted of a felony or a crime involving moral turpitude shall serve as a director" of a bank.); Ala. Code § 5-17-55(c)(1) ("If a member of the Credit Union Board of the Alabama Credit Union Administration . . . is convicted of a felony or any other crime involving moral turpitude . . . the office . . . shall be declared vacant . . . ."); Ala. Code § 8-6-9(3)(b) (ability to sell securities may be denied if certain persons have "been convicted of a felony or any misdemeanor involving moral turpitude . . . ."); Ala Code § 8-19A-11(a)(1) (telemarketing license may be denied based on a conviction for, *inter alia*, "any other crime involving moral turpitude");

VIII, § 177(b) provide that jurors must meet certain qualifications including not having "lost the right to vote by conviction for any offense involving moral turpitude," Ala Code § 12-16-60(a)(4), and that, "[a]s affecting his credibility, a witness may be examined touching his conviction for a crime involving moral turpitude," Ala. Code § 12-21-162(b).  Further, Ala. Code § 34-3-86(1) provides that conviction "of a felony other than manslaughter or of a misdemeanor involving moral turpitude" is cause for removal of an attorney by the circuit court.

The Local Rules of this Court also use moral turpitude as a standard in attorney discipline. M.D. Ala. LR 83.1(k)(1) generally provides for suspension of an attorney who has been convicted

---

Ala Code § 11-5-33(a)(6) (ineligible to serve as coroner if "convicted of a felony offense or any offense involving moral turpitude"); Ala Code § 11-43-210(b) (for 30 years, application as a reserve law enforcement officer has required certification that the applicant, *inter alia*, "has never been convicted of a felony or of a misdemeanor involving force, violence, or moral turpitude"); Ala Code § 11-43C-17 & Ala Code § 11-44E-42 (certain city officials vacate their seats upon conviction of crime involving moral turpitude); Ala Code § 11-49B-6(d) (certain transit authority board members may be removed for, *inter alia*, "conviction of a felony or other crime of moral turpitude"); Ala. Code § 15-13-159(4)(c) & Ala. Code § 15-13-160(3)(d) (certain persons associated with professional surety companies and professional bail companies, respectively, must not "have been convicted of a felony or a crime involving moral turpitude," or if so convicted, been pardoned or had civil rights restored); Ala. Code § 16-24B-3(e)(1)(d) (the contract of certain school principals may be cancelled for, *inter alia*, "[c]onviction of a felony or a crime involving moral turpitude"); Ala. Code § 22-18-6(f)(8) (license or certificate for emergency medical services personnel may be denied, suspended, or revoked for, *inter alia*, conviction "of a crime involving moral turpitude"); Ala. Code § 22-30D-8(b) & Ala. Code § 34-8A-4(f) (Governor may remove members of  boards for, *inter alia*, moral turpitude); Ala. Code § 27-40-5(a)(5) (license for premium finance companies denied, suspended, or revoked if principal "has been convicted of a crime involving moral turpitude"); Ala. Code § 34-2-34(3)(c) (certificate for architects may be denied, suspended, or revoked based on, *inter alia*, a conviction for a "felony or misdemeanor involving moral turpitude"); Ala. Code § 34-4-21(c) & Ala. Code § 34-4-29(c)(6) (conviction of a felony or a misdemeanor involving moral turpitude relevant to licensure of auctioneer and apprentice auctioneer); Ala. Code § 34-8A-16(a)(1) (license or certificate for licensed professional counselor or associate licensed counselor may be withheld, denied, revoked, or suspended for, *inter alia*, conviction "of a felony, or any offense involving moral turpitude"); Ala. Code § 34-9-10(d)(12) & Ala. Code § 34-9-18(a)(11) (conviction of, *inter alia*, a felony or misdemeanor involving moral turpitude relevant to licensure as a dentist or dental hygienist); Ala. Code § 34-13-56(c)(1) (license for funeral home services may be suspended, revoked, or placed on probation for, *inter alia*, "[c]onviction of a crime involving moral turpitude including . . . .").

of a felony or of "a misdemeanor involving moral turpitude."  Moral turpitude is used in other federal laws as well.  *E.g.,* 8 U.S.C. § 1227 (deportable aliens); 8 U.S.C. § 1182 (inadmissible aliens); 21 U.S.C. § 206 (revocation of pharmacy license in areas of China); U.S. Vet. App. R. Admis & Prac, Rule 7.

Thus, the moral turpitude standard reflects Alabama's interest in excluding from the franchise those felons whose criminal conduct is particularly reprehensible.  Nonetheless, Plaintiffs apparently take the position that the moral turpitude standard cannot be explained except on grounds of race.  They rely on a misreading of *Hunter* for this proposition.  In addressing this argument, the discussion necessarily moves to *Arlington Heights* factors other than impact which may be considered in analyzing intent.

### c.  Other *Arlington Heights* factors.

The *Arlington Heights* analysis "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."  *Arlington Heights*, 429 U.S. at 266.  Under this analysis, "[t]he historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes.  The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes."  *Id*. at 267 (internal citations omitted). "Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role. Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached."  *Id.* (footnote omitted).  "The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports."  *Id.*  at 268.

### i. Other *Arlington Heights* factors: the difficulty of proving intent.

In *Hunter,* the Supreme Court warned that "[p]roving the motivation behind official action is often a problematic undertaking." *Hunter*, 471 U.S. at 228.  That is true when dealing with a body as small as a board of county commissioners.  *Id.*  The problem is amplified when moving to a larger body, *e.g.,* a Legislature.  *Id.*  As the Supreme Court has explained:

> Inquiries into congressional motives or purposes are a hazardous matter. When the issue is simply the interpretation of legislation, the Court will look to statements by legislators for guidance as to the purpose of the legislature, because the benefit to sound  decision-making in this circumstance is thought sufficient to risk the possibility of misreading Congress' purpose.  It is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it. What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork.  We decline to void essentially on the ground that it is unwise legislation which Congress had the undoubted power to enact and which could be reenacted in its exact form if the same or another legislator made a 'wiser' speech about it.

*United States v. O'Brien*, 391 U.S. 367, 383–84 (1968).

Justice Scalia has written, albeit in dissent, that "discerning the subjective motivation of those enacting the statute is, to be honest, almost always an impossible task. The number of possible motivations, to begin with, is not binary, or indeed even finite."  *Edwards v. Aguillard*, 482 U.S. 578, 636-37 (1987) (Scalia, J., dissenting).   "To look for *the sole purpose* of even a single legislator is probably to look for something that does not exist."  *Id.* at 637.

Here, Plaintiffs seek to strike down a constitutional amendment proposed by the entire Alabama Legislature and then adopted by the electorate.  They have a high bar to clear.  The Eleventh Circuit has rejected the possibility of 42 U.S.C. § 1983 liability for a municipality based on the "alleged racially discriminatory motive of only one member of a three-member majority of a five-member council," *Mason v. Village of El Portal*, 240 F.3d 1337, 1339 (11th Cir. 2001).

   **ii. Other *Arlington Heights* factors: the history in *Hunter v. Underwood*.**

  Plaintiffs' theory seems to be that, as they see it, the Supreme Court held in *Hunter* that the moral turpitude standard was discriminatory and there is no non-racial reason for incorporating that tainted standard into the 1996 (or 2012) Constitutional Amendment.  They are wrong at both steps.

  The Supreme Court did not hold that the moral turpitude standard was inherently discriminatory.  The *Hunter* litigation was brought by misdemeanants seeking "a declaration invalidating § 182 as applied to persons convicted of crimes not punishable by imprisonment in the state penitentiary (misdemeanors) and an injunction against its future application to such persons."  *Hunter*, 471 U.S. at 224.  It was undisputed that § 182 had a racially disparate impact with respect to misdemeanants.  *Id.* at 227.  Turning to the question of proving motivation, the Supreme Court first recognized the formidability of the task, *id.* at 228, as discussed above.  It then explained that the 1901 Alabama Constitutional Convention was an exception to that standard rule, precisely because there is extensive documentation that the intent of the delegates was to establish white supremacy and disenfranchise blacks.  *Id.* at 228-32.  On the record before the Supreme Court, it was "beyond peradventure" that racial discrimination "was a 'but-for' motivation for the enactment of § 182" as a whole.  *Hunter*, 471 U.S. at 232; *see also Abbott v. Perez*, 585 U.S. ___, 138 S. Ct. 2305, 2325 (2018) (discussing *Hunter*: "The court below found that the article had been adopted with discriminatory intent, and this Court accepted that conclusion.").

  The Supreme Court does not clearly say that the moral turpitude standard itself was racially discriminatory.  There is language that "In addition to the general catchall phrase 'crimes involving moral turpitude' the suffrage committee selected such crimes as vagrancy, living in adultery, and wife beating that were thought to be more commonly committed by blacks . . . ."  *Hunter*, 471 U.S.

at 232.  While Plaintiffs may read this language to indicate that the Court thought that the 1901 delegates perceived moral turpitude crimes—as opposed to only the list of selected crimes—to be more likely committed by blacks, the Court did not clearly say that or cite to any evidence to support that specific proposition.  Instead, the Court focused on § 182 as a whole, which clearly bore racial taint.  The Court's ultimate holding was:  "Without deciding whether § 182 would be valid if enacted today without any impermissible motivation, we simply observe that its original enactment was motivated by a desire to discriminate against blacks on account of race and the section continues to this day to have that effect. As such, it violates equal protection under *Arlington Heights*."  *Hunter*, 471 U.S. at 233.

In short, the problem was not with felon disenfranchisement or even the moral turpitude standard, but with the 1901 Constitutional Convention itself, including with respect to some portions of § 182.  As the Supreme Court suggested, and the Eleventh Circuit has recognized, this does not mean any taint may never be cast aside.  *Hunter*, 471 U.S. at 233 ("*Without deciding whether § 182 would be valid if enacted today without any impermissible motivation*, we simply observe that its original enactment was motivated by a desire to discriminate against blacks on account of race and the section continues to this day to have that effect.") (emphasis added); *see also Abbott*, 138 S. Ct. at 2325 ("But the Court specifically declined to address the question whether the then-existing version would have been valid if '[re]enacted today.'") (*quoting Hunter*, 471 U.S. at 233; alteration by the Court); *Johnson v. Governor of Fla.*, 405 F.3d 1214, 1224 (11th Cir. 2005) (*en banc*) (discussing *Hunter* and *Cotton v. Fordice* and concluding "Florida's 1968 re-enactment eliminated any taint"); *see also Cotton v. Fordice*, 157 F.3d 388, 391 (5th Cir. 1998) ("*Hunter*, however, left open the possibility that by amendment, a facially neutral provision like

§ 241 might overcome its odious origin.  That is what has happened here.") (footnote omitted).

Alabama is not forever forbidden from disenfranchising felons.

### iii.   Other *Arlington Heights* factors:  the 1901 Constitutional Convention.

*Hunter* did not concern felons, as this litigation does, and so the State Defendants have had

cause to look at different aspects of the history of the 1901 Convention than did the *Hunter* parties.

Dr. Beito has concluded that "[t]here is no direct evidence in the convention debates that racial

animus motivated the inclusion of either disenfranchisement based on felony convictions or the

standard of moral turpitude when applied to felonies," though he did find "substantial evidence

that it was a motivation for other suffrage provisions such as the selection of certain misdemeanors

as disenfranchising."  Beito Report, Exhibit 1, at 3.  He found that "Alabama [has] barred certain

types of felons from voting since the beginning of its history as a State," *id.* at 10, and that the

1868 Reconstruction Constitution "was sweeping in felon disenfranchisement, in some ways more

sweeping in this respect than the Constitutions of 1819, 1861 or 1865, or, for that matter, most

other States," *id.* at 11.  While the 1901 delegates certainly set out to disenfranchise blacks based

on race, "no delegate objected to felon disenfranchisement *per se*, including those delegates who

most opposed race-based disenfranchisement.  A case in point was John H. Porter, a Populist-

Republican, who was one of the strongest critics of the new constitution.  Describing African-

Americans as industrious and loyal, he condemned disenfranchising 'any citizen of Alabama' but

then added 'except for crime.'"  Beito Report, Exhibit 1, at 14 (footnote omitted).  Dr. Beito also

speaks to John Fielding Burns, who is mentioned in *Hunter*, *see* 471 U.S. at 232, and notes that

historian Pippa Holloway has found "there is no evidence that Burns carried the level of influence

that has been suggested in the historical literature on felon disenfranchisement."  Beito Report,

Exhibit 1, at 15.  Ultimately, Dr. Beito concludes that "Given the precedent of earlier constitutions,

. . . including the 1868 Reconstruction Constitution, any constitution" adopted in 1901 "would have probably included a felon disenfranchisement clause of some type even if non-racist and African American delegates had written the document." *Id.* at 17.

Dr. Beito also considered the concept of moral turpitude generally, Beito Report, Exhibit 1, at 17-19, and in the 1901 Constitution, Beito Report, Exhibit 1, at 19-20. He found the concept was long established and had been used in federal immigration law as well as in other contexts. *Id.* at 17-19. Insofar as the 1901 Constitution was concerned, the record is silent on why the moral turpitude standard was adopted with respect to criminal disenfranchisement. *Id.* at 19-20, 21. That is, there is no evidence in the Convention debates of the sort that supported the conclusion in *Hunter* that specific crimes were selected because of their likely impact on potential black voters.

> #### iv.  Other *Arlington Heights* factors: constitutional revision efforts through the 1980s.

While the 1901 Constitution, in § 182, used the moral turpitude standard, this litigation concerns § 177(b), which repealed and replaced that provision. Karen L. Owen, Ph.D., has undertaken a review of the constitutional revision processes which led to the Legislature's proposal of Ala. Act No. 95-443 as well as data concerning the electorate's adoption of that proposal as Amendment 579, codified at Ala. Const. art. VIII, § 177. Declaration of Karen L. Owen, Ph.D., Exhibit 17. Her extensive review undermines Plaintiffs' assumptions that, in the mid-1990s, the moral turpitude standard was borrowed from the 1901 Constitution in order to intentionally discriminate against blacks. In considering this evidence, it is important that the Court recognize that Plaintiffs' presumption of bad faith of part of Alabama actors is not justified. To the contrary, "[t]he allocation of the burden of proof and the presumption of legislative good faith are not changed by a finding of past discrimination. [P]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful. The ultimate question remains

whether a discriminatory intent has been proved in a given case." *Abbott*, 138 S. Ct. at 2324-25 (internal citations and quotation marks omitted; 2nd alteration by the Court).  Here, as set out below, Plaintiffs cannot prove discriminatory intent.

Dr. Owen explains that "[w]ithin three decades after the adoption of the 1901 Alabama Constitution, Governor Emmet O'Neal and then Governor Thomas Kilby petitioned for a new constitution to revise Alabama's 'antiquated fundamental law.'"  Owen Report, Exhibit 17, at 11 (footnote omitted).  "Gubernatorial initiatives and citizens' encouragement for constitutional revisions continued through ensuing years and legislative sessions."  *Id.* at 12.  "Into the 1940s and 1950s, many Alabama State leaders continued their push for constitutional reform."  *Id.*  As early as 1953, the League of Women Voters was expressing support for a revised Constitution.  *Id.* at 13-14.  "Over the next five decades, the League advocated for revisions to the 1901 Constitution, and members supported legislative enactments that amended specific articles of the Constitution, including Article VIII on suffrage and elections."  *Id.* at 14, 42-43, 53.

### 1.   Other *Arlington Heights* factors: constitutional revision efforts through the 1980s—Governor Brewer's efforts.

"In May 1969, Governor Albert Brewer announced that 'his administration is backing a plan for a constitutional revision commission . . . ,'" Owen Report, Exhibit 17, at 14, and thereafter "the Legislature approved to set up a 21-member commission," *id.* at 15.  "The Constitutional Revision Commission convened and organized in 1970 with seven state legislators and fourteen members of the public."  *Id.* at 15.  The Commission worked on a variety of topics concerning the Constitution, *id.* at 15-16, and "Commission staff member Dr. Samuel A. Beatty prepared a report" on the Suffrage and Elections Article, *id.* at 16 (footnote omitted).   At the time, Dr. Beatty was Dean of the Walter F. George School of Law at Mercer University.  *Id.* at 16 n. 37.  Eventually, he would become an Associate Justice on the Supreme Court of Alabama.  Deposition of Mike

Waters, doc. 256-1, at 196:12-22.  Dr. Beatty had a good reputation, and he was not someone

known for supporting segregation or racism.  *Id.* at 198:22-199:19.  Similarly, there is no reason

to believe that Governor Brewer was motivated to discriminate based on race.  *See* Owen Report,

Exhibit 17, at 22-23.

With respect to § 182 of the 1901 Constitution, Dr. Beatty explained:

Section 182.

This section presently operates to disqualify one from either voting or
registering to vote when that person is an "idiot" or insane, or has been convicted
of a crime at the time of ratification of the [1901] Constitution, or convicted of one
of twenty-three (*sic*) specific crimes, including many felonies, among them is
miscegenation, "or any crime punishable by imprisonment in the penitentiary," or
any infamous crime "or crime involving moral turpitude; or convicted of being a
vagrant or tramp, or conviction for buying or selling his vote, *etc*.

***State constitutions commonly include like provisions disqualifying mental
incompetents and persons convicted of crimes.***  As statutory offenses grow or
change, their inclusion or exclusion becomes a matter of constitutional
interpretation or constitutional amendment.  Examples: (a) possession and sale of
dangerous drugs; (b) no longer may miscegenation be a crime under the U.S.
Constitution, *Loving v. Virginia*, 388 U.S. 1 (196[7]); (c) vagrancy as a
disqualification may be unconstitutional, *Harper v. Va. State Bd. of Elections*, 383
U.S. 663 (1966).  ***It would appear sufficient to describe such disqualifications in
general terms, thus overcoming these objections and eliminating a long, scattered
and redundant list of disqualifying crimes.***  Florida's provision, Art. 6, § 4, is short
and to the point: "No person convicted of a felony, or adjudicated in this or any
other state to be mentally incompetent, shall be qualified to vote or hold office until
restoration of civil rights or removal of disability."   Maryland has a similar
provision, Art. 1, § 2: "No person above the age of twenty-one years, convicted of
larceny, or other infamous crime, unless pardoned by the Governor, shall ever
thereafter be entitled to vote at any election in this State; and no persons under
guardianship, as a lunatic, or, as a person *non compos mentis*, shall be entitled to
vote."  Illinois' Constitution directs the legislature to exclude from the right of
suffrage persons convicted of "infamous crimes," and excludes idiots and insane
persons by judicial decision.

Exhibit 19 at 10 (alteration in original; some italics added; bold italics added for emphasis); *see*

*also* Owen Report, Exhibit 17, at 17-18.  Then, Dr. Beatty proposed the following language with

respect to disqualification based on mental faculties or criminal conviction: "No person convicted

of a felony involving moral turpitude, or having been adjudicated in this or any other state, territory, or district to be mentally incompetent, shall be qualified to vote until restoration of civil rights or removal of disability."  Exhibit 19 at 16 (Section 2. Disqualifications.); *see also* Owen Report, Exhibit 17, at 18.

The Constitutional Revision Commission met and considered this proposal, and many others, in October 1970.  Owen Report, Exhibit 17, at 18.  With respect to the disqualifications proposal, "there was no debate or concern from members recorded in the minutes" and the language was approved as proposed.  *Id.* (footnote omitted).  "[T]here is no evidence suggesting that citizens, interested groups, and committee members . . . had concerns about the new proposed language for voter qualifications or the disenfranchising clause that contained 'convicted of a felony involving moral turpitude.'"  *Id.* at 20.  Over several more drafts, the language "in this or any other state, territory, or district" was removed.  *Id.*

The Commission's efforts continued, with a final report submitted to the Legislature in 1973.  Owen Report, Exhibit 17, at 21.  That report proposed "No person convicted of a felony involving moral turpitude, or who is mentally incompetent, shall be qualified to vote until restoration of civil and political rights or removal of disability.  Comment: This would replace present section 182 which disqualifies idiots and insane persons and those persons convicted of any of thirty-three crimes listed in the section.  Restoration of civil and political rights is provided for by Code, Tit. 42, sec. 16."  Owen Report, Exhibit 17, at 21-22 (footnote omitted).

The Legislature considered a bill that included this proposed language, Owen Report, Exhibit 17, at 22, but only the Judicial Article was ultimately proposed by the Legislature and adopted by the electorate, *id.* at 23.  Dr. Owen touches briefly on subsequent efforts in 1975 and

1976, noting the Alabama Senate proposed a revised Suffrage and Elections article in 1976, but the House did not agree.  *Id.* at 23-24.

### 2.  Other *Arlington Heights* factors: constitutional revision efforts through the 1980s—Governor James' efforts.

On January 15, 1979, Governor Fob James assumed office.  Doc. 256-8 at 2.  At his inauguration, he said: "On this, the birthday of Martin Luther King, Jr., I claim for all Alabamians a *new beginning* free from racism and discrimination.  Let us bury forever the negative prejudices of the past.  The same standards of justice, responsibility, and reward are for one and all.  I stand on this commitment without equivocation.  So be it."  *Id.* at 4 (capitalization altered).

"Shortly after his election, [Governor] James assembled a working group, headed internally in his office by attorney Michael Waters," to focus on revising the 1901 Constitution.  Owen Report, Exhibit 17, at 25.  One issue in this regard for Governor James was eliminating provisions that were outdated or had been ruled unconstitutional.  *Id.*  The group "'used the '73 Constitution as a starting point,'" *id.* (*quoting* Waters deposition, doc. 256-1, at 60:17-18), as it worked toward a "break with the past, and [a] reject[ion of] the 1901 Constitution," *id.* at 38 (*quoting* Waters deposition, doc. 256-1, at 103:22-23).

Public hearings were held.  Owen Report, Exhibit 17, at 26.  Attorney Yetta Samford moderated the discussion concerning the disqualifications proposal at a January 30, 1979 hearing wherein Sen. Michael Figures asked why disqualification should continue once the felon has completed his sentence and any probation or parole.  Owen Report, Exhibit 17, at 26-27; *see also* doc. 256-11 at 3-4.  Samford responded that the thought was the felon should go through the restoration process, and then he added: "You have brought up something I failed to mention, that there was an elimination of a list of about 33 things in that old article that would disqualify a person, and all of that has been removed, and *now it's just a felony involving moral turpitude*, or

44

who is mentally incompetent, *and both of these are pretty serious disqualifications*."  Owen Report, Exhibit 17, at 27 (footnote omitted; emphasis added); *see also* doc. 256-11 at 4-5. Discussion continued at that hearing and in subsequent meetings.  Owen Report, Exhibit 17, at 27-28.

At a February 6, 1979 meeting, Sen. Bob Harris explained that the committee[11] "attempted to keep the essentials of a system for people to register to vote, conduct and participate in elections, mindful of the impact of the Federal laws and court decisions on the subject of the franchise.  And, in so doing, we have reduced from about 20 sections down to simply three."  Owen Report, Exhibit 17, at 28; *see also* doc. 256-13 at 40.  He acknowledged the motivations of the 1901 delegates "to restrict the right of the franchise as rigidly as they possibly could," Owen Report, Exhibit 17, at 28; *see also* doc. 256-13 at 40, and indicated that the proposal "simply provides that any citizen of the United States 18 years of age who has resided in this state for the time provided by law, if he is registered as provided by law, shall have the right to vote in the county of his residence." Owen Report, Exhibit 17, at 28; *see also* doc. 256-13 at 41.

Rep. Tony Harrison praised the disqualifications proposal, saying: "Senator, in Section 2, I just find that this is probably one of the best sections that was proposed by the working group. *And my belief in that is grounded in that it has less language and has chopped out some of the most unnecessary language that was in that Constitution.*"  Owen Report, Exhibit 17, at 29 (footnote omitted; emphasis added); *see also* doc. 256-13 at 42-43.  He then asked about the definition of moral turpitude.  Owen Report, Exhibit 17, at 29; *see also* doc. 256-13 at 43.  Sen. Bob Smith responded that "[i]t means doing wrong" and he acknowledged that the courts have "wrestled with this question."  Owen Report, Exhibit 17, at 29; *see also* doc. 256-13 at 43.  Rep.

---

[11]     The Joint Interim Committee to Study New Constitution.

Harrison suggested that they model federal law and returned to the issue of whether disenfranchisement should continue after one's sentence is completed; the discussion also concerned what should be constitutional as opposed to statutory, and references to the idea that disenfranchisement is punishment.  Owen Report, Exhibit 17, at 30-32; doc. 256-13 at 44-53.

