IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

TREVA THOMPSON, *et al.*,      )
                              )
        Plaintiffs,            )
                              )
v.                            )   Case No. 2:16-cv-783-ECM
                              )          [WO]
JOHN H. MERRILL, *etc.*, *et al.*,   )
                              )
        Defendants.           )

## MEMORANDUM OPINION and ORDER

## I.    INTRODUCTION

This case is before the Court on the Defendants' motion for summary judgment (doc. 257), two motions to exclude (doc. 258 & 259), the Plaintiffs' motion for partial summary judgment on count 18 of the complaint as amended (doc. 260), and evidentiary objections by the Defendants (doc. 274).

On September 26, 2016, the Plaintiffs filed a complaint challenging Alabama Constitution § 177(b) and ALA. CODE § 15-22-36.1(a)(3). On December 26, 2017, the Court granted in part the Defendants' motion to dismiss, largely on mootness grounds due to the enactment of new state law, and denied the motion in part. (Doc. 80 at 28). As a result of that Order, the Plaintiffs proceeded on their claims in counts 1, 2, 11, 12, and 13. (Doc. 80 at 40).

Count 1 is a claim of intentional racial discrimination in violation of equal protection and count 2 is a claim of intentional racial discrimination in violation of the Fifteenth

Amendment.  In count 11, the Plaintiffs claim that Ala. Const. art VIII, § 177(b), a felon-disenfranchisement provision, imposes retroactive criminal punishment in violation of the Ex Post Facto Clause of the United States Constitution.  In count 12, the Plaintiffs contend that Ala. Const. art VIII, § 177(b) constitutes "cruel and unusual punishment" in violation of the Eighth Amendment to the United States Constitution.  Count 13 is an equal protection wealth discrimination claim which alleges that ALA. CODE § 15-22-36.1(a)(3) violates the United States Constitution.

On March 1, 2018, the Plaintiffs filed a supplemental complaint and added counts 16, 17, and 18. (Doc. 93).[1]  Count 16 is a claim that the Secretary of State's determination that ALA. CODE § 17-3-30.1 applies retroactively is contrary to the language of the statute and therefore violates the Due Process Clause of the Fourteenth Amendment.  Count 17 is pleaded in the alternative to count 11 and is a claim that the retroactive application of ALA. CODE § 17-3-30.1 violates the Due Process Clause.  Count 18 is a claim for violation of the National Voter Registration Act of 1993, 52 U.S.C. § 20501 *et seq*. (NVRA).  After the Court's denial of a motion to dismiss the complaint as amended, the Plaintiffs are proceeding on these claims as well.

Upon consideration of the entire record in this case and the applicable law, and for the reasons that follow, the Defendants' motion to exclude is due to be DENIED, the Defendants' evidentiary objections are due to be OVERRULED in part and SUSTAINED

---

[1] The Plaintiffs did not file a complete, new amended complaint. Instead, they began the supplemental complaint with the new count 16.  The Court refers to the complaint as amended, to include the complaint and the supplemental complaint, below.

in part, the Plaintiffs' motion to exclude is due to be GRANTED in part and DENIED in part, the Plaintiffs' motion for partial summary judgment is due to be DENIED, and the Defendants' motion for summary judgment is due to be GRANTED.

## II.   JURISDICTION AND VENUE

The Court has subject-matter jurisdiction over the claims at issue pursuant to 28 U.S.C. § 1331.  The parties do not contest personal jurisdiction or venue, and the court finds adequate allegations to support both.

## III.   LEGAL STANDARDS

### A. *Daubert* Motions

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.

Rule 702 requires a trial judge to ensure that an expert's testimony rests on a reliable foundation and is relevant. *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 587 (1993).  In determining the admissibility of expert testimony under Rule 702, a court must conduct a rigorous three part inquiry, considering whether:  (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the

application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998).

This case is set for non-jury trial. The Court's gatekeeping role under *Daubert* is "more relaxed in a bench trial situation because there is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself." *Alabama State Conference for the NAACP v. Alabama*, 2020 WL 579385, *1 (M.D. Ala. 2020)(citing *United States v. Brown*, 415 F.3d 1257, 1268 (11th Cir. 2005)).

### B. Motion for Summary Judgment

Under Rule 56(a) of the Federal Rules of Civil Procedure, a reviewing court shall grant a motion for "summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing FED. R. CIV. P. 56). The movant can meet this burden by presenting evidence demonstrating there is no dispute of material fact, or by showing that the non-moving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Id.* at 322–23. Only disputes about material facts will preclude the granting of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249

(1986).  "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party.  An issue is 'material' if it might affect the outcome of the case under the governing law."  *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (citing *Anderson*, 477 U.S. at 248).

Once the movant has satisfied this burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986).  Non-movants must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  FED. R. CIV. P. 56(c)(1)(A) & (B).

In determining whether a genuine issue for trial exists, the court must view all the evidence in the light most favorable to the non-movant.  *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003).  Likewise, the reviewing court must draw all justifiable inferences from the evidence in the nonmoving party's favor. *Anderson*, 477 U.S. at 255.  However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion."  *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam).

A reviewing court is constrained during summary judgment proceedings from making the sort of determinations ordinarily reserved for the finder of fact at a trial. *See*

*Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) (citations and quotations omitted) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(a).

In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998-99 (11th Cir. 1992). In a case, such as this one, however, set for non-jury trial:

> if decision is to be reached by the court, and there are no issues of witness credibility, the court may conclude on the basis of the affidavits, depositions, and stipulations before it, that there are no genuine issues of material fact, even though decision may depend on inferences to be drawn from what has been incontrovertibly proved. Under those circumstances, which may be rare, the judge who is also the trier of fact may be warranted in concluding that there was or was not negligence, or that someone acted reasonably or unreasonably, ... even if that conclusion is deemed 'factual' or involves a 'mixed question of fact and law.' A trial on the merits would reveal no additional data. Hearing and viewing the witnesses subject to cross-examination would not aid the determination if there are neither issues of credibility nor controversies with respect to the substance of the proposed testimony. The judge, as trier of fact, is in a position to and ought to draw his inferences without resort to the expense of trial.

*Turner v. Allstate Ins. Co.,* 2020 WL 5831791, at *3 (M.D. Ala. Sept. 30, 2020).

Cross-motions for summary judgment do not affect the applicable Rule 56 standard. *See Am. Bankers Ins. Group v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). "Cross-motions . . . will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed . . . ." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (citation omitted). "When both parties move for summary judgment, the court must evaluate each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration." *Muzzy Prods., Corp. v. Sullivan Indus., Inc.*, 194 F. Supp. 2d 1360, 1378 (N.D. Ga. 2002).

## IV. FACTS

The Plaintiffs have asserted multiple claims which arise from the moral turpitude disqualification from voting eligibility in the Alabama Constitution, the qualifications for a Certificate of Eligibility to Register to Vote ("CERV") under state law, and the disclosure of disqualifying felonies on Alabama's State mail-in voter registration form. The factual context of each is important to the claims raised. Therefore, in addition to the facts underlying the Plaintiffs' claims as construed in a light most favorable to the non-movants, the Court also sets out the historical setting of the statutes.

### A. Facts Regarding the Parties

The individual Plaintiffs are citizens of Alabama who claim that they have either been denied applications to vote because of, or have not registered to vote due to uncertainty arising from, the Alabama Constitution's exclusion from voting of persons convicted of crimes of moral turpitude.

7

Plaintiff Treva Thompson ("Thompson") was convicted in 2005 of theft of property in the first degree, a class B felony, and served no time in prison. (Doc. 215-4 ¶ 3). She has completed her parole and probation. (*Id.* ¶ 4). She has more than $40,000 in outstanding legal financial obligations ("LFOs"). (*Id.*). Because of her outstanding LFOs, she does not qualify for a CERV under Alabama law.

Plaintiff Timothy Lanier ("Lanier") was convicted of burglary, a class A felony, and served eighteen years in prison. (Doc. 106-3 at 1). He was convicted based on events that occurred in January 1995. (Doc. 257-28 at 15:18-21).[2]

Plaintiff Pamela King ("King") was convicted of murder, a class A felony, in 1995 and served fifteen years in prison. (Doc. 106-4 ¶ 3). Because she was convicted of murder, she is not eligible to have her voting rights restored unless she receives a pardon. (*Id.*); *see also* ALA. CODE § 15-22-36.1(g).

Plaintiff Darius Gamble ("Gamble") was convicted of trafficking cannabis in 2008 and served a three-year prison sentence and a five-year term of probation. (Doc. 215-6 ¶¶ 3, 5). Gamble has paid $3,300 toward his fines and fees but still owes more than $29,000 in LFOs. (Doc. 215-6 at ¶ 11). He applied for a CERV in 2014, but the application was denied because of his outstanding LFOs. (*Id.* ¶ 5).

---

[2] In citations to depositions, the Court generally refers to the CMECF page number and internal document line number, but when a CMECF page has four deposition pages within it, the Court has referred to internal page numbers.

The organizational plaintiff, Greater Birmingham Ministries ("GBM"), expends resources to help individuals with felony convictions determine if they are eligible to vote or to have their voting rights restored. (Doc. 271-15).

The Defendants in this case, some of whom have been substituted as new office holders have moved into various positions, are Secretary of State Merrill ("Merrill"), Chair of the Montgomery County Board of Registrars James Snipes, and Chair of the Board of Pardons and Paroles Leah Gwathney.

## B. Factual Context of the Applicable Statutes

### 1. History of the Moral Turpitude Provision

The moral turpitude disenfranchisement provision of the Constitution of Alabama was first introduced in 1901. The 1868 and 1875 Constitutions of Alabama barred persons from voting who were convicted of any crime punishable by imprisonment in the penitentiary. (Doc. 257-1 at 16). To this catchall disqualification, the 1901 Constitution added a long list of disqualifying crimes, and language disqualifying persons from voting who were convicted of "any . . . crime involving moral turpitude," either misdemeanor or a felony. Ala. Const. art. VII, § 182.[3]   Consequently, the Constitution of 1901

---

[3] Section 182 provided in full as follows:

> All idiots and insane persons; those who shall by reason of conviction of crime be disqualified from voting at the time of the ratification of this Constitution; those who shall be convicted of treason, murder, arson, embezzlement, malfeasance in office, larceny, receiving stolen property, obtaining property or money under false pretenses, perjury, subornation of perjury, robbery, assault with intent to rob, burglary, forgery, bribery, assault and battery on the wife, bigamy, living in adultery, sodomy, incest, rape, miscegenation, crime against nature, or any crime punishable by imprisonment in the penitentiary, or of any infamous crime or crime involving moral turpitude; also, any person who shall be convicted as a vagrant or tramp, or of selling or offering to sell his vote or the vote of

disenfranchised those convicted of all felonies and several misdemeanors. (Doc. 257-1 at 17).