Sen. Mac Parsons then raised the potential of just disenfranchising all felons, as "there is just one or two felonies that don't include moral turpitude."  Owen Report, Exhibit 17, at 32; *see also* doc. 256-13 at 53.  Sen. Bob Harris agreed the number of felonies that did not involve moral turpitude was limited, to which Parsons again suggested disenfranchising all felons and Harris said "[i]t might not be a bad idea."  Owen Report, Exhibit 17, at 32; *see also* doc. 256-13 at 53.  Next, Rep. Martha Smith started a conversation about whether it was appropriate that failed attempts to commit felonies which result in only misdemeanor convictions *not* be disenfranchising.  Owen Report, Exhibit 17, at 32-33; *see also* doc. 256-13 at 54-55.  Sen. Bob Harris recognized the possibility of broadening the disenfranchisement provision, but also explained: "Well, let me simply say that what we were trying to do is *get away from the restraints and restitutions of the 1901 Constitution as far as we could,* as safely as we could, in the simplest language that we could, invest in the Legislator as much power as we could consonant with Federal laws and Federal decisions to govern the election process and the qualification of voters.  If you wanted to make it more restrictive, certainly you could add something of that language."  Owen Report, Exhibit 17, at 33 (emphasis altered); *see also* doc. 256-13 at 54-55 (emphasis added; paragraph break omitted).  Rep. Smith reiterated her concern about failed attempts at felonies and the discussion moved on.  Owen Report, Exhibit 17, at 33; *see also* doc. 256-13 at 55.

At a committee meeting the next day, the concept of felonies of moral turpitude came up again, this time in the context of eligibility to hold office.  Owen Report, Exhibit 17, at 33-34.

Rep. Harrison again raised his position that disenfranchisement is punishment which should end when the other punishment does, and he referred to moral turpitude as "nebulous language," though he would fix it by referring to all felonies.  Owen Report, Exhibit 17, at 34; *see also* doc. 256-14 at 10-12.  Again, Rep. Harrison would prefer that any disqualification be in statute so that it might be more easily changed.  Doc. 256-14 at 13.   Rep. Martha Smith again raised the issue of failed attempts at felonies, Owen Report, Exhibit 17, at 34-35; *see also* doc. 256-14 at 13-14, and she said she had "trouble with the phrase of moral turpitude, too," doc. 256-14 at 14.  Mr. Denson responded: "That is an old legal phrase that has meaning.  It is somewhat nebulous, but it has meaning in court cases.  In general, moral turpitude involves some sort of theft, robbery, something like that.  If you think that language is too nebulous – you know, all this Committee is doing is making suggestions to you, and you are the one that would do it.  We think that that is good language, but if you think it is too nebulous, then you can just do it legislatively rather than constitutionally."  *Id.* at 14-15 (paragraph break omitted).  After a discussion about whether one would be prevented from holding office following conviction but while that conviction was on appeal, *id.* at 15-16, Sen. Figures suggested that many attempts at felonies are themselves felonies and there was a brief discussion as to that issue, *id.* at 16-17.

At a public hearing in late February 1979, Mary Weidler of the Civil Liberties Union of Alabama urged the Committee to revise the Suffrage and Elections article.  Owen Report, Exhibit 17, at 35; *see also* doc. 256-16 at 4.  Because this brief exchange comes closer than anything else uncovered in the record to supporting the Plaintiffs' arguments (though it ultimately fails to do), the exchange is set out at length:

MRS. WEIDLER:  Thank you, Mr. Speaker.  Good morning, chairman and committee members.

On behalf of the Civil Liberties Union of Alabama, I urge you to revise Article VII, Suffrage and Elections, Section 7.02 Disqualification, to remove the reference referring to persons convicted of felonies involving moral turpitude.  With this revision, the section would read, "No person who is mentally incompetent shall be qualified to vote until removal of the disability."  It seems to our organization that there is no reason to continue to penalize those convicted of felonies once they have served their time.

Furthermore, the phrase "moral turpitude" is vague and indefinite, and, when added to the disability of being a convicted felon, appears unwarranted and discriminatory.

Under the present system of applying to the Board of Pardons and Paroles for restoration of rights, nearly all who apply have their rights restored.  Removal of the part of this section applying to felons would allow the Legislature to change the present method of restoration of rights to an automatic restoration once the penalty imposed by the court is served.  Other states do not require application, and it seems reasonable that the State of Alabama should remove this disability from its Constitution.

The Civil Liberties Union further believes that disenfranchising a person for conviction of a crime of 'moral turpitude' denies that person the right to vote and violates the U.S. Constitution.

It was clear from the legislative history of the 1901 Alabama Constitution that the section from which 7.02 is derived was specifically adopted because of a supposed disparate impact on black citizens, with the intent to disenfranchise blacks.

A continuation of that thinking today is clearly unacceptable.  I urge you to delete persons convicted of a felony involving moral turpitude from Section 7.02.

Thank you.

SPEAKER McCORQUODALE: All right.   Do we have any questions?  Representative Smith.

REPRESENTATIVE MARTHA JO SMITH: Pardon me, but I agree with you on automatic restoration of citizenship rights.  I agree with that.  But you are not suggesting that while these people are serving time in the penitentiary or are in fact serving their sentence, whether it be probation, work release, whatever, that they be allowed to vote, are you?

MRS. WEIDLER: No, I am not suggesting that in my statement.

REPRESENTATIVE SMITH: All right.  Would you bring me some of those bills from other states or laws from other states that make it automatic?  I would like to see us do that.

MRS. WEIDLER: Okay.  I would be happy to furnish that information.

REPRESENTATIVE SMITH: Thank you.

SPEAKER McCORQUODALE: Any other questions?  Any discussion of the members of the Governor's Committee?

Thank you very much, Mrs. Weidler.

MRS. WEIDLER: Thank you.

SPEAKER McCORQUODALE: This is the only witness that we have had that indicated the desire to be heard.  Do we have any discussion from the group here?  Any member of the Committee or any member of the Legislature that would like to be heard or express any thought in this -- along the line of Article VII?  Representative Smith.

REPRESENTATIVE SMITH:  I think we have had a lengthy debate on that. I think you all know how I feel.  So I will just reiterate that what I have said before I will stand by, and when we get in Committee we are going to add a few things, I hope.  Thank you.

SPEAKER McCORQUODALE:   Anyone else present that wishes to be heard?

All right.  We moved through that article in a hurry.  Now we will go to Article VIII.  It begins on Page 147. . . .

Doc. 256-16 at 4-7.  This is the sum of Weidler's comments, "which comprised less than three pages of this one volume's 144-page transcript and of the more than 2,000 pages of total transcript for these efforts."  Owen Report, Exhibit 17, at 35-36.

At a public hearing in early March 1979, Tom Leonard, a representative of Plaintiff GBM spoke against Section 7.02 (in addition to addressing other portions of the proposal).  Owen Report, Exhibit 17, at 36; *see also* doc. 256-19 at 22-23, 24-25.  Pertinent here, he said: "We believe that a person who has paid the price for committing a crime should not have the added burden of loss of  his vote.  Such a constitutionally-imposed disability serves to mark an ex-convict with an

additional badge of inferiority.  We believe that a wise society will not make it harder for a person to be rehabilitated.  We urge the removal of this additional punishment for people who have been convicted of crimes."  Doc. 256-19 at 24-25.  He then moved on to taxation.  *Id.* at 25.

Thus, while some concerns were raised about disenfranchisement for convictions of felonies involving moral turpitude, only a limited number of voices have been uncovered and they ran the gamut from broadening the disenfranchisement to eliminating it, at least once the sentence has been served.  Dr. Owen's report also briefly addresses references to the Suffrage and Elections article as one of the least controversial in the proposed constitution.  Owen Report, Exhibit 17, at 36-37.  Ultimately, the Senate passed a proposed constitution but the House did not, apparently for reasons having nothing to do with the issues in this case.  *Id.* at 39.  Another 15 years would pass before the Suffrage and Elections article would be revised, but another grand attempt would be made before then.

### 3.  Other *Arlington Heights* factors: constitutional revision efforts through the 1980s—Lt. Governor Baxley's efforts.

When Bill Baxley was inaugurated as Attorney General, he said "every citizen of this state is entitled to the fullest protection and benefit of its laws without regard to their age, race or station in life."  Owen Report, Exhibit 17, at 40 (footnote omitted).  He meant it.  Among other things, Baxley reopened the Sixteenth Street Baptist Church bombing case and prosecuted Robert ("Dynamite Bob") Chambliss for the murder of Denise McNair.  *Cf. Chambliss v. State*, 373 So.2d 1185 (Ala. Crim. App. 1979).  When the National States Rights Party wrote Baxley a threatening and racist letter, Exhibit 20, his formal response was: "kiss my ass," Exhibit 21.

As Lieutenant Governor, Baxley "worked with Legislators and community stakeholders to organize a special committee to draft a new constitution."  Owen Report, Exhibit 17, at 41.  Sen. Ryan deGraffenreid and Rep. Jack Venable were heavily involved in these efforts.  *Id.* at 40-41.

"After even weeks or debating and drafting," the committee "presented to the Senate their version of a new constitution."  Owen Report, Exhibit 17, at 41. The Suffrage and Elections article was the same as proposed during the Governor Brewer efforts and the Governor James efforts.  *Id.* at 42.

A draft memo by Sen. deGraffenreid explained: "The proposed new constitution completely rewrites the provisions relating to voting and elections in the current constitution.  The provisions of the Constitution of 1901 relating to voting and elections were specifically designed to prevent blacks from voting and also prevented women and persons under the age of 21 years from voting.  These lengthy and complex provisions of the present Constitution have been held to be unconstitutional under the Constitution of the United States.  *The new provisions relating to voting and elections* are very short and concise and *conform to the requirements of the United States Constitution*."  *Id.* at 42 (footnote omitted; emphasis altered).

The editors at the *Montgomery Advertiser* supported Lt. Gov. Baxley's proposed constitution, Owen Report, Exhibit 17, at 43, while the League of Women Voters endorsed the Suffrage and Elections article, *id.* at 42-43, but thought changes were needed to other parts of the proposal, *id.* at 43-44.  Mary Weidler was back testifying for the Civil Liberties Union of Alabama at a March 1983 hearing, but apparently said nothing about the Suffrage and Elections article. Exhibit 22.   The Alabama Bar Association appointed a task force to consider the proposed constitution and came out against it, but not for reasons having anything to do with felon disenfranchisement or the use of the moral turpitude standard in that context.  Owen Report,

Exhibit 17, at 44-47.  Indeed, a subcommittee reported that the Suffrage and Elections article "has been greatly simplified and amended to meet the requirements of the United States Constitution. Obsolete and unconstitutional provisions of the existing Constitution have been deleted."  *Id.* at 46 (footnote omitted).

"On July 25, 1983, the Alabama Legislature passed Act 83-683, which proposed a new constitution for the State of Alabama. The Act provided that the new constitution would be submitted to the electorate for adoption in the same manner as an amendment under § 284, as amended, Alabama Constitution of 1901, at the next general election, to be held November 8, 1983." *State v. Manley*, 441 So. 2d 864, 865 (Ala. 1983).  Before that court happen, the Supreme Court of Alabama held that the constitution could not be "amended" with an entirely new constitution by election, *id.*, and thus upheld an injunction preventing the placement of the proposed amendment on the ballot, Exhibit 23 at 2-3.  Thus, the Baxley effort, too, ended in defeat, and it would be necessary for future amendments by the electorate to be more limited in scope.

> **v.  Other *Arlington Heights* factors: Ala. Act No. 95-443 proposes to repeal the 1901 Suffrage and Elections Article and Ala. Const. art. VIII § 177 is adopted.**

In 1995, Rep. Jack Venable introduced House Bill 38 to repeal the Suffrage and Elections article and replace the criminal disenfranchisement provision with the felony of moral turpitude language that had been proposed during the Governor Brewer efforts, the Governor James efforts, and the Lt. Gov. Baxley efforts.  Owen Report, Exhibit 17, at 49-50.  Speaker Seth Hammett, who was then a Member of the House of Representatives, remembers his friend Rep. Venable speaking on House Bill 38 and that the bill was passed without controversy.  *Id.* at 50.  House Bill 38 passed the House with a vote of 79 yeas to 0 nays.  *Id.*; *see also* Exhibit 24 at 18-19.  House Bill 38 then moved to the Senate where it passed with a vote of 27 yeas to 0 nays.  Owen Report, Exhibit 17,

at 51; *see also* Exhibit 25 at 24.  "'There was no opposition to this bill; the Black Caucus and our colleagues did not raise any issue,' remarked former Speaker Seth Hammett."  Owen Report, Exhibit 17, at 51 (footnote omitted).  House Bill 38 thus became Ala. Act No. 95-443 and "would next be consider by Alabama voters in June of 1996 where it was offered as Amendment 1 on the Primary Election ballot."  *Id.*

By letter dated April 12, 1996, Rep. Venable provided information to the Alabama Attorney General's office to facilitate submitting the proposed constitutional amendment for preclearance.  Exhibit 26.  In part, that letter provided: "The proposed Article has been a part of the last three Constitutional Revision efforts.  There [were] numerous public hearings held during the 1973, 1979 and 1983 efforts, and I recall no opposition to this Article from any group.  There were no public hearings when the Article passed the legislature in 1995, and I do not recall any opposition."  Exhibit 26.

In the lead up to the June election, the *Montgomery Advertiser* issued an editorial encouraging voters to support all four proposed constitutional amendments, saying in part that Amendment 1 "strikes out a great deal of outdated and indefensible language on voting rights in Alabama."  Owen Report, Exhibit 17, at 51-52 (footnote and emphasis omitted).  Then, Phillip Rawls wrote for the Associated Press in support of Amendment 1, in part quoting Rep. Venable and Secretary of State Jim Bennett.  *Id.* at 52.  "Rawls commented, 'If you read Alabama's constitution, you'd think you couldn't vote in Alabama unless you are a white-male who owns property, can read the U.S. Constitution and has paid a poll tax.  Everyone knows that's no longer true . . . but no one had ever brought Alabama's constitution up to date.'"  *Id.*  Amendment 1 would change that: it "'would make Alabama's voting requirements match reality.'"  *Id.*  Rawls quoted Rep. Venable a saying "'It's strictly housekeeping.  It reflects the voting requirements of the state

today, rather than in 1901 when the constitution was written.'" *Id.* (footnote omitted).   Understood in context, there is nothing at all remarkable about this statement, and it certainly is not an admission of racist intent.

All four proposed constitutional amendments were adopted by the electorate at the June 1996 Primary Election.  Exhibit 8 at 2.  Amendment 1 on the ballot thus became Amendment 579 to the Alabama Constitution, and it was codified at Ala. Const. art. VIII, § 177.  Section 177 was adopted by a vote of 297,261 in favor to 95,612 opposed, which means nearly 76% of the electorate voted in favor of adoption.  Exhibit 8 at 2; Owen Report, Exhibit 17, at 53.  Moreover, Amendment 1 was approved by 70% or more of the voters in 46 of the State's 67 counties, Owen Report, Exhibit 17, at 53, and it carried at least 60% of the vote in 94% of the counties, *id.*  Amendment 1 was rejected by voters in Lowndes County and Washington County, though it carried at least 45% of the vote in both counties.  *Id.*  Those two counties also voted against the other three proposed constitutional amendments on the ballots—amendments that were heavily supported by the rest of the State—and so it is possible that the negative votes were not due to the specific content of Amendment 1.  *Id.* at 53, 55.  Of the four proposed constitutional amendments, Amendment 1 received the greatest support, *id.* at 55, and it did receive support in the majority black counties (other than Lowndes County)[12], *id.* at 56.  For example, "[i]n Macon County, where the black population in 1996 was 85.6 percent of the entire county's population, voters supported passage of Amendment 1 by 75.26 percent of the vote."  *Id.* at 56.  Further, at the time, Jefferson, Mobile, Madison and Montgomery counties were the largest in the State and their "diverse population[s]"

---

[12]      In 1996, the Alabama counties with a majority black population were Bullock, Dallas, Greene, Hale, Lowndes, Macon, Marengo, Perry, Sumter, and Wilcox.  Owen Report, Exhibit 17, at 56 (citation omitted).  Figure 1, *id.* at 54, and Table 1, *id.* at 61-62, display the Yes and No votes on Amendment 1 for each county in the State.

"overwhelmingly supported the passage of Amendment 1" with favorable voter exceeding 75%. *Id.* at 55-56.  Dr. Owen concludes "[t]here is no relationship between the racial composition of a county and the degree of support [within that county] for the 1996 amendment."  *Id.* at 57.

After the adoption of Ala. Const. art. VIII § 177, Sen.  Roger Bedford submitted a proposed constitution in 2000, which maintained § 177 without change.  Doc. 256-20 at 1, 43-44; *see also* doc. 256-1 at 240:10-244:15.   The Comment provided: "COMMENT: Amendment 579, no change.  This Amendment as ratified June 19, 1996, repealed and reenacted the entirety of old Article VIII of the Constitution of 1901.  *Amendment 579 removed outdated, unlawful and offensive provisions.*  The Amendment provides for legislative authority to prescribe 'reasonable and nondiscriminatory' requirements as prerequisites to voting."  Doc. 256-20 at 44 (emphasis altered).   Subsequent constitutional reform efforts have also not focused on the Suffrage and Elections article.  Doc. 256-1 at 239:5-240:9. The exception is a 2012 Constitutional Amendment which replaced the 1996 Amendment with a new one that that repeated the same felony disenfranchisement language, but added a subsection on secret ballots.  *See* Exhibit 10 at 2-3, 12-13.  It was approved with 66% of the vote.  Owen Report, Exhibit 17, at 58.

### d.  *Arlington Heights* factors: the analysis should end soon after 1996.

Plaintiffs have at times proceeded in a manner that suggests that the *Arlington Heights* analysis may properly consider the two decades of events following the 1996 adoption of Ala. Const. art. VIII, § 177.   Secretary Merrill and Chair Snipes acknowledge that implementation behavior which closely follows a challenged law and remains in effect for decades may be relevant to consideration of the intent behind that challenged law.   Still, it seems an enormous stretch for Plaintiffs to look to *new decisions* by *new decisionmakers* in 2003 or 2017 to ascertain the intent behind the adoption of Ala. Const. art. VIII, § 177.   It is plainly obvious that the 1995 Legislature

and the 1996 electorate could not have foreseen the Legislature's 2003 adoption of the CERV process or the 2017 delineation of which felonies involve moral turpitude for purposes of enforcing Ala. Const. art. VIII, § 177.

To the extent one focuses not on the mid-1990s replacement and repeal of § 182 but on the 2012 repeat of that mid-1990s effort (which added a provision on secret ballots, Ala. Act No. 2011-656, Exhibit 10, at 13), the 2003 adoption of the CERV process would come into play, though the 2017 delineation of which specific felonies involve moral turpitude would still be an unknown. The problem for Plaintiffs remains, however, that there is nothing to suggest any sort of racial intent in the 2012 Constitutional Amendment process.[13]  Having moved beyond the pleadings stage, Plaintiffs can no longer simply suggest that it may be so: they must offer evidence that the 2011 Legislature and the 2012 electorate chose to disenfranchise for felonies of moral turpitude in order to further their purpose of disenfranchising blacks.  Plaintiffs have no such evidence.

### e. *Arlington Heights* analysis: shifting the burden.

As the foregoing discussion demonstrates, Plaintiffs cannot show that racially discriminatory intent was "a substantial or motivating factor behind enactment of the law," *Hunter*, 471 U.S. 222, 228 (1985).  Thus, the analysis should end and judgment on Counts 1 and 2 should be entered for Secretary Merrill and Chair Snipes.

If, however, the Court were to conclude that Plaintiffs had met their burden, then the burden would shift to Secretary Merrill and Chair Snipes "to demonstrate that that law would have been

---

[13]    *Cf. Harness v. Hosemann,* 2019 WL 8113392, at *6-*7 (S.D. Miss. 2019) (setting out Mississippi ballot language for 1950 and 1968, each of which set out the entire provision as proposed to be revised—not a list of proposed changes—and concluding that the Fifth Circuit Court of Appeals in the earlier *Cotton v. Fordice* litigation understood this meant that "a majority of the voters had to approve *the entire provision, including the revision*.") (*quoting Cotton v. Fordice*, 157 F.3d 388, 391 (5th Cir. 1998)).

enacted without this factor." *Id.* Without repeating everything that has been said to this point, it is clear that Alabama has long disenfranchised felons, *see e.g.,* Beito Report, Exhibit 1, at 11-12; Ala. Const. of 1868 art. VII, § 3, reproduced as Exhibit 5 at 13; Ala. Const. of 1875 art. VIII § 3, reproduced as Exhibit 6 at 21, and certainly would have continued to disenfranchise felons in 1996 or 2012 independent of racial considerations. With respect to the moral turpitude standard, and as set out at length above, Alabama (like this Court, M.D. Ala. LR 83.1(k)(1), and Georgia, *see* Owen Report, Exhibit 17, at 7-8) has viewed moral turpitude as an appropriate standard for governing conduct in a wide variety of situations. *See* n. 10, *supra.* Indeed, the Alabama Constitution continues to provide that certain State officers may be removed from office for various reasons including "for any offense involving moral turpitude while in office." Ala. Const. art. VII § 173(a). And, it is clear from the record set out above, that moral turpitude was broadly viewed as targeting most wrong-doing.

In the alternative, if the Court were to find that the Plaintiffs have demonstrated that the Legislature and the electorate – in the mid-1990s or more recently in the early 2010s – was motivated by racial discrimination in adopting the moral turpitude standard, the Court should still find that Alabama certainly would have continued to disenfranchise felons without any racial motivation such that the appropriate remedy would be to sever the moral turpitude standard from Ala. Const. art. VIII, § 177(b). This would remedy Plaintiffs' claims of intentional racial discrimination, would be consistent with the State's sovereign authority to disenfranchise felons, *Richardson v. Ramirez*, 418 U.S. 24, 54 (1974); *Jones v. Governor of Fla.*, 950 F.3d 795, 801 (11th Cir. 2020) ("Regardless of the political trend toward re-enfranchisement, there is nothing unconstitutional about disenfranchising felons—even all felons, even for life."), and would

eliminate the need to address Plaintiffs' Count 18, which demands that all disenfranchising felonies be listed on the State's mail-in voter registration form.

* * *

Secretary Merrill and Chair Snipes are entitled to summary judgment on Counts 1 and 2.

### VI.    Felony disenfranchisement is a not punishment, a point which is relevant to Count 11 (*Ex Post Facto* Clause), Count 12 (Cruel and Unusual Punishment Clause), and Count 13 (wealth discrimination).

Count 11 alleges an *Ex Post Facto* Clause violation, doc. 1 at ¶¶ 233-38; doc. 93 at ¶¶ 52-57, while Count 12 alleges a violation of the Eighth Amendment's prohibition on cruel and unusual punishment, doc. 1 at ¶¶ 239-44; doc. 93 at ¶¶ 58-64.  "Essential to the success of each of these contentions is the validity of characterizing" disenfranchisement "as 'punishment' in the constitutional sense . . . ." *Flemming v. Nestor*, 363 U.S. 603, 613 (1960) (concerning, *inter alia*, an *Ex Post Facto* challenge); *Wilson v. Seiter*, 501 U.S. 294, 296-97 (1991) (the Eighth Amendment "prohibits the infliction of 'cruel and unusual punishments' on those convicted of crimes" and "some deprivations that were not specifically part of the sentence but were suffered during imprisonment").  Thus, a finding that disenfranchisement is punishment is a necessary precondition to granting Plaintiffs relief on these two claims; without such a finding, the claims fail.  With respect to Count 13, a similar finding is not necessary to a wealth discrimination claim, however the Eleventh Circuit panel considering a preliminary injunction in the Florida felon voting case asserted that felony disenfranchisement is punishment and, on that basis as well as another, increased the applicable level of scrutiny.  *Jones*, 950 F.3d at 807, 808-09, 817-20, 823-24.[14] Hence, the issue of whether disenfranchisement is punishment is relevant to this claim as well.

---

[14]    The Court is familiar with this Florida litigation from the recent preliminary injunction proceedings.  Docs. 215, 222 & 223.  The Eleventh Circuit is hearing Florida's appeal from the final judgment in this case initially *en banc* and on an expedited schedule.  Oral argument was held

The State Defendants recognize that the *Jones* preliminary injunction panel was emphatic that disenfranchisement is punishment, 950 F.3d at 819, but Florida relied on a "multifaceted" interest in punishment, *id.* at 810-12, and so the issue was not disputed.  Moreover, it is possible that felon disenfranchisement is not punishment for Alabama even if it is for Florida.  *Cf. Smith v. Doe*, 538 U.S. 84, 91-93 (2003) (setting out the test for determining whether a statutory scheme is civil or criminal, including consideration of legislative intent, without asserting that all laws governing sex offenders are automatically punitive or not); doc. 80 at 30 ("section 177(b) requires its own analysis").  Thus, the State Defendants make (and preserve) the argument that Alabama does not disenfranchise as punishment.

As a matter of background, the State Defendants, of course, understand that felony disenfranchisement flows from a felony conviction.  However, that does not mean that felony disenfranchisement is punishment; instead, like disqualification to sit on a jury or inability to own a gun, disenfranchisement is a collateral consequence of the conviction.  As the First Circuit has explained, "there is a critical distinction between recognizing that a particular consequence might follow—nearly automatically—*from* a criminal conviction and classifying that consequence as a sanction intended to punish a noncitizen *for* that criminal activity.  Indeed, there are a whole host of consequences that flow indelibly from a conviction" but that does not "determine whether that consequence is punitive."  *Hinds v. Lynch*, 790 F.3d 259, 265 (1st Cir. 2015).