There were attempts over time to amend the disenfranchisement provision of the Alabama Constitution, but none were successful until 1996.  The first attempt began in 1970, when a Constitutional Revision Commission ("Commission") convened. Commission staff member Dr. Samuel A. Beatty wrote a report to the Commission members in which he set out the provisions within the 1901 Constitution regarding voting qualifications, noting those which had been invalidated by court decision. (Doc. 257-19 at 3).  With respect to Section 182—providing for the disqualification of voters who are insane or convicted of various crimes—Beatty noted that state constitutions commonly include disqualifications of persons convicted of crimes, but as offenses grow and change, their inclusion becomes a matter of constitutional interpretation or amendment, so that it "would appear sufficient to describe such disqualifications in general terms, thus overcoming these objections and eliminating a long, scattered and redundant list of disqualifying crimes." (*Id.* at 10).  Beatty proposed language regarding disqualification from voting which provided, "[n]o person convicted of a felony involving moral turpitude . . . shall be qualified to vote until restoration of civil rights," and which eliminated the listed disqualifying crimes. (*Id.* at 16).

---

another, or of buying or offering to buy the vote of another, or of making or offering to make a false return in any election by the people or in any primary election to procure the nomination or election of any person to any office, or of suborning any witness or registrar to secure the registration of any person as an elector.

The Commission met and considered the proposed disqualification provision of a person convicted of a felony involving moral turpitude until restoration of civil and political rights. (Doc. 257-17 at 21-22).[4]  The Commission issued a report to the legislature in 1973, which proposed the "moral turpitude" language and included a comment that the provision would replace "section 182 which disqualifies . . . those persons convicted of one of thirty-three crimes listed in the section."  (Doc. 257-17 at 20).  The provision was not adopted by the legislature. (*Id.* at 24).

In 1976, another effort to remove the listed crimes from the disenfranchisement provision failed. (*Id.*).

In 1979, a working group was assembled by Governor Fob James. Michael Waters headed the group.  He testified in a deposition that the working group began with the 1973 Constitution draft as a starting point. (Doc. 256-1 at 60:17-61:9). When asked about the 1979 group's adoption of language from the 1973 draft, Waters said, "by eliminating that laundry list and keeping it general, you're saying, we don't endorse what the 1901 Constitution was doing."  (Doc. 256-1 at 99: 17-22).  Waters also explained in his deposition that if the phrase "moral turpitude" was adopted from the 1973 draft, he does not "read that as meaning we hereby endorse any segregationist or racial philosophy that was part of the 1901 Constitution."  (*Id.* at 99: 7-13).

At a meeting about the revisions, there was a discussion of the moral turpitude provision. Representative Tony Harrison asked Senator Bob Harris of the Joint Interim

---

[4]  This expert report is subject to the Plaintiffs' motion to exclude. For reasons to be discussed below, the Court finds the aspects of the report cited in the statement of facts to be admissible.

Committee to Study New Constitution about the legal definition of moral turpitude and Harris said that the courts have wrestled with the question and "if you go back to the 1901 Constitution, they try to go at it maybe a little bit different. I doubt you want to go back to that." (Doc. 256-13 at 43: 7-19). When asked how many felonies were not covered by the term and whether the provision could just say "felony," Harris answered, "that would disenfranchise some moonshiners, I guess, then. It might not be a bad idea." (*Id.* at 53: 18-22). Harris explained that "what we were trying to do is get away from the restraints and restrictions of the 1901 Constitution as far as we could, as safely as we could, in the simplest language that we could, invest in the Legislator as much power as we could consonant with Federal laws and Federal decisions to govern the election process and the qualification of voters." (*Id.* at 54: 21-55:5).

At a public hearing in February 1979, Mary Weidler ("Weidler") of the Civil Liberties Union of Alabama said that it was clear from the legislative history of the 1901 Constitution that the disenfranchisement section was specifically adopted with the intent to "disenfranchise blacks" and a "continuation of that thinking today is clearly unacceptable." (Doc. 256-16 at 5: 14-21). At another public hearing, Tom Leonard of Plaintiff GBM spoke against the disenfranchisement provision, stating that GBM believes that a person who has paid a price for committing a crime should not have the added loss of the right to vote. (Doc. 256-19 at 24: 16-19).

The phrase "moral turpitude" was removed in the House bill, which proposed that no person convicted "of a felony" shall be qualified to vote. (Doc. 270-6 at 6). This bill did not gain final passage. (Doc. 257-17 at 39).

In 1983, the Alabama legislature passed Act 83-683 which proposed a new constitution.   (Doc. 257-17 at 47).   State Senator Ryan deGraffenreid served on the legislative committee that drafted the proposed new constitution.   He stated in a memorandum that the "provisions of the Constitution of 1901 relating to voting and elections were specifically designed to prevent blacks from voting" and also prevented woman and persons under 21 years of age from voting, and that "[t]hese lengthy and complex provisions of the 1901 Constitution" have been held unconstitutional, so the new provisions are "very short and concise and conform to the requirements of the United States Constitution." (Doc. 257-17 at 42).   Weidler again testified in March 1983, but said nothing about the disenfranchisement provision. (Doc. 257-22).   The Alabama Supreme Court ruled that legislation passed could not be placed on the ballot as an entirely new constitution, and so the reform effort failed. (Doc. 257-17 at 47).

In 1985, the aspect of this disenfranchisement provision which applied to misdemeanor offenses was struck down in *Hunter v. Underwood*, 471 U.S. 222 (1985), because it violated the Fourteenth Amendment.

In 1995, Representative Jack Venable introduced two measures related to amending the Constitution and Alabama Code, one of which was House Bill 38, to replace Article VII of the Constitution of 1901.   (Doc. 257-17 at 49).   The bill included the provision to disenfranchise persons convicted of felonies involving moral turpitude. (Doc. 257-17 at 49-50).   Both chambers of the Alabama legislature ultimately passed the proposed amendment, Ala. Act No. 95-443.

Representative Venable was quoted at the time in a newspaper article as saying that the constitutional changes were "strictly housekeeping" to reflect "the voting requirements of the state today, rather than in 1901 when the constitution was written." (Doc. 257-17 at 52). Then-Secretary of State Jim Bennett commented that if the proposed constitutional amendment had passed in 1902, "we could have avoided all the pain and suffering we went through in the 1950s and 60s." (*Id.* at 53). No public hearings were held on the act. (Doc. 257-26).

The proposed amendment, Amendment 579, was voted on by the electorate in 1996. Amendment 579 was approved by 76% of the voters, including eight of the ten counties in Alabama with majority African American populations. (Doc. 257-17 at 56). Amendment 579 provided that "[n]o person convicted of a felony involving moral turpitude, or who is mentally incompetent, shall be qualified to vote until restoration of civil and political rights or removal of disability" and is now codified as Ala. Const. art. VIII, § 177(b).

The State was required to receive pre-clearance by the United States Justice Department for the amendment and in support of that request, Venable wrote a letter to the Office of the U.S. Attorney General in which he said that the Suffrage and Elections Articles of the 1901 Constitution had been made ineffective and that the proposed article had been part of three Constitutional Revision efforts in 1973, 1979, and 1983, that there was no opposition, and no negative votes in the legislature. (Doc. 257-26).

In 2012, the Alabama legislature proposed re-enacting the Suffrage and Elections article, Section 177, with an amendment to add a provision concerning secret ballots. Voters approved this amendment.

After the passage of Ala. Const. art. VIII, § 177(b), voting registrars had to make determinations of which felonies were disqualifying without a definitive list.  To define the term, officials within the State used sources which included Alabama case law which had largely been decided in the context of evidentiary rules governing impeachment. (Doc. 269-10 at 4).[5]

In 2017, the Alabama legislature passed Alabama Act No. 2017-378, which defined "moral turpitude."  The act began as House Bill 282 and is now codified at ALA. CODE § 17-3-30.1. It defines crimes of moral turpitude by listing crimes tied to specific Alabama Criminal Code sections and also includes crimes "as defined by the laws of the United States or by the laws of another state, territory, country, or other jurisdiction, which, if committed in this state, would constitute one of the offenses listed in this subsection." ALA. CODE § 17-3-30.1(c).  The stated purposes of the new law were to "give full effect to Article VII of the Constitution of Alabama of 1901, now appearing as Section 177 of Article VIII," to ensure that no one is wrongly excluded from the electoral franchise, and to provide a comprehensive list of acts that constitute moral turpitude for the purpose of disqualifying a person from exercising his or her right to vote.  ALA. CODE § 17-3-30.1(b)(2).

---

[5]  The Defendants object that communications from Griffin Sikes, the former Director of the Alabama Administrative Office of the Court, are hearsay. The Plaintiffs contend that Sikes' comments while he was an employee of the state are public records and admissible under FED. R. EVID. 803(8).  The Memorandum was written by Sikes as the Director of the Legal Division of the Alabama Administrative Office of Courts to Legal Counsel for the Governor. (Doc. 269-10).  It appears, therefore, to fit within the exception to the rule against hearsay for public records. FED. R. EVID. 803(8).  Within the memorandum, however, Sikes offers opinions which the Court agrees would be expert opinions, and the memorandum was not properly disclosed by the Plaintiffs as an expert report, so while the Court will consider this evidence, the Court will sustain the objection with respect to the opinions within in it.

2.  *Certificate of Eligibility to Register to Vote ("CERV").*

Alabama law sets out the procedure for a person to apply to the Board of Pardons and Paroles for a CERV.  ALA. CODE § 15-22-36.1(a)(3).  This law was adopted in 2003. Individuals with disqualifying felony convictions can have their voting rights restored through this process.   A person who has lost his or her right to vote by reason of a conviction in a state or federal court for felonies other than those excluded by statute, [6] can apply for a CERV if the person has no pending felony charges; has paid all fines, court costs, fees, and victim restitution ordered by the sentencing court at the time of sentencing on disqualifying cases; and has been released upon completion of sentence, been pardoned, or has completed probation or parole. ALA. CODE § 15-22-36.1(a).  If an applicant satisfies all requirements, the CERV is automatic. ALA. CODE § 15-22-36.1(b).

3.  *Facts regarding the State Mail-in Voter Registration Form*

In 2018, Secretary of State Merrill's office sent the federal Executive Director of the Election Assistance Commission (EAC) a letter informing the EAC of Alabama's change in felony disenfranchisement law, and the EAC asked how that act would change Alabama's voter registration instructions. (Doc. 260-5).   Ed Packard, Alabama's

---

[6] Ala. Code § 15-22-36.1(g) provides as follows:
   A person who has lost his or her right to vote by reason of conviction in a state or federal court for any of the following will not be eligible to apply for a Certificate of Eligibility to Register to Vote under this section: Impeachment, murder, rape in any degree, sodomy in any degree, sexual abuse in any degree, incest, sexual torture, enticing a child to enter a vehicle for immoral purposes, soliciting a child by computer, production of obscene matter involving a minor, production of obscene matter, parents or guardians permitting children to engage in obscene matter, possession of obscene matter, possession with intent to distribute child pornography, or treason.