To analyze whether felon disenfranchisement is punitive, this Court should first ask whether it was intended to punish.  *See, e.g.*, *United States v. Ursery*, 518 U.S. 267, 288 (1996).

---

on August 18, 2020.  A decision has not yet been issued.  *Jones v. Governor of Fla.*, Case No. 20-12003 (11th Cir. pending).  The Eleventh Circuit has stayed most of the trial court's final judgment, *see* Orders dated July 1, 2020 (stay) and July 29, 2020 (modification of stay), and the Supreme Court declined to vacate the stay, *Raysor v. DeSantis*, No. 19A1071, 591 U.S. ___, ___ S. Ct. ___, 2020 WL 4006868 (July 16, 2020) (denying application to vacate July 1 stay).

If punishment was intended, the inquiry ends. *Smith v. Doe*, 538 U.S. 84, 92 (2003).  If not, the Court should "examine whether the statutory scheme is so punitive either in purpose or effect as to negate [the State's] intention." *Id.* (internal citations and quotation marks omitted; alteration by the Court). The Supreme Court traditionally employs the seven factors outlined in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963), to analyze the second part of the test, though the list is "neither exhaustive nor dispositive." *Smith v. Doe,* 538 U.S. at 97.  "[O]nly the clearest proof will suffice to override legislative intent . . . ." *Id.* at 92 (internal citations and quotation marks omitted).

In considering legislative intent, "[w]hether a statutory scheme is civil or criminal is first of all a question of statutory construction.  We consider the statute's text and its structure to determine the legislative objective." *Smith v. Doe*, 538 U.S. at 92 (internal citations and quotation marks omitted). "Other formal attributes of a legislative enactment, such as the manner of its codification or the enforcement procedures it establishes, are [also] probative of the legislature's intent." *Id.* at 94.  *See also Simmons v. Galvin*, 575 F.3d 24, 43-44 (1st Cir. 2009).

Applied here, the evidence indicates that Alabama does not intend to disenfranchise felons as punishment.  Undeniably, some of the discussion in Alabama over the years has included persons expressing the view that disenfranchisement is punitive, and some of that is included in the above discussion of the racial intent claims.  However, the history of the constitutional revision efforts under Governor Brewer, under Governor James, and under Lt. Governor Baxley all demonstrate that felony disenfranchisement was part of the discussion on revising the Suffrage and Elections article.  *See* 41-52, *supra.*  The same was true when Ala. Const. art. VIII § 177 was finally adopted in 1996 and then re-enacted with amendment in 2012.  *See* 52-55, *supra.*

In 1995, the Alabama Legislature passed Ala. Act No. 95-443, Exhibit 7, proposing an amendment to repeal and replace the entire Suffrage and Elections article.  The Alabama electorate approved that proposal in June 1996 by a vote of 297,261 to 95,612.  Certification of Results, Exhibit 8 at Amendment 1).  The amendment was summarized as:

> Proposing an amendment of the Constitution of Alabama of 1901, repealing Article VIII, relating to suffrage and elections.  The amendment would repeal the existing Article VIII, and provide that, in accordance with constitutional requirements, suffrage would extend to residents who are citizens, 18 years of age or older who have not been convicted of a felony involving moral turpitude.  This amendment would further provide that the Legislature would provide for certain voting procedures by statute.  (Proposed by Act 95-443).

Certification of Results, *available at* doc. 43-3.  This is the language that was on the actual ballots. Ala. Act No. 95-443 at § 3, Exhibit 7.  *Cf. Simmons*, 575 F.3d at 44 (noting the voter guide proposing a Massachusetts constitutional amendment did not mention punishment).  The newspaper coverage concerning the proposed amendment focused on voting and the sponsor, Rep. Venable, was quoted as referring to the amendment as a "housekeeping" measure that would bring the voting requirements up to date.  *See* 53-54, *supra*.

The Suffrage and Elections article was re-enacted with amendment in 2012, adding the provision concerning secret ballots found in subsection (d).  Ala. Act No. 2011-656, Exhibit 10 at 11-15.  As it stands today, Ala. Const. art. VIII, § 177 provides:

> (a) Every citizen of the United States who has attained the age of eighteen years and has resided in this state and in a county thereof for the time provided by law, if registered as provided by law, shall have the right to vote in the county of his or her residence. The Legislature may prescribe reasonable and nondiscriminatory requirements as prerequisites to registration for voting. The Legislature shall, by statute, prescribe a procedure by which eligible citizens can register to vote.

> (b) No person convicted of a felony involving moral turpitude, or who is mentally incompetent, shall be qualified to vote until restoration of civil and political rights or removal of disability.

(c) The Legislature shall by law provide for the registration of voters, absentee voting, secrecy in voting, the administration of elections, and the nomination of candidates.

(d) The right of individuals to vote by secret ballot is fundamental. Where state or federal law requires elections for public office or public votes on referenda, or designations or authorizations of employee representation, the right of individuals to vote by secret ballot shall be guaranteed.

Ala. Const. art. VIII, § 177.

Thus, Ala. Const. art. VIII, § 177 addresses itself to election matters.  Subsection (a) limits voting to citizens of the United States who are residents of Alabama and age 18 or older, Ala. Const. art. VIII, § 177(a).  Subsection (c) requires the Legislature to "provide for the registration of voters, absentee voting, secrecy in voting, the administration of elections, and the nomination of candidates."  Ala. Const. art. VIII, § 177(c).  Subsection (d) concerns secrecy of the ballot.  Ala. Const. art. VIII, § 177(d).  None of these provisions speak to punishment.

Section 177(b) does disqualify those convicted of felonies or moral turpitude, but it also disqualifies those who are "mentally incompetent," Ala. Const. art. VIII, § 177(b).  The mentally incompetent, like the non-United States citizen, the non-Alabama resident, and the child under the age of 18, is not disenfranchised as punishment.  *Washington v. State,* 75 Ala. 582, 585 (1884) (discussing bases for disenfranchisement). *See also Simmons*, 575 F.3d at 44 (in evaluating an *Ex Post Facto* challenge, taking note of others disenfranchised in Massachusetts besides incarcerated felons).

It is true that convicted felons are punished, but, under Ala. Const. art. VIII, § 177, the disenfranchised felons are in the company of other groups as to whom there is no rational argument that punishment is at play.  Further, even as to felons, punishment is not always an available intent. Section 177(b) disenfranchises all "person[s] convicted of a felony involving moral turpitude," irrespective of which sovereign secured that conviction.  And, while that point has always been

clear, it is plainly stated in Ala. Code § 17-3-30.1(c)(48), which provides that "[a]ny crime as defined by the laws *of the United States or by the laws of another state, territory, country, or other jurisdiction*, which, if committed in this state, would constitute one of the offenses listed in this subsection" is also disqualifying. Ala. Code § 17-3-30.1(c)(48) (emphasis added). Alabama has no punitive interest—and no authority to punish—a felon who was convicted by the United States, by the State of Georgia or Mississippi, or by any other jurisdiction. Alabama may only impose punishment on those persons convicted in its own courts.

Moving from substance to structure, not only is Ala. Const. art. VIII, § 177(b) the Suffrage and Elections article of the Constitution, but the statutes that implement it are part of the Alabama Code that regulates elections, *i.e.*, Title 17. *See* Ala. Code § 17-3-30 (qualifications of electors generally); Ala. Code § 17-3-30.1 (disqualification of electors involving felonies of moral turpitude); Ala. Code § 17-3-31 (restoration of right to vote). There are criminal provisions within Title 17, and it is a crime to lie about one's qualifications to vote on the voter registration form, but the overall purpose of Title 17 is to regulate elections.

The supplemental complaint alleges that Ala. Code § 17-3-30.1, which delineates which felonies are disqualifying under Ala. Const. art. VIII, § 177(b), itself disenfranchises and is punitive. Doc. 93 at ¶¶ 52-64. However, Ala. Code § 17-3-30.1 does not disenfranchise anyone; it sets out who is disenfranchised by Ala. Const. art. VIII, § 177(b). Ala. Code § 17-3-30.1 is housed in Title 17's Chapter 3, which is entitled Voter Registration. The statute expressly declares that its purpose is to "give full effect" to Ala. Const. art. VIII, § 177, "[t]o ensure that no one is wrongly excluded from the electoral franchise" and "[t]o provide a comprehensive list of acts that constitute moral turpitude for the limited purpose of disqualifying a person from exercising his or her right to vote." Ala. Code § 17-3-30.1(b)(2). Section (c) then sets out the list of disqualifying

felonies with the introduction that it is "[f]or purposes of" Ala. Const. art. VIII, § 177(b).  In any event, even if in a statute rather than the constitution, felon disenfranchisement is not punitive for all the reasons argued throughout this section.

In short, on the facts of this case, Plaintiffs will not be able to establish that the Alabama Legislature and/or electorate acted with punitive intent in adopting Ala. Const. art. VIII, § 177(b) in the 1990s or more recently, nor that the Legislature acted with punitive intent in adopting Ala. Code § 17-3-30.1 (which does not actually do the work of disenfranchisement).[15]

In the absence of evidence of punitive intent, the *Mendoza-Martinez* factors do not provide "the clearest proof" sufficient to override the State's intent not to punish, *Smith v. Doe*, 538 U.S. at 92.  The *Mendoza-Martinez* factors are: (1) "[w]hether the sanction involves an affirmative disability or restraint"; (2) "whether it has historically been regarded as a punishment"; (3) "whether it comes into play only on a finding of scienter"; (4) "whether its operation will promote the traditional aims of punishment—retribution and deterrence"; (5) "whether the behavior to which it applies is already a crime"; (6) "whether an alternative purpose to which it may rationally

---

[15]     Earlier in the proceedings, Plaintiffs relied on Alabama's Readmission Act for the proposition that Alabama was not allowed to disenfranchise for any reason that was not punitive. Doc. 97 at 13.  However, the Plaintiffs ellipsed critical language. *See id.*  In pertinent part, the Readmission Act says that Alabama's constitution cannot "be so amended or changed as to deprive any citizen or class of citizens of the United States of the right to vote in said State, *who are entitled to vote by the constitution thereof herein recognized*, except as punishment for such crimes as are now felonies at common law  . . . ."  Doc. 97-1 at 2 (emphasis added).  Alabama's 1868 Reconstruction Constitution made clear that *no* felons were "entitled to vote."  See Beito Report, Exhibit 1, at 11.  Moreover, "[m]ost words have different shades of meaning and consequently may be variously construed" when they appear in different contexts. *Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007).  The purpose of the Readmission Act provision cited by Plaintiffs was to ensure that readmitted States could continue to disenfranchise felons, just not in a racially discriminatory manner.  *See Richardson*, 418 U.S. at 41-52.  The phrase "except as punishment for such crimes" was intended only to ensure that disenfranchisement be connected to felony convictions under equally applicable laws, not to limit the philosophical underpinnings of a State's felon disenfranchisement laws.

be connected is assignable for it"; and (7) "whether it appears excessive in relation to the alternative purpose assigned." *Mendoza-Martinez*, 372 U.S. at 168-69. "It is important to note . . . that these factors must be considered in relation to the *statute on its face*, and only the *clearest proof* will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Hudson v. United States*, 522 U.S. 93, 100 (1997) (internal citations and quotation marks omitted; emphasis added).

As to the first *Mendoza-Martinez* factor, felon disenfranchisement "imposes no physical restraint, and so does not resemble the punishment of imprisonment, which is the paradigmatic affirmative disability or restraint." *Smith v. Doe*, 538 U.S. at 100. Moreover, the Supreme Court has held that occupational debarment is not punitive, *id.*, and it is clear that some regulation of sex offenders is not, *id.* at 105-06.

As to the second *Mendoza-Martinez* factor, the State Defendants recognize that disenfranchisement has historically been viewed by some as being punitive, but it has also been historically recognized as a paradigmatic example of a restriction that is *not* punitive. In *Trop v. Dulles*, 356 U.S. 86 (1958) (plurality opinion), a plurality of the Supreme Court used felon-disenfranchisement as an example of a restriction that is not punitive and would not violate the *Ex Post Facto* Clause:

> [A] statute has been considered nonpenal if it imposes a disability, not to punish, but to accomplish some other legitimate governmental purpose. . . . The point may be illustrated by the situation of an ordinary felon. A person who commits a bank robbery, for instance, loses his right to liberty and often his right to vote. If, in the exercise of the power to protect banks, both sanctions were imposed for the purpose of punishing bank robbers, the statutes authorizing both disabilities would be penal. But because the purpose of the latter statute is to designate a reasonable ground of eligibility for voting, this law is sustained as a nonpenal exercise of the power to regulate the franchise.

*Id.* at 96–97.  The Supreme Court of Alabama has agreed.  *Washington v. State*, 75 Ala. 582, 585 (Ala. 1884) (holding that disenfranchisement "must . . . be adjudged a mere disqualification, imposed for protection, and not for punishment . . . .").   The Second Circuit has rejected a Cruel and Unusual Punishment claim on two theories, one of which was that *Trop* made clear that felon disenfranchisement is not punishment.  *Green v. Bd. of Elections of City of New York*, 380 F.2d 445, 450 (2d Cir. 1967).

In emphatically stating that "disenfranchisement is punishment," the *Jones* panel only cited one binding authority, namely *Johnson v. Governor of State of Florida*, 405 F.3d 1214, 1228 (11th Cir. 2005) (*en banc*), before pivoting to Florida's Readmission Act.  *Jones*, 950 F.3d at 819.  In turn, *Johnson* relies on *Richardson*, for the proposition that "Felon disenfranchisement laws are unlike other voting qualifications. These laws are deeply rooted in this Nation's history and are a punitive device stemming from criminal law.  *See Richardson*, 418 U.S. at 48-52, 94 S. Ct. 2655."  *Johnson*, 405 F.3d at 1228.  The referenced discussion in *Richardson* concerns the Readmission Acts and the Reconstruction Act, but all in service of explaining the meaning of the Equal Protection Clause, not holding that disenfranchisement is punishment.  *Richardson*, 418 U.S. at 48-52.  Thus, the language in *Richardson* and then *Johnson* was *dicta,* but the *Jones* panel treated *Johnson*, and non-binding authorities, as dispositive of the question.[16]   The First Circuit has read *Richardson* differently, saying:  "Indeed, in holding that felon disenfranchisement has 'affirmative sanction' in § 2 of the Fourteenth Amendment of the U.S. Constitution, the Supreme Court noted the historical *prevalence* of state felon disenfranchisement laws *and never characterized even*

---

[16]      The *Johnson* Court had also cited to non-binding authority for a footnote earlier in the opinion stating that criminal disenfranchisement is punitive.  *Johnson*, 405 F.3d at 1218 n. 5.

*California's broad disqualification of former felons as punitive.*"  *Simmons v. Galvin*, 575 F.3d 24, 45 (1st Cir. 2009) (*citing Richardson*, 418 U.S. 24 (1974); second emphasis added).

As to the third and fifth *Mendoza-Martinez* factors, felon disenfranchisement "is effective regardless of a finding of scienter or the type of crime so long as it is a felony.  That [felon disenfranchisement] may be tied to criminal activity is insufficient to render the [law] punitive." *Simmons*, 575 F.3d at 45 (internal citations and quotation marks omitted).  Similarly, in *Smith v. Doe,* the Court found these two factors "of little weight."  538 U.S. at 105.  While the law at issue was invoked based on prior crime, the challenged obligations were "not predicated upon some present or repeated violation."  *Id.*  So, too, with felon disenfranchisement.

Circling back to the fourth *Mendoza-Martinez* factor, disenfranchisement does not promote the traditional aims of punishment because it is "unlikely, in the best of circumstances" that "losing the right to vote is a punishment that could give a would-be criminal pause."  *Jones*, 950 F.3d at 812.  Moreover, the language put before the voters in 1996 and 2012 did not speak to punishment, Exhibit 7 at 1-2; Exhibit 10 at 14; *cf. Simmons,* 575 U.S. at 45 (considering the voter guide as a better source than "sporadic" comments of legislators[17]), and Ala. Act No. 2017-378 (which created Ala. Code § 17-3-30.1) does not speak in terms of punishment.

As to the sixth *Mendoza-Martinez* factor, disenfranchisement for conviction of a felony involving moral turpitude is rationally connected to the State's undeniable interest "in excluding from the franchise persons who have manifested a fundamental antipathy to the criminal laws of the state or of the nation by violating those laws sufficiently important to be classed as felonies." *Shepherd v. Trevino*, 575 F.2d 1110, 1115 (5th Cir. 1978); *see also Green*, 380 F.2d at 451-52;

---

[17]    It is not clear that legislative history is relevant given the Supreme Court's direction that the *Mendoza-Martinez* factors are to be applied by looking at the face of the challenged law. *Hudson v. United States*, 522 U.S. at 100, 101.

*Washington v. State*, 75 Ala. 582, 585 (1884).  This interest has been discussed above, *see* 30-32, *supra,* and is not repeated.  The State Defendants do add that, in response to interrogatories directed to Secretary of State Merrill demanding the State's interests in disenfranchising felons, the Secretary articulated the State's interests as grounded in the philosophy of republican government and theory of social compact, as discussed above; punishment was not invoked as a State interest.  Exhibit 27 at 4-10 (Interrogatory No. 2).  The "rational connection" of felony disenfranchisement "to a nonpunitive purpose is a '[m]ost significant' factor in [the Court's] determination that the statute's effects are not punitive."  *Smith v. Doe*, 538 U.S. at 102 (*quoting United States v. Ursery*, 518 U.S. 267, 290 (1996); first alteration by the Court).

And as to the seventh *Mendoza-Martinez* factor, it is settled law that Alabama may disenfranchise all felons for life, *Richardson*, 418 U.S. at 54; *Jones*, 950 F.3d at 801, undermining any suggestion that disenfranchisement could be excessive in relation to the State's interest in protecting the ballot box.

In sum, felony disenfranchisement is not intended by the State of Alabama to be punitive, and the Plaintiffs cannot offer the "clearest proof" that felony disenfranchisement is nonetheless punitive.  On this basis, Secretary Merrill and Chair Snipes are entitled to summary judgment on Counts 11 and 12.

**VII.   The United States Constitution would be rendered internally inconsistent if felony disenfranchisement, which is affirmatively sanctioned by the Fourteenth Amendment, could violate the *Ex Post Facto* Clause (Count 11) or the Eighth Amendment's Cruel and Unusual Punishment Clause (Count 12).**

As set out above, § 2 of the Fourteenth Amendment provides "an affirmative sanction" for "the exclusion of felons from the vote."  *Richardson*, 418 U.S. at 54; *Hayden v. Pataki*, 449 F.3d 305, 316 (2d Cir. 2006) (*en banc*) ("The starting point for our analysis is the explicit approval given felon disenfranchisement provisions in the Constitution.").  Thus, the Constitution expressly

recognizes the right of a State to disenfranchise felons,  *Richardson*, 418 U.S. at 54; *see also Simmons v. Galvin*, 575 F.3d 24, 34 (1st Cir. 2009) (felony disenfranchisement is "deeply rooted in our history, in our laws, and in our Constitution"), and "felon disenfranchisement provisions are presumptively constitutional,"  *Hayden*, 449 F.3d at 316; *see also Richardson*, 418 U.S. at 53 ("[W]e have strongly suggested in dicta that exclusion of convicted felons from the franchise violates no constitutional provision.").  The Eleventh Circuit has recently said that, "[r]egardless of the political trend toward re-enfranchisement, there is nothing unconstitutional about disenfranchising felons—even all felons, even for life."  *Jones*, 950 F.3d at 801.  Plaintiffs nonetheless contend that felon disenfranchisement is punishment (it is not) and, as such, there are substantial limits imposed on the State's ability to disenfranchise felons by the *Ex Post Facto* Clause (Count 11) and the Eighth Amendment's prohibition on cruel and unusual punishment (Count 12).  Thus, all felons may be disenfranchised for life, *except* "all felons" only includes those convicted of the most serious crimes after a certain date.  In this way, to accept Plaintiffs' analysis would be to read the United States Constitution as internally inconsistent.  That makes no sense.  Not only did the Fourteenth Amendment follow the adoption of the *Ex Post Facto* Clause, which is found in the original Constitution, U.S. Const. art. I § 10, and the Eighth Amendment, but the Eighth Amendment's prohibition on cruel and unusual punishment is made applicable to the States by the Fourteenth Amendment, *Robinson v. California*, 370 U.S. 660, 667 (1962).

A Mississippi district court recently granted the State summary judgment on an Eighth Amendment claim on just this analysis: "Simply put, it would be internally inconsistent for the Eighth Amendment to prohibit criminal disenfranchisement while § 2 of the Fourteenth Amendment permits it."  *Harness v. Hosemann*, 2019 WL 8113392, at *11 (S.D. Miss. 2019).  In so doing, the court relied on the earlier decision of a Washington district court in *Farrakhan v.*

*Locke*, 987 F. Supp. 1304 (E.D. Wash. 1997).  The *Farrakhan* court considered multiple claims and said: "In order to uphold these claims . . . , the Court would have to conclude that the same Constitution that recognizes felon disenfranchisement under § 2 of the Fourteenth Amendment also prohibits disenfranchisement under other amendments.  The Court is not inclined to interpret the Constitution in this internally inconsistent manner or to determine that the Supreme Court's declaration of the facial validity of felon disenfranchisement laws in *Richardson v. Ramirez* was based only on the fortuity that the plaintiffs therein did not make their arguments under different sections of the Constitution."  *Farrakhan*, 987 F. Supp. at 1314; *see also Sheperd v. Trevino,* 575 at 1114 ("Section 2's express approval of the disenfranchisement of felons thus grants to the states a realm of discretion in the disenfranchisement and reenfranchisement of felons which the states do not possess with respect to limiting the franchise of other citizens."); *cf. Johnson v. Bredesen*, 624 F.3d 742, 752 (6th Cir. 2010) (in a felon voting case, refusing to accept privileges and immunities argument that would have rendered the Fourteenth Amendment internally inconsistent).

The Mississippi court also, in a footnote, recognized that while felon disenfranchisement is specially treated in the § 2 of the Fourteenth Amendment, it is not mentioned at all in the Eighth Amendment.  *Harness*, 2019 WL 8113392, at \*12 n. 7.  The same is true of the *Ex Post Facto* Clause.  U.S. Const. art. I § 10.  The Mississippi court reasoned that the more specific provision governed.  *Harness*, 2019 WL 8113392, at \*12 n. 7.

While felon disenfranchisement is not a constitution-free zone,  *cf. Hunter,* 471 U.S. at 233 (intentional racial discrimination in violation of the Equal Protection Clause); *Sheperd*, 575 F.2d at 1114 (discussing Equal Protection); *Harvey v. Brewer*, 605 F.3d 1067, 1079 (9th Cir. 2010) (same), it is a long-established and affirmatively sanctioned practice, and it is improper to read the

Constitution as internally inconsistent in order to bring felon disenfranchisement within the scope of the *Ex Post Facto* Clause and the Eighth Amendment's prohibition on cruel and unusual punishment.

**VIII.   Secretary Merrill and Chair Snipes are entitled to summary judgment on Count 12 which alleges cruel and unusual punishment in violation of the Eighth Amendment.**

The Eighth Amendment mandates that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.  In Count 12 of the original complaint, Plaintiffs allege that Ala. Const. art. VIII, § 177(b) imposes cruel and unusual punishment, doc. 1 at ¶¶ 239-44, and, in their supplemental complaint, they allege that Ala. Code § 17-3-30.1, which delineates the felonies that involve moral turpitude for voting purposes, imposes cruel and unusual punishment, doc. 93 at ¶¶ 58-64.  In fact, Ala. Code § 17-3-30.1 does not disenfranchise anyone; it sets out who is disenfranchised by § 177(b), and thus the supplemental claim is a non-starter.  And, for reasons already explained, *see* 58-71, *supra*, the Court should not reach the merits of either claim because felony disenfranchisement is not punishment and, even if it were, it would render the Constitution internally inconsistent to suggest that the Eighth Amendment could limit that which the Fourteenth Amendment affirmatively sanctions.  In the event the Court rejects these arguments, then, in the alternative, the Court should conclude that the State has legitimate interests that justify imposition of the punishment of disenfranchisement and that Plaintiffs have not been subjected to cruel and unusual punishment.

The Eighth Amendment "contains a narrow proportionality principle that applies to noncapital cases."  *United States v. Johnson,* 451 F.3d 1239, 1242 (11th Cir. 2006) (*per curiam*). "Outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare."  *Rummel v. Estelle*, 445 U.S. 263, 272 (1980).

And, while the Supreme Court has not charted the clearest path, it "is clear enough" to resolve this case. *United States v. Farley*, 607 F.3d 1294, 1336 (11th Cir. 2010).

In *Farley*, Judge Ed Carnes walked the path, explaining the pertinent Supreme Court decisions and deriving guiding principles applicable here. *Farley*, 607 F.3d at 1336-43. The principles are:

- The courts should take a "hands off" approach to Cruel and Unusual Punishment claims in non-capital cases "because the fixing of prison terms for specific crimes involves a substantive penological judgment that, as a general matter, is properly left within the province of legislatures, not courts." *Id.* at 1340 (internal citations and quotation marks omitted).