Administrator of Elections, sent a draft of the form language which referenced the Secretary of State's website rather than listing out the disqualifying felony convictions. The Federal Form changed to include the reference to the Secretary of State's website. Specifically, the State instructions for the Federal Form state that to register in Alabama you must "not have been convicted of a felony involving moral turpitude (or have had your civil and political rights restored). The list of moral turpitude felonies is available on the Secretary of State web site at: sos.alabama.gov/mtfelonies." (Doc. 260-5).

The Secretary of State's office also adopted that language in the State's mail-in voter registration form.  The revised mail-in form states in the requirements section that to register to vote you must not "have been convicted of a disqualifying felony, or if you have been convicted, you must have had your civil rights restored."  (Doc. 260-7).  In the Voter Declaration section, the form includes this statement: "I am not barred from voting by reason of a disqualifying felony conviction (The list of disqualifying felonies is available on the Secretary of State's web site at:  sos.alabama.gov/mtfelonies)."  (Doc. 260-7).

## V.    DISCUSSION

The Defendants move for summary judgment as to all pending claims and the Plaintiffs move for summary judgment only as to count 18 of the complaint as amended. The parties also move to exclude evidence.

### A.  Motions to Exclude Evidence and Evidentiary Objections

The Defendants and the Plaintiffs each move to exclude testimony of an expert witness and the Defendants object to various evidentiary submissions of the Plaintiffs.  The

Court addresses below the motions to exclude and will address evidentiary objections in the context of the analysis of the Plaintiffs' claims.

*1. Motion to Exclude the Evidence of Daniel A. Smith, Ph.D.*

The Defendants move to exclude portions of the testimony of a Plaintiffs' expert, Daniel A. Smith, Ph.D. ("Smith"), on the grounds that his testimony is deficient in terms of data and methodology or, in the alternative, lacks relevance.  The Defendants explain that they do not question Smith's qualifications, but contend that the methodology he used is not reliable and that his analysis is not helpful to the Court because it does not address the questions at issue in this case.  The Defendants state that Smith engaged in analyses aimed at examining the racial impact of the list of felonies included in the 2017 Act, but that there is no claim which challenges the intent behind the 2017 Act, and that the impact of the 2017 Act cannot inform the intent of those voting to approve an amendment in 1986. With regard to Smith's LFOs analysis, the Defendants assert that Smith included in his analysis felons who owed court-ordered fees for offenses other than the disqualifying cases. The Defendants acknowledge that in a supplemental report, Smith states that he has revised his analysis and stands by his opinion, but the Defendants contend if the data is not reliable, he cannot base an opinion on it.

The Plaintiffs respond that Smith used a reliable methodology to conclude that disenfranchising felonies listed in ALA. CODE § 17-3-30.1 have a racially discriminatory impact.  In response to the argument that the impact of a list adopted in 2017 could not be indicative of intent in passing an amendment in 1996, the Plaintiffs argue that the 1996 amendment was made to codify the "full effect" of the 1901 Constitution, and so, analysis

of the effect of the felonies included and excluded in 2017 is equivalent to an analysis of the effect of the 1901 "moral turpitude" standard.  The Plaintiffs also contend that Smith used a reliable methodology to conclude that LFOs are the largest barrier to restoration of voting rights in Alabama and that African Americans are more likely to owe LFOs than white individuals.

The Defendants' arguments regarding Smith's evidence are largely about its relevance, particularly with respect to the evidence regarding discriminatory impact. Therefore, the Court will deny the motion to exclude, but will determine the relevance of the evidence in connection with the discussion of the Plaintiffs' claims.

### 2.  Motion to Exclude the Evidence of Dr. Karen Owen

The Plaintiffs seek to exclude the testimony and expert report of Defendants' expert Dr. Karen Owen ("Owen").   The Plaintiffs argue that Owen lacks relevant experience, education, and knowledge and does not use reliable methodologies.   The Plaintiffs acknowledge that Owen possesses a Ph.D. in political science, but point out that her focus areas are special education and women in politics, and that she lacks meaningful qualifications regarding issues of race, racial discrimination, felony disenfranchisement, and Alabama history because she does not teach classes in those areas nor has she published any articles in those areas.  The Plaintiffs question her methodology. The Plaintiffs state that merely looking for overt signs of racial discrimination in public records is not sufficient.  They rely on *United States v. Brown*, 415 F.3d 1257 (11th Cir. 2005), in which an expert with experience in plant pathology was found to be not qualified to serve as an expert in plant chemistry because he lacked expertise in the scientific field at issue.  The

Plaintiffs further point to other courts which have concluded that Owen's analysis was unhelpful and excluded her testimony. *See Common Cause v. Lewis*, 2019 WL 4569584, at *97 (N.C. Super. Ct. 2019).

The Defendants respond that Owens' proffered testimony involves a comprehensive study of the historical and political record around the 1996 Alabama Constitutional Amendment, including constitutional reform efforts prior to the adoption of that amendment. They argue that Owen's work in this case is within the scope of her expertise as a political scientist.

In a case discussed by the parties, another judge of this district has recently examined similar arguments regarding exclusion of expert testimony. *See Alabama State Conference of National Assoc. for the Advancement of Colored People v. Alabama*, 2020 WL 579385 (M.D. Ala. 2020). In that case, a law professor was offered as an expert in the judicial selection process and the plaintiffs objected to his opinion that the State adopted its system for nondiscriminatory reasons. The court determined that contextual evidence about the reasons for judicial elections would be considered but that a legal opinion was inadmissible. *Id.* at *4.

In this case, this Court must determine whether there is sufficient evidence to support a finding of intent to discriminate. To the extent that Owens' report and testimony are helpful in this analysis, such as in the consideration of the factors under the applicable legal standard, the Court will consider it, but the Court does not find admissible under Rule 702, and will not consider, any conclusion by Owen that there is no evidence of intent to discriminate. The motion is, therefore, due to be GRANTED in part and DENIED in part.

**B. Defendants' Motion for Summary Judgment as to Counts 1, 2, 11, 12, 13, 16, 17**

*1. Claims of Race Discrimination in Counts 1 and 2*

Both a Fourteenth Amendment Equal Protection Clause claim and a Fifteenth Amendment discrimination claim require proof of intent to discriminate. *Greater Birmingham Ministries v. Sec'y of State for Alabama*, 966 F.3d 1202, 1224 (11th Cir. July 21, 2020). Therefore, the Court applies the same analysis to both claims. *Id.* "A state's decision to permanently disenfranchise convicted felons does not, in itself, constitute an Equal Protection violation." *Johnson v. Governor of State of Florida*, 405 F.3d 1214, 1217 (11th Cir. 2005)(en banc)(citing *Richardson v. Ramirez*, 418 U.S. 24, 53–55 (1974)). However, states cannot promulgate felon disenfranchisement laws "with the intent to deprive one racial group of its right to participate in the political process." *Id.* at 1218. There is a two-step procedure for analyzing whether a disenfranchisement law violates the Equal Protection Clause. *Hunter v. Underwood*, 471 U.S. 222, 227–28 (1985). First, whether racially discriminatory intent was a "substantial or motivating factor" for the law's enactment that "continues to this day to have that effect." *Id.* at 228. Second, "[o]nce racial discrimination is shown to have been a 'substantial' or 'motivating' factor behind enactments of law, the burden shifts [from the plaintiff] to the law's defenders to demonstrate that the law would have been enacted without this factor." *Id.*; *see also Johnson*, 405 F.3d at 1222–23.

The Defendants have moved for summary judgment as to the Fourteenth and Fifteenth Amendment race discrimination claims in counts 1 and 2 on the same ground:

that the Plaintiffs are unable to point to evidence of discriminatory intent.  The Defendants'

contention is that there is no evidence that Alabama Const. art. VIII, section 177(b)

(proposed as Amendment 579), which was adopted by the electorate in 1996, was adopted

for the purpose of disenfranchising African Americans on the basis of their race.

The Plaintiffs dispute the Defendants' characterization of their claim.  The Plaintiffs

explain that their claim is that racially discriminatory intent from 1901 still existed at the

time of the Constitutional enactment in 1996. (Doc. 268 at 12).  The Plaintiffs argue that

the "moral turpitude" provision initially adopted in 1901 was intentionally racially

discriminatory and that Ala. Const. art. VIII, § 177(b) was strictly a housekeeping bill that

did not remove the racially discriminatory intent.

In evaluating a claim of intent to discriminate in legislation, courts apply non-

exhaustive factors probative of discriminatory intent.  *See Village of Arlington Heights v.

Metro. Hous. Dev. Corp*., 429 U.S. 252, 266 (1977).   In this case, however, the

discriminatory intent inquiry is complicated by the fact that in 1985, the United States

Supreme Court found that enactment of the disenfranchisement provision in the 1901

Alabama Constitution was "motivated by a desire to discriminate against blacks on account

of race and the section continues to this day to have that effect."  *Hunter*, 471 U.S. at 233.

Therefore, the Court will examine the questions posed by both analytical frameworks

argued by the parties:  one, is there sufficient evidence of discriminatory intent as continued

from 1901, or, two, have the Plaintiffs established discriminatory intent in the enactment

of Section 177(b) of the Alabama Constitution in 1996.

a.  Issue of Discriminatory Intent Continuing from 1901

22

In *Johnson*, the Eleventh Circuit in an en banc decision rejected an argument similar to the Plaintiffs' claim in this one; namely, that racial animus motivated the adoption of a criminal disenfranchisement provision in 1868 and the animus remained legally operative at the time a new statute was enacted. 405 F.3d at 1217. This Court, therefore, is guided here by the analysis in *Johnson*.

The *Johnson* court explained that the issue of discriminatory intent in this context requires resolution of whether a "subsequent legislative re-enactment can eliminate the taint from a law that was originally enacted with discriminatory intent." *Id.* The court noted that this question was left open by the Supreme Court in *Hunter. Id.* at 1223; *see also Abbott v. Perez,* 138 S. Ct. 2305, 2325 (2018)(explaining that in *Hunter* the Court specifically declined to address the question whether the then-existing version of a statute would have been valid if "[re]enacted today.") (internal citations omitted).

The Plaintiffs in this case have presented evidence that the 1901 disenfranchisement provision was racially discriminatory. For purposes of the motion for summary judgment, the Defendants do not dispute the evidence that the 1901 constitution was enacted with discriminatory intent. (Doc. 274 at 5). Furthermore, in *Hunter* the "court below found that the article had been adopted with discriminatory intent, and [the Supreme] Court accepted that conclusion." *Abbott*, 138 S. Ct. at 2325. In light of *Hunter*, and the Defendants' concession for purposes of the motion for summary judgment, this Court accepts that there is evidence of racial discrimination in the 1901 enactment of the moral turpitude disenfranchisement provision. That conclusion, however, does not end the inquiry.