- "[J]udicial humility" is also appropriate because "the Eighth Amendment does not mandate adoption of any one penological theory, and over time there have been varying theories and approaching to criminal sentencing." *Id.* (internal citations and quotation marks omitted).

- Proportionality review is necessarily limited because "variations in underlying theories and in the length of prescribed prison sentences are the inevitable, often beneficial, result of the federal structure, which means that one jurisdiction or another will usually treat offenders more severely than most jurisdictions do." *Id.* (internal citations and quotation marks omitted).

- "[P]roportionality review should be informed by objective factors to the maximum possible extent." *Id.* (internal citations and quotation marks omitted). "[T]he most prominent objective factor is the type of punishment imposed," for instance, "the difference between *cadena temporal*," which was chained hard labor at issue in

*Weems v. United States*, 217 U.S. 349 (1910), *Farley*, 607 F.3d at 1336 & n. 28, 1304 (internal citations and quotation marks omitted), "and more traditional forms of punishment imposed under the Anglo-Saxon system," or "the difference between capital punishment and imprisonment for a term of years," *Farley*, 607 F.3d at 1340 (internal citations and quotation marks omitted).  Important in the application of these principles to Plaintiff Thompson alone, "the difference between one term of years and another is not subject to that kind of objective analysis" due to the lack of standards, and this "is why outside the context of capital punishment, *successful* challenges to the proportionality of particular sentences are exceedingly rare." *Id.* at 1340-41 (internal citations and quotation marks omitted).

- Finally, and critically, the Cruel and Unusual Punishment Clause does not demand proportionality: "[r]ather, it forbids only extreme sentences that are grossly disproportionate to the crime." *Id.* at 1341 (internal citations and quotation marks omitted).

Thus, the initial task before the Court is consideration of whether "the sentence imposed leads to an inference of gross disproportionality."   *Farley*, 607 F.3d at 1342 (internal citations and quotation marks omitted).  Where there is no such inference, as here, the analysis is complete and there is no need to consider the sentences of others within the same jurisdiction or the sentences imposed by other jurisdictions. *Id.*; *see also United States v. Johnson*, 451 F.3d 1239, 1243 (11th Cir. 2006) (*per curiam*) ("If the sentence is grossly disproportionate, the court must then consider the sentences imposed on others convicted in the same jurisdiction and the sentences imposed for commission of the same crime in other jurisdictions.") (internal citations and quotation marks omitted).

Plaintiff Thompson stands convicted of theft of property (1st degree), a class B felony, doc. 1 at ¶ 38, for which she was subject to a maximum sentence of 20 years, Ala. Code § 13A-5-6(a)(2).  Plaintiff Lanier stands convicted of burglary (1st degree), a class A felony,  doc. 1 at ¶ 48, *see also* Exhibit 28 at 13:9-14, and Plaintiff King stands convicted of murder, also a class A felony, doc. 1 at ¶ 49.  The sentence for a class A felony is as much as "life or not more than 99 years." Ala. Code § 13A-5-6(a)(1).  Plaintiff Gamble stands convicted of trafficking in cannabis, doc. 93 at ¶ 26, which is also a class A felony, Ala. Code § 13A-12-231(15), and was subject to a mandatory minimum term of imprisonment and fine, Ala. Code § 13A-12-231(1).

"In general, a sentence within the limits imposed by statute is neither excessive nor cruel and unusual under the Eighth Amendment."  *United States v. Johnson*, 451 F.3d at 1243 (internal citations and quotation marks omitted).  Accordingly, assuming disenfranchisement were treated equally to incarceration, the claims of Lanier, King, and Gamble, each of whom stand convicted of class A felonies, are non-starters.  *Cf. United States v. Johnson*, 451 F.3d at 1243 ("Because the district court sentenced Johnson within the statutory limits, he has not made a threshold showing of disproportionality with respect to his sentence.").  The claim of the organizational Plaintiff similarly fails.[18]

---

[18]     Plaintiff GBM has no felony convictions and no injury of cruel and unusual punishment, but contends that Alabama's felony disenfranchisement laws cause it other injuries.  Doc. 1 at ¶¶ 61-64; doc. 93 at ¶¶ 28-31.  GBM has not, in this litigation, purported to bring suit on behalf of any members, doc. 1 at ¶¶ 61-64; doc. 93 at ¶¶ 28-31, and, it certainly could not stand in the shoes of the felons it assists to assert Cruel and Unusual Punishment Clause violations on the basis of hand-selected felonies without converting this proceeding into an unwieldy and advisory one—in violation of Article III's restrictions on federal court jurisdiction.  Accordingly, GBM's challenge should be treated as facial, which means it bears the burden "to establish that no set of circumstances exists under which [the challenged law] would be valid, or that the [law] lacks any plainly legitimate sweep."  *United States v. Stevens*, 559 U.S. 460, 472 (2010) (internal citations and quotation marks omitted); *see also Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450-51 (2008) (discussing the standard for facial challenges and why they are disfavored); *Greater Birmingham Ministries v. Secretary of State of Alabama*, 966 F.3d 1202,

That leaves Plaintiff Thompson, who stands convicted of theft of property (1st degree), a class B felony, doc. 1 at ¶ 38, for which she was subject to a maximum sentence of 20 years, Ala. Code § 13A-5-6(a)(2).  Lifetime disenfranchisement is not grossly disproportionate because the complaint is essentially as to the term of the disenfranchisement, but "the difference between one terms of years and another is not subject to [the] kind of objective analysis" that the Supreme Court demands.  *Farley*, 607 F.3d at 1340.

Further, as to all of the Plaintiffs, the issue is one of felony disenfranchisement, which carries an "an affirmative constitutional sanction."  *Jones*, 950 F.3d at 802.  Indeed, while considering a different kind of claim, the Eleventh Circuit recently said, "[r]egardless of the political trend toward re-enfranchisement, there is nothing unconstitutional about disenfranchising felons—even all felons, even for life."  *Jones*, 950 F.3d at 801.  Similarly, the Old Fifth Circuit has said that "the specific holding of the [*Richardson*] Court was that a state may deny the franchise to that group of convicted felons who have completed their sentences and paroles."  *Shepherd*, 575 F.2d at 1114.  And the Ninth Circuit, in a decision by Justice O'Connor (Ret.), determined that "once a felon is properly disenfranchised a state is at liberty to keep him in that status indefinitely and never revisit that determination."  *Harvey*, 605 F.3d at 1079 (*citing Richardson*, 418 U.S. at 26-27).  Years ago, writing for the Second Circuit, Judge Friendly rejected a Cruel and Unusual Punishment claim on grounds that felon disenfranchisement is not punishment and on grounds that, "if it were punishment, the framers of the Bill of Rights would not have regarded

---

1221 (11th Cir. 2020) ("However, [g]iven the fact that petitioners have advanced a broad attack on the constitutionality of Alabama's voter ID law, and because Plaintiffs seek relief that would invalidate the statute in all its applications, they bear a heavy burden of persuasion.") (internal citation and quotation marks omitted; alteration by the Court).  Thus, GBM's claim fails*, inter alia,* with the failure of any individual Plaintiffs' claim.  It also fails on its face because lifetime disenfranchisement is obviously not grossly disproportionate as to those convicted of capital murder.

it as cruel and unusual" given the prevalence of the death penalty for felonies and the prevalence of felony disenfranchisement laws.  *Green v. Bd. of Elections of City of New York*, 380 F.2d 445, 450 (2d Cir. 1967).  The conclusions of these courts are consistent with the statement of Rep. Eckley (OH), quoted by the Supreme Court in *Richardson*, that at the time the Fourteenth Amendment was being debated there was a federal law that "persons convicted of crime against the laws of the United States, the penalty for which is imprisonment in the penitentiary, are now and always have been disfranchised, and a pardon did not restore them unless the warrant of pardon so provided."  *Richardson*, 418 U.S. at 46 (internal citation omitted).  In the face of statements like these, Plaintiffs cannot demonstrate that it is grossly disproportionate to disenfranchise any of them, even for life.

* * *

Because Plaintiffs cannot demonstrate that lifetime disenfranchisement is grossly disproportionate, there is "no need for any comparative analysis" of how other States are treating felons with respect to voting rights, and their Cruel and Unusual Punishment Clause claim fails. The claim actually fails before then because felon disenfranchisement is not punishment, and because it would make the United States Constitution internally inconsistent to read the Cruel and Unusual Punishment Clause as a limitation on the State's right to disenfranchise felonies.  For all of these reasons, Secretary Merrill and Chair Snipes are entitled to summary judgment on Count 12.

**IX.    Secretary Merrill and Chair Snipes are entitled to summary judgment on Count 11 which alleges a violation of the *Ex Post Facto* Clause, Count 17 which alleges a similar claim under the Due Process Clause in the event that disenfranchisement is not punishment (which it is not), and Count 16 which relatedly alleges that Plaintiffs are subject to retroactive disenfranchisement in violation of the Due Process Clause on grounds that the State provides a right to Plaintiffs to vote which is being denied.**

Count 11 of the original complaint alleges that Ala. Const. art. VIII, § 177(b) violates the

*Ex Post Facto* Clause[19] because "moral turpitude is undefined and decided on an *ad hoc* basis" by

the Boards of Registrars in each county.  Doc. 1 at ¶ 238.  Following the enactment of Ala. Act

No. 2017-378, which is codified as amended at Ala. Code § 17-3-30.1, Plaintiffs filed a

supplemental complaint in which Count 11 alleges that "[a]s to individuals with convictions prior

to August 1, 2017, Section 17-3-30.1's application imposes retroactive punishment in violation of

the U.S. Constitution's prohibition on *ex post facto* laws"  Doc. 93 at ¶ 57.  It is not clear whether

the supplemental claim supersedes the original claim, or sits alongside it, and so Secretary Merrill

and Chair Snipes conservatively assume the latter.[20]  Both claims are dependent on the idea that

disenfranchisement is punishment and, further, that the *Ex Post Facto* Clause could bar what the

---

[19]    "Article I, § 10, of the Constitution prohibits the States from passing any 'ex post facto Law.'"  *Cal. Dep't of Corr. v. Morales*, 514 U.S. 499, 504 (1994).  The Supreme Court has "held that the Clause is aimed at laws that "retroactively alter the definition of crimes or increase the punishment for criminal acts."  *Id.* (internal citations and quotation marks omitted).

[20]    That said, the original claim would seem to be moot as it is premised on Plaintiffs' conception of moral turpitude as "undefined," doc. 1 at ¶ 238, and Ala. Code § 17-3-30.1 has provided a list of disqualifying felonies.  Doc. 72 at 11-18 (denying preliminary injunction motion grounded in Counts 6 through 10 because those Counts were mooted by the enactment of Ala. Act No. 2017-378); *id.* at 11 ("When, during the pendency of a lawsuit, the challenged law undergoes substantial amendment so as plainly to cure the alleged defect, . . . there is no live controversy for the Court to decide.") (internal citation and quotation marks omitted; alteration by the Court); *see also id.* at 25 ("Plaintiffs do not deny that [Ala. Act No. 2017-378's] comprehensive list of crimes that involve moral turpitude provides the clarity they sought for [Ala. Const. art. VIII,] § 177(b)." (internal citation, quotation marks, and footnote omitted).

Fourteenth Amendment affirmatively sanctions.  Both of those premises are wrong, as discussed at 58-71, *supra*.

In turn, Count 17 of the supplemental complaint is pled as an alternative to Count 11: Plaintiffs' allege that, if felon disenfranchisement is not punishment such that it can violate the *Ex Post Facto* Clause, then "the retroactive application of Section 17-3-30.1 to individuals with convictions predating its passage violates the Due Process Clause . . . ."  Doc. 93 at ¶ 90; *see also id.* at ¶ 85; doc. 179-1 at 14.  Relatedly, Count 16 in the supplemental complaint alleges that Secretary Merrill and Chair Snipes violate the Due Process Clause by "apply[ing] [Ala. Code § 17-3-30.1] retroactively to people with disqualifying convictions entered prior to August 1, 2017," because, they say, those felons have a State-created right to vote which they are being denied.  Doc. 93 at ¶ 81; *see also* doc. 179-1 at 12.

Because of the overlapping themes, Secretary Merrill and Chair Snipes treat Counts 11, 16, and 17 together and explain why they are entitled to summary judgment as to each Count.

### a.  Alabama law was clear at the time that the individual Plaintiffs committed their felonies that those felonies were disenfranchising.

As an initial matter, Alabama law was clear that Plaintiffs' felonies were disenfranchising at the time Plaintiffs committed those felonies, and thus Plaintiffs' allegations are not factually supported.  Counts 11 and 17 are premised on the idea that moral turpitude was, in Plaintiffs' estimation, vague, *but see Jordon v. De George*, 341 U.S. 223 (1951) (holding moral turpitude is not vague), and thus the law was not clear.  While Plaintiffs offer the claims in the abstract, this Court should evaluate them as applied to each individual Plaintiff.  "Facial challenges . . . run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied."

*Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008).  And, because the claims fail as to the individual Plaintiffs, any facial claims would also fail.  *Id.* at 450-51; *United States v. Stevens*, 559 U.S. 460, 472 (2010).[21]

Plaintiff Thompson was convicted of theft of property (1st degree) in 2005.  Doc. 1 at ¶ 38.  About 20 years earlier, the Supreme Court of Alabama said that theft involves moral turpitude.  *See Stahlman v. Griffith*, 456 So. 2d 287, 290-91 (Ala. 1984).

Plaintiff Lanier was convicted of one or two counts of burglary (1st degree), Doc. 1 at ¶ 48; *see also* Exhibit 28 at 13:9-14, based on events occurring in January 1995, Exhibit 28 at 15:18-21.  At that time—before the 1996 Constitutional Amendment at issue in this case—all felonies were disenfranchising.  *See* 21, *supra*.  Additionally, the Alabama courts had said before Lanier's 1995 felonies that burglary involves moral turpitude.  *See Ex parte McIntosh*, 443 So. 2d 1283, 1285 (Ala. 1983) (*citing Matthews* as having held that burglary involves moral turpitude); *Matthews v. State*, 286 So. 2d 91, 94 (Ala. Crim. App. 1973).

Plaintiff King was convicted of murder in 1995.  Doc. 1 at ¶ 49.  As with Plaintiff Lanier, Plaintiff King committed her felony before the 1996 Constitutional Amendment at issue in this case, and thus at a time when all felonies were disenfranchising, *see* 21, *supra*.  Further, there is no question that the Supreme Court of Alabama had recognized murder as involving moral turpitude before King's felonious actions.  *See Ex parte McIntosh*, 443 So. 2d at 1285.

Plaintiff Gamble was convicted of trafficking in cannabis around 2008.  Doc. 93 at ¶ 26.  At least 25 years prior, the Supreme Court of Alabama has explained that there was a difference

---

[21]     Plaintiff GBM has none of the injuries asserted in Counts 11, 16 and 17, and thus, as with the Cruel and Unusual Punishment claim discussed at n. 18, *supra*, GBM's claims should be treated as facial and should fall along with those of the individual Plaintiffs.

between possession for one's own use, on the one hand, and possession for resale or trafficking, on the other, with the latter involving moral turpitude. *See Ex parte McIntosh*, 443 So. 2d at 1286.

Thus, on the facts of this case, each individual Plaintiff was disenfranchised on the basis of conviction for a felony that the law clearly provided was disenfranchising at the time of the Plaintiffs' felonious actions *and* each individual Plaintiff continues to this day to be disenfranchised on the basis of that felony conviction. Thus, at all relevant times, the individual Plaintiffs' felonies have been disenfranchising: nothing has changed. The claims in Counts 11 and 17 that Plaintiffs have been subjected to consequences—punitive or not—that were unclear at the time of their offense are factually unsupported. Indeed, the complete lack of merit of the claims raises questions of standing, as the Plaintiffs have no injury and there is no relief for the Court to provide. *City of Miami Gardens v. Wells Fargo & Co.,* 931 F.3d 1274, 1282 (11th Cir. 2019).

**b. Since 1996 and through today, Ala. Const. art. VIII, § 177(b) has disenfranchised persons convicted of felonies involving moral turpitude; Ala. Code § 17-3-30.1 merely replaces the common law definition of moral turpitude with a statutory definition.**

Plaintiffs misunderstand Alabama law. They contend that Ala. Const. art. VIII, § 177(b) had no lawful effect before the Ala. Act No. 2017-378 was enacted to implement it, doc. 93 at ¶¶ 77-78, and that the legislation, as Ala. Code § 17-3-30.1, is being applied retroactively to disenfranchise persons who committed their disqualifying felonies before the legislation took effect. While it is understandable that Plaintiffs experience the law as preventing their participation in future elections based on felonies committed before the statute took effect, their legal theory is non-sense and is premised on willful blindness to the facts.

Ala. Const. art. VIII, § 177(b) provides that persons convicted of felonies involving moral turpitude are disenfranchised, until their voting rights are restored:

> No person convicted of a felony involving moral turpitude, or who is mentally incompetent, shall be qualified to vote until restoration of civil and political rights or removal of disability.

Ala. Const. art. VIII, § 177(b).  Section 177(b) has been in effect since 1996 and continues to be in effect today.  Ala. Const. art. VIII, § 177(b); Exhibit 8 at 2 (certifying passage of the proposed constitutional amendment).  On its face, the provision states that certain felons are disqualified "until restoration of civil and political rights," Ala. Const. art. VIII, § 177(b).

Section 177(b) has been implemented to disenfranchise those convicted of felonies involving moral turpitude unless the felon's rights have been restored.  For instance, the voter registration form in use when this litigation was filed provided that one eligibility requirement is not being convicted of a disqualifying felony, *see* doc. 105-3, and, in August 2016, Plaintiff Lanier was denied registration based on his felony conviction, Exhibit 28 at 12.

Before the 2017 Act, the State Attorney General understood the Alabama Constitution to disenfranchise persons convicted of felonies involving moral turpitude, explaining: "If a person is convicted of a felony involving moral turpitude, *that person is ineligible to vote unless his or her civil and political rights have been restored.  ALA. CONST. art. VIII, § 177 (amend. 579)*." Opinion to Hon. William C. Segrest, Executive Director, Board of Pardons and Paroles, dated March 18, 2005, A.G. No. 2005-092, Exhibit 18, at 4 (emphasis added).

When that Opinion prompted litigation (on grounds that *all* felons were being disenfranchised—not that none were, *Chapman v. Gooden*, 974 So.2d 972, 978, 980 (Ala. 2007)), the Supreme Court of Alabama understood the law the same way the Attorney General did, *see Chapman,* 974 So.2d at 976-83, 985-89.  Indeed, during the course of that litigation, the Court entered an Order stating: "[W]e explain, for the benefit of the voter registrars of the State of Alabama, that the quoted portion of the final order [, which it declined to stay,] means only that

pursuant to Amendment No. 579 [Ala. Const. art. VIII, § 177] the voter registrars cannot deny voter registration to an individual otherwise qualified to vote simply because he or she has been convicted of *some* felony; *denial of voter registration based on a felony conviction is appropriate only if the felony involved moral turpitude*." Order, *Worley v. Gooden*, Case No. 1051712 (Ala. Oct. 25, 2006), Exhibit 30, at 2 (emphasis added, except for initial emphasis). That is, applications to register to vote may be denied based on the disqualification in § 177(b).

And it was not just the executive and judicial branches of government who understood the law this way. The Alabama Legislature obviously thought that at least some felons were disenfranchised when it created the Certificate of Eligibility to Register to Vote program to restore voting rights to select felons in 2003, Ala. Act No. 2003-415, Exhibit 14, and then amended the program in 2016, Ala. Act No. 2016-387, Exhibit 16. If there were no disqualified felons, there would be no one in need of rights restoration aimed specifically at felons.

Accordingly, Plaintiffs' allegation that § 177(b) was not effective without implementing legislation, doc. 93 at ¶ 77, is contrary to the understanding of all three branches of Alabama government, including the State's highest court. It is also contrary to years of facts on the ground.

With that background in place, Ala. Code § 17-3-30.1 merely delineates in statute which felonies involve moral turpitude for purposes of § 177(b). It is a provision in Chapter 3 (which governs voter registration) within Title 17 (which governs elections). Thus, Ala. Code § 17-3-30.1 replaces the common law standard that was in place for effectuating § 177(b) before its enactment. Critically, Ala. Code § 17-3-30.1 operates *prospectively* on *elections* occurring after its effective date. The statute does not act retroactively as to elections, as that would be impossible without a time machine.

The Secretary of State's office has reasonably advised local election officials Ala. Code § 17-3-30.1 applies to elections occurring after its effective date.  "[I]ndeed, the Secretary encouraged Boards of Registrars to allow persons whose felony convictions were not on the Ala. Act No. 2017-378 list to register to vote even before the effective date so that they would be able to participate in a special federal election for United States Senate that took place shortly after the effective date[]."  Exhibit 27 at 37 (Interrogatory No. 14); *see also* doc. 72 at 15-16 (memorandum opinion and order).  These actions were premised on the idea that Ala. Code § 17-3-30.1 narrowed which felonies were disenfranchising, rather than—as Plaintiffs now suggest—disenfranchising felons for the first time.

Indeed, the July 2017 preliminary injunction proceedings included a declaration of George Noblin that the Montgomery County Board of Registrars had "permitted an individual convicted of a felony to register to vote [whose] felony would have been disqualifying under the old law [but] is not under the new law."[22]  Doc. 63-5 at ¶ 4.  The proceedings also included "[e]xhibits, submitted by both Plaintiffs and Defendants, [that] include compilations of coverage . . . and confirm that there have been no less than thirty-five sources of publicity about Alabama's laws on felon disenfranchisement, with most of those sources also reporting on HB 282."  Doc. 72 at 28.[23]

These actions are consistent with the factual reality that felons were disenfranchised by Ala. Const. art. VIII, § 177(b) before Ala. Code § 17-3-30.1 was enacted, just as they continue to be today.  Plaintiffs' contention that Ala. Code § 17-3-30.1 can only disenfranchise persons who commit their felonies after the effective date of that statute relies on the flawed premise that Ala. Const. art. VIII, § 177(b) was ineffective until implementing legislation was passed.

---

[22]     At the time of his declaration, Mr. Noblin was a defendant in this case.  He is now deceased.

[23]     House Bill 282 became Ala. Act No. 2017-378 and was codified at Ala. Code § 17-3-30.1.

Moreover, Plaintiffs' interpretation would simultaneously create an administrative nightmare and undermine the Legislature's intent in enacting Ala. Code § 17-3-30.1.  Plaintiffs would have anyone whose disenfranchising felony predates Ala. Code § 17-3-30.1 be governed by a different standard than the one set out in the statute.  They assume those persons would be allowed to vote because they believe § 177(b) was ineffective, but it was not (as just set out).  Thus, under Plaintiffs' interpretation of the "prospective" application of Ala. Code § 17-3-30.1, any felon who committed his disenfranchising felony before the effective date of Ala. Act No. 2017-378 would be governed by the common law standard Plaintiffs' challenged, while any felon who committed his disenfranchising felony after the effective date of Ala. Act No. 2017-378 would be governed by the statutory standard.  This scenario would keep the original standard in place for decades to come *and* add a new complexity to it.  That was plainly not what the Legislature set out to do.

"Where, as here, [the] Court is called upon to construe a statute, the fundamental rule is that the court has a duty to ascertain and effectuate legislative intent expressed in the statute, which may be gleaned from the language used, the reason and necessity for the act, and the purpose sought to be obtained."  *Ex parte Holladay*, 466 So. 2d 956, 960 (Ala. 1985); *see also Pace v. Armstrong World Indus., Inc.,* 578 So. 2d 281, 283 (Ala. 1991) ("We may also look to the reason and necessity for the statute and the purpose sought to be obtained by enacting the statute.") (*citing Ex parte Holladay*); *State v. T. R. Miller Mill Co.*, 130 So. 2d 185, 188 (Ala. 1961) ("In determining and giving effect to the legislative intent, courts may look to the history of a statute and the purpose sought to be accomplished, conditions which led to its enactment, ends to be accomplished and evils to be remedied; a rational, sensible and liberal construction with due consideration of the practical effect should be reached in ascertaining a dubious legislative intent."); *Forty Three*

84

*Investments, LLC v. Water Works Bd. of City of Birmingham*, ___ So.3d ___, 2020 WL 2091815 (Ala. Civ. App. 2020) (*citing T. R. Miller Mill Co.*); *McGuire Oil Co. v. Mapco, Inc.*, 612 So.2d 417, 422 (Ala.1992) ("In construing a statute, the intent of the legislature, as expressed in the statute is ascertained and effectuated, and that intent may be gleaned from considering the language used, the reason and necessity for the act, and the goals sought to be accomplished.").