The *Johnson* court looked to the Fifth Circuit's discussion in *Cotton v. Fordice*, 157 F.3d 388 (5th Cir. 1988) to guide its analysis.  The Eleventh Circuit noted that in *Cotton*, a disenfranchisement provision was challenged which had been adopted with discriminatory intent in 1890, but was amended by the legislature in 1950 to remove burglary as a disenfranchising crime, and was amended in 1968 to add murder and rape as disenfranchising crimes, "two crimes which were historically excluded because they were not considered 'black' crimes." *Johnson*, 405 F.3d at 1224 (citing *Cotton*, 157 F.3d at 391). The Eleventh Circuit also noted that the Fifth Circuit emphasized that the statutory provision had been amended twice through a deliberative process, which included both houses of the legislature passing the amendment by a two-thirds vote, publication of the provision before the popular election, and approval by a majority of voters. *Id.*

Applying that analysis to the Florida statute, the Eleventh Circuit determined that Florida's statute fell within the reasoning of *Cotton* because Florida's disenfranchisement provision was amended through a deliberative process in 1968 which narrowed the class of disenfranchised individuals to those convicted of felonies. *Id.*  The process through which the amendment was made included that the amendment first was considered by the Suffrage and Elections Committee, which sent its final proposal to the Constitutional Revision Commission, which then reviewed the changes to the Constitution and sent a draft to the legislature, which approved the new Constitution, and finally the voters approved the new Constitution. *Johnson*, 405 F.3d at 1224.  The court held that, assuming there was animus in 1868, there was sufficient deliberation to remove any taint of discriminatory animus.  *Id.*

24

Similarly, in analyzing a disenfranchisement statute re-enactment, the Second Circuit Court of Appeals explained that subsequent legislation removed the taint of discrimination where the plaintiffs had not alleged any such bad faith on the part of the delegates adopting the subsequent legislation, the amendment was deliberative and substantive in scope, and there was no allegation of discriminatory intent. *See Hayden v. Paterson*, 594 F.3d 150, 167 (2d Cir. 2010).

The two main considerations in these cases are the nature of the change made and the nature of the process. This Court, therefore, focuses on those aspects of the facts in this case.

The Plaintiffs argue that the instant case is unlike the cases discussed because Ala. Const. art. VIII, § 177(b) retained crimes originally included in the provision because they were thought to be committed by African Americans, whereas, for example in *Cotton*, crimes were added which were not traditionally African American crimes. 157 F.3d at 391. The Plaintiffs point out that the changes were presented to legislators and the public as "housekeeping" matters.

The amendment by the legislature in 1995 was admittedly described in a publication as only engaging in "housekeeping," but it, like the amendment in *Johnson*, was substantive in scope because the original 1901 version disenfranchised all felonies as well as some minor offenses (doc. 257-1 at 17), while the 1996 version of the provision removed some felonies as disenfranchising crimes. *See Johnson*, 405 F.3d at 1221 (characterizing a change in the statute as substantive because in narrowed the class of persons who could be disenfranchised and re-enfranchised some persons who previously were disenfranchised).

25

The Plaintiffs also argue that the process of adopting Ala. Const. art. VIII, § 177(b) was not deliberative. The Plaintiffs argue that there is enough evidence to create a question of fact as to whether the 1996 restatement of the 1901 criminal disenfranchisement provision included any meaningful deliberative process that could be said to have changed its underling purpose. The Plaintiffs have argued that section 182's provision disenfranchising individuals convicted of "any . . . crime involving moral turpitude" continues the discriminatory animus in section 177(b) because section 177(b) uses the same the phrase, "moral turpitude," as the 1901 Alabama Constitution.  The Plaintiffs point to the memo prepared by Beatty in 1970 as part of the Governor Brewer's Commission and argue that the intent was merely to restate, not revise, Section 182.  The 1996 legislative process, the Plaintiffs contend, was not deliberative because the bill adopted the "moral turpitude" language from Beatty's proposal without deliberation.  The Plaintiffs also point to the Defendants' expert, Owen, who stated that there was no evidence to suggest that the amendment was made in reaction to *Hunter*. (Doc. 269-2 at 173: 25—174:7).  They also point to the testimony of Waters regarding the 1979 Constitutional revision working group, that at the time the group proposed to use the phrase "moral turpitude," it did not have knowledge of any racially discriminatory intent behind the phrase moral turpitude, and argue that if they had no knowledge, the group could not have deliberated the issue. (Doc. 269-3 at 137: 6-14).  The Plaintiffs argue that the only time "moral turpitude" was deliberated by the legislature was in connection with the 1979 revision attempt, and that the House bill actually removed the language "moral turpitude," but the bill did not pass the Senate.  Finally, the Plaintiffs point out that there is no evidence that the amendment

was passed with the recognition of the holding in *Hunter*, and argue, therefore, that adopting that language without offering an alternative rationale suggests a continuation of past discrimination.

The Defendants take issue with the Plaintiffs' characterization of the evidence and contend that the facts are not disputed, only the interpretation of them. The Defendants contend that whether there is sufficient deliberation is an issue of law, not fact. (Doc. 274 at 11).

The Court first notes that the use of the phrase "moral turpitude" does not on its own support a finding of continued discriminatory intent by the legislature in part because that phrase historically has been used in Alabama law outside of the context of felon disenfranchisement.  For example, there are statutes which provide for the removal of members of financial boards as well as revocation of licenses, for felonies involving moral turpitude. *See, e.g.*, ALA. CODE § 5-17-55(c)(1); ALA. CODE § 34-8A-16(a)(1).  There is no evidence that those enactments were made with discriminatory intent, so the mere use of "moral turpitude" in Ala. Const. art. VIII, § 177(b) is not sufficient under *Johnson* to establish that the re-enactment of moral turpitude was with discriminatory intent.

In examining whether the legislature's adoption in 1995 of the moral turpitude standard in the context of felon disenfranchisement was done with sufficient deliberation to remove any taint of discriminatory animus, the Court finds persuasive the reasoning of another district court. *See Harness v. Hosemann*, 2019 WL 8113392, at *8 (S.D. Miss. 2019).  That court pointed out that under *Hunter*, changes through "judicial pruning" are not sufficient to remove a taint of discrimination, but found that the deliberation in that

case by a task force and legislative committees was sufficient. *Id.* at 9.   Because the legislature took affirmative action to adopt a provision, the case was "not a case like *Hunter* where the state itself did nothing to cure the defect, nor was a constitutionally infirm statute perpetuated into the future by neutral official action." *Id.* at *10 (quotation omitted).

The evidence before the Court in this case also demonstrates that this is not a case where a constitutionally infirm statute was perpetuated into the future by a lack of action or by neutral official action by the State, but is instead a case of a deliberative process which lead to the re-enacting the felon disenfranchisement provision for felonies of moral turpitude in the Alabama Constitution. The evidence indicates that the efforts over time considered past reform attempts and built on them. For example, the letter seeking preclearance for the 1996 amendment reveals that the amendment was thought to be the result of a process including three Constitutional revision efforts in 1973, 1979, and 1983. (Doc. 257-26).

Statements by persons involved in the process explained that "what we were trying to do is get away from the restraints and restrictions of the 1901 Constitution as far as we could, as safely as we could, in the simplest language that we could, invest in the Legislator as much power as we could consonant with Federal laws and Federal decisions to govern the election process and the qualification of voters." (Doc. 256-13 at 54: 21- 55:5).  Senator deGraffenreid demonstrated awareness that the provisions of the Constitution of 1901 were designed to prevent African Americans from voting and expressed a desire to move away from that Constitution in 1983. (Doc. 257-17 at 42).

28

Evidence pointed to which identified opposition in the form of an objection that a "moral turpitude" standard had a discriminatory intent was from February 1979, when Mary Weidler of the Civil Liberties Union of Alabama testified at a public hearing. (Doc. 256-16 at 5: 14-21). And, although Mary Weidler again testified in March 1983, at that time she said nothing about the disenfranchisement provision. (Doc. 257-22).

After this process of attempting to revise the constitution, in 1995, the legislature passed Amendment 579, which provided that no person convicted of a felony involving moral turpitude, or who is mentally incompetent, shall be qualified to vote until restoration of civil and political rights or removal of disability. At the time the proposed amendment was presented to the electorate, it was described as an amendment which reflected "the voting requirements of the state today, rather than in 1901 when the constitution was written." (Doc. 257-17 at 52). There is no evidence of opposition to the amendment at that time. The amendment, Amendment 579, was voted on by the electorate in 1996 and approved by 76% of the voters, including eight of the ten counties in Alabama with majority African American populations. (Doc. 257-17 at 56).

Under the facts presented in the instant case, at the time *Hunter* was decided, only the courts had acted to change the disenfranchisement provision, but the Alabama legislature took deliberative action over time to change, and ultimately did change, with approval of the electorate, the Alabama Constitution.[7] The difference between this case

---

[7] While some of the efforts to reform the Alabama Constitution occurred prior to the decision in *Hunter*, no legislation had been enacted at that time and there is nothing in the *Hunter* decision to indicate that the Court was presented with evidence of the reform efforts.

and *Johnson*; namely, that the deliberation by the Alabama legislature did not occur in the context of one proposed amendment by the legislature that ultimately enacted it, is not significant because other cases applying the same analysis have considered multi-year actions. *See, e.g., Cotton*, 157 F.3d at 391 (considering amendments made in two different years).  In short, applying *Johnson*, the Court concludes that the State of Alabama has moved beyond the circumstances identified in *Hunter*, and that the change made to the Alabama Constitution through an amendment which re-enacted the moral turpitude provision and which was developed and proposed by the legislature and adopted by the electorate was sufficient to remove the taint of discriminatory intent present in 1901.  405 F.3d at 1224.

The Court turns now to the question presented by the second analytical framework: whether the Plaintiffs have presented sufficient evidence of discriminatory intent with regard to the 1996 amendment itself under the *Arlington Heights* factors.

### b.   Issue of Discriminatory Intent in 1996

"As a general matter, determining the intent of the legislature is a problematic and near-impossible challenge." *Greater Birmingham Ministries*, 966 F.3d at 1227.  The Eleventh Circuit has recently summarized the *Arlington Heights* factors used to discern intent as follows:  (1) the impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departures; (5) the contemporary statements and actions of key legislators; (6) the foreseeability of the disparate impact; (7) knowledge of that impact; and (8) the availability of less discriminatory alternatives. *Id.* at 1225.

30

The Plaintiffs do not appear to have presented evidence as to many of the *Arlington Heights* factors, such as procedural and substantive departures or the availability of less discriminatory alternatives. *See id.* Instead, they have focused on evidence regarding the historical context of the passage of the amendment, the implementation of the statute, and evidence which they contend demonstrates discriminatory impact.