The Legislature found and declared that "there [was] no comprehensive list of felonies that involve moral turpitude" such that felons and election officials did not have the benefit of the same. Ala. Code § 17-3-30.1(b)(1)(b).  As set out in the law itself, the Legislature sought "[t]o give full effect" to § 177(b), "[t]o ensure that no one is wrongly excluded from the electoral franchise," and "[t]o provide a comprehensive list."  Ala. Code § 17-3-30.1(b)(2).  Under Plaintiffs' reading, the Legislature failed miserably, taking no action as to the thousands of then-convicted felons and instead merely put in place the building blocks for a uniform system that would not be fully effective until the last then-existing felon died or had his rights stored.  If the Court thought Plaintiffs' theory had any validity, it could consider these results in rejecting the theory. *Volkswagen of Am., Inc. v. Dillard*, 579 So. 2d 1301, 1305 (Ala. 1991) ("[I]f the statute is ambiguous or uncertain, the Court may consider conditions that might arise under the provisions of the statute and examine the results that will flow from giving the language in question one particular meaning rather than another.").

To the extent the Court has any doubt about the correctness of the State Defendants' interpretation of State law (and assuming the claims cannot be decided without resolving the issue), the Court should certify the question to the Supreme Court of Alabama pursuant to Ala. R. App. P. 18.  The question of how Alabama law should be interpreted can only authoritatively be decided by that court. *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975) ("This Court, however, repeatedly

has held that [S]tate courts are the ultimate expositors of [S]tate law, and that we are bound by their constructions except in extreme circumstances not present here.") (internal citations and footnote omitted).

To the extent necessary to meet Plaintiffs' arguments, Secretary Merrill and Chair Snipes incorporate herein the discussions in this brief explaining: (1) disenfranchisement is not punishment, *see* 58-68, *supra*; (2) the State has valid non-punitive reasons for disenfranchising felons, *see* 30-32, *supra*; (3) the State has the constitutional authority to set qualifications for voters, *see* 133-35, *infra*, and, (4) the moral turpitude standard, *see* 32-35, *supra.*

\* \* \*

Secretary Merrill and Chair Snipes are entitled to summary judgment on Counts 11, 16, and 17.

## X.    Chair Gwathney is entitled to summary judgment on Count 13, which alleges wealth discrimination in violation of the Equal Protection Clause.

Alabama's Certificate of Eligibility to Register to Vote process makes it possible for some disenfranchised felons to get their voting rights back without going through the more time-consuming and discretionary pardon process.  Ala. Code § 15-22-36.1.  As pertinent to Count 13, to be eligible for a CERV the felon must have "paid all fines, court costs, fees, and victim restitution ordered by the sentencing court at the time of sentencing on the disqualifying cases." Ala. Code § 15-22-36.1(a)(3).  Plaintiffs Thompson, Gamble and Greater Birmingham Ministries challenge this requirement as wealth-based discrimination.  Doc. 1 at ¶¶ 245-52; doc. 93 at ¶¶ 65-69.  Count 13 is brought only against Chair Gwathney, doc. 1 at ¶¶ 245-252; doc. 93 at ¶¶ 65-69, and she is entitled to summary judgment on it.

### a. Background.

### i. The Florida litigation.

Count 13 raises the same wealth discrimination claim that was recently litigated in Florida. In November 2018, Florida voters adopted a constitutional amendment (Amendment 4) that automatically re-enfranchises most felons "upon completion of all terms of sentence." *Jones v. Governor of Fla.*, 950 F.3d 795, 800 (11th Cir. 2020) (*per curiam*); Fla. Const. art. VI, § 4. The Florida Legislature enacted implementing legislation which, pertinent here, said that completing the sentence includes satisfying the financial terms of the sentence. *Jones*, 950 F.3d at 803. In response to the Governor's request for an advisory opinion, the Supreme Court of Florida agreed, holding that "'all terms of sentence' encompasses not just durational periods but also all" "fines, restitution, costs, and fees" "imposed in conjunction with an adjudication of guilt." *Advisory Opn. to the Governor re: Implementation of Amendment 4, The Voting Restoration Amendment*, 288 So. 3d 1070, 1072 (Fla. 2020) (*per curiam*).

Federal court plaintiffs moved for a preliminary injunction arguing that the requirement amounted to, *inter alia*, wealth discrimination in violation of the Equal Protection Clause. *Jones v. DeSantis*, 410 F. Supp. 3d 1284, 1289-90 (N.D. Fla. 2019). The district court correctly determined as follows:

> So a state can properly disenfranchise felons, even permanently, and if the state decides to restore the right to vote to anyone, the state can exercise discretion in choosing among the candidates. Consistent with this considerable leeway, a state can rationally choose to take into account not only whether a felon has served any term of imprisonment and supervision but also whether the felon has paid any financial obligation included in the sentence. A state can rationally decide that the right to vote should not be restored to a felon who is able to pay but chooses not to do so. Indeed, a state's decision not to restore the vote to such a person survives even strict scrutiny, so long as it is recognized, as *Richardson* requires, that the Constitution affirmatively allows disenfranchisement.

*Jones*, 410 F. Supp. 3d at 1300.

With respect to those unable to pay, the *Jones* district court concluded that Florida must "put in place an appropriate procedure through which an individual plaintiff may register and vote if otherwise qualified and genuinely unable to pay outstanding financial obligations." *Jones*, 410 F. Supp. 3d at 1303.  "When a felon claims inability to pay, the State need not just take the felon's word for it. The State may properly place the burden of establishing inability to pay on the felon and, to that end, may put in place an appropriate administrative process.  That this places a greater burden on the felon claiming inability to pay than on felons with no unpaid obligations is unavoidable and not improper." *Id.*  Importantly, the court entered a preliminary injunction in favor of only the 17 individual plaintiffs.  *Id.* at 1310-11.  Nowhere did the court explain what genuine inability to pay looks like, or how many elections a felon *who can afford to pay* may constitutionally miss while paying the legal financial obligations imposed due to a felony conviction.

On appeal from the preliminary injunction ruling, a panel of the Eleventh Circuit noted that "Each plaintiff is a felon who has alleged that he or she would be eligible for re-enfranchisement under Amendment 4 but for non-payment of outstanding [legal financial obligations]. Each plaintiff has also alleged that he or she is *indigent* and, therefore, *genuinely unable* to pay those obligations." *Jones*, 950 F.3d at 800 (emphasis added); *see also id.* at 811 ("for *these* seventeen plaintiffs, who are indigent and genuinely unable to pay despite good faith efforts").  The Eleventh Circuit recognized that the preliminary injunction was limited to the named plaintiffs, *id.* at 805, 807, and even rejected a State interest in avoiding the burden of developing an administrative process to implement the district court's injunction because it only applied to the 17 plaintiffs and not to thousands more alleged to be similarly situated, *id.* at 813.  The Eleventh Circuit recognized that "the [district] court did not define the term 'genuine inability to pay,' again leaving it to the

State to make a reasonable, good faith determination of how it could implement that term consistent with the court's order." *Id.* Indeed, Florida "is free to consider any reasonable factors including current assets and liabilities, income, and *bona fide* efforts the felon has made to pay." *Id.* at 830. The appellate court never made a determination about whether the Plaintiffs were genuinely unable to pay, *see id.* at 816 ("the plaintiffs in this case, *if* they are genuinely unable to pay") (emphasis added), and the court never articulated a standard for making such a determination.

The bulk of the panel's opinion is spent on determining the standard of review (the Court settled on strict scrutiny) and offering *dicta* about whether Florida's scheme would survive under the rational basis review it rejected. *Jones*, 950 F.3d at 807-25. During the course of its discussion, the Court raised facts about Florida that are not present in this record. For instance, Florida converts criminal monies owed to civil liens if a felon is unable to pay, and these liens are part of what must be paid under Florida's implementing legislation. *Id.* at 803 & n. 4. Additionally, 80.5% of felons had outstanding legal financial obligations due and nearly 60% owed at least $500. *Id.* at 815. The Court also noted a Florida Court Clerks and Comptroller's 2018 Annual Assessments and Collections Report and general information about legal financial obligations scheme, like a mandatory fine of up to $750,000. *Id.* at 816. There is nothing comparable in the record in this case. In fact, Alabama has a general fine schedule that tops out at $60,000; specific crimes may carry higher fines. Ala. Code § 13A-5-11.

The Florida district court certified a plaintiff class in early April. *Jones v. DeSantis*, Case No. 4:19-cv-300-RH-MJF, doc. 321 (N.D. Fla. April 7, 2020). The case was tried in late April and early May, *Jones v. DeSantis*, Case No. 4:19-cv-300-RH-MJF, docs. 387, 390, 392, 399, 401,

407, 410, 418 (N.D. Fla. 2020) (minute entries for 8 days of trial).  The district court rendered its

decision in late May, *Jones v. DeSantis*, ___ F. Supp.3d ___, 2020 WL 2618062 (N.D. Fla. 2020).

As Plaintiffs' have noted, the district court "create[d] a rebuttable presumption of inability

to pay for individuals that had an appointed attorney or [were] granted indigent status in the last

proceedings that resulted in a felony conviction or [who] submit an affidavit of inability to pay."

Doc. 215-30 n. 13 (internal citations and quotation marks omitted).  The first elements of this

standard – appointed counsel and indigent status – speak to events that may be years or decades

stale, and not necessarily to current ability to pay.  The latter – an affidavit – appears contrary to

the court's earlier assertion that "the State need not just take the felon's word for it."  *Jones*, 410

F. Supp. 3d at 1303.

The Florida Governor and Secretary of State promptly appealed.  *Jones v. DeSantis*, Case

No. 4:19-cv-300-RH-MJF, doc. 422 (N.D. Fla. May 29, 2020).  The Eleventh Circuit stayed most

of the trial court's final judgment, expedited the appeal, and granted initial hearing *en banc*.  *See*

n. 14, *supra*.

### ii.   Restoration of voting rights through pardons and CERVs.

Section 177(b) of the Alabama Constitution provides that "No person convicted of a felony

involving moral turpitude, or who is mentally incompetent, shall be qualified to vote *until*

*restoration of civil and political rights* or removal of disability."  Ala. Const. art. VIII, § 177(b)

(emphasis added).  When that provision was adopted in 1996, the Alabama Board of Pardons and

Paroles had "the authority and power, after conviction and not otherwise, to grant pardons and

paroles and to remit fines and forfeitures" "[i]n all cases, except treason and impeachment and

cases in which sentence of death is imposed and not commuted."  Ala. Code § 15-22-36(a).  The

ABPP has the same power today.  *Id.*  "Between January 1, 2015 and April 30, 2020, the Board of

Pardons and Paroles held 4,083 pardon hearings and granted a pardon about 75% of the time, resulting in 3,080 pardons."   Doc. 222-1 at 4-5 (Interrogatory No. 1).

The ABPP has produced additional evidence about the pardon process in the form of its testimony pursuant to Fed. R. Civ. P. 30(b)(6).  Doc. 211-5.  Eddie Cook was, at the time of the testimony, the Executive Director of the Board, and he had previously spent about nine months serving on the Board.  Doc. 211-5 at 17:9-11; *id.* at 20:9-12.  He testified that monies owed is one important factor the Board Members consider in determining whether to grant a pardon, *id.* at 31:14-32:8, 48:12-51:2, 56:8-11, 57:22-58:5, and he explained at least some of the reasons why it is important that the felon have paid his monies due, or "made great efforts to pay that," *id.* at 45:15-46:8; 99:9-23.  For instance, it indicates rehabilitation, *id.* at 45:15-46:8, as well as remorse and a desire to do right, *id.* at 99:9-23.

Owing monies is not a disqualifier that will prevent a felon from even being considered by the Board.  Doc. 211-5 at 37:2-38:19; *id.* at 42:19-43:13.  Mr. Cook testified that the Board has sometimes denied pardons because of monies owed, *id.* at 59:7-13, but Plaintiffs' counsel did not follow up for any details, *id.* at 93:16-94:3.  During Mr. Cook's service on the Board, there were a "few cases" where pardons were denied *despite* monies due where "the person had shown a history of continuous paying for years." *Id.* at 71:9-12, 72:14-22.

Chair Gwathney has produced evidence in this case of a pardon and remission where significant court-ordered monies were due.  In 1998, Odeana Fields was convicted of trafficking in cocaine.  Doc. 222-2 at 5.  He was sentenced to 30 years and fined $50,000, as well as ordered to pay $2,000 in other assessments.  *Id.*  In 2014, the District Attorney filed a motion to remit the DA collection fee balance, *id.* at 6, which the State court granted, *id.* at 7.  The ABPP "granted

Mr. Fields a pardon and remitted his trafficking fine in full ($48,289.16) . . . ."  *Id.* at 8; *see also id.* at 9-12.

Separate from pardons, in 2003 that Alabama Legislature affirmatively created the CERV process specifically to restore the voting rights of selected felons, and in 2016 it revised the process.   Ala. Code § 15-22-36.1.   A CERV is available only to felons who meet certain requirements.   They must have been convicted of a felony of moral turpitude, Ala. Code § 15-22-36.1(a)(1), but not one of the enumerated felonies deemed too heinous to allow participation in the CERV program, Ala. Code § 15-22-36.1(a)(1) & (g).   The felon must not have any "criminal felony charges pending against him or her in any state or federal court,"  Ala. Code § 15-22-36.1(a)(2), and must have been "released upon completion of sentence," have been pardoned, or have "successfully completed probation or parole and ha[ve] been released from compliance by the ordering entity,"  Ala. Code § 15-22-36.1(4)(a)-(c).   Additionally, and pertinent here, the felon must have "paid all fines, court costs, fees, and victim restitution ordered by the sentencing court at the time of sentencing on disqualifying cases."  Ala. Code § 15-22-36.1(a)(3).   Thus, in order to be eligible for a CERV, a felon need not first pay court-ordered monies due on felonies that do not involve moral turpitude, court-ordered monies due on misdemeanors, or any post-sentence fees.  *See id.*

The CERV program is not required by the federal or State Constitutions; it was enacted by statute as a matter of sovereign grace.   It is also not automatic.   Felons seeking restoration of their voting rights must apply for a CERV and await ABPP's determination of whether they meet the requirements set out in Ala. Code § 15-22-36.1(a).   If these requirements are met, the CERV is issued; CERVs are not discretionary the way pardons are.   Ala. Code § 15-22-36.1(b).   The ABPP

is statutorily required to issue the CERV or issue a letter of denial by the 44th day after the felon has applied.  Ala. Code § 15-22-36.1(c)-(f); *see also* doc. 222-3 at ¶ 4.

### iii.  Plaintiff Treva Thompson.

Plaintiff Thompson pled guilty to theft of property in the first degree in 2005.  Doc. 1 at ¶ 38; doc. 222-4 at 13:5-14.  As a result of the plea, she avoided jail, but spent five years on probation and was required to pay nearly $36,000 in *restitution*.  Doc. 222-4 at 18:10; doc. 215-4 at 6 (reflecting R001 in the amount of $2,500.00 and R002 in the amount of $33,465.06, for a total of $35,965.06).[24]  There were some other minor assessments as well, doc. 215-4, and Thompson was later assessed a DA collection fee of $10,124.12[25] when she failed to comply the terms of the plea agreement with regard to paying the court-ordered monies.  Doc. 222-4 at 32:5-10; doc. 215-4 at ¶ 5; doc. 215-4 at 10 (D999 Amount).  In 2017, Thompson's income was approximately $13,500.  Doc. 222-4 at 34:5-8.  In 2019, her income was approximately $26,929, doc. 215-4 at ¶ 6, or about double her 2017 income.  She is not indigent.  Nonetheless, she has not made a payment toward her court-ordered monies in nearly five years.  Doc. 215-4 at 10 (Last Paid Date); *see also* doc. 222-4 at 5 (Interrogatory No. 9).

Thompson helps support her children and her seven grandchildren, but her children are grown and she has not said she has custody of (and thus legal responsibility for) any of her grandchildren.  Doc. 222-5 at 5-6 (Interrogatory No. 10); doc. 215-4 at ¶ 7; doc. 222-4 at 32:23-33:1; 34:12-13.  She says she "likely spend[s], at most, $150 a month" on purchases for her children and grandchildren, and that she makes payment on a loan for which she co-signed.  Doc.

---

[24]    *See also* Ala. Code § 15-18-65 (Legislative findings and purpose); Ala. Code § 15-18-67 & Ala. Code § 15-18-69 (hearings and findings); Ala. Code § 15-18-68 (criteria for determining restitution).

[25]    This DA collection fee is a post-sentencing fee and thus need not be paid in order for Thompson to be eligible for a CERV. Ala. Code § 15-22-36.1(a)(3).

222-5 at 5-6 (Interrogatory No. 10).  When she recently received $2,200 in the form of an Economic Impact Payment, *id.* at 4 (Interrogatory No. 7), she spent it on car repairs and payments to creditors, *id.* at 6 (Interrogatory No. 11), but made no payment on her court-ordered monies.[26] In short, she prioritizes other expenses over the court-ordered monies that she agreed to pay as part of a plea deal that kept her out of jail.

### iv.  Plaintiff Darius Gamble.

In 2006, Plaintiff Gamble was pulled over by the DEA and found to be in possession of more than $10,000 in cash and a registered 380 pistol.  Doc. 222-6 at 20:8-21:4; 33:23-35:12.  At the time, there was approximately 30 or 35 pounds of cannabis on the way to his house *via* mail. *Id.* at 27:6-14; 29:15-17.  In early 2008, Gamble entered into a plea agreement, doc. 215-10 at 14, and was sentenced accordingly, doc. 215-10 at 15.  Specifically, he was sentenced to 10 years which was split with three years to serve and the remainder suspended for five years of supervised probation.  *Id.*  He had spent some time in jail after his arrest, and was thus released in 2009, having served his three years.  Doc. 222-6 at 30:11-31:14.  He then served his five years on probation.  *Id.* at 35:20-22.

In addition to the time in custody and on probation, Gamble was sentenced to pay a $50,000 fine and some minor assessments.[27]  Doc. 215-10 at 15.  The plea agreement and then the sentencing order provided that all the court-ordered monies were due by February 11, 2016; otherwise, a 30% collection fee would be added "and the District Attorney shall pursue collection."

---

[26]    She also did not spend that money on the "medical procedure" she says she needs. *Compare* doc. 215-4 at ¶ 8 *with* Doc. 222-5 at 6 (Interrogatory  No. 11).

[27]    *See also* Ala. Code § 13A-5-2(b) (authorizing a sentence of a fine in addition to imprisonment); Ala. Code § 13A-5-11 (generally applicable caps on fines for felonies, if no specific statute provides otherwise).

Doc. 215-10 at 14-15.  February 2016 was eight years after sentencing, *id.*, and more than six years after Gamble was released from prison in 2009, doc. 222-6 at 30:20-22; 49:7; 50:4-5.

Shortly after his release, Gamble started making payments of $50 toward his court-ordered monies, but his monthly payments dropped to $25 in July 2016.  *See State of Alabama v. Darius L. Gamble*, Case No. CC-2006-001468.00 (Shelby Co. Circuit Court); *see also* doc. 222-6 at 49:7-12; 52:12-16.  After the February 2016 deadline had rolled by without Gamble having met his commitment, the DA collection fee was added, and someone reached out to Gamble to see how much he could pay.  Doc. 222-6 at 56:19-58:13.  That conversation resulted in Gamble paying only $25 per month.  *Id.* at 56:19-58:13.  Gamble testified that he was originally paying $50 per month because that was the court order, *id.* at 54:12-14, and that he is now paying $25 per month because it was negotiated that way, *id.* at 58:10-13; *see also* doc. 215-6 at ¶ 12; doc. 222-7 at 7 (Interrogatory Nos. 17 & 18).  Of course, before anyone agreed to accept $25 per month, Gamble agreed to pay in full by February 2016 and did so as part of a plea agreement to resolve his arrest.  Doc. 215-10 at 14-15.

Last year, Gamble wrote to the State court of conviction.  Docs. 215-6 at 13-15.  The local District Attorney's office understood Gamble to be asking that his fine be remitted, and an ADA filed an opposition to that request.  Doc. 215-10 at 2.  The DA's response also indicated that the statute pursuant to which Gamble pled and was sentenced carried a fine of $25,000, not $50,000.  Doc. 215-10 at 3-4, 8-11.  The DA moved, "in the ends of justice and fairness" that the fine be reduced from $50,000 to $25,000 and that the collection fee (which is a percentage of the balance) likewise be reduced.  Doc. 215-10 at 8-11.  The State court granted the DA's motion.  Doc. 215-6 at 17.   Gamble currently owes a little more than $20,000 on his fine and some minor other

assessments.  Doc. 222-7 at 3 (Interrogatory No. 2); *See State of Alabama v. Darius L. Gamble*, Case No. CC-2006-001468.00 (Shelby Co. Circuit Court).

Gamble also owes nearly $6,000 on the DA collection fee.  *See State of Alabama v. Darius L. Gamble*, Case No. CC-2006-001468.00 (Shelby Co. Circuit Court).  That money need not be paid before he is eligible for a CERV.  Ala. Code § 15-22-36.1(a)(3) ("at the time of sentencing").  However, Gamble's monthly payments are being applied to the DA collection fee.  *See State of Alabama v. Darius L. Gamble*, Case No. CC-2006-001468.00 (Shelby Co. Circuit Court).  The Alabama Administrative Office of Courts created a form, doc. 215-2, to assist felons in having the application of their payments reprioritized.  Gamble has never requested reprioritization.  *State of Alabama v. Darius L. Gamble*, Case No. CC-2006-001468.00 (Shelby Co. Circuit Court).

As Gamble continues to pay the DA collection fee, and make no progress whatsoever on the underlying criminal fine, he is earning $72,599 annually, Doc. 222-7 at 4 (Interrogatory No. 4). That amount reflects a raise of more than $4,000 since his deposition, doc. 222-6 at 60:16-17, though his payments on his court-ordered monies have not changed during that time.  Gamble is clearly paying as little as he is allowed, rather than as much as he can, *i.e.,* making best efforts.

In January 2020, Gamble had about $2,500 in a savings account.  Doc. 222-7 at 4 (Interrogatory No. 8).  Since he purchased his home in February 2014, he has made approximately $3,500 in extra payments on the principal.  *Id.* at 6 (Interrogatory No. 13).  Indeed, at his deposition it was clear he was spending more on extra payments on the mortgage than on his court-ordered monies each month.  *See* doc. 222-6 at 68:21-69:11 (reflecting that he pays about $1,100 monthly on his mortgage) & Exhibit 16 thereto (doc. 222-6 at 42) (reflecting an amount due of $1,042.96 and a prior payment of $1,100, or $57.04 above the amount due).

Since January 1, 2015, Gamble had donated about $3,000 to United Way through a campaign at his office.  Doc. 222-7 at 5 (Interrogatory No. 9).  And, since he joined this lawsuit on March 1, 2018, Gamble has spent approximately $5,000 on his two adult children[28], *id.* at 6 (Interrogatory No. 14); doc. 222-6 at 63:19-67:18, and more than $13,000 on expenses for his mother, doc. 222-7 at 5-6 (Interrogatory No. 15).  If the nearly $5,000 he has spent on life insurance for his mother is in addition to the other payments he has made on her behalf, then he has spent nearly $19,000 on his mother in just over two years.  *Id.*

Of the $1,200 Economic Impact Payment he received earlier this year, Gamble spent $50 on two months' worth of court-ordered monies, Doc. 222-7 at 5 (Interrogatory No. 10), and that was as a substitute for his usual payment, not in addition thereto, *State of Alabama v. Darius L. Gamble*, Case No. CC-2006-001468.00 (Shelby Co. Circuit Court).  He directed $750 to other debt.  Doc. 222-7 at 5 (Interrogatory No. 10).  Gamble also has a little more than $100,000 in a retirement account though work, which he says he cannot borrow from to pay his court-ordered monies.  *Id.* at 4 (Interrogatory Nos. 5 & 6).  He has spent approximately $4,500 to resolve other arrests since his 2009 release, though he says much of this was put on a credit card, *id.* at 5 (Interrogatory No 11), and he has acquired other debt as well, *id.* at 5-6 (Interrogatory No. 12).

### v.  Plaintiff Greater Birmingham Ministries.

The supplemental complaint added Greater Birmingham Ministries to the Plaintiffs bringing Count 13.  *Compare* doc. 1 at ¶¶ 245-52 *with* doc. 93 at ¶¶ 65-69.  "GBM regularly works to register, educate, and increase turnout among African-American and Latino voters, as well as low-income voters in general."  Doc. 223-1 at ¶ 4.  "Among its other election-related activities,

---

[28]     Gamble has four children.  Doc. 222-6 at 64:3-4.  Two are minors for whom he owes child support.  *Id.* at 62:8-63:18.  The other two are adults.  *Id.* at 63:19-64:2; 65:9-14.

each year GBM helps hundreds of formerly incarcerated men and women seeking to restore their voting rights and register to vote." *Id.* at ¶ 7. GBM alleges that it is able to register fewer voters because of the court-ordered monies requirement, *id.* at ¶ 9, and that "[t]he time and resources" GBM spends helping felons who are unable to vote due to the court-ordered monies requirement "diverts resources away from GBM's other voter registration initiatives," *id.* at ¶ 10, and other priorities, *id.* at ¶ 11.