When a court examines the *Arlington Heights* factors as a form of analysis separate from the removal-of-taint analysis in *Johnson*, the historical context of the statute is not strongly indicative of intent in a case where the evidence "is largely unconnected to the passage of the actual law in question." *Id.* at 1228. As the Eleventh Circuit has explained, a court's examination of the historical background of a status focuses on the specific sequence of events leading up to the challenged decision and does not provide "an unlimited look-back to past discrimination." *Id.* (citation omitted). The sources of evidence of discriminatory intent in the past are only "relevant to the extent that they naturally give rise to—or tend to refute—inferences regarding the intent of the [1995] Legislature." *Abbott*, 138 S. Ct. at 2327.

The Plaintiffs have pointed out that the stated purposes of ALA. CODE § 17-3-30.1(b)(2) include giving "full effect to Article VII of the Constitution of Alabama of 1901, now appearing as Section 177 of Article VIII." As discussed above, however, the Court has found that the taint of past discrimination was removed when the legislature proposed and the electorate adopted Ala. Const. art. VIII, § 177(b), so the Court does not conclude that the enactment in 1995 of the "moral turpitude" standard also found in 1901 is evidence of intent. *See also Abbott*, 138 S. Ct. at 2330.

The Plaintiffs also point to the State of Alabama's implementation of the "moral turpitude" standard over time as evidence of intent, arguing, based on evidence including an expert report and evidence that registrars used different lists of disqualifying crimes, that the legislature's failure to clarify the term "moral turpitude" is evidence of intent.

The Defendants respond that they accept for purposes of the motion for summary judgment the evidence[8] regarding the manner in which the moral turpitude standard was implemented, but argue that it is unclear why such evidence is evidence of racially discriminatory intent.  This Court agrees that evidence of the difficulty of implementing the "moral turpitude" standard in the years following the adoption of the standard, without more, is not evidence probative of any racially discriminatory intent of the legislature at the time the standard was adopted.  Plaintiffs provide "no evidence that the Alabama legislators who supported the law intended the law to have a discriminatory impact or

---

[8] While the Defendants appear to accept the premise that there were issues with a consistent implementation of the "moral turpitude" standard, much of the Plaintiffs' evidence on this point is objected to by the Defendants as hearsay.  For example, the Defendants object to the reliance on the complaint in another case to the extent that the complaint in that case is offered to prove the truth of the allegations asserted.  The Plaintiffs respond that they do not offer the complaint for the truth of the matters asserted, but to show that the Defendants were on notice that the failure to define "moral turpitude" caused confusion and a lack of uniformity. Because it is offered for the fact that it was made, and not for the truth of the matters asserted, this evidence is definitionally not hearsay. FED. R. EVID. 801(c)(2). The Plaintiffs also have cited a Campaign Legal Letter to Morgan County, which the Defendants object to on the grounds of hearsay.  The Plaintiffs respond that this letter and the documents which accompany it are exceptions to hearsay as records of regularly conducted activity and that the Morgan County Board of Registrars has been listed as a potential witness in initial disclosures, and so can be called to testify as to the content of the letter.  *See* FED. R. EVID. 803(8). The Defendants do not contest this in their reply. (Doc. 281 at 2).  The Court, therefore, finds that this evidence can be considered. The Defendants assert that the Plaintiffs' reliance on the work of Donald Strong is improper because he was not timely disclosed an expert. They concede that Dr. Strong's writings are admissible as ancient documents pursuant to FED. R. EVID. 803(16).  The Plaintiffs respond that they do not intend to call Dr. Strong as an expert, but point out that his work was cited in Dr. Peyton McCrary's timely-disclosed expert report.  While the Court finds that the evidence is admissible, it will only be considered to the extent that it is relevant.

believed that the law would have such an effect." *Greater Birmingham Ministries*, 966 F.3d at 1229.

The Plaintiffs also have presented evidence of discriminatory impact in the form of an expert report from Smith.  The Plaintiffs rely on Smith's conclusions with respect to the disqualifying convictions listed in the 2017 law based on the voter registration file in 2019. (Doc. 268 at 28).  Smith's conclusion is that the felony convictions classified by ALA. CODE § 17-3-30.1 have a disproportionate effect on the ability of African Americans to register to vote in Alabama. (Doc. 270-2 at 56).

The Defendants argue in response that the Plaintiffs have not presented relevant evidence because Smith analyzed the effect of a statute enacted by a different legislature, the 2016 legislature, and not the legislature that proposed the 1996 constitutional amendment.  The Defendants argue that it is irrational to hold that the intent of the 1995 Alabama legislature and 1996 electorate can be determined based on an action taken in 2017.

The Court tends to agree that the impact of the 2017 law does not bear on the intent of a law passed in 1996.  *See Johnson*, 405 F.3d at 1222 n.17 ("The plaintiffs focus on the present racially disparate impact of the felon disenfranchisement provision, but this amount of disparate impact was not present in 1968 when the provision was enacted. Although disturbing, the present racially disparate impact of the felon disenfranchisement law does not guide our analysis.").  Because the 2017 law is a clarification of what constitutes moral turpitude under the 1996 law, however, Smith's analysis may have some relevance.

Even assuming Smith's evidence of impact of the 2017 statute is relevant, however, "without proof of discriminatory intent, a generally applicable law with disparate impact is not unconstitutional. The Fourteenth Amendment does not regard neutral laws as invidious ones, even when their burdens purportedly fall disproportionately on a protected class." *Greater Birmingham Ministries*, 966 F.3d at 1231. (internal quotation and citation omitted).   The Plaintiffs in this case have not provided other evidence of intent. Furthermore, as discussed previously, there is evidence that the moral turpitude standard is race-neutral because there are other Alabama statutes which use the moral turpitude standard for which there is no evidence of discriminatory intent. *See, e.g.*, ALA. CODE § 5-17-55(c)(1); ALA. CODE § 34-8A-16(a)(1).

Accordingly, considering the evidence the Plaintiffs have pointed to relevant to the *Arlington Heights* factors, this Court concludes that the Plaintiffs have not presented sufficient evidence to create a genuine issue of material fact as to discriminatory intent.

In summary, whether this Court analyzes the issue under the *Johnson* framework; that is, as an issue of whether discriminatory intent present in 1901 was removed in 1996 with the enactment of Ala. Const. art. VIII, § 177(b), or whether this Court analyzes the issue with respect to the application of the *Arlington Heights* factors to the enactment of Ala. Const. art. VIII, § 177(b), the Plaintiffs have not met their burden under the first prong of *Hunter*.

Because prong one is not met, the Court need not reach *Hunter*'s second prong and summary judgment is due to be GRANTED as to the Fourteenth and Fifteenth Amendment claims. *Greater Birmingham Ministries*, 966 F.3d at 1232.

34

2. *Claims in Count 11, Count 12, and Count 17*

In Count 11 of the complaint as amended, the Plaintiffs claim section 177(b)'s felon-disenfranchisement provision imposes retroactive criminal punishment in violation of the Ex Post Facto Clause of the U.S. Constitution.  In count 12, the Plaintiffs contend that section 177(b) constitutes "cruel and unusual punishment" in violation of the Eighth Amendment to the U.S. Constitution.  Count 17 is pleaded as an alternative to count 11.  In it, the Plaintiffs allege that if the felony disenfranchisement statute is determined to be civil, and not penal, its retroactive application violates due process.  The Court finds it appropriate to address certain aspects of these claims together because the Defendants raise a preliminary issue with respect to counts 11 and 12 as a ground for summary judgment; namely, that disenfranchisement is not punishment.  The ground applies to both claims because the Eighth Amendment "bans only cruel and unusual punishment," *Wilson v. Seiter*, 501 U.S. 294, 302 (1991), and "an ex post facto claim can only be successful if the law can be characterized 'as "punishment" in the constitutional sense.'" *Manocchio v. Kusserow*, 961 F.2d 1539, 1541 (11th Cir. 1992).

There is an intent-effects test for analyzing whether a statute imposes punishment for purposes of the Eighth Amendment and the Ex Post Facto Clause.  *See Smith v. Doe*, 538 U.S. 84, 92 (2003)(applying a two-step "intent-effects" test to analyze whether a state statute violated the Ex Post Facto Clause); *United States v. Under Seal*, 709 F.3d 257, 263 (4th Cir. 2013)(applying the *Smith* framework to determine whether a statute imposed punishment proscribed by the Eighth Amendment).

In *Trop v. Dulles*, 356 U.S. 86, 96 (1958), the Supreme Court addressed the nature of a felon disenfranchisement statute, explaining that in deciding whether or not a law is punishment, courts look to the purpose of the statute.  "If the statute imposes a disability for the purposes of punishment—that is, to reprimand the wrongdoer, to deter others, etc., it has been considered penal."  *Id.* A statute is not punishment "if it imposes a disability, not to punish, but to accomplish some other legitimate governmental purpose." *Id.* Some statutes may have "both a penal and a nonpenal effect." *Id.*

The Defendants contend that Alabama's felon-disenfranchisement law is a voting disqualification and does not impose punishment and thus violates neither the Eighth Amendment nor the Ex Post Facto Clause.

The Plaintiffs respond that the Eleventh Circuit has unequivocally stated that "[d]isenfranchisement is punishment." *Jones v. Governor of Fla.*, 950 F.3d 795, 819 (11th Cir. 2020).[9]  In *Jones II*, while disagreeing with much of *Jones I*, the court continued to use language indicating that disenfranchisement statutes are punishment, noting that, "Florida automatically disenfranchises all felons upon conviction, and the challenged laws only lift that *punishment* for felons who have completed all terms of their sentences." *Jones II*, 975 F.3d at 1032 (emphasis altered).[10]

---

[9] The Eleventh Circuit's decision in *Jones*, 950 F.3d 795 was an affirmance of the district court's granting of a motion for preliminary injunction (hereinafter referred to as *Jones I*). The case proceeded to trial and the district court entered a permanent injunction which was appealed.  The en banc Eleventh Circuit reversed the judgment of the district court and vacated the challenged portions of the permanent injunction. *Jones v. Governor of Fla.*, 975 F.3d 1016 (11th Cir. 2020) (hereinafter referred to as *Jones II*).  *Jones II*, however, did not vacate the decision in *Jones I*.

[10] The Plaintiffs also cite to evidence to prove that disenfranchisement is punishment which is objected to by the Defendants on grounds of hearsay, such as law review and newspaper articles including an article

It may be that in its affirmation that the Florida statute concerned "*punishment* for felons who have completed all terms of their sentences," the Eleventh Circuit merely was acknowledging that the Florida disenfranchisement law has two purposes. *See Jones II*, 975 F.3d at 1032. The Eleventh Circuit in *Johnson*, however, acknowledged the role that disenfranchisement provisions have as voting qualifications and reasoned that "[f]elon disenfranchisement laws are unlike other voting qualifications. These laws are deeply rooted in this Nation's history and are a punitive device stemming from criminal law." 405 F.3d at 1228. In light of these cases, this Court concludes that Alabama's disenfranchisement provision, which is similar to Florida's, must be viewed as imposing punishment.