GBM is suing based on these injuries to itself, and not on behalf of third parties. *Cf. Jacobson v. Fla. Sec'y of State*, 957 F.3d 1193, 1204-05 (11th Cir. 2020) (discussing associational standing and organizational standing). It "must prove (1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Id.* at 1201. It is not clear that GBM has an injury that would be redressed by a favorable decision on this Count because *Jones* does not demand that Chair Gwathney cease enforcing its court-ordered monies requirement as to all felons; indeed, *Jones* authorizes an administrative process to require felons to establish a genuine inability to pay before exempting them from the court-ordered monies requirement of Ala. Code § 15-22-36.1(a). *Jones*, 410 F. Supp. 3d at 1303; *Jones,* 950 F.3d at 805. Such a process would continue to require felons to determine if they have outstanding court-ordered monies. In addition, felons may continue to assess whether they believe themselves able to pay, and, if they answer in the negative, they may then invoke whatever administrative process ABPP puts in place (if required to do so). To the extent that GBM wishes to continue assisting these felons, there is no reason to believe its workload would be decreased, rather than increased, by a new administrative process implemented pursuant to *Jones*. This practical result undermines GBM's organizational interests in requiring a new process and thus its standing. *See Greater Birmingham Ministries v. Alabama*, 161 F. Supp. 3d 1104, 1114-15 (N.D. Ala. 2016)

(doubting that GBM's injury was redressable because granting an injunction as to the positively identify provision of Alabama's photo ID requirement would not affect GBM's "interests and efforts in educating the voters about obtaining a photo ID"); *cf. Thole v. U.S. Bank N.A.,* 590 U.S. ____, 140 S.Ct. 1615, 1622 (2020) (holding that the plaintiffs lacked an injury because "[w]inning or losing this suit would not change" the plaintiffs' monetary interests).

### vi.   Consideration of inability to pay in Alabama State courts.

Former Alabama Circuit Judge Tim Jolley testified in this case that, at sentencing, he would consider a criminal defendant's ability to pay certain court-ordered monies, if the issue is raised by defense counsel.  Doc. 209-2 at 49:5-50:2; 136:20-138:9; 141:2:143:1.  Where he presided, "[t]he DA's office basically doesn't fine people in felony cases," *id.* at 138:3-4, so fines are presumably not part of the court-ordered monies he was discussing.  He testified that inability to pay can be raised after sentencing during a probationary period, and, under certain circumstances, even later.  *Id.* at 138:10-139:6.  Judge Jolley also testified that "the law requires that the court take into consideration the defendant's ability to pay in – in setting the amount of restitution.  In other words, if someone comes into court and they're claiming $40,000 in restitution, but the defendant can't pay that, the court is supposed to set restitution at an amount that the defendant can pay.  And that's after a hearing, after a due process hearing, or in the event that the parties can agree on an amount as well."  *Id.* at 140:8-18; *see also* Ala. Code § 15-18-65 (Legislative findings and purpose); Ala. Code § 15-18-67 & Ala. Code § 15-18-69 (hearings and findings); Ala. Code § 15-18-68 (criteria for determining restitution); *Hurd v. State*, 68 So.3d 219 (Ala. Crim. App. 2010) (remanding with instructions where restitution order did not set out specific findings).

Alabama Rule of Criminal Procedure 26.11 speaks to factors to consider in imposing restitution as well as factors to consider in imposing a non-mandatory fine.  It also provides that

court costs are part of the penalty.  While Rule 26.11 does not state who has the burden of proof, the Alabama Court of Criminal Appeals recently held that the burden is on the defendant to present evidence of inability to pay.  *State v. R.B.F.,* ___ So.3d ___, 2020 WL 1228015 (Ala. Crim. App. 2020) (juvenile case where only Rule 26.11 applies and not Ala. Code § 15-18-68).

> **b.  Alabama's court-ordered monies requirement is constitutional under rational basis review.**

Alabama's court-ordered monies requirement should be evaluated under rational basis review.  This is the correct standard of review generally, and it is appropriate because Plaintiffs' Thompson and Gamble are not genuinely unable to pay their restitution and fine, respectively, and they are not acting in good faith.  Plaintiff GBM, in asserting its interests and not those of some indigent third party, must be permitted to attack the requirement only in a broad way in order to avoid Article III problems.   Under rational basis review, Alabama's court-ordered monies requirement survives.

Plaintiffs Thompson and Gamble are distinguishable from the named plaintiffs in the Florida litigation. The Eleventh Circuit panel spoke in terms of "*these* seventeen plaintiffs, who are indigent and genuinely unable to pay despite good faith efforts." *Jones,* 950 F.3d at 811.  Later in the analysis, the opinion speaks to felons who are unable to pay "despite their best efforts for reasons beyond their control."  *Id.* at 817; *see also id.* at 822 ("on account of their indigency and inability to pay for reasons wholly beyond their control").   And, while the Court expressed concerns about missing elections, it never expressly stated that a felon who cannot pay his court-ordered monies in full before the next election (whenever it happens to be) is one who is unable to pay.  Such a broad exception, which Plaintiffs support, doc. 215 at 5, 7, 9, would swallow the rule.

Plaintiffs Thompson and Gamble are not indigent.  Thompson's annual income for 2019 was just under $27,000, doc. 215-4 at ¶ 6, and Gamble's current annual salary is $72,599, doc.

222-7 at 4 (Interrogatory No. 4).  As a result, this Court should only examine Ala. Code § 15-22-

36.1(a)(3)'s court-ordered monies requirement under rational basis review—a review the

requirement would have "little trouble" passing.  As Justice O'Connor explained when sitting with

the Ninth Circuit:

> We have little trouble concluding that Arizona has a rational basis for restoring voting rights only to those felons who have completed the terms of their sentences, which includes the payment of any fines or restitution orders. Just as States might reasonably conclude that perpetrators of serious crimes should not take part in electing government officials, so too might it rationally conclude that only those who have satisfied their debts to society through fulfilling the terms of a criminal sentence are entitled to restoration of their voting rights. *See Madison v. State*, 161 Wash.2d 85, 163 P.3d 757, 771 ([Wash.] 2007) [(*en banc*)]; *see also Owens v. Barnes*, 711 F.2d 25, 27–28 (3d Cir.1983) (scheme restoring voting rights to unincarcerated felons satisfies rational basis review).

*Harvey v. Brewer*, 605 F.3d 1067, 1079-80 (9th Cir 2010).  Even the Eleventh Circuit panel

recognized that if rational basis review only looks at whether the legal financial obligations

requirement "has some conceivable relation to a legitimate interest of the state, we would readily

say that the [legal financial obligation] as applied to the whole class of felons is rational."  *Jones*,

950 F.3d at 814.

The Eleventh Circuit did continue by saying that it could be problematic, even under

rational basis review, if most felons were genuinely unable to pay, *Jones*, 950 F.3d at 814-15, but

that *dicta* makes as much sense as saying the requirement that felons complete their sentences may

not be rational if most of the disqualified felons are unable to do so during their lifetimes.  The

absurdity of this analysis is brought home if one imagines a scenario where the only felons a State

disenfranchises are those convicted of murder, since murderers can, and should, be expected to

experience long terms of incarceration and supervision.  The court-ordered monies requirement is

not a rule intended to generally govern the masses in a reasonable manner, but a requirement

intended to select among all disenfranchised felons those worthy of re-enfranchisement.  The

federal courts have no basis for demanding that, if Alabama chooses to re-enfranchise some felons, it must choose to re-enfranchise *most* of them.  *Jones*, 410 F. Supp. 3d at 1300 ("So a state can properly disenfranchise felons, even permanently, and if the state decides to restore the right to vote to anyone, the state can exercise discretion in choosing among the candidates."); *Harvey*, 605 F.3d at 1079-80 (quoted just above); *cf. Johnson v. Governor of State of Florida*, 405 F.3d 1214, 1234-35 (11th Cir. 2005) (*en banc*) (which felons to be enfranchised is a policy choice for the States, not the federal courts); *Richardson*, 418 U.S. at 55 (policy arguments from *amici* should be directed elsewhere).

Further distancing themselves from the *Jones* panel's holding, Plaintiffs Thompson and Gamble have not made good faith efforts to pay, even as they reaped the benefits of their plea agreements.  Thompson has not made a payment in nearly five years.  Gamble is paying as little as he can get away with paying, rather than as much as he can afford.  Moreover, each agreed to pay their court-ordered monies pursuant to plea agreements that resolved their criminal conduct in a more favorable manner than might have otherwise occurred, and they have not lived up to their ends of those bargains.  Thus, Plaintiffs Thompson and Gamble are not entitled to relief under *Jones*.  They are not "indigent and genuinely unable to pay despite good faith efforts," *Jones*, 950 F.3d at 811, or "best efforts [and] for reasons beyond their control."  *Id.* at 817; *see also id.* at 822 ("on account of their indigency and inability to pay for reasons wholly beyond their control"). Instead, their claim must be evaluated under rational basis review, which it fails.

In addition to the State's interests in protecting the ballot box, which are detailed at 30-32, *supra*,  the State has a rational basis in not being required to build an administrative state to sort through who is and is not able to pay their court-ordered monies.  Florida likewise asserted an interest in avoiding "the administrative costs associated with conducting individualized

determinations of ability to pay." *Jones*, 950 F.3d at 813. The *Jones* panel recognized that "ease of administration and reduction of costs may be a legitimate state interest," *id*., but rejected that interest on appeal of the preliminary injunction motion because the relief was limited to only the 17 named plaintiffs, *id*. These are, however, appropriate considerations at summary judgment, especially since GBM necessarily brings a facial challenge.

First, and obviously, Chair Gwathney would need to determine what it means for a felon to be "genuinely unable to pay despite good faith efforts," *Jones*, 950 F.3d at 811, or "best efforts [and] for reasons beyond their control," *id*. at 817; *see also id*. at 822 ("on account of their indigency and inability to pay for reasons wholly beyond their control"). There is clearly ground for disagreement on this matter when Plaintiff Gamble continues to press his claim despite the fact that he earns $72,599 annually, doc. 222-7 at 4 (Interrogatory No. 4), and has been paying $25 monthly towards his court-ordered monies, *See State of Alabama v. Darius L. Gamble*, Case No. CC-2006-001468.00 (Shelby Co. Circuit Court); *see also* doc. 215-6  at ¶ 11; doc. 222-6 at 56:21-23.

Second, even assuming that determining the standard were easy, the declaration of ABPP's Director of the Board Operations Division, Effie Hawthorne, develops what more would be required. "[P]olicies and forms would have to be created or amended . . . to reflect the requirement for applicants to provide specified reliable information" for conducting an analysis of genuine inability to pay, and "the CERV application itself and accompanying rules would have to go through" the rulemaking process to achieve that. Doc. 222-3 at ¶ 13. That would just be to start:

> Moreover, before the [ABPP] could implement a new investigation process into CERV applicants' claimed genuine inability to pay, significant statewide training for hundreds of investigating officers/staff would be required to ensure that each person performing CERV investigations understands the added requirements and applies objective scrutiny of reliable information provided by applicants in a relatively uniform manner to make a call on whether the individual is genuinely

unable to pay, for reasons beyond his control, the court-ordered monies owed. Training curriculum would have to be developed to included amended/new policies and forms. Trainers would have to be identified to cover the hundreds of impacted employees expeditiously. Typically, the [ABPP] conducts mandatory training in regional locations throughout the entire State, with multiple opportunities to attend training for employees surrounding each location, including makeup training sessions. Subsequent periodic training would be needed to maintain the new system and to ensure that new employees received the same instruction as those initially receiving it. . . .

Doc. 222-3 at ¶ 14.  New staff would likely need to be hired, and the field offices are already understaffed.  *Id.* at ¶¶ 15-16.  Moreover, Director Hawthorne is concerned about the ABPP's ability to comply with the statutory 44-day turnaround time because evaluating a CERV applicant's ability to pay will, *inter alia*, make the ABPP dependent on information from the applicant and add to the analysis to be conducted at each step of the process.  *Id.* at ¶¶ 7-12.

Alabama's decision to apply the court-ordered monies requirement uniformly and without an exception for those who would assert an inability to pay easily survives rational basis.

### c. The *Jones* panel concluded that strict scrutiny was triggered because disenfranchisement is punishment being imposed on the basis of wealth, but Alabama does not assert an interest in punishing through disenfranchisement.

The Eleventh Circuit refused to apply rational basis review in *Jones.*  The panel recognized that "[w]ealth . . . is not a suspect classification" and that "felons may be stripped of their right to vote permanently."  *Jones*, 950 F.3d at 808.  Nonetheless, the panel broke with the two courts it acknowledged had considered the appropriate standard of review under the same circumstances[29],

---

[29]     The Eleventh Circuit said: "The only two courts to face this precise claim—wealth discrimination in automatic felon re-enfranchisement schemes that, as a practical matter, deny indigent felons access to the franchise—concluded that rational basis scrutiny applied because felons do not have a fundamental right to vote and wealth is not a suspect classification. *See Johnson v. Bredesen*, 624 F.3d 742 (6th Cir. 2010); *Madison v. State*, 161 Wash.2d 85, 163 P.3d 757 (2007)."  *Jones*, 950 F.3d at 808.  Two points follow.  First, the Eleventh Circuit created a circuit split.  *See also Harvey*, 605 F.3d at 1079-80 (addressing the question of felon re-enfranchisement conditioned on payment of court-ordered monies where no plaintiff claimed

and held that strict scrutiny applied because wealth was being used in relation to voting and because, the Eleventh Circuit said, disenfranchisement is punishment that, again, was being imposed on the basis of wealth.  *Id.* at 808-09, 817-20, 823-24.  Alabama does not assert a punishment interest, and that pulls a critical pillar out from under the *Jones* panel's decision to apply strict scrutiny, thereby distinguishing that case.[30]  The argument that disenfranchisement is not punishment has been made above, *see* 58-68, *supra,* and is incorporated by reference here.

### d. The *Jones* panel was wrong to conclude that strict scrutiny was triggered because declining to re-enfranchise a felon based on his failure to pay court-ordered monies is wealth discrimination.

Alabama's interest in felon disenfranchisement is in what the Eleventh Circuit referred to as "Safeguarding the ballot box from a singularly unqualified group of potential voters."  *Jones*, 950 F.3d at 812.  Indeed, the group is so "singularly unqualified" that the United States Constitution singles them out in approving their disenfranchisement.  *Richardson*, 418 U.S. at 54; *see also Jones*, 950 F.3d at 801. Nonetheless, the Court gave short shrift to this State interest, quickly maneuvering to a wealth discrimination mindset.  *Jones*, 950 F.3d at 813.  The Eleventh Circuit said:

> This interest, however, is not plausibly furthered by the distinction Amendment 4 draws between those who have paid their financial obligations and those who have not.  This is because the classification at issue is not between people who have disregarded the laws of society and those who have not, nor among groups of felons who have committed crimes that demonstrate that they are more hostile to democracy and the rule of law than are others. Rather, the classification

---

indigency, but indicating that the standard to apply in such a case would be rational basis).  Second, Plaintiffs' claim here is not limited to indigent felons; indeed, Plaintiffs are not indigent.

[30]  Apparently, the Eleventh Circuit recognizes that, even if disenfranchisement were punishment, that alone would not increase the level of scrutiny.  *Jones*, 950 F.3d at 823-24 (distinguishing the *Shepherd*, which applied rational basis to a challenge to Texas' re-enfranchisement scheme on grounds that wealth was not involved).  Hence, a determination that disenfranchisement is punishment is necessary, but not sufficient, to increase the level of scrutiny. To push to strict scrutiny, that punishment must be imposed on the basis of wealth.  Chair Gwathney explains why the panel's wealth-based analysis is wrong below.

> is simply drawn between those who have paid their financial obligations and those who have not. This distinction is unrelated entirely to a felon's prudent exercise of the franchise and cannot be said to reasonably further that purpose. *See Harper [v. Virginia State Bd. of Elections]*, 383 U.S. [663,] 666, 86 S.Ct. 1079 [(1966)] ("Voter qualifications have no relation to wealth nor to paying or not paying this or any other tax.").

*Jones*, 950 F.3d at 813.  With all respect, the panel is wrong.  Saying that requiring a felon to pay the court-ordered monies arising from his conviction, despite an alleged inability to do so, before re-enfranchising him amounts to wealth-based discrimination makes as much sense as saying that denying the franchise to a 40-year-old felon with a 60-year sentence of incarceration amounts to age discrimination.  That may in part explain the Eleventh Circuit's subsequent decisions in *Jones* to hear Florida's appeal of the district court's final judgment *en banc* and to stay the district court's order pending resolution of the appeal.

We do not deal here with an across-the-board fee that has been imposed on all voters as a test of wealth: in the case of Plaintiff Thompson, the unpaid court-ordered monies are almost entirely *restitution* for the money she stole and, in the case of Plaintiff Gamble, the unpaid court-ordered monies are almost entirely a *criminal fine* that is undeniably as much a part of the sentence as his time in prison was, *see* Ala. Code § 13A-5-2(b) ("In addition to imprisonment, every person convicted of a felony may be sentenced by the court to pay a fine authorized by Section 13A-5-11."); Ala. Code § 13A-5-11 ("A sentence to pay a fine for a felony . . . ."); Ala. Code § 13A-5-11 and Ala. Code § 13A-5-12 Commentary ("The Criminal Code continues recognition of the use of a fine as a traditional means of punishment or deterrence  . . . .").  These court-ordered monies are individually tied to their criminal convictions—a direct reflection of the harm they imposed on society, not some arbitrary test of wealth.  That is, to require payment of court-ordered monies before a felon's voting rights can be restored is not "to introduce a capricious or irrelevant factor," as was the case in *Harper*, where wealth was at issue.

Indeed, *Harper* reasoned that "once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment. That is to say, the right of suffrage 'is subject to the imposition of state standards which are not discriminatory and which do not contravene any restriction that Congress, acting pursuant to its constitutional powers, has imposed.'" *Harper*, 383 U.S. at 665.  It is undeniable that a State cannot disenfranchise all felons and then re-enfranchise only the female, Episcopalian felons.  But here, the restitution and fines go to the very essence of the Plaintiffs' status as felons, and the Fourteenth Amendment, even as it ensures Equal Protection, simultaneously approves disenfranchising felons for life.  *Richardson*, 418 U.S. at 54.  Moreover, the outstanding nature of these court-ordered monies indicates that Plaintiffs Thompson and Gamble have not fully met the obligations arising from their convictions.

The Florida district court originally seemed to understand this distinction.  The court reasoned that the difference between (1) a hypothetical requirement that felons have a net worth of $100,000 to earn re-enfranchisement and (2) the reality of Florida's challenged provisions "is that the financial condition in the hypothetical is unrelated to a felon's sentence, while the final obligations at issue under" Florida law "are part of a felon's sentence." *Jones*, 410 F. Supp. 3d at 1302.  That is, the difference is that the hypothetical is about "[w]ealth, [which] like race, creed, or color is not germane to one's ability to participate intelligently in the electoral process," *Harper*, 383 U.S. at 668, such that "[t]o introduce wealth or payment of a fee as a measure of a voter's qualifications is to introduce a capricious or irrelevant factor," *id.*  By contrast, one's status as a felon is not irrelevant; its relevance is written into the Fourteenth Amendment.  *Richardson*, 418 U.S. at 54 ("the exclusion of felons from the vote has an affirmative sanction in § 2 of the Fourteenth Amendment").

The *Jones* district court itself acknowledged that, given the difference between the hypothetical and the challenged provisions before it, "one could reasonably argue both sides of the question whether this difference changes the result" of the constitutional analysis, "[i]f writing on a clean slate." *Jones*, 410 F. Supp. 3d at 1302. The district court thought, however, that the slate was not clean, *id.* at 1302-1303, and that the matter had been resolved by the *en banc* Eleventh Circuit in *Johnson v. Governor of Florida*. The district court was wrong on this score. *Jones,* 950 F.3d at 824 ("[W]e also disagree with the district court that this Court's *en banc* decision in *Johnson* controls the resolution of this case."[31]). Properly considered, the State's interest is strong enough to win the intellectual tug-of-war.

In moving to a strict scrutiny analysis and holding that the legal financial obligations requirement failed that analysis, the *Jones* courts created an absurd result which should have caused them to question their analysis. For instance, following trial, the Florida district court explained that on plaintiff "was convicted of a federal felony and ordered to pay over $59 million in restitution jointly and severally with others. She is unable to pay that amount." *Jones v. DeSantis*, ___ F. Supp. 3d ____, 2020 WL 2618062, at *7 (N.D. Fla. May 24, 2020) (footnote omitted). The court never stopped to ask how much harm that felon must have caused to be ordered to pay that much in restitution, or to ponder the absurdity of concluding that her voting rights must, as a matter of constitutional law, be restored immediately while someone who owes $5,000 in restitution may be made to miss one or more elections while he pays his financial obligation to his victim.

---

[31]    The way the *Jones* panel proceeds to explain the *Johnson* language is inconsistent with the what the *Johnson* Court said. *Jones* says the *Johnson* footnote resolved a wealth discrimination claim. *Jones*, 950 F.3d at 824-25. The *Johnson* Court said it was addressing a poll tax claim and doing so on the facts. *Johnson*, 405 F.3d at 1216 n.1.

### e. Even if strict scrutiny applies, Alabama's court-ordered monies requirement is constitutional when the State's true interests are fairly weighed.

When the *Jones* panel considered Florida's interests during its strict scrutiny analysis, the Court wholly failed to consider the interest Alabama asserts, though Florida asserted it too and though the panel said that the State's interests were, unsurprisingly, part of the analysis to be undertaken. Specifically, the panel said it would address "four considerations: (1) the nature of the individual interest affected; (2) the extent to which it is affected; (3) the rationality of the connection between legislative means and purpose; and (4) the existence of alternative means for effectuating the purpose." *Jones*, 950 F.3d at 825 (internal citations and quotation marks omitted).

"[V]oting is undoubtedly a weighty interest." *Jones*, 950 F.3d at 825. With respect to the extent to which that interest is affected, separate from the CERV process, Alabama continues to have a pardon process. The evidence in this case does not indicate that the process is as slow as it apparently is in Florida, *see id.* at 826. And, while pardons are discretionary, the ABPP has granted a rather high percentage of the applications in recent years. Specifically, "[b]etween January 1, 2015 and April 30, 2020, the [ABPP] held 4,083 pardon hearings and granted a pardon about 75% of the time, resulting in 3,080 pardons." Doc. 222-1 at 4-5 (Interrogatory No. 1). Chair Gwathney has also offered evidence about a felon who received a pardon despite a large, unpaid drug trafficking fine. Doc. 222-2.

The third and fourth considerations primarily deal with Alabama's interests in regulating voter qualifications. These have been addressed above, *see* 30-32, *supra*, and the discussion is incorporated by reference here. Requiring a felon to have completed his full sentence (including any financial terms of that sentence) and to have taken steps to make society whole before inviting him back into the voting booth is rationally connected to the State's interests. The *Jones* Court shortchanged the State's interests by again over-reading *Harper* and failing to understand that the

109

payment of court-ordered monies arising from a felony conviction is nothing like an irrelevant test of wealth. *Jones*, 950 F.3d at 827.  Alabama also has a State interest in not being required to build an administrative state to sort through who is and is not able to pay their court-ordered monies, as discussed above at 102-04, *supra.*

There is no alternative means for effectuating the State's purpose in protecting the ballot box, which is the fourth consideration the Court said applied, *Jones*, 950 F.3d at 825.  If felons who have not completed their sentences and made society whole are permitted to vote, then the State's fundamental sovereign interests in determining the qualifications for the persons who will be entrusted with electing State, county, and local officials and setting policy will be undermined.[32] *Cf. Johnson v. Governor of Fla.*, 405 F.3d at 1232 n. 35.  Further, the votes of persons who meet the State's qualifications will be diluted by these improper votes, and the general population may experience a lack of confidence in the integrity of the government as felons who have not paid the restitution they owe their victims (like Thompson) and who have not paid their criminal fines (like Gamble) "participate in the collective decisionmaking of a democratic society," *Jones*, 950 F.3d at 828.  These harms are substantial and obvious.  The Eleventh Circuit never addressed them.  *Id.* at 827 (considering only an alternative means of effectuating debt collection).  This Court should. Additionally, the State's interest in not expending the resources to build an administrative state to sort through felons supports its current enforcement of the court-ordered monies requirement.

* * *

Chair Gwathney is entitled to summary judgment on Count 13.

---

[32]   These interests are discussed at 30-32, *supra*, and 133-35, *infra.*

**XI.      Secretary Merrill is entitled to summary judgment on Count 18, which alleges that the State mail-in form does not comply with a provision of the National Voter Registration Act of 1993.**

The National Voter Registration Act of 1993 "erect[s] a complex superstructure of federal regulation atop state voter-registration systems.  The Act has two main objectives: increasing voter registration and removing ineligible persons from the State's voter registration rolls."  *Husted v. A. Philip Randolph Inst.*, 584 U.S. ____, 138 S. Ct. 1833, 1838 (2018) (internal citations and quotation marks omitted).  As to the first objective, the NVRA "requires States to provide simplified systems for registering to vote in federal elections."  *Arizona v. Inter Tribal Council of Arizona*, 570 U.S. 1, 5 (2013) (cleaned up).  "The Act requires each State to permit prospective voters to register to vote in elections for Federal office by any of three methods: simultaneously with a driver's license application, in person, or by mail."  *Id.* (internal citations and quotation marks omitted).  It is mail-in registration that is pertinent here.