The Defendants contend that they are still entitled to summary judgment as to counts 11 and 12, and that if the disenfranchisement provision is not punitive, they are also entitled to summary judgment on count 17. The Court turns now to the claims in counts 11 and 12.[11]

---

from the YALE LAW JOURNAL and an article from *ThinkProgress.* Facts set out in law review articles and informal websites are similar to facts set out in newspapers, and, as such, they are inadmissible hearsay not subject, without more, to any exception. *Smith v. Vestavia Hills Bd. of Educ.*, 2018 WL 1408537, at *7 (N.D. Ala. 2018), *aff'd*, 791 F. App'x 127 (11th Cir. 2019). As to the THINKPROGRESS article, the Plaintiffs contend that the quote from Defendant Merrill in a newspaper is not hearsay under FED. R. EVID. 801, but even if it is, Merrill can be called at trial to testify. The Court agrees that the evidence is admissible, but as discussed below, even if the Court does not consider this evidence, the Eleventh Circuit has indicated that disenfranchisement is punishment.

[11] As earlier noted, count 17 is pleaded in the alternative to count 11. For the reasons discussed, this Court has concluded that the Eleventh Circuit considers felon disenfranchisement to be punitive, undermining a claim based on the civil sanction. Even if the Alabama disenfranchisement statute is regulatory and not punitive, however, for the reasons discussed below, the Court concludes that the Plaintiffs have not created a question of fact as to reasonable notice of the potential severity of the penalty.

a.   Count 11

The provision that "[n]o ... ex post facto Law shall be passed," U.S. Const. art. I, § 9, cl. 3, includes "[e]very law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed." *Peugh v. United States*, 133 S.Ct. 2072, 2077–78 (2013) .  At issue "is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated." *Weaver v. Graham*, 450 U.S. 24, 30 (1981).

The Plaintiffs' initial claim was that Ala. Const. art. VIII, § 177(b) violated the federal constitution because moral turpitude was undefined and applied on an ad hoc basis. After ALA. CODE § 17-3-30.1 was enacted in 2017, the Plaintiffs amended their claim to be that the statute imposed retroactive punishment as to individuals with convictions prior to August 1, 2017.  The Plaintiffs strenuously contest that the moral turpitude standard in effect prior to 2017 gave notice that any felony was disenfranchising.  They point out that the statute itself states that there was no comprehensive list of felonies that involve moral turpitude. ALA. CODE § 17-3-30.1.  The Plaintiffs' argument is that because the system in place prior 2017 was void as unconstitutionally vague, the first time any felon could have been disenfranchised was with the enactment of ALA. CODE § 17-3-30.1.

The Defendants urge the Court to evaluate this claim as to each individual Plaintiff, arguing that the claim should not be decided in the abstract, citing *Washington State Grange v. Washington Stet Repub. Party*, 552 U.S. 442, 450 (2008), for the proposition that courts should not formulate a rule of constitutional law that is broader than is required

by the precise facts to which the rule is to be applied. They contend that the Plaintiffs' argument that ALA. CODE § 17-3-30.1 applied retroactively to felonies committed before the act took effect misunderstands Alabama law. The Defendants argue that Alabama law was clear that the Plaintiffs' felonies were disenfranchising at the time the Plaintiffs committed those felonies, so the facts do not support the Plaintiffs' claims.

The Defendants' first point is that the Constitution of 1901 disenfranchised all persons convicted of crimes "punishable by imprisonment in the penitentiary," which would include all felonies. (Doc. 257-1 at 16-17). Therefore, Plaintiff Lanier,[12] convicted of burglary based on events that occurred in January 1995, (doc. 257-28 at 4: 18-21), and Plaintiff King, convicted of murder in 1995 (doc. 106-4 ¶ 3),[13] had notice that their convictions were disenfranchising.

As noted in the previous discussion of historical facts, there was a Constitutional provision in place in 1901 that was unchanged until 1996, with the exception of some provisions which were removed by court decision. *See Hunter v. Underwood*, 471 U.S. 222, 233 (1985)(striking down disenfranchisement for misdemeanors and noting court decisions which struck crimes including assault and battery on the wife and miscegenation). Although attempts were made to amend the Constitution, it was not amended until 1996. As written from 1901 until 1996, the disenfranchisement provision disenfranchised persons convicted of crimes punishable by imprisonment in the

---

[12] The Plaintiffs state that Lanier had disenfranchisement reimposed, so he has a Double Jeopardy complaint, but that claim is not in the complaint or amended complaint and is not properly before the Court at this time.

[13] Murder was also identified as a crime of moral turpitude in case law. *Ex parte McIntosh*, 443 So. 2d 1283 (Ala. 1983).

penitentiary.  (Doc. 257-1 at 17).  Therefore, as to Plaintiffs Lanier and King, who were convicted of felonies committed prior to 1996, the Court agrees that they had fair notice that their crimes were disenfranchising, and there is no ex post facto violation.  *See Weaver*, 450 U.S. at 30; *see also United States v. Ingram*, 165 F. App'x 793, 795 (11th Cir. 2006)("Ingram had fair warning about the possible penalties she faced; no ex post facto principles encompassed by the Due Process Clause were implicated.").

The Defendants next contend that Plaintiffs Thompson and Gamble had notice at the time of their crimes that they had committed crimes of moral turpitude based on existing case law.  Plaintiff Thompson was convicted of theft of property.  The Defendants point out that the Alabama Supreme Court held that theft was a crime involving moral turpitude. *See Stahlman v. Griffith*, 456 So. 2d 287, 290-91 (Ala. 1984).  In *Stahlman*, the Court noted that theft of property is a Class C felony and attempted theft of property in the second degree is a Class A misdemeanor and explained that it is not the class of the crime but its nature that determines whether it is admissible as a crime of moral turpitude for impeachment purposes.  456 So. 2d at 290-91.  The Court identified "settled law that a conviction for the misdemeanor offense of theft is a crime involving moral turpitude . . . ." *Id.* at 290. The Defendants also state that Gamble's crimes of conviction were held to involve moral turpitude, citing *Ex parte McIntosh*, 443 So. 2d 1283 (Ala. 1983).  *In Ex parte McIntosh*, the Court determined that mere possession of marijuana is not a crime of moral turpitude even though it is a felony, possession "for resale, however, takes on an entirely different character, one which does involve moral turpitude" because "[t]rafficking in and encouraging others to utilize a controlled substance, such as marijuana, indicates far

greater untrustworthiness and depravity of character than personal consumption of a controlled substance." 443 So. 2d at 1286.

The Plaintiffs argue that the decisions relied on by the Defendants were about whether the *Alabama Rules of Evidence* permitted impeachment, and so do not speak to whether those convictions would result in disenfranchisement. The Plaintiffs also state that theft of property and trafficking in cannabis were not included in the 2014 Board of Registrars' Handbook.  The Plaintiffs have also presented evidence to demonstrate that there was a lack of consensus about which crimes constituted felonies of moral turpitude.

It is clearly the case that ALA. CODE § 17-3-30.1(1)(b) recognized that there was no comprehensive list of the felonies that involved moral turpitude at the time of its passing, but that does not mean that there were no determinations about what constituted moral turpitude.  There also is substantial evidence that there were different opinions among registrars and other state officials about which felonies were disqualifying as felonies of moral turpitude.  A different question might be presented if the Alabama Supreme Court had not determined for any purpose that the crimes the Plaintiffs were convicted of were not considered to be crimes of moral turpitude, but that it is not the situation presented. Instead, there were cases decided by the Alabama Supreme Court which determined that crimes these Plaintiffs were convicted of were crimes of moral turpitude.  Furthermore, there is unrefuted evidence that the State officials considered those Alabama decisions to be a source of the definition of moral turpitude for purposes of the disenfranchisement provision. (Doc. 269-10).  There is no evidence before the Court which contradicts that this case law was relied upon in the context of State officials' applying of the

disenfranchisement provision.  Therefore, the common law definition of moral turpitude as determined by Alabama courts served as fair notice to these Plaintiffs that their crimes were crimes of moral turpitude so that the subsequently enacted statute which codified those crimes was not an ex post facto law as to these Plaintiffs.  *Cf. Dobbert v. Fla.*, 432 U.S. 282, 297 (1977) (holding that there was no ex post facto violation where the death penalty was invalidated after the defendant acted, because the subsequently invalidated statute's "existence on the statute books provided fair warning as to the degree of culpability which the State ascribed to the act . . . .").

The parties' arguments with respect to an ex post facto claim by Plaintiff GMB specifically are not well-developed and are included only in footnotes in their voluminous briefs.  The Defendants argue that because GBM has none of the injuries asserted in count 11 (or, they argue, counts 16, 17, and 18), its claims should be "treated as facial and fall along with those of the individual Plaintiffs." (Doc. 261 at 79 n.21).  The Plaintiffs argue that GBM has standing to bring the ex post facto claim because it has to divert resources to assisting individuals who seek rights restoration, citing to twenty-three pages of deposition testimony which includes a discussion of increased expenses in helping people apply for CERVs.  (Doc. 268 at 46 n.14).

The Court infers from the multi-page evidence referred to by the Plaintiffs that they are arguing that GMB can assert an ex post facto claim based on violations of the law as to individuals because GMB has expended resources helping persons, including persons other than the named Plaintiffs.  The Plaintiffs, however, have not pointed to evidence which demonstrates that GBM has suffered harm due to expenditure of resources for any persons,

named Plaintiffs or otherwise, who did not have notice that their felonies were disqualifying felonies of moral turpitude. The Court cannot conclude, therefore, that the Plaintiffs have met their burden to present sufficient evidence on the part of GBM to proceed on an ex post facto claim, in light of the determination above that the individual Plaintiffs have not demonstrated an Ex Post Facto Clause violation. Summary judgment is due to be GRANTED to the Defendants as to these claims.

### b. Count 12 Eighth Amendment Claim

The Plaintiffs have clarified that their claim under the Eighth Amendment is that it categorically violates the Eighth Amendment for Alabama to permanently disenfranchise a person for one of the crimes listed in ALA. CODE § 17-3-30.1 without regard for the individual facts of the offense.[14] The Plaintiffs also argue that it is cruel and unusual punishment for Alabama to permanently disenfranchise a person for a crime that has nothing to do with the political process, but allows a politician convicted of public corruption continue voting. The Plaintiffs point to evidence, including laws from other states,[15] to support their contention that there is a growing consensus of states against lifetime disenfranchisement.

An Eighth Amendment challenge to a sentencing practice that applies to an entire class of offenders requires a court to examine objective indicia of society's standards to

---

[14] The Defendants moved for summary judgment on a proportionality claim. The Plaintiffs subsequently clarified that they are not pursuing a proportionality claim, but are instead pursuing a categorical claim. In their reply, the Defendants moved for summary judgment as to the categorical claim, and the Court gave the Plaintiffs additional time in which to address their categorical claim.