The NVRA provides, *inter alia*, that the Election Assistance Commission (a federal agency), "in consultation with the chief election officers of the States, shall develop a mail voter registration application form for elections for Federal office," 52 U.S.C. § 20508(a)(2), *i.e.,* the Federal Form, *Arizona*, 570 U.S. at 4; *League of Women Voters of the United States v. Newby*, 238 F.Supp.3d 6, 7-8 (D.D.C. 2017) (discussing the Federal Form and the federal agency responsible for it).  To promote "simplified systems for registering to vote," *Arizona*, 570 U.S. at 5, the NVRA provides that the form "require only such . . . information . . . as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process."  52 U.S.C. § 20508(b)(1).  The form must include "a statement that--(A) specifies each eligibility requirement (including citizenship); (B) contains an attestation that the applicant meets each such requirement; and (C) requires the

signature of the applicant, under penalty of perjury." 52 U.S.C. § 20508(b)(2). The States must "accept and use" the Federal Form, 52 U.S.C. § 20505(a)(1), and the States may develop a form of their own that meets the same requirements, 52 U.S.C. § 20505(a)(2). The STATE OF ALABAMA MAIL-IN VOTER REGISTRATION FORM is such a form.

The State mail-in form "specifies each eligibility requirement" for applicants on one simple page. The applicant must be (1) a United States citizen, (2) who lives in her Alabama county of registration, (3) who will be 18 years old by Election Day, (4) who has not been adjudged incompetent, and (5) who has not convicted of a disqualifying felony. Plaintiff GBM, however, alleges in Count 18 that the form does not "specif[y] each eligibility requirement" because it could be even *more* specific.[33] In GBM's view, the NVRA requires Secretary Merrill to list each disqualifying felony on the voter registration form itself, as if not committing each disqualifying felony is a separate eligibility requirement (i.e., "You must be someone (1) who is a U.S. citizen, (2) who lives in Alabama, (3) who will be 18 by Election Day, (4) who is not incompetent, and (5) who has not committed murder, and (6) who has not committed terrorism, and (7) who has not committed kidnapping, *etc*."). No principle of statutory interpretation demands that unnatural reading. The Secretary's reading of the Act is the more ordinary and natural reading. *See Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004) ("[W]e must give words their 'ordinary or natural' meaning."). And GBM's you-can-always-be-more-specific reading would lead to absurd results and potentially render § 20508(b)(2)(A) unconstitutional. Secretary Merrill thus is entitled to summary judgment on this claim.

---

[33]     This Court has dismissed GBM's claim concerning the Federal Form. Doc. 179-1 at 18, 25.

> a. **GBM only alleged a claim concerning the State mail-in form and, in any event, lacks standing to challenge any other Alabama voter registration form.**

As an initial matter, GBM has alleged a claim against the Secretary of State concerning only the State mail-in form (and not any other).  The supplemental complaint refers to that form as the "State Form," doc. 93 at ¶ 18[34], and then discusses the content of the "State Form," *id.* at ¶¶ 19-20.  While paragraph 94 acknowledges a provision of the Act that concerns different voter registration forms, paragraph 97 specifically alleges that "[n]either the Alabama-specific instructions to the Federal Form, as dictated to the EAC by Defendant Merrill, *nor the State Form* provide sufficient information to meaningfully 'inform applicants . . . of [ ] voter eligibility requirements' in Alabama."  Doc. 93 at ¶ 97 (emphasis added; last two alterations by GBM).  The next paragraph then alleges that "[b]y failing to include complete voter eligibility requirements *on these forms*, Defendant Merrill has violated and continues to violate the NVRA."  Doc. 93 at ¶ 98 (emphasis added).  And, ¶ 100 alleges that "[b]ecause of this ongoing NVRA violation, GBM diverts significant organizational resources to informing voters of the eligibility requirements within Section 17-3-30.1 that are not communicated via *the State Form* or Federal Form."  Doc. 93 at ¶ 100 (emphasis added). Thus, the supplemental complaint challenges only the State mail-in form.  As discussed next, GBM has suggested that its challenge is broader than that; however, GBM cannot amend its complaint through briefing, *cf. Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1314-15 (11th Cir. 2004) (*per curiam*).

Earlier in the litigation, the Secretary found it unclear exactly which of the State's voter registration forms were being challenged, and he argued that GBM could challenge only the State

---

[34]     In pertinent part, paragraph 18 provides: "Despite HB 282's significant change to the law regarding voter eligibility, the Secretary of State has not updated *the State of Alabama Mail-In Voter Registration Form ("State Form"),* . . . ."  Doc. 93 at ¶ 18 (emphasis added).

mail-in form because that is the only form GBM appears to use.[35]  That is, of course, consistent with the doctrine of standing which requires GBM to demonstrate that there is "a causal connection between the injury and the conduct complained of," and that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision," *City of Miami Gardens v. Wells Fargo & Co*., 931 F.3d 1274, 1282 (11th Cir. 2019) (citation and internal quotation marks omitted).  GBM responded that if forms that it does not use were more to its satisfaction, there would be less work for GBM to do.  Doc. 108 at 2.  This is wild speculation, and it is insufficient at the dispositive motion stage.  *City of Miami Gardens*, 931 F.3d at 1282 (Because standing is "an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of litigation.") (citation and internal quotation marks omitted).

GBM never supplemented its production of documents to suggest it uses any form other than the "State Form" identified in its supplemental complaint.  Additionally, it has now admitted in response to interrogatories that it cannot prove any injury resulting from any other Alabama voter registration form.  Exhibit 31 at 11 (Objections and Response to Interrogatory No. 17)[36]; Exhibit 32 at 25 (Objections and Response to Interrogatory Nos. 18-20).  As a result, GBM lacks standing to challenge any Alabama form other than the mail-in voter registration form.

Restricting GBM's claim to the State mail-in form is also consistent with this Court's earlier analysis grounded in 52 U.S.C. § 20508(b)(2)(A) and 52 U.S.C. § 20505(a)(2), *see* doc.

---

[35]    Doc. 105 at 3 & 4 (discussing Request for Production No. 8 and the documents GBM produced); *see also* docs. 105-2 at 16 (Request for Production No. 8 asked for samples of the voter registration forms GBM uses), 105-3 (State mail-in form produced by GBM), and 105-4 at 17-18 (manual, including the State mail-in form, produced by GBM).

[36]    Other portions of this document were later amended.

179-1 at 19, 21.  These statutory provisions concern the Federal Form and State mail-in forms, respectively, and the former contains the "specify" language on which GBM relies.  Of note, the NVRA's motor voter provision requires that voter registration application "include a statement that--(i) *states* each eligibility requirement (including citizenship)."  52 U.S.C. § 20504(c)(2)(C)(i) (emphasis added).[37]  This is the provision on which the Secretary focused in his initial motion to dismiss.  Doc. 95 at 20-21.  Moreover, when the United States threatened suit against the State and State officials in 2015 concerning the motor voter provision, Exhibit 33 at ¶ 1, the resulting Memorandum of Understanding and an amendment thereto demanded "an NVRA-compliant voter registration application."  *E.g.,* Exhibit 33 at ¶¶ 27, 31, 38; Exhibit 34 at ¶ 38.  That litigation threat has been fully resolved.  Accordingly, the supplemental complaint is best read as challenging only the State mail-in form (and the Federal Form, though that claim is dismissed) and, in the alternative, GBM lacks standing to challenge any other Alabama voter registration form.

> **b. The State mail-in form includes a statement that specifies each of Alabama's eligibility requirements and was amended last year to reasonably address concerns for potential voters that Plaintiff GBM raised.**

Paragraph 18 of the supplemental complaint alleges that the State mail-in form has not been updated to reflect the passage of Ala. Act No. 2017-378.  Doc. 93 at ¶ 18.  Paragraph 19 alleges that the form speaks in terms of disqualifying felonies without providing information about which felonies are disqualifying "*or how to determine whether a conviction is disqualifying.*"  Doc. 93 at ¶ 19 (emphasis added).  Paragraph 20 then continues by speculating that "[a] likely and reasonable interpretation of the phrase 'disqualifying felony conviction,' *without additional*

---

[37]     Section 20504 requires that the States make the opportunity to register to vote or update voter registration a part of the process for issuing a driver's license or other "personal identification document issued by a State motor vehicle authority," 52 U.S.C. § 20502(3).

*information*, is that felony convictions are always disqualifying, rather than a subset of felony convictions are disqualifying."  Doc. 93 at ¶ 20 (emphasis added).

Plaintiff GBM has always been wrong about this claim because the State mail-in form does "include a statement that . . .  specifies each eligibility requirement." 52 U.S.C. § 20508(b)(2)(A). Near the top-right corner, the form provides:

**To register to vote in the State of Alabama, you must:**
- Be a citizen of the United States.
- Live in Alabama.
- Be at least 18 years of age on or before election day.
- Not have been convicted of a disqualifying felony, or if you have been convicted, you must have had your civil rights restored.
- Not have been declared "mentally incompetent" by a court.

*See* STATE OF ALABAMA MAIL-IN VOTER REGISTRATION FORM, *available at* https://www.sos.alabama.gov/sites/default/files/voter-pdfs/nvra-2.pdf?_ga=2.53480296.1528578860.1596917869-1474776292.1593447793 (last visited September 1, 2020).  This is a statement of each of Alabama's eligibility requirements, and all that section 20508(b)(2)(A) requires.[38]

Nonetheless, since the supplemental complaint was filed, the Secretary of State has amended the State mail-in form in ways that reasonably address GBM's concerns for potential voters.  The Voter Declaration section repeats the qualifications language and now includes additional language in a parenthetical that: "The list of disqualifying felonies is available on the

---

[38]  The amendment to the voter registration forms to add the word "disqualifying" before "felony" was precleared on July 14, 2006.  *Chapman v. Gooden*, 974 So.2d 972, 980 n. 3 (Ala. 2007); Exhibit 29.

Secretary of State's web site at: sos.alabama.gov/mtfelonies)  The Voter Declaration appears as

follows:



**Voter Declaration - Read and Sign Under Penalty of Perjury**

▶ I am a U.S. citizen
▶ I live in the State of Alabama
▶ I will be at least 18 years of age on or before election day
▶ I am not barred from voting by reason of a disqualifying felony conviction (The list of disqualifying felonies is available on the Secretary of State's web site at: sos.alabama.gov/mtfelonies)
▶ I have not been judged "mentally incompetent" in a court of law

I solemnly swear or affirm to support and defend the constitution of the United States and the State of Alabama and further disavow any belief or affiliation with any group which advocates the overthrow of the governments of the United States or the State of Alabama by unlawful means and that the information contained herein is true, so help me God.

**YOUR SIGNATURE** _____   **DATE**(mm/dd/yyyy) _____

If you falsely sign this statement, you can be convicted and imprisoned for up to five years.

*See* STATE OF ALABAMA MAIL-IN VOTER REGISTRATION FORM, *available at*
https://www.sos.alabama.gov/sites/default/files/voter-pdfs/nvra-
2.pdf?_ga=2.53480296.1528578860.1596917869-1474776292.1593447793          (last   visited

September 1, 2020).[39]

Thus, the State mail-in form "include[s] a statement that . . .  specifies each eligibility

requirement"—citizenship, residence, age, *etc.*—and further contains a statement that both makes

clear that not all felonies are disqualifying and alerts felons to how they can get more information.

Additionally,  though  not  reproduced  above,  the  form  includes  two  phone  numbers  for  the

Secretary's Elections Division (1-800-274-8683 and 334-242-7210) as well as an address and

phone number for each Board of Registrars' office in the State.

Before the Secretary of State updated the Voter Declaration set out above, the Election

Assistance  Commission  had  made  a  similar  change  to  the  Federal  Form's  State-specific

---

[39]          The prior form is available in the record at doc. 105-3.

instructions for Alabama.[40]   Declaration of Ed Packard, Exhibit 35, at ¶¶ 2-9; *see also* Federal

Form,                                     *available*                                     *at*

https://www.eac.gov/sites/default/files/eac_assets/1/6/Federal_Voter_Registration_ENG.pdf

(last visited September 1, 2020) (reflecting Alabama's State-specific instructions were last updated

on August 31, 2018).  The changes do not moot Count 18, but they do inform this Court's analysis.

*Naturist Soc'y, Inc. v. Fillyaw*, 958 F.2d 1515, 1519-20 (11th Cir. 1992).

### c. Secretary Merrill has the better reading of § 20508(b)(2)(A)'s requirement to include a statement that specifies each eligibility requirement.

"We begin, as courts always should in matters involving statutory interpretation, with the

statutory language."   *Durr v. Shinseki*, 638 F.3d 1342, 1344 (11th Cir. 2011).

Section 20508(b)(2)(A) requires that the Federal Form "include a *statement* that-- (A) *specifies*

each eligibility requirement (including citizenship),"   52 U.S.C. § 20508(b)(2)(A), and that

requirement carries over to any State mail-in voter registration form, 52 U.S.C. § 20505(a)(2).

On earlier cross motions for summary judgment, this Court considered the meaning of

"specify" as follows:

> "Specify" does not appear to be a defined term in the statute. "In the absence of a
> statutory definition of a term, [courts] look to the common usage of words for their
> meaning." *CBS Inc.* [*v. PrimeTime 24 Joint Venture*], 245 F.3d [1217,] 1222 [(11th
> Cir. 2001)]. "Specify" is defined in BLACK'S LAW DICTIONARY as "to mention
> specifically; to state in full and explicit terms; to point out; to tell or state precisely
> or in detail; to particularize; or to distinguish by words one thing from another."
> BLACK'S LAW DICTIONARY (6th ed. 1990); *see also* WEBSTER'S THIRD NEW
> INTERNATIONAL DICTIONARY, Unabridged. 2019 (defining "specify" as "to
> mention or name in a specific or explicit manner," "to include as an item in a
> specification," "to make specific: to give a specific character or application to.").
> In the context of interpreting a different statute, the Supreme Court has cited the
> following definition of "specify:" "to name or state explicitly or in detail." *See*

---

[40]     The Federal Form contains an application, general instructions, and State-specific
instructions. 11 C.F.R. § 9428.3.

*Kucana v. Holder*, 558 U.S. 233, 243 & n.10 (2010) (citing WEBSTER'S NEW COLLEGIATE DICTIONARY 1116 (1974)).

Doc. 179-1 at 21.  The question presented here, however, is not simply how to interpret the single word "specify," but rather the phrase "a statement that specifies each eligibility requirement."  For as the Eleventh Circuit has warned, "Courts should avoid slicing a single word from a sentence, mounting it on a definitional slide, and putting it under a microscope in an attempt to discern the meaning of an entire statutory provision."  *Wachovia Bank, N.A. v. United States*, 455 F.3d. 1261, 1267 (11th Cir. 2006).  Or as Judge Learned Hand elegantly put it, "the meaning of a sentence may be more than that of the separate words, as a melody is more than the notes." *Helvering v. Gregory*, 69 F.2d 809, 810–811 (2d Cir. 1934); *see also* A. Scalia & B. Garner, *Reading Law* 356 (2012) ("Adhering to the *fair meaning* of the text (the textualist's touchstone) does not limit one to the hyperliteral meaning of each word in the text. . . .  The full body of a text contains implications that can alter the literal meaning of individual words.") (footnote omitted)).  This point is critical because "[a] word in a statute may or may not extend to the outer limits of its definitional possibilities."  *Wachovia Bank*, 455 F.3d. at 1267 (*quoting Dolan v. United States Postal Serv.*, 546 U.S. 481, 486 (2006)).

Here, the Court should look to "the common usage of words" to determine whether the State mail-in form "specifies each eligibility requirement."  Doc. 179-1 at 21 (*citing CBS Inc.,* 245 F.3d at 1222); *see also Harrison v. Benchmark Electronics Huntsville, Inc.,* 593 F.3d 1206, 1212 (11th Cir. 2010) ("We assume that Congress used the words in a statute as they are commonly and ordinarily understood . . . .") (cleaned up).  Under an ordinary reading of the NVRA, the State mail-in form specifies each eligibility requirement imposed by the State when it lists the five requirements each applicant must meet.

This reading is bolstered by the fact that the NVRA does more than just create the Federal Form; it also reaches voters through the State's motor vehicle department and various voter registration agencies and it imposes requirements concerning maintenance of the voter registration list.  52 U.S.C. §§ 20501 *et seq.*  Even focused on the Federal Form, there is more to it than the requirement to "include a statement that . . . specifies each eligibility requirement,"[41] and there are more eligibility requirements than simple avoidance of a disqualifying felony conviction.  One of Alabama's eligibility requirements is that a registrant resides in the State, but the voter registration form does not provide any explanation of how to determine residence, though it can sometimes be quite complicated as revealed in, for instance, the election contest at issue in *Horwitz v. Kirby*, 197 So. 3d 943 (Ala. 2015).  Similarly, the Alabama Code addresses domicile for voters whose "dwelling . . . is located partly in two or more counties, districts, or precincts," Ala. Code § 17-3-33, and for "[a]ny person who lives on a line between counties, districts, or precincts," Ala.

---

[41]    The Federal Form must meet the requirements set out in 52 U.S.C. § 20508(b).  First, the Federal Form "may require only such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process."  52 U.S.C. § 20508(b)(1).   Second, it "shall include a *statement* that-- (A) *specifies each eligibility requirement (including citizenship)*; (B) contains an attestation that the applicant meets each such requirement; and (C) requires the signature of the applicant, under penalty of perjury."  52 U.S.C. § 20508(b)(2) (emphasis added).   Third, the Federal Form "may not include any requirement for notarization or other formal authentication."   52 U.S.C. § 20508(b)(3).   And, fourth, the form "shall include, in print that is identical to that used in the attestation portion of the application--(i) the *information required in section 20507(a)(5)(A) and (B) of this title*; (ii) a statement that, if an applicant declines to register to vote, the fact that the applicant has declined to register will remain confidential and will be used only for voter registration purposes; and (iii) a statement that if an applicant does register to vote, the office at which the applicant submits a voter registration application will remain confidential and will be used only for voter registration purposes."   52 U.S.C. § 20508(b)(4) (emphasis).   "[T]he *information required in section 20507(a)(5)(A) and (B) of this title*," 52 U.S.C. § 20508(b)(4) (emphasis), is information about "voter eligibility requirements; and penalties provided by law for submission of a false voter registration application."  52 U.S.C. § 20507(a)(5)(A) & (B).

Code § 17-3-34. Neither the Alabama-specific instructions for the Federal Form nor the State mail-in form include this level of detail. *Cf. Hernández v. Mesa*, 589 U.S. ___, ___, 140 S. Ct. 735, 741-42 (2020) ("No law pursues its purposes at all costs.") (internal citations and quotation marks omitted); *see also Kucana v. Holder*, 558 U.S. 233, 252 (2010).

Additionally, § 20508(b)(2)(A) itself requires "a *statement* that—(A) specifies each eligibility requirement (including citizenship)." 52 U.S.C. § 20508(b)(2)(A). "Statement" limits "specifies" to an extent because a statement is not commonly read to call for an exhaustive explanation. Other provisions of the NVRA also suggest that something less than outer limits of specification is appropriate. *Cf. Arkansas Games & Fish Com'n v. United States,* 568 U.S. 23, 36 (2012) ("But the first rule of case law as well as statutory interpretation is: Read on."); *Wachovia Bank, N.A. v. United States*, 455 F.3d. 1261, 1267 (11th Cir. 2006) ("[C]ontext is king.").

One provision earlier, § 20507(a)(5) provides that the States shall "*inform applicants* under sections 20504 [motor voter], 20505 [mail registration], and 20506 [voter registration agencies] of this title of -- (A) *voter eligibility requirements* . . . ." 52 U.S.C. § 20507(a)(5)(A) (emphasis added). *Informing applicants* sounds a lot less onerous task than specifying eligibility requirements to the $n^{\text{th}}$ degree.

Moreover, while the provisions related to the mail-in registration form and voter registration agencies use the "specify" language, 52 U.S.C. §§ 20506(A)(i)(I) & 20508(b)(2)(A), the motor voter provision says that registration form "shall include a statement that—*states* each eligibility requirement . . . ," 52 U.S.C. § 20504(c)(2)(C)(i) (emphasis added). If Congress meant something different by the different language, it gave no indication in the text of the NVRA what difference was intended or why. And, indeed, such a choice would actually conflict with GBM's theory of this claim: To the extent GBM is concerned that potential applicants would not have any

and all questions answered on the face of the voter registration form, GBM does not explain why Congress would have had that concern for the mail-in voter registration forms, but not the motor voter forms. Instead, this language too makes clear that one can "specify" to a wide range of degrees.

Insofar as context is concerned, it is also noteworthy that the NVRA recognizes that convictions can be disqualifying, and Congress responded to that fact by requiring the United States Attorneys' offices to notify State officials of federal convictions and provide the information local election officials need to make eligibility assessments. 52 U.S.C. § 20507(g)(1)-(3).[42] Though aware that convictions are disqualifying, and presumed to know that States' laws on these issues vary, *Miles v. Apex Marine Corp.,* 498 U.S. 19, 32 (1990) ("We assume that Congress is aware of existing law when it passes legislation.") (citation omitted), Congress did not single out criminal convictions for more explicit treatment in terms of defining the degree to which each State's law must be explained. By contrast, Congress was explicit about other matters, for instance notifications that must be provided to persons offered the opportunity to register at a voter registration agency, 52 U.S.C. § 20506(a)(6)(B).[43]

Secretary Merrill's approach to compliance with section 20508(b)(2)(A) is also consistent with the approach of the Election Assistance Commission. The Commission revised the Alabama-specific instructions on the Federal Form in consultation with the Secretary of State's office. Packard Decl., Exhibit 35, at ¶¶ 2; *Arizona,* 570 U.S. at 5 ("Each state specific instruction must be

---

[42]    Similarly and later, as part of the Help America Vote Act of 2002 (HAVA), Congress required the States to coordinate statewide voter registration lists "with State agency records on felony status." 52 U.S.C. § 21083(a)(2)(A)(ii)(I).

[43]    As part of HAVA, Congress imposed more requirements for the mail-in form which, while focused on eligibility and precise in their demands, did not address felony disenfranchisement. 52 U.S.C. § 21083(b)(4)(A) (requiring two questions and a statement that are explicitly set out in the statute and another statement that is described in the statute).

approved by the EAC before it is included on the Federal Form.").   In pertinent part, those instructions now provide:

> **9. Signature.** To register in Alabama you must:
> • be a citizen of the United States
> • be a resident of Alabama and your county at the time of registration
> • be 18 years old before any election
> • not have been convicted of a felony involving moral turpitude (or have had your civil and political rights restored). The list of moral turpitude felonies is available on the Secretary of State web site at:
> sos.alabama.gov/mtfelonies

Federal                          Form,                          *available*                          *at* https://www.eac.gov/sites/default/files/eac_assets/1/6/Federal_Voter_Registration_ENG.pdf at 8 (last visited September 1, 2020).   This language is not identical to the language that Secretary Merrill adopted, but it certainly follows the same broad principle of specifying the requirement that an applicant must not be disqualified by reason of a felony conviction and then providing means of obtaining further information.

This Court should defer to the Commission's interpretation because Congress has not "directly spoken to the precise question at issue," *Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984).   The Commission has been charged with actually developing the Federal Form, 52 U.S.C. § 20508(a)(2), including prescribing any necessary regulations, 52 U.S.C. § 20508(a)(1); *see also* 11 C.F.R. §§ 9428.3 *et seq.*, and that requires making policy judgments about, *inter alia*, the specificity of eligibility requirements.   "The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation

of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Chevron*, 467 U.S. at 843 (internal citation and quotation marks omitted; first alteration by the Court).

Alternatively, if *Chevron* deference does not apply, a lesser deference does. "[A]gencies charged with applying a statute necessarily make all sorts of interpretive choices, and while not all of those choices bind judges to follow them, they certainly may influence courts facing questions the agencies have already answered." *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001). "The fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position. The approach has produced a spectrum of judicial responses, from great respect at one end to near indifference at the other." *Id.* at 228 (footnotes and citations omitted); *see also Skidmore v. Swift & Co.*, 323 U.S. 134, 139-40 (1944).

Deference is appropriate here because there is necessarily room for discretion in how specifically the eligibility requirements must be listed, *Shea v. Vialpando*, 416 U.S. 251, 262 n. 11 (1974) ("the sound principle of according deference to administrative practice normally applies only where the relevant statutory language is unclear *or susceptible to differing interpretations*") (emphasis added), and the Commission is charged with working through those details in consultation with the chief election officials in the States,  52 U.S.C. § 20508(a)(2).  The Secretary of State's office relied on its election expertise in determining that not possessing a disqualifying felony conviction was one "eligibility requirement" (as opposed to several dozen or hundred separate eligibility requirements).  And he determined that a reference to a website made more sense than a lengthy list of felonies.  *See* Packard Decl., Exhibit 35, at ¶¶ 3, 9-11.  The Commission

indicated to the Secretary's office that it would consider the Secretary's proposal before ultimately following that course, Packard Decl., Exhibit 35, at ¶¶ 2-4.