[15] Some of this evidence is objected to by the Defendants as hearsay; however, the objections are moot because even if the Court does not consider the evidence, as will be discussed, the Eleventh Circuit has acknowledged a trend toward re-enfranchisement.

determine whether there is a national consensus against the sentencing practice and then determine whether the punishment violates the Constitution. *See Graham v. Florida*, 560 U.S. 48, 61 (2010).

The Eleventh Circuit addressed the issue presented here in *Jones I*. The Eleventh Circuit recognized a trend toward re-enfranchisement, noting that "nearly half of the states have in some way expanded felons' access to the franchise," but explained that "[r]egardless of the political trend toward re-enfranchisement, there is nothing unconstitutional about disenfranchising felons—even all felons, even for life." 950 F.3d 795, 801–02 (citing *Richardson v. Ramirez*, 418 U.S. 24, 56 (1974) for the proposition that the lifelong disenfranchisement of felons does not violate the Equal Protection Clause). This determination is consistent with the Eleventh Circuit's earlier conclusion in the context of a First Amendment challenge that "the Supreme Court 'ha[s] strongly suggested in dicta that exclusion of convicted felons from the franchise violates no constitutional provision.'" *Hand v. Scott*, 888 F.3d 1206, 1212 (11th Cir. 2018)(citation omitted).

While neither of these decisions involved Eighth Amendment claims, this view is consistent with the view of other courts who have examined the issue in the context of an Eighth Amendment challenge and have determined that it would be inconsistent to determine that something allowed by the Fourteenth Amendment violates the Eighth Amendment. *See Harness v. Hosemann*, 2019 WL 8113392, at *11 (S.D. Miss. 2019) ("[I]t would be internally inconsistent for the Eighth Amendment to prohibit criminal disenfranchisement while § 2 of the Fourteenth Amendment permits it."); *Farrakhan v. Locke*, 987 F. Supp. 1304, 1314 (E.D. Wash. 1997) ("The Court is not inclined to interpret

the Constitution in this internally inconsistent manner or to determine that the Supreme Court's declaration of the facial validity of felon disenfranchisement laws in *Richardson v. Ramirez* was based only on the fortuity that the plaintiffs therein did not make their arguments under different sections of the Constitution."),[16] *aff'd in part by Farrakhan v. Washington*, 338 F.3d 1009, 1016 (9th Cir. 2003).

This Court finds that the reasoning of these courts is consistent with the Eleventh Circuit's expressed view so that, even accepting the Plaintiffs' evidence of a trend against permanent disenfranchisement, Alabama's law allowing for the permanent disenfranchisement of felons which is allowed by the Fourteenth Amendment does not violate the Eighth Amendment. Accordingly, summary judgment is due to be GRANTED to the Defendants as to this claim.

### 3. Count 13 Equal Protection Wealth Discrimination

Count 13 is an equal protection wealth discrimination claim which challenges ALA. CODE § 15-22-36.1(a)(3). The statute at issue provides that individuals with certain disqualifying felony convictions can have their voting rights restored through a CERV, issued by the Alabama Board of Pardons and Paroles ("the Board"). The Board must grant a CERV if a person has (1) lost his or her right to vote by reason of conviction in a state or federal court for a crime other than those listed in a separate section, (2) no pending felony charges, (3) paid all fines, court costs, fees, and victim restitution ordered by the sentencing court at the time of sentencing on disqualifying cases, and (4) been released upon

---

[16] The Eleventh Circuit has cited *Farrakhan* favorably for the proposition that First Amendment challenges to felon disenfranchisement have not been successful. *See Hand*, 888 F.3d at 1212.

completion of sentence, pardoned, or successfully completed probation or parole. ALA. CODE § 15-22-36.1.  It is the Plaintiffs' contention that requiring an individual to pay their fines, court costs, and fees, otherwise known as LFOs, is discrimination on the basis of wealth.  Plaintiffs Thompson and Gamble cannot vote because they have not paid their outstanding LFOs.

During the briefing on the motions for summary judgment, the law in the Eleventh Circuit was clarified with respect to the wealth discrimination claim advanced by Plaintiffs in this case.  In *Jones II*, the Eleventh Circuit held that the level of scrutiny to be applied to this wealth discrimination claim is rational basis. 975 F.3d at 1033. The Defendants contend that *Jones II* controls, and entitles them to summary judgment on the Plaintiffs' wealth discrimination claim because Alabama, like Florida, has rationally concluded that those who have completed their sentences, acted so that they have no pending felony charges, and do not have convictions for particularly reprehensible felonies, are the best candidates to have their rights to vote restored.

The Plaintiffs take the position that *Jones II* is distinguishable because the classification drawn by Alabama's LFO requirement is different from the law in Florida at issue in *Jones II*, and requires a classification of citizens based on wealth, subjecting it to a per se prohibition.  In the Plaintiffs' view, because Alabama's CERV process sets payment of LFOs as an electoral standard which is separate and apart from the requirement that citizens complete their sentence, it engages in wealth discrimination.  They argue that the Florida statute defined completion of sentence as including the payment of fees and that in *Jones II*, the law drew a line between people who had completed their sentence and

those who had not, so that the court concluded that there was a rational basis for drawing that line. *Id.*

The Defendants respond that merely because the Alabama statute sets out the requirement to complete the supervisory portions of a sentence in one statutory subsection and the requirement to have paid court-ordered monies in a separate subsection does not mean that there is a felon-only fee aimed at wealth.

The Court agrees that the distinction between Florida's law, which requires completion of sentence which includes payment of money, and Alabama's law, which requires completion of sentence and payment of money imposed as part of that sentence, does not distinguish this case from *Jones II*. *Cf.* 975 F.3d at 1030 ("[R]equiring felons to complete their sentences is directly related to voting qualifications because imprisonment and parole are imposed as punishment for the crimes by which felons forfeited their right to vote.").

In *Jones II*, the court made clear that "laws that govern felon disenfranchisement and re-enfranchisement are subject to rational basis review" if they apply "regardless of race, religion, or national origin." *Id.* at 1033. The court stated that the Florida law did not single out failure to complete financial terms for special treatment, but then went on to say, "in any event, wealth is not a suspect classification." *Id.* The court also explained that "[t]he per se rule . . . does not apply to voting requirements that are related to legitimate voter qualifications, even if some voters must pay to comply with the requirement." *Id.* Although the Plaintiffs in this case have argued that the moral turpitude standard was adopted with

racial intent, for reasons discussed above, that intent does not apply to the 1996 enactment, and, furthermore, has not been shown to apply to the CERV statute.

The Plaintiffs further contend that there are genuine issues of disputed facts underlying the issue of whether Alabama's statute survives rational basis review.  They argue that Alabama's law permits those who owe LFOs but who have committed some crimes such as illegally voting more than once in an election, to vote, but withholds the right to vote from people who owe LFOs for crimes like theft of property that bear no relationship to the ability to vote responsibly.  The Plaintiffs contend that *Jones II* does not bar relief here because all felons were disenfranchised in *Jones II*, whereas Alabama law only disenfranchises felons who committed crimes of moral turpitude, with no rational basis for its distinction.

The Defendants contend that the Plaintiffs are comparing the wrong groups. They state that the relevant comparison is between disenfranchised felons who are eligible for rights restoration and disenfranchised felons who are not eligible.  Felons who were never disenfranchised are not part of the analysis of the rational basis for Alabama's law regarding which disenfranchised felons' rights can be restored.

In explaining the rational basis review of Florida's law, the Eleventh Circuit explained that it must uphold the classification unless the felons negate every conceivable basis which might support it. *Jones II*, 975 F.3d at 1034. A classification survives rational basis review if it is rationally related to some legitimate government interest. *Id.*  "If the relationship between a State's interest and its means of achieving it is 'at least debatable,' then it survives scrutiny." *Id.* at 1036. In conducting rational basis review of Florida's

LFOs requirement, the Eleventh Circuit explained that Florida had two interests in its LFOs requirement: an interest in disenfranchising convicted felons and an "interest in restoring felons to the electorate after justice has been done and they have been fully rehabilitated by the criminal justice system." *Id.* (emphasis omitted).

As in Florida, the voters in Alabama could rationally conclude that when felons have lost their right to vote, "the felons who have completed all terms of their sentences, including paying their fines, fees, costs, and restitution, are more likely to responsibly exercise the franchise than those who have not." *Id.* "The classification may exclude some felons who would responsibly exercise the franchise and include others who are arguably less deserving.*" Id.* at 1035. But the Constitution only requires a rational line. *See id.* Therefore, this Court concludes that the fact that the State does not disenfranchise all felons does not mean that Alabama has no rational basis for concluding that disenfranchised felons who have completed their sentences and paid their LFOs are more likely to responsibly exercise the right to vote and therefore more deserving of having their right to vote restored. Summary judgment is due to be GRANTED to the Defendants on this claim.

4. *Count 16 Fourteenth Amendment Claim for Violation of a Liberty Interest*

The Plaintiffs' due process theory in count 16 is that the retrospective application of ALA. CODE § 17-3-30.1 to people with disqualifying convictions before August 1, 2017 is not consistent with the wording of the Alabama statute and, therefore, the disenfranchised are deprived of a liberty interest in a right to vote in violation of the Due Process Clause. The Plaintiffs argue that ALA. CODE § 17-3-30.1 is written in the present tense and that Alabama law has a presumption against retrospective application, so

retrospective application violates state law, and, therefore, violates the Due Process Clause. In other words, the argument is that by interpreting state law to apply retrospectively, the State of Alabama has violated state law in a way which violated the federal rights of voters who had committed certain felonies which had not been determined to be disqualifying at the time of their offense.

The Plaintiffs rely in part on *Duncan v. Poythress*, 657 F.2d 691 (5th Cir. 1981).[17] In *Duncan*, the court examined a violation of substantive due process when a state failed to provide an election, impinging on the right to vote. *Id.* at 704-05 (explaining that the claim "is not procedural, but substantive: they allege the unlawful abrogation of a constitutionally protected right to vote."). The court explained that it previously had said that "the right to vote in a state election, in itself, is not a right secured by the constitution or by federal law." 657 F.2d at 704. The court further reasoned, however, that prior precedent did not preclude "granting of federal relief when public officials disenfranchise an entire electorate in violation of state law." *Id.* The court found that it "is fundamentally unfair and constitutionally impermissible for public officials to disenfranchise voters in violation of state law so that they may fill the seats of government through the power of appointment." *Id.; see also Gonzalez v. Governor of Georgia*, 978 F.3d 1266 (11th Cir. Oct. 27, 2020)(applying *Duncan* in a case in which the Governor of Georgia solicited applications for an appointment of a district attorney and the Secretary of State cancelled the election for that office).