The Commission recently followed a similar course with Tennessee.  That State's instructions say: "To register in Tennessee you must: . . . not have been convicted of a felony, but if convicted, *your eligibility to register and vote depends upon the crime you were convicted of and the date of your conviction.  For more information about this process*, call 877-850-4959 or visit https://sos.tn.gov/restoration. If your conviction has been expunged, you are not considered to have a felony conviction." Federal Form at 24 (emphasis added).  These instructions, which essentially say "it's complicated" and then provide contact information, were updated this year. *Id.*

It is also important to note that it was *after* the Commission acted as to the Federal Form, that Secretary Merrill made changes to the State mail-in form.  *See* Packard Decl., Exhibit 35, at ¶¶ 2-9.  "[T]he well-reasoned views of the agencies implementing a statute 'constitute a body of experience and informed judgment to which courts *and litigants* may properly resort for guidance." *Mead Corp.,* 533 U.S. at 227 (internal citations and quotation marks omitted; alteration by the Court; italics added); *see also Skidmore*, 323 U.S. at 140.

Secretary Merrill's judgment about how to comply with the Act also makes sense because the form at issue is a mail-in form.  It would not be practical to add a lengthy list of felonies to the State mail-in form, while keeping that form as one-page (front and back) form that can be easily completed and mailed.  Packard Decl., Exhibit 35, at ¶¶ 3, 9-11 & Exhibits.

GBM's demand to re-design the mail-in voter registration form to require an out-sized proportion of the form to address an issue that applies to a small percentage of the population is properly rejected.

### d. GBM's reading of section 20508(b)(2)(A) would lead to absurd results.

While Alabama could simply disenfranchise all felons, it has chosen to let many vote—those whose felony convictions do not involve moral turpitude.  GBM would read section 20508(b)(2)(A) to punish Alabama for this choice by demanding greater specification, no matter how cumbersome the result.  But "the legislature is presumed to act with sensible and reasonable purpose," and thus "a statute should, if at all possible, be read so as to avoid an unjust or absurd conclusion."  *Durr v. Shinseki*, 638 F.3d 1342, 1349 (11th Cir. 2011).  Here, GBM's reading leads to absurd results.

Section 17-3-30.1(c) of the Alabama Code lists nearly 50 paragraphs of felonies which involve moral turpitude for purposes of voting, and thus are disqualifying felonies.  The list is as follows:

(1) Murder as defined in the following sections:

a. Subdivision (1) of subsection (a) of Section 13A-5-40.

b. Subdivision (2) of subsection (a) of Section 13A-5-40.

c. Subdivision (3) of subsection (a) of Section 13A-5-40.

d. Subdivision (4) of subsection (a) of Section 13A-5-40.

e. Subdivision (5) of subsection (a) of Section 13A-5-40.

f. Subdivision (6) of subsection (a) of Section 13A-5-40.

g. Subdivision (7) of subsection (a) of Section 13A-5-40.

h. Subdivision (8) of subsection (a) of Section 13A-5-40.

i. Subdivision (9) of subsection (a) of Section 13A-5-40.

j. Subdivision (10) of subsection (a) of Section 13A-5-40.

k. Subdivision (11) of subsection (a) of Section 13A-5-40.

l. Subdivision (12) of subsection (a) of Section 13A-5-40.

m. Subdivision (13) of subsection (a) of Section 13A-5-40.

n. Subdivision (14) of subsection (a) of Section 13A-5-40.

o. Subdivision (15) of subsection (a) of Section 13A-5-40.

p. Subdivision (16) of subsection (a) of Section 13A-5-40.

q. Subdivision (17) of subsection (a) of Section 13A-5-40.

r. Subdivision (18) of subsection (a) of Section 13A-5-40.

s. Subdivision (19) of subsection (a) of Section 13A-5-40.[44]

t. Section 13A-6-2.

(2) Manslaughter as defined in Section 13A-6-3.

(3) Assault as defined in Section 13A-6-20, except for subdivision (5) of subsection (a) of Section 13A-6-20[45], and Section 13A-6-21.

(4) Kidnapping in the first degree as defined in Section 13A-6-43.

(5) Kidnapping in the second degree as defined in Section 13A-6-44.

(6) Rape as defined in Sections 13A-6-61 and 13A-6-62.

(7) Sodomy as defined in Sections 13A-6-63 and 13A-6-64.

(8) Sexual torture as defined in Section 13A-6-65.1.

(9) Sexual abuse as defined in Sections 13A-6-66, 13A-6-67, and 13A-6-69.1.

(10) Enticing a child to enter a vehicle for immoral purposes as defined in Section 13A-6-69.

(11) Facilitating solicitation of unlawful sexual conduct with a child as defined in Section 13A-6-121.

(12) Electronic solicitation of a child as defined in Section 13A-6-122.

(13) Facilitating the on-line solicitation of a child as defined in Section 13A-6-123.

(14) Traveling to meet a child for an unlawful sex act as defined in Section 13A-6-124.

(15) Facilitating the travel of a child for an unlawful sex act as defined in Section 13A-6-125.

(16) Human trafficking as defined in Sections 13A-6-152 and 13A-6-153.

(17) Terrorism as defined in Section 13A-10-152.

(18) Soliciting or providing support for an act of terrorism as defined in Section 13A-10-153.

(19) Hindering prosecution of terrorism as defined in Section 13A-10-154.

(20) Endangering the water supply as defined in Section 13A-10-171.

---

[44]     Two new subdivisions of the capital murder statute have been added since Ala. Code § 17-3-30.1(c) was first adopted in 2017.  *Compare* Ala. Act No. 2017-378, Exhibit 12 *with* Ala. Code § 13A-5-40(a)(20) (murder in the presence of a child under the age of 14 when the victim is a parent or legal guardian of the child) & (21) (murder of a first responder acting in an official capacity), adopted by Ala. Act No. 2018-537 and Ala. Act No. 2019-514, respectively.

[45]     Section 13A-6-20(a)(5) concerns driving under the influence. Ala. Code § 13A-6-20(a)(5).

(21) Possession, manufacture, transport, or distribution of a destructive device or bacteriological or biological weapon as defined in Section 13A-10-193.

(22) Selling, furnishing, giving away, delivering, or distribution of a destructive device, a bacteriological weapon, or biological weapon to a person who is less than 21 years of age as defined in Section 13A-10-194.

(23) Possession, manufacture, transport, or distribution of a detonator, explosive, poison, or hoax device as defined in Section 13A-10-195.

(24) Possession or distribution of a hoax device represented as a destructive device or weapon as defined in subsection (c) of Section 13A-10-196.

(25) Attempt to commit an explosives or destructive device or bacteriological or biological weapons crime as defined in Section 13A-10-197.

(26) Conspiracy to commit an explosives or destructive device or bacteriological or biological weapons crime as defined in Section 13A-10-198.

(27) Hindrance or obstruction during detection, disarming, or destruction of a destructive device or weapon as defined in Section 13A-10-199.

(28) Possession or distribution of a destructive device or weapon intended to cause injury or destruction as defined in Section 13A-10-200.

(29) Treason as defined in Section 13A-11-2.

(30) Dissemination or public display of obscene matter containing visual depiction of persons under 17 years of age involved in obscene acts as defined in Section 13A-12-191.

(31) Possession and possession with intent to disseminate obscene matter containing visual depiction of persons under 17 years of age involved in obscene acts as defined in Section 13A-12-192.

(32) Parents or guardians permitting children to engage in production of obscene matter as defined in Section 13A-12-196.

(33) Production of obscene matter containing visual depiction of persons under 17 years of age involved in obscene acts as defined in Section 13A-12-197.

(34) Distribution, possession with intent to distribute, production of obscene material, or offer or agreement to distribute or produce, as defined in Section 13A-12-200.2.

(35) Trafficking in cannabis, cocaine, or other illegal drugs or trafficking in amphetamine and methamphetamine as defined in Section 13A-12-231.

(36) Bigamy as defined in Section 13A-13-1.

(37) Incest as defined in Section 13A-13-3.

(38) Torture or other willful maltreatment of a child under the age of 18 as defined in Section 26-15-3.

(39) Aggravated child abuse as defined in Section 26-15-3.1.

(40) Prohibited acts in the offer, sale, or purchase of securities as defined in Section 8-6-17.

(41) Burglary as defined in Sections 13A-7-5 and 13A-7-6.

(42) Aggravated theft by deception as defined in Section 13A-8-2.1.

(43) Theft of property as defined in Sections 13A-8-3 and 13A-8-4.

(44) Theft of lost property as defined in Sections 13A-8-7 and 13A-8-8.

(45) Theft of trademarks or trade secrets as defined in Section 13A-8-10.4.

(46) Robbery as defined in Sections 13A-8-41, 13A-8-42, and 13A-8-43.

(47) Forgery as defined in Sections 13A-9-2 and 13A-9-3.

(48) Any crime as defined by the laws of the United States or by the laws of another state, territory, country, or other jurisdiction, which, if committed in this state, would constitute one of the offenses listed in this subsection.

Ala. Code § 17-3-30.1(c)(1)-(47).

That list is specific.  It is also longer than any list included in the State-specific instructions of the Federal Form—even if the references to the Alabama Code are omitted.  Of course, those Code citations add information.  For instance, subsection 47 is "Forgery as defined in Sections 13A-9-2 and 13A-9-3."  Ala. Code § 17-3-30.1(c)(7).  The citations are to forgery in the 1st and 2nd degrees, respectively.  Forgery in the 3rd degree is also a felony, Ala. Code § 13A-9-3.1, but is not included in the list of disqualifying felonies.  Hence, if the Secretary were to just list descriptions of the felonies without the Code citations, some additional descriptions would be needed.[46]  And, while some felonies may be easily listed, others carry a more complex description.  For example, "Possession, manufacture, transport, or distribution of a destructive device or bacteriological or biological weapon as defined in Section 13A-10-193," Ala. Code § 17-3-30.1(c)(21), is a mouthful.  Plainly, it would not be practical to add this list to the State mail-in form, while keeping that form as one-page (front and back) form that can be easily completed and

---

[46]     The Secretary's online list includes "Forgery 1st Degree – Section 13A-9-2" and "Forgery 2nd Degree – Section 13A-9-3."  *See* sos.alabama.gov/mtfelonies (last visited September 1, 2020).

mailed, and that was the Secretary's judgment as well, Packard Decl., Exhibit 35, at ¶¶ 3, 9-11 & Exhibits.

Moreover, the 48th paragraph above shows that GBM's reading of the NVRA is as limitless as it is unworkable:  "Any crime as defined by the laws of the United States or by the laws of another state, territory, country, or other jurisdiction, which, if committed in this state, would constitute one of the offenses listed in this subsection," is also disqualifying.  Ala. Code § 17-3-30.1(c)(48).  Hence, it is difficult to see why GBM's hyper-specific reading of "specify" would not require the State to list the equivalent felonies of every other government on the planet to be sure the form "state[s] in full and explicit terms" the eligibility requirements that an applicant avoid conviction for burglary in Georgia the State, Georgia the country, South Carolina, South Sudan, or any other jurisdiction.  The Secretary of State's office gave no serious consideration to attempting this feat.  Packard Decl., Exhibit 35, at ¶ 9.  And surely such "[i]mpossible standards of specificity are not required." *Jordan v. De George*, 341 U.S. 223, 231 (1951).

GBM says that their reading of "specify" need not go *that* far.  But why not?  In at least some cases, it will be far easier for someone convicted of a felony in Alabama to click on the Secretary of State's website and see whether his crime of conviction is one of the 47 listed there than it will be for someone convicted out-of-State to determine whether his conviction would constitute a disqualifying felony in Alabama.  *See Skinner v. State*, 987 So. 2d 1172, 1177 (Ala. Crim. App. 2006) (reversing and remanding so circuit court could hold a hearing regarding whether a California conviction was a qualifying felony for purposes of Alabama's habitual offender statute); *cf. Mathis v. United States*, 579 U.S. ___, ___, 136 S. Ct. 2243, 2251 (2016) (considering whether "the elements of Mathis's crime of conviction (Iowa burglary) cover a greater swath of conduct than the elements of the relevant ACCA offense (generic burglary)").

Thus, if the Secretary can satisfy the NVRA by treating all out-of-State disqualifying convictions as part of one eligibility requirement—as GBM concedes—then he can satisfy the NVRA by treating all in-State and out-of-State disqualifying convictions as part of one eligibility requirement—the simple requirement to be free "of a disqualifying felony conviction."  *See* State mail-in form.

The problems with GBM's reading run deeper still.  GBM acknowledges that "most felony convictions are not disqualifying," doc. 97 at 31, and Alabama easily could have adopted a longer list.  Alabama may also wish to make changes to the list in Ala. Code § 17-3-30.1(c).  Indeed, the list was first adopted in 2017 by Ala. Act No. 2017-378, Exhibit 12, and has already been revised to include a newly-created felony, *i.e.,* aggravated theft by deception, *see* Ala. Act No. 2019-513, Exhibit 13.  There would seem to be room for further improvements as well.[47]  There is also always the possibility that a felony on the list could be held unconstitutional or repealed.  In those instances, GBM's theory would require not simply updating a readily-available online list, but reprinting hundreds of thousands (or more) of forms at substantial cost.  Packard Decl., Exhibit 35, at ¶¶ 12-13.

In short, even if "specify each eligibility requirement" could be read to require listing each felony on the above list (with or without their out-of-State counterparts), that strained reading should be rejected.  The Supreme Court's decision in *Public Citizen v. United States Department of Justice*, 491 U.S. 440 (1989), is instructive.  The case involved whether the Federal Advisory Committee Act (FACA), which was intended to regulate the "numerous committees, boards, commissions, councils, and similar groups which have been established to advise officers and

---

[47]     For instance, impeachment is listed as a felony for which a CERV is not available, Ala. Code § 15-22-36.1(g), and for which voting rights may not otherwise be restored, Ala. Code § 17-3-31, but is missing from the list of disqualifying felonies in Ala. Code § 17-3-30.1(c).

agencies in the executive branch of the Federal Government." *Id.* at 445-46.  The FACA applied to, among other entities, any committee "utilized" by the executive branch. *Id.* at 451.  And the question in the case was whether FACA applied to the American Bar Association's Standing Committee on Federal Judiciary. Though the Standing Committee's advice was "utilized" by the President "in one common sense of the term," *id.* at 452, the Court did not read the FACA so broadly. *Id.* at 443-45, 451-52.  The Court explained that "'Utilize' is a woolly verb, its contours left undefined by the statute itself.  Read unqualifiedly, it would extend FACA's requirements to any group of two or more persons, or at least any formal organization, from which the President or an Executive agency seeks advice.  We are convinced Congress did not intend that result." *Id.* at 452 (footnote omitted).  "Nor can Congress have meant—as a straightforward reading of 'utilize' would appear to require—that all of FACA's restrictions apply if a President consults with his own political party before picking his Cabinet.  It was unmistakably *not* Congress' intention to intrude on a political party's freedom to conduct its affairs as it chooses." *Id.* at 453 (citation omitted); *see also id.* at 463-64 ("A literalistic reading, however, would catch far more groups and consulting arrangements than Congress could conceivably have intended.").  So too here.

The *Public Citizen* Court recognized that "[l]ooking beyond the naked text for guidance is perfectly proper when the result it apparently decrees is difficult to fathom or where it seems inconsistent with Congress' intention, since the plain-meaning rule is rather an axiom of experience than a rule of law, and does not preclude consideration of persuasive evidence if it exists."  490 U.S. at 455 (internal citation and quotation marks omitted).  It "is particularly appropriate here, given the importance [the Court has] consistently attached to interpreting statutes to avoid deciding difficult constitutional questions where the text fairly admits of a less

problematic construction." *Id.* at 455; *see also id.* at 465-67 (further discussing constitutional avoidance).

Here, there is no need to look beyond the text to realize that the State mail-in form specifies each of Alabama's eligibility requirements for voters. GBM's contrary reading would result in such a lengthy list that Alabama would effectively be prevented from using the moral turpitude standard it has deemed appropriate—a situation that would raise serious constitutional concerns. This is true with the current 47-item list and any longer list that Alabama may wish to adopt. This is further true if it would be necessary to list the analogous felonies of other jurisdictions, which could create an overwhelming (and mostly advisory) research project. In short, GBM's "sterile reading of the statute ignores Congress' practical purpose and exalts literalness over common sense." *Gelman v. Federal Election Comm'n*, 631 F.2d 939, 943 (D.C. Cir. 1980).

> **e.  GBM's reading of § 20508(b)(2)(A) would render that provision unconstitutional; § 20508(b)(2)(A) should be interpreted to avoid raising significant constitutional concerns.**

"When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Crowell v. Benson*, 285 U.S. 22, 62 (1932) (footnote omitted); *see also Zadvydas v. Davis*, 533 U.S. 678, 689 (2001). GBM's interpretation of the requirement to "include a statement that . . . specifies each eligibility requirement" would render section 20508(b)(2)(A) unconstitutional by interfering with the State's authority to set voter qualifications. "Since the power to establish voting requirements is of little value without the power to enforce those requirements," that

interference is reason for this Court, even if not convinced that the Secretary's reading is the best one, to determine whether it "is at least a possible one." *Arizona*, 570 U.S. at 17-18.[48]

"[T]he States establish qualifications for voting for state officers . . . ." *Katzenbach v. Morgan*, 384 U.S. 641, 647 (1966); *see also Simmons v. Galvin*, 575 F.3d 24, 33 (1st Cir. 2009) ("The state has a strong interest in setting its own qualifications for voters . . . ."). By constitutional design, "the qualifications established by the States for voting for members of the most numerous branch of the state legislature also determine who may vote for United States Representatives and Senators." *Katzenbach*, 384 U.S. at 647.[49]  The Constitution has, of course, been amended to impose some limits on the State's power to set qualifications.[50]  Still, the Supreme Court has recognized that "[t]he States have long been held to have broad powers to determine the conditions under which the right of suffrage may be exercised, absent of course the discrimination which the Constitution condemns." *Lassiter v. Northampton Cty. Bd. of Elections*, 360 U.S. 45, 50 (1959)

---

[48]     In *Arizona*, Justice Thomas rejected the United States' position that Congress has authority to set voter registration rules, instead concluding that the States exclusively have the authority to set voter-eligibility requirements and determine whether they have been met. *Arizona*, 570 U.S. at 29-38 (Thomas, J., dissenting); *see also Husted*, 138 S. Ct. at 1848-50 (Thomas, J., concurring) ("Respondents' reading of the NVRA would seriously interfere with the States' constitutional authority to set and enforce voter qualifications.").   The Secretary preserves the argument for consideration on appeal.   Justice Thomas also determined that "Constitutional avoidance is especially appropriate in this area because the NVRA purports to regulate presidential elections, an area over which the Constitution gives Congress no authority whatsoever." *Arizona*, 570 U.S. at 35 (Thomas, J., dissenting).

[49]     U.S. Const. art. I § 2 (House elections); U.S. Const. amend. XVII (Senate elections); *Arizona*, 570 U.S. at 16 ("[T]he Elections Clause empowers Congress to regulate *how* federal elections are held, but not *who* may vote in them."); *id.* at 17; *id.* at 25-28 (Thomas, J., dissenting) (explaining the history behind this choice).  *See also* U.S. Const. art. II § 1 cl. 2 (Presidential electors); U.S. Const. amend. XIV (recognizing the State's right to set qualifications and, specifically, to disenfranchise felons).

[50]     U.S. Const. amend. XV (eliminating disenfranchisement based on "race, color, or previous condition of servitude"); U.S. Const. amend. XIX (enfranchising women); U.S. Const. amend. XXVI (lowering the voting age to 18); *see also* U.S. Const. amend. XXIV (eliminating poll taxes).

(internal citations omitted).   In this area, "there is wide scope for exercise of [the State's] jurisdiction. Residence requirements, age, *previous criminal record* are obvious examples indicating factors which a State may take into consideration in determining the qualifications of voters." *Id.* at 51 (internal citations omitted; emphasis added).

While Alabama has chosen not to disenfranchise on the basis of all felonies, or even most felonies, *see* doc. 97 at 31, Alabama has developed a lengthy list of 47 paragraphs' worth of felonies that would take substantial room to detail, especially when considering the need to address exceptions (like assault, but not when driving under the influence) or lengthy descriptions (like the felonies concerning destructive devices, bacteriological weapons, and biological weapons).   *See* 126-29, *supra.*   Additionally, Alabama has reasonably decided that the fact that one's felony conviction was secured by a different jurisdiction—say the federal government or Georgia—does not change the analysis of whether the felon should be permitted to join Alabama's electorate, *see* Ala. Const. art. VIII, § 177; Ala. Code § 17-3-30.1(c)(48).   Thus, reading "specify" at "outer limits of its definitional possibilities," *Wachovia Bank, N.A. v. United States*, 455 F.3d. 1261, 1267 (11th Cir. 2006) (internal block quote and citation omitted), would require listing not just the 47 named Alabama felonies but the analogous felonies of other jurisdictions.   That list would likely be impossible to compile.

Moreover, Alabama may wish to change its list over time, or it may have change forced upon it (in the form of a holding that a felony on the list is unconstitutional).   To try to list all the disqualifying felonies on the State mail-in form and then maintain that list on the form would be so unwieldy and so expensive as to interfere with, or cancel out, Alabama's right to set policy as to who will be included in the electorate. *See* Packard Decl., Exhibit 35, at ¶¶ 10, 12-13 (explaining

that the State mail-in form is a one-page form intended to be mailed and the costs associated with production).

The constitutional conflict is escalated when one considers that, prior to the passage of Ala. Act No. 2017-378, Alabama could not have provided a comprehensive list of moral turpitude felonies (even limited to Alabama crimes) because none existed.  This despite the fact that the moral turpitude standard is perfectly constitutional without an administratively-helpful list.  *See Jordon v. De George*, 341 U.S. 223 (1951).  Similarly, on a *going-forward basis*, it would be impossible for Alabama to comply with GBM's novel interpretation if, for any reason, Ala. Code § 17-3-30.1 were held unconstitutional or repealed.

Tellingly, the original complaint in this case, doc. 1, filed before the enactment of Ala. Act No. 2017-378, contained no claim that the State mail-in form did not comply with the NVRA. GBM contends that "[t]he fact that the Secretary of State did not previously list the disqualifying felonies says more about the unconstitutional vagueness of the prior law than about what the NVRA requires to be specified on the registration form."  Doc. 108 at 6-7 (footnote omitted). While GBM might wish that were the case, *but see De George*, 341 U.S. 223, the fact remains that it is GBM's novel reading of section 20508(b)(2)(A) that would hold more than two decades of practice unlawful and put an absurd and unconstitutional burden on the State.

\* \* \*

Count 18 is limited to GBM's attack on State mail-in form, and Secretary Merrill is entitled to summary judgment as to that claim.  He has the better reading of § 20508(b)(2)(A), while GBM's reading would lead to absurd and unconstitutional results that are to be avoided.

## XII.    Conclusion.

While there are a lot of issues pending in this case, there are not material facts in dispute. Accordingly, for the foregoing reasons, Secretary of State John H. Merrill, Chair of the Montgomery County Board of Registrars James Snipes, III, and Chair of the Board of Pardons and Paroles Leigh Gwathney are entitled to judgment as a matter of law as to each claim pending against them

Respectfully submitted,

Steve Marshall
 *Attorney General*

s/Misty S. Fairbanks Messick
James W. Davis (ASB-4063-I58J)
Winfield J. Sinclair (ASB-1750-S81W)
Misty S. Fairbanks Messick (ASB-1813-T71F)
*Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Post Office Box 300152
Montgomery, Alabama 36130-0152
telephone:       334.353.8674
facsimile:       334.353.8400
Jim.Davis@AlabamaAG.gov
Winfield.Sinclair@AlabamaAG.gov
Misty.Messick@AlabamaAG.gov

**Counsel for the State Defendants**

**CERTIFICATE OF SERVICE**

I hereby certify that, on September 2, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Armand Derfner (aderfner@derfneraltman.com); Danielle Lang (dlang@campaignlegalcenter.org); James U. Blacksher (jblacksher@ns.sympatico.ca); Jessica Ring Amunson (jamunson@jenner.com); J. Gerald Herbert (gherbert@campaignlegalcenter.org); J. Mitch McGuire (jmcguire@mandabusinesslaw.com); Mark P. Gaber (mgaber@campaignlegalcenter.org); Michael E. Stewart (mstewart@jenner.com); Jason P. Hipp (jhipp@jenner.com); Molly Danahy (mdanahy@campaignlegal.org); Jonathan Diaz (jdiaz@campaignlegalcenter.org); Melissa Takara Fedornak (mfedornak@jenner.com); and, Julie Strass Harris (Julie.StrausHarris@usdoj.gov).

s/Misty S. Fairbanks Messick
Of Counsel