---

[17] Decisions of the former Fifth Circuit issued prior to October 1, 1981 are binding precedent. *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1210 (11th Cir.1981) (en banc).

The Eleventh Circuit in *Jones II* made it clear that issues regarding disenfranchised felons do not address the fundamental right to vote, explaining that "[w]hatever may be true of the right to vote generally, felons cannot complain about their loss of a fundamental right to vote because felon disenfranchisement is explicitly permitted under the terms of *Richardson*." *Jones II*, 975 F.3d at 1029 (quotation omitted). The Plaintiffs' argument to the contrary is that the right to vote was taken away by the State in 2017 because the disenfranchisement was unlawful, either by being unconstitutionally vague or by violating the Ex Post Facto Clause.

The Defendants argue in response that the *Duncan* case on which the Plaintiffs rely is more limited than they have argued. The Defendants also argue that mistakes by state officials in determining who is disenfranchised do not rise to the level of a constitutional violation and that Alabama law provides for an appeal when an applicant is denied voter registration, ALA. CODE § 17-3-55, or is removed from the rolls, ALA. CODE § 17-4-3(b).

The Court has already discussed why the Plaintiffs have not shown that the application of the 2017 law was a violation of the Ex Post Facto Clause. The Plaintiffs' claims based on vagueness were mooted by the 2017 law, (doc. 80 at 27-28), so no determination has been made as to the law's validity, but for the same reasons as discussed in connection with the Ex Post Facto Clause claims, the Court cannot conclude that, as to these Plaintiffs, the law was unconstitutionally vague because they had notice of their disenfranchisement.

Even if there were a question as to whether the State had given the Plaintiffs a right to vote which it did not divest until 2017, *Duncan* and *Gonzalez* involved dramatically

different facts of disenfranchisement of the electorate in violation of state law through filling seats of government through the power of appointment. *See Gonzalez*, 978 F.3d at 1271.  The Plaintiffs' claim is this case would call for a dramatic extension of existing precedent which this Court is disinclined to do. *See County of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998)(courts are "reluctant to expand the concept of substantive due process.").  Accordingly, the State's applying of ALA. CODE § 17-3-30.1 to people who had disqualifying convictions before August 1, 2017 has not been shown to constitute a federal constitutional deprivation, and summary judgment is due to be GRANTED as to the Defendants on this claim.

### C.  Cross Motions for Summary Judgment on Count 18 NVRA Claim

The Defendants and Plaintiffs cross-moved for summary judgment on count 18 of the complaint as amended which alleges that the State of Alabama's mail-in voter registration form violates the NVRA because the form does not include a listing of all of the felonies which are disenfranchising under Alabama law.  The Defendants contend that the State mail-in form meets the NVRA because the statute does not require each disqualifying felony to be listed on the form.[18]

Title 52, § 20508(b)(2)(A) of the United States Codes provides that a mail-in voter registration form "shall include a statement that—(A) specifies each eligibility requirement (including citizenship)."  States can use a mail-in voter registration form that meets the

---

[18] Earlier in this litigation, the Defendants apparently overlooked the NVRA provision regarding the mail-in form, which requires the eligibility requirement to be specified, and focused only on the motor vehicle voter registration form which does not include the "specify" language.  It was primarily on that basis that this Court denied Defendants' previous motion on this issue. (Doc. 178).

criteria in § 20508. 52 U.S.C. § 20505. "Specify" is not a defined term in the statute. In the context of interpreting a different statute, the Supreme Court has cited the following definition of "specify:" "to name or state explicitly or in detail." *See Kucana v. Holder*, 558 U.S. 233, 243 n.10 (2010) (citing WEBSTER'S NEW COLLEGIATE DICTIONARY 1116 (1974)).

The Alabama mail-in voter registration form provides that to register to vote in Alabama a person must be a citizen of the United States, live in Alabama, be at least 18 years of age on or before election day, not have been convicted of a disqualifying felony, or "if you have been convicted, you must have had your civil rights restored," and not have been declared mentally incompetent by a court. (Doc. 257-35 at 19). The form also includes a Voter Declaration declaring, "I am not barred from voting by reason of a disqualifying felony conviction (The list of disqualifying felonies is available on the Secretary of State's web site at: sos.alabama.gov/mtfelonies)." (*Id.*). Under Alabama law, the disqualifying felony convictions are crimes of moral turpitude, as defined in ALA. CODE § 17-3-30.1(c).

The Plaintiffs contend that because the State mail-in form provides only that to register to vote one must not have been convicted of a disqualifying felony, but does not name the disqualifying convictions, it does not "specify" the eligibility requirement. The Plaintiffs note that other requirements on the form go beyond a mere statement to an explicit naming of the requirement. For example, the form does not merely state that there is a minimum age requirement, but instead specifies that to register to vote, a person must be at least 18 years of age on or before election day. The Plaintiffs contend, however, that

a "catch all" provision to include all of the disqualifying felonies under other state and federal law, in addition to the specifically listed Alabama felonies, would satisfy their understanding of the definition of "specifies" as used in the NVRA.

As the Court noted earlier in this litigation, (doc. 178 at 24), the Plaintiffs' position that each disqualifying felony must be listed on the form to comply with the NVRA would seem to require a listing of each state and federal law that would be disqualifying under Alabama law, as those are also disqualifying felonies under state law. ALA. CODE § 17-3-30.1(c) (crimes of moral turpitude include crimes "as defined by the laws of the United States or by the  laws of another state, territory, country, or other jurisdiction, which, if committed in this state, would constitute one of the offenses listed in this subsection."). If, as the Plaintiffs argue, a catchall provision which generally refers to particular crimes is sufficiently specific to satisfy the requirement that the form "specify" the qualification, then a specification of a qualification—disqualifying felony—which generally refers to particular crimes must also be specific enough. If instead the statute requires not only that eligibility requirements be specified, but also that each disqualifying felony within that requirement be set out, then every state and federal felony which disqualifies a person from voting would have to be listed, a position not even the Plaintiffs take. Therefore, the requirement that a mail-in voter registration form "shall include a statement that—(A) specifies each eligibility requirement (including citizenship)" is satisfied by the specification that a registering voter must not have a disqualifying felony, without the additional particularized listing of each felony that is disqualifying.

To support this reading of the statute, the Defendants point out that there is more than one form which can be provided for voter registration and that the statutory language regarding the forms is not the same.  The mail-in form is governed by the statute which uses the term "specifies," 52 U.S.C. § 20508(b)(2)(A), whereas the statute which applies to the "voter registration application portion of an application for a State motor vehicle driver's license" requires a "statement that--(i) *states* each eligibility requirement (including citizenship)." 52 U.S.C. § 20504 (c)(2)(C)(i) (emphasis added).

The Defendants contend that this Court should apply the canon of statutory construction that where the literal reading of a statutory term would "compel an odd result," courts can look for other evidence of congressional intent to lend the term its "proper scope." *Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 454 (1989).   In this case, if one form with voter eligibility requirements requires a listing of the disqualifying felonies and the other does not, the difference in language would produce the odd result of substantially different forms.  As the Defendants point out, in 52 U.S.C. § 20507(a)(5), Congress required that in the administration of voter registration for elections for federal office, each State shall inform applicants under sections 20504, 20505, and 20506, of voter eligibility requirements.   This indicates an intent to inform voters of eligibility requirements in the same manner with respect to motor, mail-in, and agency registration. This Court agrees, therefore, that to avoid the "odd result" of different voter registration forms, the NVRA which requires eligibility requirements to be "specified" does not require each felony to be separately listed, but only requires that the eligibility requirement itself--having no disqualifying felony conviction--be specified.

The Plaintiffs argue that there is no reason why "specify" should not inform the Court's reading of "states," in the motor registration form, rather than vice versa.  If, through the comparison of these two provisions of the statute, the NVRA is rendered ambiguous, the Defendants have argued that this Court should defer to the interpretation of the EAC of the NVRA, citing *Chevron, U.S.A. v. Nat'l Re. Def. Council, Inc*., 467 US. 837, 842 (1984).  The Defendants further argue that even if *Chevron* deference does not apply, the deference given to agency interpretations in less formal formats should apply. *See Skidmore v. Swift & Co*., 323 U.S. 134, 140 (1944).

An agency's interpretation may merit some deference whatever its form, given the specialized experience and broader investigations and information available to the agency, and given "the value of uniformity in its administrative and judicial understandings of what a national law requires." *United States v. Mead Corp*., 533 U.S. 218, 234–35 (2001); *see also Fish v. Kobach*, 840 F.2d 710 (10th Cir. 2016) (holding that the contents of the mail-in Federal Form are prescribed partly by statute and otherwise entrusted to the administrative judgment of the EAC, a federal agency).

The NVRA provides that the EAC, in consultation with the chief election officers of the states, shall develop a mail voter registration application form for elections for Federal office. 52 U.S.C. § 20508(a)(2).  This form must include a statement that specifies each eligibility requirement. 52 U.S.C. § 20508(b)(2).

The Defendants have provided evidence of electronic mail communications between the EAC and the Secretary of State's office in which the EAC requested guidance on the changes in Alabama's law and stated that it would review Alabama's requested

changes for the voter registration form. (Doc. 257-35 at 11 & 12).  The EAC changed the instructions on the Federal Form in 2018 to provide that conviction of a felony of moral turpitude is a disqualification, and referring to the Alabama Secretary of State's website without listing each felony.  (*Id.* ¶ 4).  The State mail-in form had contained language that a person must not have been convicted of a disqualifying felony, but in 2019 that form was changed to also refer to the Secretary of State's website, consistent with the Federal Form. (Doc. 257-35  ¶ 8).

The Court finds it appropriate to give deference to the determination by the EAC that the language adopted in the Federal Form complied with the NVRA.  Therefore, if the NVRA is ambiguous, with deference to the EAC, the Court concludes that the NVRA does not require a list of each felony within the specification of the eligibility requirements.  The Plaintiffs' partial motion for summary judgment is due to be DENIED and the Defendants' motion is due to be GRANTED as to this claim.

## VI.  CONCLUSION

For the reasons discussed, it is hereby ORDERED as follows:

1. The Defendants' motion to exclude (doc. 258) is DENIED.

2. The Plaintiffs' motion to exclude (doc. 259) is GRANTED in part and DENIED in part, as discussed above.

3. The Defendants' evidentiary objections (doc. 264) are SUSTAINED in part and OVERRULED in part, as discussed above.

4. The Defendants' motion for summary judgment (doc. 257) is GRANTED.

5.   The Plaintiffs' motion for partial summary judgment (doc. 260) is DENIED.

6.   The Plaintiffs' motion to clarify and continue (doc. 285) is DENIED as moot.

A separate Final Judgment will be entered in accordance with this Memorandum Opinion and Order.

Done this 3rd day of December, 2020.


/s/ Emily C. Marks
EMILY C. MARKS
CHIEF UNITED STATES DISTRICT JUDGE